**2017-2122, -2123, -2124, -2239, -2241, 2018-1482**

# United States Court of Appeals for the Federal Circuit

ROBERT BOSCH, LLC,

*Appellant,*

– v. –

ANDREI IANCU, Director, U.S. Patent and Trademark Office,

*Intervenor.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2016-00034, IPR2016-00036, IPR2016-00038, IPR2016-00039, IPR2016-00040, IPR2016-00041*

## BRIEF FOR APPELLANT

KSENIA TAKHISTOVA
HUNTON ANDREWS KURTH LLP
One Broadway
New York, NY 10004
(212) 425-7200

MARK A. HANNEMANN
THOMAS R. MAKIN
PATRICK R. COLSHER
ERIC S. LUCAS
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

*Counsel for Appellant*

COUNSEL PRESS, LLC (888) 277-3259

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Robert Bosch, LLC v. Iancu

Case No. 2017-2122 (lead), -2123, -2124, -2239, -2241, 2018-1482

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Robert Bosch LLC

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Robert Bosch LLC | Robert Bosch LLC | Robert Bosch North America Corporation<br>Robert Bosch GmbH |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Andrews Kurth Kenyon: Eric T. Schreiber

Shearman & Sterling LLP: Enrique W. Iturralde (patent agent)

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

None.

June 18, 2018
Date

/s/ Mark A. Hannemann
Signature of counsel

Please Note: All questions must be answered

Mark A. Hannemann
Printed name of counsel

cc: ______________________

Reset Fields

# TABLE OF CONTENTS

**Page**

Table of Authorities ....................iv

Statement of Related Cases ....................1

Jurisdictional Statement ....................3

Statement of the Issues ....................4

Statement of the Case ....................6

I. The Two Kinds of Windshield-Wiper Blades ....................6

A. Conventional Blades ....................6

B. Beam Blades ....................8

II. Bosch's Beam Blades Revolutionized the Industry ....................11

III. Bosch's '698 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch's Commercial Success ....................14

A. The Appel '770 Patent Calls for Uniform Force Distribution ....................14

B. The Arai Patent Also Calls for Uniform Force Distribution ....................17

C. Unlike the Prior Art, Bosch's '698 Patent Calls For Non-Uniform Force Distribution ....................19

D. Nexus ....................21

E. The Board's Conclusion ....................22

IV. Bosch's '974 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch's Commercial Success ....................22

A. Prohaska ....................23

B. Appel '551 ....................25

C. Hoyler ....................25

D. Bosch's '974 Patent ....................25

E. Nexus ....................26

V. Bosch's '905 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch's Commercial Success ....................27

A. Prohaska ....................27

B. Hoyler ....................28

C. Bosch's '905 Patent ....................28

D. Nexus ....................29

VI. Bosch's '264 Patent, Bosch's '823 Patent, and the Board's Perplexing, Opposite Decisions on the Same Factual and Legal Issues in Two IPRs ....................31

Summary of the Argument ....................35

Argument ....................38

I. Standard of Review ....................38

II. The Invention Claimed In the '698 Patent Was Not Proven Obvious ....................38

A. The Arai Reference Teaches Uniform Force Distribution ....................39

B. The Appel '770 Reference Also Teaches Uniform Force Distribution ....................42

C. The Board's Faulty Obviousness Reasoning ....................44

III. The Invention Claimed in the '974 Patent Was Not Proven Obvious ....................45

IV. The Invention Claimed in the '905 Patent Was Not Proven Obvious ....................51

V. The Board Erred in Its Consideration of the Objective Evidence of Non-Obviousness ....................57

A. The Board Was Wrong to Disregard Bosch's Evidence of Nexus, Which Was Not Contested by the Petitioner ................58

B. The Board Wrongly Minimized the Importance of the Objective Evidence ....................................................................61

VI. The Board Acted Arbitrarily and Capriciously in Finding Claim 3 of the '264 Patent to be Unpatentable .................................................65

Conclusion and Statement of Relief Sought ..........................................................67

# TABLE OF AUTHORITIES

**Cases**

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ........................................................36

*Honeywell Int'l v. Mexichem Amanco Hldgs.*,
865 F.3d. 1348 (Fed. Cir. 2017) ........................................................39

*In re Nuvasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ........................................................48

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................33, 54

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ........................................................62

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ........................................................57

*Uniroyal, Inc. v. Rudikin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988) ........................................................62

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d, 1309 (Fed. Cir. 2017) ........................................................63

**Statutes**

5 U.S.C. § 706........................................................36

35 U.S.C. § 282........................................................53

35 U.S.C. § 311........................................................3

28 U.S.C. § 1295........................................................3

# STATEMENT OF RELATED CASES

This is a consolidated appeal from six final written decisions stemming from six *inter partes* reviews, IPR2016-00034 (U.S. Patent No. 6,973,698), IPR2016-00036 (U.S. Patent No. 6,944,905), IPR2016-00038 (U.S. Patent No. 6,292,974), IPR2016-00039 (U.S. Patent No. 7,228,588), IPR2016-00040 (U.S. Patent No. 7,484,264), and IPR2016-00041 (U.S. Patent No. 8,099,823), before the United States Patent and Trademark Office, Patent Trial and Appeal Board (the "Board") with Costco Wholesale Corporation ("Costco") as the petitioner and Robert Bosch LLC ("Bosch") as the patent owner.

In 2017, Bosch timely filed notices of appeal as to all six final written decisions under the caption *Robert Bosch, LLC v. Costco Wholesale Corporation*. Five of the appeals—appeal numbers 2017-2170 (IPR2016-00041), 2017-2122 (IPR2016-00038), 2017-2123 (IPR2016-00039), 2017-2124 (IPR2016-00040), and 2017-2241 (IPR2016-00036)—were consolidated (appeal number 2017-2122 was designated the lead). Appeal number 2017-2239 (IPR2016-00034) was designated a companion case to the lead docket. The panel was comprised of Circuit Judges Lourie, Reyna, and Stoll.

On July 27, 2017, Costco moved to dismiss Bosch's appeal number 2017-2170 (IPR2016-00041) without prejudice, arguing that Bosch's notice of appeal was ineffective because it was filed while Costco's request for rehearing as to

claim 6 was still pending before the Board. On September 7, 2017, this Court granted Costco's motion to dismiss appeal number 2017-2170 for lack of jurisdiction based on Costco's timely request for rehearing of the final written decision in IPR2016-00041. The remaining appeals were stayed pending resolution of Costco's rehearing request.

On November 20, 2017, the Board denied Costco's rehearing request, and, on January 22, 2018, Bosch timely re-filed its notice of appeal (appeal number 18-1482 (IPR2016-00041)). The six appeals were subsequently consolidated; Costco withdrew; the Director of the U.S. Patent and Trademark Office intervened; and the official caption was updated to *Robert Bosch, LLC v. Iancu*.

Counsel is unaware of any case that will directly affect or be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

This is an appeal pursuant to 35 U.S.C. § 141(c) from the Board's final written decisions on March 30, 2017 (IPR2016-00038, IPR2016-00039, and IPR2016-00040), April 12, 2017 (IPR2016-00041), and April 24, 2017 (IPR2016-00034 and IPR2016-00036). The Board had jurisdiction over the IPRs pursuant to 35 U.S.C. § 311 et seq.

Bosch filed timely notices of appeal on May 31, 2017 (IPR2016-00038, IPR2016-00039, and IPR2016-00040), June 26, 2017 (IPR2016-00034 and IPR2016-00036), and January 22, 2018 (IPR2016-00041).

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

# STATEMENT OF THE ISSUES

1. *With respect to the ’698 patent:* the prior art teaches a feature (uniform force distribution along the length of a wiper blade) that is the opposite of the claimed feature (non-uniform force distribution, with less force at one or both ends of the wiper blade than in its center). Did the Board err in finding the claim unpatentable for obviousness?

2. *With respect to the ’974 patent:* the prior art in the proposed and instituted grounds does not teach the existence of the problem solved by the claimed invention, nor does it teach the existence of any problem that would cause one of skill in the art to combine elements from various prior art patents to make the claimed invention. Did the Board err in finding the claims unpatentable for obviousness, using as the evidence of motivation to combine prior art not included in the grounds, and to which Bosch had no opportunity to respond?

3. *With respect to the ’905 patent:* the prior art teaches an element called a “clamp,” while the claimed invention uses an element called an “end cap.” Did the Board err in finding that the preponderance of the evidence shows that a “clamp” is an “end cap” to one of skill in the art, and thus finding the claims unpatentable for obviousness?

4. *With respect to all three of the foregoing patents:* did the Board err by giving the uncontested objective evidence of non-obviousness little or no weight, and thus finding the claims unpatentable for obviousness?

5. *With respect to claim 3 of the '264 patent:* did the Board err, and act arbitrarily and capriciously, by finding the claim unpatentable for obviousness when the Board reached exactly the opposite factual and legal conclusions about the identical prior art on identical arguments and an identical record in a parallel IPR?

# STATEMENT OF THE CASE

## I. The Two Kinds of Windshield-Wiper Blades

Wiper systems have three main components: a motor, a wiper arm, and a wiper blade. The motor moves the wiper arm back and forth across the windshield. The arm is pressed into the windshield by a strong spring. The blade is mounted at the end of the wiper arm, and, pressed onto the windshield and dragged across it by the arm, wipes the windshield.

The wiper blade thus serves to distribute the downward force of the wiper arm to the rubber wiper strip, as the blade is dragged across the windshield. This distribution of the wiper arm force to the wiper strip, through the structure of the wiper blade, is central to the technical issues in these IPRs.

### A. Conventional Blades

The wiper blades in use more than twenty years ago (when Bosch made the first of its inventions described in the patents challenged in these IPRs) are now referred to as "conventional" blades. These blades use a yoke-style tree structure to distribute the force of the wiper blade along the wiper strip (see illustration below). The yoke structure is composed of long, rigid elements joined with pivoting connections. The downward force of the arm is applied to the center of the blade and is transferred through the yoke structure to the wiper strip.




The pivoting connections allow the blade to adapt somewhat as it is pressed against and moves across the curved surface of a windshield. However, because of their yoke-style structure, conventional blades do not distribute the downward force of the wiper arm evenly along the length of the wiper strip. Instead, there are spots of higher pressure where the yoke is attached to the wiper strip, interspersed between areas of lower pressure. This uneven pressure distribution can lead to streaking, chattering, and other wipe-quality problems, particularly toward the edges of curved windshields, where the ends of conventional blades tend not to fit tightly to the curves and cannot apply much pressure.[1]

---

[1] The Board's opinions in these IPRs betray a basic misunderstanding of the technology at this point. The Board described the yoke structure of conventional blades as being composed of "flexible rails," rather than rigid, pivoting elements. *E.g.*, Appx10123 [Final Written Decision (IPR2016-00036) at 3]. The Board appears to have been confused by one expert's reference to the "flexible rails" used to reinforce the wiper strip on conventional blades. *See* Appx10705-10706 [Exhibit 1007 Declaration of Dr. Gregory Davis, sworn to October 9, 2015 (IPR2016-00036), ¶20].

In addition to uneven pressure distribution, the yoke-style structure has other disadvantages. Ice and snow (or debris) can clog the pivot joints, making for poor wipe quality. And the yoke structure is inherently tall relative to the wiper strip itself. The height of the yoke structure can obscure a driver's vision, but the tall blade also grabs the wind flowing across the windshield when the car is underway, causing the blade to be lifted off the windshield and reducing wiping pressure more and more as the speed of the car increases.

### B. Beam Blades

A proper understanding of the rigid, pivoting yoke structure of conventional blades is critical to understanding the unconventionality of the second kind of wiper blades: "beam blades." Beam blades replace the rigid, pivot-jointed yoke structure with a pre-curved, spring-elastic support element. Properly engineered, this elastic support element will distribute the downward force of the wiper arm continuously along the entire length of the wiper strip, rather than applying the force in only a few spots like the yoke structure of conventional blades. (See illustration below.)




FIG.1

In addition to allowing more even pressure distribution, replacing the rigid, pivot-jointed yokes with a curved spring has other advantages. Unlike conventional blades, beam blades cannot be clogged by ice and snow, because there is no yoke structure to clog. And beam blades can be made with a much lower profile than the taller, multi-level yoke structures.

Beam blades seem like a simple solution to the problems that conventional blades present, and they have been the subject of patents for decades; for that reason, it can be puzzling to those not of skill in the art why beam blades first appeared in commercial use only relatively recently.

One answer is that engineering functional beam blades is not trivial. Bosch's expert, an MIT professor of mechanical engineering who has spent years consulting on Bosch wiper litigations and is familiar with the design and development of wiper blades, and with the engineering difficulties associated with beam blades, testified that Bosch encountered a number of problems in its development process.[2] He also testified that, "It was understood that beam blades and conventional blades were significantly different, such that one could not simply transfer conventional blade structures to beam blades."[3] A Bosch engineer previously testified to the same effect. He explained that one difficulty was that beam blades "had big sensitivity to different parameters."[4]

---

2 Appx11129 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶24].

3 Appx11130 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶25].

4 Appx11383-11384 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 346:16-347:3]. (His native language is German, not English.)

So, for example, despite the apparent simplicity of designing a beam blade, the copycat blades made by an early Bosch competitor (whom Bosch successfully sued for patent infringement) performed very poorly.[5]

## II. Bosch's Beam Blades Revolutionized the Industry

Despite the drawbacks inherent in conventional-blade technology and the long-felt need to replace it,[6] as evidenced by, for example, the existence for decades of paper patents describing beam blades, it was Bosch that made the first commercially successful beam blades.[7] Bosch introduced the Aerotwin beam blade in the aftermarket in 2002; there were no earlier commercially viable beam blades.[8] Bosch introduced a second beam blade, the Icon blade, in 2005.[9]

---

[5] Appx11304-11306 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 267:18-269:3].

[6] Appx11308 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 271:4–22].

[7] Appx11521-11522 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶3].

[8] Appx11521-11522 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶3].

[9] Appx11522 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶5].

The Aerotwin blade was given many awards, including the Pace award and the Automechanika award,[10] as was the Icon blade, which was given the Frost & Sullivan research award.[11]

These products were a great commercial success. Sales of Icon were $17M in 2006, $24M in 2007, and $28M in 2008, figures that are significant in the context of aftermarket wiper blades.[12] Customer demand for the blades was high, despite the fact that they were more expensive than conventional blades; in fact, customers were more excited about the Icon product than about any other product that Bosch's product manager, who started working with wiper blades in 1993, had ever seen before.[13] The customers "recognized that the beam blade product

---

[10] Appx11522 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶3]; Appx11274 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 237:8–24].

[11] Appx11523-11524 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶8]; Appx11296 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 259:11–18].

[12] Appx11523 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶8].

[13] Appx11522-11523 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶5]; Appx11289 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 252:3–16] (emphasis added).

segment was going to be a very popular segment for consumers and they wanted to enter that market as quickly as possible."[14] Bosch's product manager testified at an earlier trial:

> Q: Mr. Kashnowski, from the time Bosch introduced them down to the present day, have beam blades with spoilers and end caps been successful commercially?
>
> A: Absolutely. As I said, **I can't think of a product line that's ever come into the wiper blade market, either OE, original equipment manufacturer, or aftermarket that has had the type of success and provided the type of growth or delivered the type of value to consumers that this product style has done.**[15]

Bosch was not alone in the new market segment for long. Knockoff products identical to Icon appeared in the U.S. market within a year of Icon's release.[16] And knockoff blades still appear in the market, despite Bosch's years of infringement litigation against other suppliers. However, all of Bosch's major competitors have

---

[14] Appx11284 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 247:17–20].

[15] Appx11307 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 270:14–22] (emphasis added).

[16] Appx11524 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶9].

entered into licensing agreements with Bosch.[17] The company has been paid royalties from these agreements.[18]

## III. Bosch's '698 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch's Commercial Success

The Board found claim 1 of Bosch's United States Patent No. 6,973,698 to be unpatentable as obvious in view of two earlier patents: United States Patent No. 4,028,770 ("Appel '770"), and United States Patent No. 4,807,326 ("Arai").

### A. The Appel '770 Patent Calls for Uniform Force Distribution

Appel '770 is a patent describing a beam blade. There is no evidence that anyone was ever able to commercialize Appel's beam blade. Appel's goal, expressed repeatedly in the '770 patent, was to use the beam-blade structure to achieve uniform pressure distribution along the entire length of the blade, "thereby assuring against windshield streaking and the like" and achieving "superior wiping characteristics."[19] As the abstract states, for example:

> A windshield wiper assembly is disclosed as comprising a one-piece blade superstructure fabricated of a molded polymeric material having a curvilinear shape **such that**

---

[17] Appx11524-11525 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶11].

[18] Appx11524-11525 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶11].

[19] Appx8122 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 6:13–19].

> **uniform wiping pressure is applied along its entire length** as a result of a force being exerted at the center of the superstructure by means of an ancillary wiper arm . . . . .[20]

In addition to the advantage of uniform wiping pressure ("it will be appreciated that superior wiping characteristics will be readily achieved by the wiper assembly of the present invention by virtue of the fact that **a uniform pressure** is exerted along the entire length therefore against the associated windshield")[21] Appel '770 calls out two advantages associated with the low profile made possible by beam-blade technology:

> The windshield wiper assembly of the present invention will be seen to have an extremely low profile or silhouette, as compared to prior art assemblies, thereby minimizing visual obstruction as well as the undesirable windlift effect when the vehicle encounters strong head winds or is traveling at a high rate of speed.[22]

The Appel '770 patent incorporates by reference another Appel patent from a decade earlier than the '770 patent, United States Patent No. 3,192,551 ("Appel

---

[20] Appx8118 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at Abstract] (emphasis added).

[21] Appx8122 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 6:13–19] (emphasis added).

[22] Appx8122 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 5:64–6:2].

’551”). The Appel ’551 patent also describes a beam blade designed to achieve uniform pressure distribution along the length of the blade. *E.g.*:

> A single spring element is provided as a backbone to which is mounted a conventional rubber wiping blade which together operate **to distribute a centrally applied actuating arm pressure load relatively uniformly along the length of the blade** throughout variations in windshield contour traversed by the wiper. [23]
>
> * * *
>
> Preferably the resilient backbone member is adapted … **to provide substantially uniform pressure** along the length of contact between the flexible rubber wiping blade and the windshield. [24]

The ’770 patent itself describes the earlier Appel ’551 patent as being intended to provide uniform pressure distribution:

> U.S. Pat. No. 3,192,551, issued July 6, 1965, discloses a windshield wiper blade assembly having a one-piece resilient backbone member or superstructure fabricated of a suitable resilient, metallic material and **designed such that uniform wiping pressure is exerted along the entire length of an associated wiper blade** by means of a wiper arm acting at a central point along the superstructure. [25]

---

[23] Appx8115 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 1:23–28] (emphasis added).

[24] Appx8115 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 1:28–41] (emphasis added).

[25] Appx8120 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 1:6–13] (emphasis added).

* * *

> As described in U.S. Pat. No. 3,192,551, which patent is incorporated by reference in the descriptive portion of this specification, the aforesaid **uniform pressure** may be accomplished by forming the superstructure 16 such that it assumes a generally arcuate configuration of a predetermined radius in a free form or state so that as the superstructure 16 is moved normally toward the windshield surface, the opposite ends of the associated blade would make initial contact, with progressive contact being made by the blade with the windshield from the ends thereof toward the center as increasing pressure is applied at the center. . . . As stated in the aforementioned United States patent incorporated by reference herein, it is also possible to combine, in a number of different ways, the various constructional approaches incorporating progressive dimensional variations in free-form curvature, width and/or thickness **to provide a superstructure 16 having the desired uniform pressure loading characteristics**. [26]

### B. The Arai Patent Also Calls for Uniform Force Distribution

Arai is also a U.S. patent describing a beam blade. Like the Appel patents, it affirms the desirability of uniform pressure distribution, and it explains how in this respect a beam blade is superior to a conventional blade:

> **It is important that a blade rubber contacts with the surface of a windshield being wiped under a uniform pressure distribution along the length thereof** or in the longitudinal direction for enabling satisfactory wiping effects. . . . It is also known to form the yoke member of

---

[26] Appx8121 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 3:14–51] (emphasis added).

> a plurality of pivotally connected yoke elements so that the force is transmitted to the wiperblade through plural locations. When the force is transmitted from the yoke member to the wiperblade through a small number of locations, it is difficult to obtain uniform pressure distribution.[27]

Like Appel, Arai explains that a benefit of his invention is that it results in uniform pressure distribution, stating, *e.g.*, "the pressure distribution along the length of the blade rubber is **uniform** . . . ."[28] His figures 7 and 8 reflect the relatively uniform pressure distribution in his invention (fig. 7) as compared to the prior art (fig. 8), but he acknowledges that in practice his pressure distribution was not exactly uniform.[29] There is no scale on these figures, but according to Arai, they show that "According to the invention, the pressure change in the longitudinal direction is small . . . ."[30]

Arai also discusses the curved shape of his wiper blade. He states, "The curvature is preferably small at opposite end portions and is large at the central

---

27 Appx8110 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 1:12–26] (emphasis added).

28 Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:34–36] (emphasis added).

29 Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:48–4:8].

30 Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:53–4:1].

portion."[31] He means by this that the radius of curvature is smaller at the ends, *i.e.*, that the blade is curved more sharply at the ends than it is in the middle, as shown in figures 5 and 6. "Thus, the pressure distribution along the length of the blade rubber is **uniform**."[32]

### C. Unlike the Prior Art, Bosch's '698 Patent Calls For Non-Uniform Force Distribution

Bosch's '698 patent is the result of Bosch's practical findings as it developed the first commercially successful beam blades. The patent explains that a previously unknown problem arises when the pressure distribution is made "as uniform as possible"[33]:

> The uniform pressure distribution over the entire wiper blade length desired in both instances, however, causes the wiper lip, which belongs to the wiper blade and does the actual wiping work, to abruptly flip over along its entire length from its one drag position into the other when the wiper blade reverses its working direction. This drag position is essential for an effective and low-noise operation of the wiper system. However, the abrupt flipping over of the wiper lip—which is inevitably

---

31 Appx8110 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 1:60–61].

32 Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:34–36] (describing figure 5) (emphasis added).

33 Appx7782 [Exhibit 1001 U.S. Patent No. 6,973,698 (IPR2016-00034) at 1:29–39].

> connected with a back and forth movement of the wiper blade—produces undesirable knocking noises.[34]

In other words, when the pressure distribution along the length of the blade is made uniform, as taught to be desirable by Appel and Arai, the result is a blade that makes an undesirable knocking noise every time the wiper arm reverses its direction—a problem nowhere known in the prior art, likely because, despite the ideas in paper patents, there were no commercially viable beam blades in production before Bosch made its inventions.

Bosch's solution? To change the beam design so that, in contradiction to the prior art, the pressure distribution is intentionally non-uniform, with less pressure at one or both ends of the wiper blade:

> In order to produce as low-noise as possible a tilting over of the wiper lip 28 from its one drag position into its other drag position, the carrying element 12 used for distributing the contact force (arrow 24) is designed so that the contact force of the wiper strip 24 or the wiper lip 28 against the window surface 26 is greater in its center section 36 (FIG. 8) than in at least one of the two end sections 38.[35]
>
> * * *
>
> The reduction of the contact force of the wiper lip 28 against the window surface 26 in the region of one or both wiper blade ends, prevents an abrupt flipping over or snapping over of the wiper lip 28 from its one drag

---

[34] Appx7782 [Exhibit 1001 U.S. Patent No. 6,973,698 (IPR2016-00034) at 1:40–50].

> position into its other drag position. In contrast, with the wiper blade according to the invention, a comparatively gentle tilting over of the wiper lip is produced, starting from the wiper blade end and continuing to the wiper lip center or to the other wiper lip end.[36]

### D. Nexus

Bosch's Aerotwin and Icon beam blades embody the '698 patent.[37] Petitioner did not present any evidence contradicting this fact. And the quiet flip-

---

[35] Appx7783 [Exhibit 1001 U.S. Patent No. 6,973,698 (IPR2016-00034) at 4:6–15].

[36] Appx7783-7784 [Exhibit 1001 U.S. Patent No. 6,973,698 (IPR2016-00034) at 4:66–5:7].

[37] Appx8838-8842 [Exhibit 2014 Plaintiff Robert Bosch LLC's Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in Robert Bosch LLC v. Alberee Products, Inc., in the District of Delaware, Case No. 12-574 (LPS) (IPR2016-00034)]; Appx8787-8789 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶6, 11]; Appx8394 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00034), ¶27]; Appx8905-8908 [Exhibit 2015 Exhibit 24 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00034)]; Appx8985-8988 [Exhibit 2016 Exhibit 25 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00034)]; Appx8535-8536, Appx8542, Appx8546, Appx8550-8551, Appx8553-8556, Appx8654-8655, Appx8660-8661 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00034) at 234:25–235:4; 241:8-9; 245:16-17; 249:25–250:5; 252:17–255:3; 353:22–354:1; 359:12–360:4]; Appx8708-8709 [Exhibit 2006 April 19, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00034) at 698:19–699:22]; Appx16027-16031 [2017-02-07 Hearing Transcript at 32:11–36:3].

over that results from the use of the invention of the ’698 patent was one reason for the Bosch products’ success.[38] Again, the petitioner presented no evidence to the contrary.

### E. The Board’s Conclusion

As discussed in more detail in the argument section below, from the uniform-pressure-distribution prior art described above, the Board concluded that Bosch’s non-uniform-pressure-distribution invention, made by Bosch to solve a problem unknown in the prior art, was obvious. In reaching this conclusion, the Board not only found that it was prima facie obvious to do the opposite of what was taught in the prior art, but also ignored all of Bosch’s objective evidence of non-obviousness, on the basis that Bosch had not shown a nexus between that evidence and the claimed invention.

## IV. Bosch’s ’974 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch’s Commercial Success

The Board found claims 1, 2, and 8 of Bosch’s United States Patent No. 6,292,974 to be unpatentable as obvious in view of a U.K. patent application, No.

---

[38] Appx8787 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00034), ¶6]; Appx8542, Appx8546, Appx8551, Appx8571-8572 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00034) at 241:8-9; 245:16-17; 250:6–8; 270:8–271:3]; Appx8394 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00034), ¶27].

GB 2,106,775 (“Prohaska”) in combination with either the Appel ’551 patent (discussed above) or a German patent dating from 1954: No. 1,028,896 (“Hoyler”).

### A. Prohaska

Prohaska is a patent describing a spoiler (wind deflector) for a conventional blade. Prohaska explained that his invention was for a conventional blade, and noted the pressure-distribution problem associated with conventional blades:

> According to the invention there is provided a wiper blade . . . comprising a supporting structure including at least one yoke element. . . .[39]
>
> * * *
>
> Due to the fact that in all cases conventional rubber wiper elements and supporting structure can be used, the invention provides a stable wiper blade with an advantageous flow pattern. . . .[40]
>
> * * *
>
> As far as supporting structures are concerned which consist of an interlocking yoke system with several clawed yokes carrying the wiper element and one main yoke articulated to the clawed yokes, the contact pressure transmitted to the wiper element transmitted from the wiper arm via such a supporting structure is not the same in all places. As is known the pressure between the working points of the clawed yokes is slightly lower than

---

[39] Appx252 [Exhibit 1004 UK Patent Application GB No. 2,106,775 to Prohaska (IPR2016-00038) at 1:43–48].

[40] Appx255 [Exhibit 1004 UK Patent Application GB No. 2,106,775 to Prohaska (IPR2016-00038) at 4:13–16].

> at the working points of the clawed yokes on the wiper element. . . .[41]

Prohaska does not discuss beam blades.

With respect to conventional blades and their "supporting structure," Prohaska observes that wind lift can be a problem:

> As is known the air stream striking the wiper blade laterally produces a lifting force at the supporting structure and at the wiper element which is effective in a direction away from the pane to be cleaned. Thus the contact pressure of the wiper element on the pane is diminished, so that the wiping pattern deteriorates and the wiper blade may be lifted at high vehicle speed.[42]

Prohaska suggests various spoiler designs to remedy the high-speed lift problem with conventional blades, as well as to help make pressure distribution more even ("As is known the pressure between the working points of the clawed yokes is slightly lower than at the working points of the clawed yokes on the wiper element. It therefore can be reasonable to arrange spoilers in these places of the wiper element."[43]).

---

[41] Appx252 [Exhibit 1004 UK Patent Application GB No. 2,106,775 to Prohaska (IPR2016-00038) at 1:101–111].

[42] Appx252 [Exhibit 1004 UK Patent Application GB No. 2,106,775 to Prohaska (IPR2016-00038) at 1:8–15].

[43] Appx252 [Exhibit 1004 UK Patent Application GB No. 2,106,775 to Prohaska (IPR2016-00038) at 1:107–112].

### B. Appel ’551

As described above in connection with the Bosch ’698 patent, Appel ’551 is a patent describing a beam blade, teaching the benefits of even pressure distribution.

### C. Hoyler

Hoyler is another early (1954) patent describing a beam blade, this one with a molded plastic “hump” in the middle for connection to the wiper arm.[44] It does not discuss wind lift or spoilers.

### D. Bosch’s ’974 Patent

Bosch’s ’974 patent is also the result of Bosch’s practical findings as it developed its commercially successful beam blades. In the course of its testing and development work, Bosch discovered that beam blade performance suffers from wind lift—that is, that their wiping pressure is significantly reduced when the vehicle is traveling at speed, because of the airflow over the windshield. Bosch’s inventors solved this problem by mounting a flexible rubber spoiler on top of the beam.

Like the problem addressed by the ’698 patent, this is a problem—and solution—that only someone building and testing actual beam blades would

---

[44] *See generally* Appx262-268 [Exhibit 1006 German Patent No. 1,028,896 to Hoyler (IPR2016-00038)].

discover; the conventional wisdom was that beam blades are so low to the windshield that wind lift would not be a problem, and moreover that mounting a component to the top of the beam would disturb the beam's force distribution and, by making the blade taller, increase the wind-lift problem.[45]

### E. Nexus

Bosch's Aerotwin and Icon beam blades embody the '974 patent.[46] Petitioner did not present any evidence contradicting this fact. And the beam blade

---

[45] Appx8122 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 5:64–6:2]; Appx833, Appx943-944, Appx972-989 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 236:6–18, 346:16–347:3, 375:2–392:1]; Appx996-997 [Exhibit 2006 April 19, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 665:21–669:18].

[46] Appx1134-1138 [Exhibit 2014 Plaintiff Robert Bosch LLC's Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in Robert Bosch LLC v. Alberee Products, Inc., in the District of Delaware, Case No. 12-574 (LPS) (IPR2016-00038)]; Appx1175-1199 [Exhibit 2015 Exhibit 24 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00038)] (showing the elements of the '974 patent); Appx1266-1279 [Exhibit 2016 Exhibit 25 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00038)] (same); Appx1083-1085 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00038), ¶¶6, 11]; Appx691 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00038), ¶29]; Appx831-832, Appx836, Appx846-847, Appx949, Appx950-951 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the

that results from the use of the invention of the ’974 patent can be used at high speeds without wind lift compromising wiping quality—this was one reason for the Bosch products’ success.[47] Again, the petitioner presented no evidence to the contrary.

## V. Bosch’s ’905 Patent, the Grounds on Which It Was Found Unpatentable, and Its Nexus to Bosch’s Commercial Success

The Board found claims 13, 17, and 18 of Bosch’s United States Patent No. 6,944,905 to be unpatentable as obvious in view of Prohaska in combination with Hoyler.

### A. Prohaska

As described above, Prohaska is a patent describing a spoiler for a conventional blade.

---

District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 234:25–235:4, 239:6–12, 249:25–250:12, 352:9–16, 353:22–354:1]; *see also* Appx1004-1005 [Exhibit 2006 April 19, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 698:19–699:21] (discussing related ’905 patent); Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

[47] Appx691 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00038), ¶29]; Appx836, Appx846-847, Appx867-868, Appx934, Appx949, Appx950-952 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 239:6–16, 249:25–250:12, 270:14–271:22, 337:10–23, 352:9–16, 353:21–355:25]; Appx1083-1085 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00038), ¶¶6, 11]; Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

### B. Hoyler

As described above, Hoyler is a patent describing a beam blade. It does not discuss wind lift or spoilers. It includes "clamps" (element 6 in the figures below) to hold the blade assembly together.[48]




Cross-section A-A Cross-section C-C Cross-section B-B

### C. Bosch's '905 Patent

The '905 patent represents an improvement to the basic beam blade described in the '974 patent. It describes a particular spoiler configuration, that is, a spoiler with "two diverging legs" and "claw-like extensions" gripping the edges

---

[48] Appx10235, Appx10237 [Exhibit 1004 German Patent No. DE1028896 to Hoyler, with translation (IPR2016-00036) at col. 2, Fig. 1].

of the beam to hold the spoiler onto the beam. It also describes "end caps" (element 68 in the figure below), that cover the ends of the metal beam.




FIG.1

**D. Nexus**

Bosch's Aerotwin and Icon beam blades embody the '905 patent.[49] Petitioner did not present any evidence contradicting this fact. And the beam blade

---

[49] Appx11574-11578 [Exhibit 2014 Plaintiff Robert Bosch LLC's Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in Robert Bosch LLC v. Alberee Products, Inc., in the District of Delaware, Case No. 12-574 (LPS) (IPR2016-00036)]; Appx11615-11639 [Exhibit 2015 Exhibit 24 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00036)]; Appx11706-11719 [Exhibit 2016 Exhibit 25 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International

that results from the use of the invention of the ’905 patent can be used at high speeds without wind lift compromising wiping quality; it is light enough that heavier-duty driving motors are not required, and it is easy to assemble. It was a reason for the Bosch products’ success.[50] Again, the petitioner presented no evidence to the contrary.

---

Trade Commission (claim charts) (IPR2016-00036)]; Appx11444-11445 [Exhibit 2006 April 19, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 698:19–699:21]; Appx11271-11272, Appx11286-11287, Appx11289-11291, Appx11390-11391, Appx11393-11395, Appx11396-11397 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 234:25–235:4, 249:25–250:5, 252:17–254:21, 353:22–354:1, 356:18–358:2, 359:12–360:8]; Appx1083-1085 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶6, 11]; Appx11131-11132 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶30]; Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

[50] Appx11131-11132 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶30]; Appx11276, Appx11307-11308, Appx11374, Appx11393-11397 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 239:6–16, 270:14–271:22, 337:10–23, 356:18–360:8]; Appx11523-11525 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶6, 11]; Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

## VI. Bosch's '264 Patent, Bosch's '823 Patent, and the Board's Perplexing, Opposite Decisions on the Same Factual and Legal Issues in Two IPRs

The Board found claim 3 of Bosch's United States Patent No. 7,484,264 to be unpatentable for obviousness. However, when considering the same prior art and the same arguments in a different IPR with respect to a similar claim in Bosch's United States Patent No. 8,099,823, the same panel of the Board found the second claim not to be unpatentable, using exactly opposite fact-finding and reasoning.

Like the claims of the '905 patent, independent claim 1 of the '264 patent calls for a beam blade with a hollow spoiler. Dependent claim 3 adds the limitation that the spoiler is a "binary component" in which the portion with the claw-like extensions is harder than the portion toward the top of the spoiler.

The '264 patent is related to another Bosch wiper patent, United States Patent No. 8,099,823. Claim 6 of the '823 patent is a twice-dependent claim, the immediate antecedent of which (claim 5) recites a "binary component" limitation word-for-word identical to that in claim 3 of the '264 patent.[51]

---

[51] *Compare* Appx12790 [Exhibit 1001 U.S. Patent No. 8,099,823 "Automobile Windshield Wiper Blade," to Kraemer et al. (IPR2016-00041), claim 5] *with* Appx4890 [Exhibit 1001 U.S. Patent No. 7,484,264 (IPR2016-00040), claim 3]. Claim 6 itself describes the location in the spoiler where the spoiler transitions from the harder material to the softer material. Appx12790 [Exhibit 1001 U.S. Patent No. 8,099,823 "Automobile Windshield Wiper Blade," to Kraemer et al. (IPR2016-00041), claim 6].

Costco petitioned for IPR of both claim 3 of the ’264 patent and claim 6 of the ’823 patent. With respect to the “binary component” elements of the two claims, Costco pointed to exactly the same references in each IPR: a Bosch patent referred to as “Kotlarski ’090,” and a patent referred to as “Mathues.”

With the exception of citations and references to the additional limitation in claim 6 (*see* n.51 above), Costco’s “binary component” arguments about Kotlarski ’090 and Mathues were word-for word identical in the two petitions.[52]

Bosch’s argument in response was similarly word-for-word identical in the two IPRs.[53]

Costco’s reply argument was similarly word-for-word identical in the two IPRs.[54]

However, the Board’s decisions about the obviousness of the two “binary component” claims were not word-for-word identical. In fact, the Board—the same

---

[52] *Compare* Appx12772-12775 [Petition for inter partes review (IPR2016-00041) at 51–54] *with* Appx4878-4881 [Petition for inter partes review (IPR2016-00040, Paper No. 1) at 53–56].

[53] *Compare* Appx14445-14446 [2016-07-22 Patent Owner’s Response (IPR2016-00041, Paper No. 32) at 11–12] *with* Appx6155-6156 [2016-07-22 Patent Owner’s Response (IPR2016-00040, Paper No. 28) at 10–11].

[54] *Compare* Appx15577-15579 [2016-10-24 Petitioner’s Reply in Support of Petition (IPR2016-00041, Paper No. 38) at 15–17] *with* Appx7288-7291 [2016-10-24 Petitioner’s Reply in Support of Petition (IPR2016-00040, Paper No. 34) at 15–18].

panel in each IPR—came to exactly opposite conclusions in the two IPRs, despite the arguments and evidence on both sides being identical.

In the IPR of the ’823 patent, the Board concluded that claim 6 was not obvious, because (i) Kotlarski ’090 taught two separate components, not a binary component (“missing from petitioner’s analysis is an explanation for why it would have been obvious to combine the two separate components in Kotlarski ’090 into a single component”), and (ii) Mathues did not teach anything having to do with spoilers (“Although Mathues teaches that the *wiper portion* should be softer than the retention portion, and is not clear to us [*sic*, it is not clear to us], nor does Petitioner explain, how this is applicable to *spoilers*.”)[55]

In the IPR of the ’264 patent, however, the Board came to the exactly opposite conclusion, that claim 3 was unpatentable for obviousness, either (i) in view of Kotlarski ’090 (“Petitioner’s reasoning that a person of ordinary skill in the art would have utilized claw-like extensions formed of a harder material (plastic) than the longitudinal area closer to the base of the spoiler (rubber), as disclosed by Kotlarski ’090, in order to grip the spring rails is well supported by the evidence of record”), or (ii) in view of Mathues (“Petitioner’s reasoning that a person of ordinary skill in the art would have utilized claw-like extensions being made of a

[55] Appx12698-12699 [Final Written Decision (IPR2016-00041) at 22–23] (emphasis in original).

harder material (plastic) than the longitudinal area closer to the base of the spoiler (rubber), as disclosed by Mathues, in order to grip the spring rails is well supported by the evidence of record”).[56]

There is no appeal of the finding of non-obviousness of claim 6 of the ’823 patent.

[56] Appx4813, Appx4815-4816 [Final Written Decision (IPR2016-00040) at 35, 37–38].

# SUMMARY OF THE ARGUMENT

In the IPRs of the ’698, ’974, and ’905 patents, the Board (and before that, the petitioner) used hindsight to find the claimed inventions to have been obvious. The Board picked individual elements from various pieces of prior art to match elements of the claims, then argued that the claimed inventions were obvious because one of skill in the art at the time of the invention could have—not would have—combined those elements and ended up with the claimed inventions.

The problem is that while one of skill in the art could have made these combinations, he or she would have had no motivation to do so. These patents address problems that can be apparent only to someone who had built a beam blade and extensively tested it. All of the prior-art references are merely paper patents; there is no product-related prior art. Bosch was the first ever to make a commercially successful beam blade, and thus the first to discover—and solve—the real-world problems with beam blades. There is no evidence that one of skill in the art would have recognized these or any other problems from the prior-art references, and no evidence that he or she would have had any reason to make the proposed combinations of elements. And without a motivation to combine, there is no obviousness. *See, e.g., KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 415–19 (2007).

In the IPR of the ’698 patent, the prior art teaches, over and over again, the virtues of a wiper blade where the contact force from the arm is uniformly distributed over the length of the blade. But in real life uniform force distribution along the entire length of the blade causes a problem, one that Bosch solved by specifying a particular, non-uniform force distribution. The Board erred in finding that uniform-force-distribution prior art renders obvious the non-uniform-force-distribution invention of the ’698 patent.

In the IPR of the ’974 patent, the Board found that one of skill in the art would have known that high-speed wind lift is a problem even with beam blades. The Board based this finding on a piece of prior art that is not part of any ground of unpatentability, one which Bosch was given no opportunity to address after its teachings were first argued by the petitioner in reply papers.[57] The Board’s reliance on this additional prior art was improper, and the obviousness finding that resulted was wrong.

In the IPR of the ’905 patent, the Board incorrectly found that all the individual elements of the claimed invention were taught in the prior art. The invention includes an “end cap” as a claim element. The prior art describes a

[57] In fact, the reference describes a conventional blade and says nothing at all about beam blades to one of skill in the art, a point upon which Bosch’s technical expert would have expanded if given the opportunity to do so.

"clamp." The Board wrongly determined that to one of skill in the art, a "clamp" is an "end cap." There is no preponderance of the evidence to support this finding.

And in all three IPRs, the Board erred by giving little or no weight to Bosch's unrebutted, uncontested objective evidence of non-obviousness. The Board should be required to reconsider its obviousness conclusion in light of that evidence.

Finally, in the IPR of the '264 patent, the Board arbitrarily and capriciously ruled claim 3 to be unpatentable for obviousness, when the same panel found a parallel claim in a different patent to be patentable over the same prior art in light of arguments on both sides that were word-for-word the same in the two co-pending IPRs.

# ARGUMENT

## I. Standard of Review

The Board's legal conclusions of obviousness should be reviewed de novo. *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374 (Fed. Cir. 2018).

The Board's underlying factual findings should be reviewed for substantial evidence supporting the Board's findings. *Id.*

The Board's actions and determinations must be vacated or reversed if they were arbitrary or capricious. 5 U.S.C. § 706(2)(A).

## II. The Invention Claimed In the '698 Patent Was Not Proven Obvious

The sole claim of the '698 patent calls for a beam blade with two pertinent properties: *first*, that the contact force in the center section of the blade is greater than the contact force in one or both end sections of the blade, and *second*, that the blade is curved more sharply in the center section than in the end sections.[58] The patent explains that this configuration is desirable because it results in a beam

---

[58] The first property can be caused by the second, but only if the cross-section of the beam is uniform along its length. All else being equal, a section that is more sharply curved toward the windshield will have a greater contact force, but if the cross-section of the beam varies over the length of the blade, there is no necessary relationship between contact pressure and degree of curvature. *E.g.*, if the blade is thicker at the ends than in the middle, and therefore more difficult to deform at the ends than at the middle, then the end sections could produce the same contact force as the center section, even if they were curved less than the center section.

blade that reverses direction without the annoying thwack that would be heard if the contact pressure were uniform and the entire wiper strip therefore flipped over at the same time when the blade reverses direction.

By its very nature, this advantage is apparent only to someone who has actually built and used a beam blade with a uniform pressure distribution. Until someone has used such a blade, he or she hasn't heard the thwack, and so he or she is ignorant of the existence of the problem solved by the invention of the '698 patent. There is no teaching about this problem anywhere in the cited prior art.

The Board found the invention of the '698 patent to be unpatentable on only one ground: obviousness in view of a combination of two references, Arai and Appel '770.

### A. The Arai Reference Teaches Uniform Force Distribution

The Arai patent reflects its inventors' attempt to achieve uniform force distribution. It says so explicitly:

> **It is important that a blade rubber contacts with the surface of a windshield being wiped under a uniform pressure distribution** along the length thereof or in the longitudinal direction for enabling satisfactory wiping effects. . . . When the force is transmitted from the yoke member to the wiperblade through a small number of

> locations, it is difficult to obtain uniform pressure distribution. . . .[59]
>
> According to the invention, the backing member can easily be formed to have desired rigidity against bending, thus, it is not required to connect the wiperblade to the yoke member through three or more points for obtaining uniform pressure distribution. . . .[60]
>
> **Thus, the pressure distribution along the length of the blade rubber is uniform**. . . .[61]
>
> FIG. 6 shows a modified form…. **The embodiment enables to obtain relatively uniform pressure distribution** with respect to a wide range between a low pressure and a high pressure. . . .[62]

Despite these teaching of uniform force distribution, the Board relied upon Arai to teach non-uniform force distribution, in particular, to teach a force distribution where the contact force is less in the end sections than in the center section.[63]

---

[59] Appx8110 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 1:11–26].

[60] Appx8110 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 2:3–7].

[61] Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:34–36].

[62] Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:37–45].

[63] Appx7687-7688 [Final Written Decision (IPR2016-00034, Paper No. 65) at 16–17].

There is not a word about this kind of pressure distribution in Arai. The Board relied entirely on the graph of Fig. 7 for this teaching.[64] But the inventor used Fig. 7 (the invention) in comparison with Fig. 8 (the prior art) in order to show that the invention produced a more uniform force distribution than the prior art, not to show an intentionally non-uniform distribution. *See* Appx8111 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034) at 3:48–4:8] ("According to the invention, the pressure change in the longitudinal direction is small. . . . Therefore, the wiping property is good.").

Apparently in their testing the Arai inventors discovered that they had failed to achieve exactly uniform force distribution, and the Fig. 7 graph seems to indicate that at "high" arm pressure, their tests showed a pressure drop in the end sections compared to the center section, despite their efforts to make the pressure distribution along the length of the blade uniform.[65] This pressure drop is shown in the graph, but it is unintended, and taught to be undesirable. *Cf. Honeywell Int'l v. Mexichem Amanco Hldgs.*, 865 F.3d. 1348, 1354–56 (Fed. Cir. 2017) (noting the caution with which inherent disclosures must be used in obviousness analyses, and

---

[64] Appx7687-7688 [Final Written Decision (IPR2016-00034, Paper No. 65) at 16–17].

[65] *See* Appx8109 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034), Fig. 7].

holding that unexpected inherent properties show non-obviousness, not obviousness—*a fortiori* here, where the prior art explicitly teaches away from the inherent disclosure of accidental non-uniformity).

It is uncontested, however, that the Arai patent does not teach a wiper blade with the end sections curved less sharply than the center section, which is the second pertinent property of the invention claimed in the ’698 patent. Instead, Arai is the opposite, with the end sections curved more sharply than the center section, presumably in an attempt to increase the pressure at the end sections and achieve a perfectly uniform force distribution.[66]

### B. The Appel ’770 Reference Also Teaches Uniform Force Distribution

The Board relied on the Appel ’770 patent for a teaching of a wiper blade curved less sharply at the end sections than in the middle. That patent itself is, however, devoid of any such teaching. In reality, the Board relied on a different reference that was not part of the ground of rejection, Appel ’551, which it found to be incorporated by reference into Appel ’770.[67]

---

[66] *See* Appx8109 [Exhibit 1004 U.S. Patent No. 4,807,326 (IPR2016-00034), Fig. 5].

[67] Appx7694-7698 [Final Written Decision (IPR2016-00034, Paper No. 65) at 23–24].

Like Arai, Appel ’551 teaches the virtues of uniform pressure distribution. This teaching is throughout the reference.[68]

And it teaches that one way to achieve uniform pressure distribution is to use a beam with a parabolic curve, that is, one where the end sections are less curved than the center section.[69] It then explains that the same uniform pressure distribution can also be achieved with a circularly (uniformly) curved blade, if either the width of the beam or the thickness of the beam tapers from the center to the ends.[70] Again, the objective in selecting the shape of a beam is to provide uniform pressure distribution:

> As shown in FIG.  the backbone 36a and rubber blade 37a have a free form circular arc curvature modified at the ends with somewhat less curvature, **adapted to provide uniform contact pressure** along the length of contact with a flat windshield 43 when fully depressed by the actuating arm (not shown).[71]

---

[68] *See, e.g.*, Appx8115-8116 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 1:23–41, 1:52–55, 2:23–45, 3:9–56].

[69] Appx8115 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 2:23–45].

[70] Appx8115-8116 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 2:46–62 (width), 2:63–3:8 (thickness)].

[71] Appx8116 [Exhibit 1005 U.S. Patent No. 3,192,551 (IPR2016-00034) at 3:73–4:3 (emphasis added)].

Appel ’770 teaches the virtues of uniform pressure distribution exclusively, and it incorporates Appel ’551 by reference explicitly for its teaching of uniform pressure distribution. Appx8121 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 3:14–30] (“As described in [Appel ’551], which patent is incorporated by reference in the description portion of this specification, the aforesaid **uniform pressure may be accomplished** by forming the superstructure 16 such that it assumes a generally arcuate configuration of predetermined radius. . . .”) (emphasis added).

### C. The Board’s Faulty Obviousness Reasoning

To find the ’698 patent unpatentable for obviousness, the Board took one reference that teaches uniform force distribution, with an incidental disclosure of an undesirable lessening of the contact pressure at the ends of the blade (Arai Fig. 7, the high-pressure curve), and combined it with another reference that teaches uniform force distribution, with one of several ways of achieving that uniform force distribution being a curve that is sharper in the middle than it is in the ends (Appel ’551, incorporated for its uniform-pressure-distribution description into Appel ’770).

Bosch’s invention was to cure the previously unknown thwacking-noise problem by designing the blade to have less contact pressure in one end section (or both end sections) than it does in the center section. It is true that to find

obviousness the Board need not have evidence of an earlier inventor attempting to solve the same problem that Bosch later solved, but the Board is required to have some reason—other than hindsight—that it would have been obvious to modify the uniform-force-distributing, parabolic-shaped blade of Appel to have the non-uniform force distribution of that one "high-pressure" curve in Fig. 7 of Arai. There is no evidence of any such reason in the record. Instead, both pieces of prior art that formed the ground of rejection uniformly teach the virtues of uniform force distribution. The Board's decision should be reversed.

## III. The Invention Claimed in the '974 Patent Was Not Proven Obvious

Bosch developed the first commercially viable beam blades.[72] In doing so, Bosch discovered a number of different problems, and patented solutions for some of those problems.

One problem, discussed above, was the noise that occurred when a blade with even force distribution reversed direction. Another problem was wind lift. Wind lift at high speed was known to be a problem in *conventional* blades. It was believed to result from the bracket superstructure that raised the profile of a conventional wiper blade high off the surface of the windshield, and was therefore not expected to be a problem in beam blades, which have a low profile and sit

[72] Appx1081-1082 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00038), ¶3].

close to the surface of the windshield. In its design and testing process, however, Bosch discovered that in fact wind lift is a significant problem for beam blades after all, at least when the vehicle on which the blades are mounted is traveling at high speed.

Bosch solved the problem by adding a flexible spoiler along the top of the beam, to provide downforce at speed without the problems that would have been caused by simply increasing the force applied by the wiper arm to press the wiper blade harder against the windshield. Bosch added this spoiler despite the conventional wisdom that a higher profile would cause more wind problems, not less, and despite the fears of one of skill in the art that adding a component to the top of the beam would disturb its force distribution and result in lower wiping quality.[73]

Despite the fact that no one knew of the problem solved by adding a spoiler, and despite the then-conventional wisdom about the side effects of adding a

---

[73] Appx8122 [Exhibit 1006 U.S. Patent No. 4,028,770 (IPR2016-00034) at 5:64–6:2]; Appx833, Appx943-944, Appx972, Appx973, Appx980-981, Appx985-989 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 236:6–18, 346:16–347:3, 375:2–23, 376:6–11, 383:12–384:17, 388:23–392:2]; Appx996-997 [Exhibit 2006 April 19, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 665:21–669:18].

component to the top of a beam blade, the Board found claims 1, 2, and 8 of the ’974 patent unpatentable for obviousness. To do so, the Board hypothesized that one of ordinary skill in the art at the time of the invention would have reached back decades into the prior art to take a beam-type wiper blade from the 1965 Appel ’551 patent (or the 1954 Hoyler patent), and add to it one of the conventional-blade spoilers described in the 1983 Prohaska patent.

But, to establish a motivation to combine, the Board relied on an additional reference, the Barth patent, which was not part of any ground ever proposed by the petitioner or instituted by the Board, and to which Bosch was given no opportunity to reply.

In its petition for *inter partes* review, Petitioner argued that wind lift was a known problem (implying that the wind-lift problem would have motivated a person of ordinary skill in the art to combine its beam blade prior art references, Appel and Hoyler, with its conventional-blade spoiler prior art reference, Prohaska).[74]

Bosch responded to that generic motivation argument by explaining that wind lift was only known to be a problem in high-profile conventional blades—

---

[74] *See* Appx81-82 [Petition for inter partes review (IPR2016-00038, Paper No. 1) at 16–17].

such as Prohaska, the conventional blade relied upon in Petitioner's grounds. Bosch supported its explanation with an expert declaration.[75]

After Bosch's expert declaration was submitted, Petitioner raised a new argument, based on a prior art reference, Barth, that it had included in its exhibit table but mentioned nowhere else in its petition. Petitioner argued that (i) Barth discloses that wind lift is a result of the "pine tree" shape of the wiper strip; (ii) the '974 patent wiper strip is a "pine tree" shape; and thus (iii) the problem of wind lift is applicable to both conventional and beam blades.[76] (Its argument ignored the fact that Barth describes a conventional blade, and that Barth does not disclose this problem to be applicable to beam blades, which naturally have a lower profile and which are more drastically affected by structural changes, such as the addition of a spoiler).

Bosch asked the Board to exclude this new rationale, without success. And, in its final written decision, the Board found Bosch's attorney argument on the Barth patent to be insufficient, and criticized Dr. Dubowsky's declaration as

---

[75] Appx703-705 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00038) at ¶¶57–62].

[76] Appx1596-1599 [2016-10-24 Petitioner's Reply in Support of Petition (IPR2016-00038, Paper No. 33) at 5–8].

conclusory on this point (ignoring that Dr. Dubowksy did not know of the Barth argument when he made his declaration).

Bosch did not have the opportunity to adequately rebut Petitioner's new technical rationale because it was not on notice of it during the only stage of the proceeding in which, under the Board's rules, it could have submitted evidence and expert testimony (namely, the Patent Owner Response stage).

The Board acknowledges that Barth "was not the basis of any ground of unpatentability" but rationalizes its use of Barth (and charges Bosch of being on notice) by stating that "Barth was cited as part of the knowledge of a person of ordinary skill in the art. Pet. ii; Ex. 1008 ¶ 15 (reproducing Figure 1 of Barth)."[77] But Page ii of the Petition is the table of exhibits; Barth is not mentioned anywhere else in the Petition. And, the citation to ¶ 15 (and reproduction of Figure 1 of Barth) in Petitioner's expert declaration has nothing to do with the wind-lift problem on which the Board's motivation conclusion rests. The figures of Barth relied upon in the Final Written Decision are Figures 3 and 4, which were first mentioned in Petitioner's Reply.

This Court has previously vacated and remanded Board final written decisions when a new figure (and rationale) was relied upon in reply without the

---

[77] Appx34 [Final Written Decision (IPR2016-00038, Paper No. 68) at 34].

patent owner having an adequate opportunity to respond in its patent owner response. *In re Nuvasive, Inc.*, 841 F.3d 966, 969–73 (Fed. Cir. 2016).

In *Nuvasive*, the Petitioner argued in its Petition that a reference called Michelson provided the motivation to combine its prior art, but the Petitioner did not "include an assertion about or citation to material encompassing Michelson's Figure 18." *Id.* The Patent Owner then rebutted this generic argument in its Patent Owner Response and included citations to figures 16, 19, and 20 of Michelson, which supported its rebuttal argument. *Id.* On Reply, for the first time in the IPR, the Petitioner pointed specifically to figure 18 of Michelson, which supported its motivation argument. *Id.* The Patent Owner objected, unsuccessfully, to this first-time, new use of Figure 18. *Id.* at 970. The Board ultimately held several claims invalid as obvious, and its decision relied on the reply-raised Michelson rationale.

This Court vacated and remanded that case, finding that the Board's decision violated due process and the Administrative Procedure Act. *Id.* at 971–73. In doing so, this Court explained:

> [T]here was no notice of the Figure 18 point before Nuvasive filed its Patent Owner Response. The opportunity to file that Response therefore did not provide the required opportunity to address the factual assertion about Figure 18 on which the Board ultimately relied.

*Id.* at 972.

The Patent Owner in *Nuvasive* had significantly more notice of the late-raised Michelson argument than Bosch had about the late-raised Barth rationale. In *Nuvasive*, there was a concurrently filed IPR in which Figure 18 of Michelson was disclosed in the Petition and relied upon throughout the proceeding.

Bosch had no notice of the wind-lift rationale allegedly supported by Figures 3 and 4 of Barth, and therefore this Court should vacate the Board's decision.

## IV. The Invention Claimed in the '905 Patent Was Not Proven Obvious

The Board found claims 13, 17, and 18 of the '905 patent to be unpatentable for obviousness in view of Hoyler and Prohaska. But each of those claims includes an element missing from the prior art: an "end cap" at the ends of the beam.

The end caps are element 68 in Fig. 1 of the '905 patent:




*’905 Patent Annotated Fig. 1*

As the Board recognized (see Appx10139 [Final Written Decision (IPR2016-00036) at 19]), the Hoyler patent describes a wiper blade with “clamps”

at the ends of the blade.[78] The clamps are element 6 in the side and top views of Fig. 1 of Hoyler:




*Annotated Side View of Hoyler Fig. 1*

78 Appx10235, Appx10237 [Exhibit 1004 German Patent No. DE1028896 to Hoyler, with translation (IPR2016-00036) at col. 2, Fig. 1].




*Annotated Top View of Hoyler Fig. 1*

To reach its conclusion of obviousness, the Board found that the "clamps" in the Hoyler patent are "caps," reasoning that each clamp "covers the end and sides of the blade. Thus, it caps the end."[79]

First, the Board was wrong when it said that the Hoyler clamps "cover the end and sides of the blade." It is apparent from the figures that the clamps extend over only part of the end and side; unlike in the end caps shown in the '905 patent, the corners are open. The Board cites no evidence in support of its finding to the contrary.

---

[79] Appx10140 [Final Written Decision (IPR2016-00036) at 20].




*Annotated Side View of Hoyler Fig. 1*




*Annotated Top View of Hoyler Fig. 1*

Second, even if what the Board meant was that the Hoyler clamps "cover parts of the end and sides of the blade," that is not a basis for concluding that the clamps are "end caps" to one of skill in the art. The Board cites no evidence whatsoever for such a conclusion about how one of skill in the art would understand the phrase "end caps" (a phrase which neither party sought to have construed, and which the Board did not construe), or how one of skill in the art would understand the clamps in the Hoyler patent. Indeed, there is no evidence in the record on this point, other than (i) one conclusory sentence from the petitioner's technical expert, which contains no reasoning whatsoever, and on which the Board did not rely ("Hoyler discloses end caps (clamps 6) disposed at

the ends of spring 5"[80]), and (ii) Bosch's expert's opinion that that to one of skill in the art, Hoyler does not teach "end caps." Bosch's expert opined, "I understand that Petitioner contends that "clamps 6" in Hoyler '896 are end caps, but the clamps are not caps. The clamps do not cap the ends—that is, cover the sharp corners that could scratch a car or person."[81]

In ruling that "clamps" are "caps," the Board assumed *ex cathedra* power and acted without evidence—indeed, contrary to the evidence—in favor of relying on its own technical opinion, which it expressed in its two-word rebuttal to Bosch's expert: "We disagree."[82] The question before the Board was how one of skill in the art would have understood the Hoyler patent, *KSR*, 550 U.S. at 406 (teachings of prior art are evaluated from the perspective of one of skill in the art), not how the individual members of the panel understood it from their lay perspective. It was an issue on which the petitioner had the burden of proof, because the Board was required to presume that Bosch's claims were patentable. 35 U.S.C. § 282(a). The Board was not free to substitute its own opinion for that of

---

[80] Appx10717 [Exhibit 1007 Declaration of Dr. Gregory Davis, sworn to October 9, 2015 (IPR2016-00036), ¶45].

[81] Appx11147 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶69].

[82] Appx10139 [Final Written Decision (IPR2016-00036) at 19].

Bosch's expert, especially because the Board made no finding at all, nor even a suggestion, that something impaired the credibility of Bosch's expert.

On the record the petitioner presented to it, the Board's duty was to find the claims not unpatentable, absent a preponderance of the evidence that Hoyler's "clamps" were, to one of skill in the art at the time of Bosch's invention, "end caps."[83] There was no such preponderance; there is no substantial evidence supporting the Board's finding; there is not even any evidence recited in the Board's opinion. On the record expressed in its final written decision, the Board simply was not free to disagree with Bosch's expert and find that "clamps" are "end caps," and its decision should be vacated.

## V. The Board Erred in Its Consideration of the Objective Evidence of Non-Obviousness

The Board found the claims at issue in this appeal to be unpatentable for obviousness. It did so using hindsight reasoning, reconstructing the claimed inventions by taking elements from various prior-art patents and combining them

---

[83] There is no question on this appeal about whether Hoyler makes end caps obvious, that is, whether one of skill in the art would have been capable of turning those clamps into caps, and been motivated to do so. That was not argued in the petition in this IPR, and it was not part of the final written decision. If that had been argued, Bosch would have presented evidence about, *inter alia*, what a person of skill in the art would have thought the effect of a cap would be on the very sensitive end sections of a beam blade—that is, that one of skill in the art would have found a cap undesirable. The only question the Board considered was whether the Hoyler clamps *are* end caps.

into the claimed inventions. The Board would not have found the claims unpatentable if its hindsight reconstructions had been checked by a proper evaluation of Bosch's uncontested objective evidence of non-obviousness.

### A. The Board Was Wrong to Disregard Bosch's Evidence of Nexus, Which Was Not Contested by the Petitioner

The Board found there to be no nexus between the claims at issue and the objective evidence of non-obviousness in either the IPR of the '698 patent or the IPR of the '974 patent. The Board wrongly overlooked that Bosch's evidence of nexus described above was utterly uncontested.

Bosch's objective evidence centered on the commercial success of two of its aftermarket products: the Aerotwin blade and the Icon blade.

Bosch established that these products embodied the patents at issue. To do so, Bosch provided the Board with the classic form of evidence on this issue: claim charts illustrating the correspondence between the products, on the one hand, and the patents, on the other hand.[84] These claim charts were not created for the IPRs;

---

[84] Appx8905-8908 [Exhibit 2015 Exhibit 24 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00034)]; Appx8985-8988 [Exhibit 2016 Exhibit 25 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00034)]; Appx1175-1199 [Exhibit 2015 Exhibit 24 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00038)] (showing the elements of the '974 patent); Appx1266-1279 [Exhibit

they were exhibits Bosch submitted to the ITC in support of an infringement complaint to that agency.

Bosch also provided the Board with interrogatory responses from another litigation explaining that the products practice the patents.[85]

None of this evidence was contested. There is no evidence whatsoever in the record that Bosch's products do not practice these patents, let alone substantial evidence. There was no evidence that Bosch was lying to the ITC or to the court in its previous litigations, nor evidence that Bosch was falsely marking its products.

Because Bosch's products are covered by its patents, there is a legal presumption of nexus between objective evidence related to the products, on the one hand, and the non-obviousness of the claims, on the other hand. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1071–73 (Fed. Cir. 2018). There was no

---

2016 Exhibit 25 to Complaint in In the Matter of Certain Wiper Blades, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts) (IPR2016-00038)] (same).

85 Appx8838-8842 [Exhibit 2014 Plaintiff Robert Bosch LLC's Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in Robert Bosch LLC v. Alberee Products, Inc., in the District of Delaware, Case No. 12-574 (LPS) (IPR2016-00034)]; Appx1134-1138 [Exhibit 2014 Plaintiff Robert Bosch LLC's Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in Robert Bosch LLC v. Alberee Products, Inc., in the District of Delaware, Case No. 12-574 (LPS) (IPR2016-00038)].

evidence that Bosch's awards, royalties, and commercial success were due to something other than the patented inventions, so that presumption was unrebutted.

Moreover, Bosch provided direct evidence that the success of its products resulted from the advantages the claimed inventions provide, and from the presence of the claimed elements. There was direct testimony that the invention of the '698 patent (non-uniform pressure distribution, which resulted in quiet operation)[86] and the invention of the '974 patent (a beam blade with a spoiler, which resulted in acceptable high-speed wiping performance),[87] as well as the invention of the '905 patent (a beam blade with a lightweight and easy-to-assemble

---

[86] Appx8787 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00034), ¶6]; Appx8542, Appx8546, Appx8551, Appx8571-8572 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00034) at 241:8-9; 245:16-17; 250:6–8; 270:8–271:3]; Appx8394 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00034), ¶27].

[87] Appx691 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00038), ¶29]; Appx836, Appx846-847, Appx867-868, Appx934, Appx949, Appx950-952 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00038) at 239:6–16, 249:25–250:12, 270:14–271:22, 337:10–23, 352:9–16, 353:21–355:25]; Appx1083-1085 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00038), ¶¶6, 11]; Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

spoiler, and end caps to cover the sharp ends of the beam)[88] were all related to the objective evidence of non-obviousness.

Again, there was no evidence to the contrary.

In view of the uncontested evidence establishing nexus, by presumption and by direct evidence, the Court should vacate the final written decisions in the IPRs of the ’698 and ’974 patents, in which the Board wrongly found there to be no nexus.

### B. The Board Wrongly Minimized the Importance of the Objective Evidence

In the IPR of the ’905 patent, the Board grudgingly accepted that Bosch had shown a nexus between its products and the claims. However, even in that IPR, the Board wrongly found that evidence to be of minimal importance. The Board made similar statements in the IPRs of the ’698 and ’974 patent, where, as discussed above, the Board found no nexus between the products and the claims, despite the absence of any evidence to the contrary. In all three IPRs, the Board was wrong

---

[88] Appx11131-11132 [Exhibit 2003 Declaration of Dr. Steven Dubowsky (IPR2016-00036), ¶30]; Appx11276, Appx11307-11308, Appx11374, Appx11393-11397 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 239:6–16, 270:14–271:22, 337:10–23, 356:18–360:8]; Appx11523-11525 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶6, 11]; Appx16075 [2017-02-07 Hearing Transcript at 80:6–12].

about the significance of the objective evidence, and the final written decisions should be vacated.

As with the nexus issue, the key to the Board's mistake in evaluating the significance of the objective evidence is that there was no contrary evidence in the record. Bosch gave evidence that its Icon sales alone were almost $70M in just three years, a sales total that Bosch's product manager said were significant, and that no one testified was not significant.[89] The product manager also testified, for example, that in his many years of experience, he had never seen another product that "had the type of success" that the Bosch beam blades did, and that customers were tremendously excited about the products.[90] No one testified that customers were not tremendously excited by the Bosch beam blades, or that they were not unusually successful in the marketplace.

---

89 *See, e.g.*, Appx11523 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶8].

90 Appx11307, Appx11288-11289 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 270:14–22, 251:15–252:16]; Appx11523 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶8].

He also testified that there was a long-felt need for beam blades,[91] testimony that is supported by the existence of the decades-old beam-blade patents that were never commercialized but are now presented as prior art. Again, no one testified that there was not a long-felt need for these products.

Both products were recognized with industry awards, Aerotwin the Pace and Automechanika awards, and Icon an award from Frost & Sullivan.[92] The products were so successful that the market was soon flooded with knockoffs.[93] Bosch licensed some of its industry competitors under its beam-blade patents, and has earned royalties as a result.[94]

All of this is objective evidence of non-obviousness, evidence to which the Board should have paid attention. "These objective guideposts are powerful tools

---

[91] Appx11521 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶2].

[92] Appx11522, Appx11523-11524 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶3, 8]; Appx11274-11275, Appx11296 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 237:8–238:6, 259:11–18].

[93] Appx11524 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶¶9–10]; Appx11294-11295 [Exhibit 2005 April 15, 2010 Trial Transcript from Robert Bosch LLC v. Pylon Manufacturing Corporation in the District of Delaware, Case No. 08-542 (SLR) (IPR2016-00036) at 257:23–258:11].

[94] Appx11524-11525 [Exhibit 2007 Declaration of Martin Kashnowski (IPR2016-00036), ¶11].

for courts faced with the difficult task of avoiding subconscious reliance on hindsight.” *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). “That which may be made clear and thus ‘obvious’ to a court, with the invention fully diagrammed and aided by experts in the field, may have been a breakthrough of substantial dimension when first unveiled.” *Id., citing Uniroyal, Inc. v. Rudikin-Wiley Corp.*, 837 F.2d 1044, 1051 (Fed. Cir. 1988).

This Court explained in the *Dietz & Watson* case, among others, why the Board should have paid attention to the objective evidence:

> These objective criteria thus help turn back the clock and place the claims in the context that led to their invention. Technical advance, like much of human endeavor, often occurs through incremental steps toward greater goals. These marginal advances in retrospect may seem deceptively simple, particularly when retracing the path already blazed by the inventor. For these reasons, this court requires consideration of these objective indicia because they “provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product.” Obviousness requires a court to walk a tightrope blindfolded (to avoid hindsight)—an enterprise best pursued with the safety net of objective evidence.

*Id.* at 1378–1379 (citations omitted).

Especially in view of the fact that the objective evidence of non-obviousness was uncontested, the Court should vacate the final written decisions in the IPRs of all three of the ’698, ’974, and ’905 patents.

## VI. The Board Acted Arbitrarily and Capriciously in Finding Claim 3 of the ’264 Patent to be Unpatentable

The Board was wrong on the merits with respect to claim 3 of the ’264 patent. Its decision in the ’823 IPR—in which it found the claim at issue to be *non-obvious* because the prior art *did not* teach a binary-component spoiler, and that no one had articulated a reason to change the prior art to include such a spoiler, and which is not the subject of any appeal—was correct. There is no substantial evidence supporting the Board’s findings about the prior art in the ’264 IPR, its conclusion of obviousness was wrong, and the Court should reverse the finding of unpatentability of claim 3 of the ’264 patent for that reason.

The Court should also reverse the finding of unpatentability of claim 3 because it was an arbitrary and capricious decision, as the opposite finding in the ’823 IPR shows. Considering word-for-word the same arguments and evidence, the Board reached opposite conclusions in the two proceedings. Nothing could better evidence an arbitrary and capricious decision than the very same panel reaching exactly the opposite conclusion in two proceedings on an identical issue. *See, e.g.*, *Vicor Corp. v. SynQor, Inc.*, 869, F.3d, 1309, 1322 (Fed. Cir. 2017) (“While not every instance of an agency reaching inconsistent outcomes in similar, related cases will necessarily be erroneous, under the circumstances here, where a panel simultaneously issues opinions on the same technical issue between the same parties on the same record, and reaches opposite results without explanation, we

think the best course is to vacate and remand these findings for further consideration.”).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

There is no rational explanation for the Board's opposite decisions in the IPRs of the '264 and '823 patents. The Board's ruling of unpatentability in the '264 IPR was not only wrong, but arbitrary and capricious in view of its patentability decision in the '823 IPR, which is not challenged on appeal. The '264 decision should be reversed.

In the '698, '974, and '905 IPRs, the Board found obviousness based on the existence of various claim elements in the prior art (for the most part, decades-old prior art) and a proclamation that one of ordinary skill in the art could have assembled those elements into the claimed inventions. This process is textbook hindsight. The reason courts consider objective evidence is to avoid hindsight, but in this case, the Board wrongly rejected and minimized the objective evidence. The unpatentability decisions in the '698, '974, and '905 IPRs should be reversed in light of the objective evidence, or in the alternative remanded to the Board for further consideration of the objective evidence.

In the '905 IPR, the Board sought to find the "end cap" element in the prior art, so that it could make the kind of hindsight assemblage that characterized its decisions in these IPRs. But there is no end cap in the prior art. There is a clamp. On the grounds presented in the IPR and the reasoning adopted in the final written decision, the burden was on the petitioner to prove, by a preponderance of the

evidence, that one of ordinary skill in the art would have perceived the "clamp" to be an "end cap." Not only was there no substantial evidence supporting this proposition, there was direct evidence to the contrary. The final written decision should be vacated and reversed.

In the '974 IPR, the Board did articulate a reason that one of skill in the art would have combined elements from various prior-art documents to make the claimed invention. However, the only evidence of that reason was in a piece of prior art that was part of no instituted ground and to which Bosch had no opportunity to respond with technical evidence. The Board's decision should be vacated and, in view of the lack of any motivation to combine in any instituted ground, reversed.

And last, in the '698 IPR, the Board added together two references teaching away from non-uniform force distribution, and yet concluded that they proved the obviousness of non-uniform force distribution. The Arai and Appel references are evidence of non-obviousness, not obviousness, and the Board's unpatentability decision should be reversed.

Dated: June 18, 2018

Respectfully submitted,

*/s/ Mark A. Hannemann*

Mark A. Hannemann
Thomas R. Makin
Patrick R. Colsher
Eric S. Lucas
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Tel: (212) 848-4000
Fax: (646) 848-7696

Ksenia Takhistova
HUNTON ANDREWS KURTH LLP
One Broadway
New York, NY 10004
Tel. (212) 425-7200

# ADDENDUM

Trials@uspto.gov
Tel: 571-272-7822

Paper 68
Entered: March 30, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

COSTCO WHOLESALE CORP.,
Petitioner,

v.

ROBERT BOSCH LLC,
Patent Owner.

---

Case IPR2016-00038
Patent 6,292,974 B1

---

Before PHILLIP J. KAUFFMAN, WILLIAM V. SAINDON, and BARRY L. GROSSMAN, *Administrative Patent Judges*.

KAUFFMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION

*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

## A. OVERVIEW

Costco Wholesale Corp. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, and 8 of U.S. Patent No. 6,292,974 B1 (Ex. 1001, "the '974 patent"). Pet. 1. Robert Bosch LLC ("Patent Owner") filed a Preliminary Response (Paper 15, "Prelim. Resp.") to the Petition. We instituted *inter partes* review of claims 1, 2, and 8. Paper 16 ("Dec.").

We discuss preliminary matters, such as motions, in Section II below.

We held an oral hearing on January 18, 2017. *See* Paper 66 ("Tr."); *see also* Ex. 1206 (Petitioner's transcript errata).

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, and 8 the '974 patent are unpatentable.

## B. RELATED PROCEEDINGS

The parties indicate that the '974 patent is at issue in: *Robert Bosch LLC v. Alberee Products Inc. et al.*, No. 12-574-LPS (consolidated with No. 14-142-LPS) (D. Del.) ("the related litigation"). Pet. 1; Paper 5, 1.

The parties are currently involved in the following *inter partes* proceedings ("these proceedings"):

| Case # | U.S. Patent # | Abbreviation |
|---|---|---|
| IPR2016-00034 | 6,973,698 | "the '698 patent" |
| IPR2016-00036 | 6,944,905 | "the '905 patent" |
| IPR2016-00038 | 6,292,974 | "the '974 patent" |
| IPR2016-00039 | 7,228,588 | "the '588 patent" |
| IPR2016-00040[1] | 7,484,264 | "the '264 patent" |
| IPR2016-00041 | 8,099,823 | "the '823 patent" |

Two of the patents at issue in these proceedings, the '905 patent and the '974 patent, were at issue in prior litigation between Patent Owner and Pylon Manufacturing Corporation. Paper 36, 2. *Robert Bosch LLC v. Pylon Manufacturing Corporation* (D. Del., Case No. 08-542 (SLR)) ("the Pylon litigation"). *See* Paper 35, 1.

In these proceedings, sometimes a party submitted an identical paper or exhibit in all of the proceedings even though that paper or exhibit may not be applicable, or applies in a different manner, to a particular proceeding. At other times, we are able to apply the analysis of one proceeding to another.

[1] The '264 patent (IPR2016-00040) is a division of the application that became the '588 patent (IPR2016-00039). IPR2016-00040, Ex. 1001, 1 (62). The remaining patents are not related.

C. EVIDENCE AND ASSERTED GROUNDS OF UNPATENTABILITY

Petitioner asserts that the challenged claims are unpatentable under the following grounds:

| **Claims Challenged** | **§** | **References(s)** |
|---|---|---|
| 1, 2, 8 | 103(a) | Prohaska[2] and Appel[3] |
| 1, 2, 8 | 103(a) | Prohaska and Hoyler[4] |

Pet. 3.

## II. PRELIMINARY MATTERS

A. PETITIONER'S MOTION TO STRIKE AND MOTION TO EXCLUDE

These Motions deal with Exhibits 2005 and 2007. Exhibit 2005 is a transcript from the Pylon litigation between Patent Owner and a third party, and a portion of the transcript includes the testimony of Mr. Merkel, a named inventor on the '974 patent.[5] Paper 35, 1; Ex. 1001, [75]. Exhibit 2007 is the Declaration of Martin Kashnowski, a Robert Bosch LLC employee. Ex. 2007 ¶ 1. Patent Owner filed both Exhibits in conjunction with Patent Owner's Response as evidence relating to secondary considerations. *See* PO Resp. 7–15.

---

[2] U.K. Patent Application No. GB 2 106 775 A, published Apr. 20, 1983 (Ex. 1004).

[3] U.S. Patent No. 3,192,551, issued July 6, 1965 (Ex. 1005).

[4] German Patent No. 1,028,896, published June 24, 1954 (Ex. 1006). The certified English translation begins at page 6.

[5] At times, the questioner mistakenly refers to the '974 patent as the '947 patent. *See, e.g.*, Ex. 2005, 226:3, 234:18.

In the Motion to Strike, Petitioner contends that we should strike Mr. Merkel's trial testimony from the Pylon litigation as a matter of routine discovery because Patent Owner did not make Mr. Merkel available for cross-examination.[6] Paper 35, 1–5 (citing 37 C.F.R. §§ 42.12, 42.51–53). We deal with the hearsay issue Petitioner raises in the Motion to Strike (Paper 35, 5, n.2) in the analysis of Petitioner's Motion to Exclude.

In the Motion to Exclude, Petitioner seeks to exclude: (1) Mr. Merkel's former trial testimony (Ex. 2005, 210–264), (2) portions of Mr. Kashnowski's testimony (Ex. 2007 ¶ 6, second, third, and fourth sentences), and (3) those portions of Patent Owner's Response that rely on evidence that is excluded. Paper 50, 1–2.

The background section that follows pertains to both Motions. For the reasons that follow, both motions are *denied.*

*1. Background*

On April 15, 2010, in Wilmington, Delaware, Mr. Merkel testified in the Pylon litigation. Paper 35, 1; Paper 60, 3; Ex. 1106, Tab A, ¶ 4. Mr. Merkel was then living in Germany and was an employee of Robert Bosch Gmbh, Patent Owner's parent company. Ex. 2005, 210:4–211:3. English is a second language for Mr. Merkel and he testified with the aid of a translator. *Id.*

---

[6] Exhibit 2005 has native page numbers (129–393) one line down from the top right corner, and exhibit page numbers (1–265) in the lower right corner. For example, the first page of the exhibit has native page 129 and exhibit page number 1. For consistency, we reference exhibit page numbers. Where a party cites to native page numbers, we convert to exhibit page numbers.

On July 22, 2016, Patent Owner submitted, as evidence related to secondary considerations, a transcript from the Pylon litigation that includes the testimony of Mr. Merkel (Ex. 2005) and a declaration from Mr. Kashnowski (Ex. 2007). *See* PO Resp. 7–15.

On July 29, 2016, Petitioner objected to Exhibits 2005 and 2007 on several grounds, including hearsay under Federal Rules of Evidence 801–804.[7] Paper 29, 2, 4; Paper 35, 1–2; Paper 50, 2–4.

On August 12, 2016, in response to those objections, Patent Owner served (on Petitioner), as supplemental evidence, a declaration from Mr. Merkel regarding his availability. Paper 36, 1; Ex. 1106 ¶ 4. Mr. Merkel states that he is a former employee of Patent Owner's parent company Robert Bosch GmbH, and currently lives in Germany. Ex. 1106, Tab A ¶¶ 1–3; *see also* Paper 5, 1 (regarding parent company). Mr. Merkel states that he will not voluntarily give a deposition in this case because of his cardiac health. Ex. 1106, Tab A ¶¶ 5–6. Subsequently, Petitioner filed Mr. Merkel's Declaration as Tab A of Exhibit 1106, following which Patent Owner filed a copy as Exhibit 2021.

During discussion of the matter, Patent Owner proposed that Mr. Merkel answer written questions, and Petitioner declined, seeking cross-examination in person. *See* Paper 35, 2; Ex. 1106 ¶ 6; Ex. 1106, Tab C, 12. Subsequently, Petitioner asked that Patent Owner voluntarily withdraw Mr. Merkel's testimony, and Patent Owner declined. Paper 35, 2; Ex. 1106, Tab E, 31. Following this, Petitioner requested a conference call with the

---

[7] The objections were filed within five business days of service of Patent Owner's Response and Exhibit 2005. *See* 37 C.F.R. § 42.64(b).

Board and asked that either: (1) Mr. Merkel be made available for cross-examination or (2) the Board authorize a Motion to Strike Mr. Merkel's testimony. Paper 35, 2. During the call, Counsel for Patent Owner represented that, prior to creating Mr. Merkel's Declaration that was served as supplemental evidence, Patent Owner had not contacted Mr. Merkel in years. Ex. 1106 ¶ 3. We authorized Petitioner to file a Motion to Strike and authorized Patent Owner to file a response. Paper 31.

2. *Analysis of Motion to Strike*

Petitioner cites to our rules in support of the contention that, as a matter of routine discovery, we should strike Mr. Merkel's testimony from the Pylon litigation (Ex. 2005) because Patent Owner did not make Mr. Merkel available for cross-examination. Paper 35, 1. Patent Owner counters, and we agree, that the testimony at issue is not "affidavit testimony prepared for the proceeding" as recited in 37 C.F.R. § 42.51(b)(1)(ii); rather, the testimony at issue is Mr. Merkel's trial testimony from earlier District Court litigation. Paper 36, 3–4.

Petitioner also makes three similar assertions, with supporting case citations, that striking Mr. Merkel's testimony is warranted because Patent Owner did not make Mr. Merkel available for in-person cross-examination. Paper 35, 3–5. All of the cases cited by Petitioner are routine, non-precedential decisions.[8]

---

[8] *See* Standard Operating Procedure 2, ¶ III.E (Revision 9) (stating that in contrast to a routine opinion, a precedential opinion "is binding authority in subsequent matters involving similar facts or issues").

First, Petitioner contends that a party must make a witness available when proffering that witness's testimony. *See* Paper 35, 3 (citing *HTC Corp. v. NFC Technology, LLC*, Case IPR2014-01198, slip op. at 3 (PTAB Nov. 6, 2015) (Paper 41) and *Square Inc. v. REM Holdings 3, LLC*, Case IPR2014-00312, slip op. at 2–3 (PTAB Dec. 9, 2014) (Paper 37)); *see also* Paper 35, 2 (citing *Square Inc* for the proposition that Petitioner is entitled to cross-examination). In *HTC Corp.*, the Board expunged a declaration from a nonparty witness where that witness declined cross-examination for "personal reasons" and caused considerable delay in the proceeding. *HTC Corp.*, slip op. at 1–5. The case at hand is distinguishable in several respects: the document at issue is a trial transcript rather than a declaration, Mr. Merkel is unavailable based on an alleged medical condition rather than "personal reasons," and Petitioner does not allege that Mr. Merkel caused delay in this proceeding. *See id.* In *Square Inc.*, where the witness was outside the United States, the Board determined that cost alone was not a sufficient reason to preclude in-person cross-examination. *Square Inc.*, slip op. at 2–3. Here, in contrast, cost is not the sole issue; it is uncontested that the witness (Mr. Merkel) is unavailable due to a medical condition that allegedly precludes travel.

Second, Petitioner contends that submittal of Mr. Merkel's testimony subjects him to cross-examination, adding that this point is reinforced by Patent Owner "having submitted an affidavit from Mr. Merkel" in these proceedings. Paper 35, 4 (citing *IBG LLC v. Trading Techs. Int'l, Inc.*, Case CBM2015-00179, slip op. at 2–3 (PTAB Apr. 15, 2016) (Paper 39)). To the extent that Petitioner suggests that Patent Owner filed Mr. Merkel's Declaration in this proceeding, that is incorrect. As explained above, Patent

Owner served that Declaration as supplemental evidence, and Petitioner, not Patent Owner, filed it as an exhibit (Tab A of Ex. 1106). Patent Owner's service of Mr. Merkel's Declaration as supplemental evidence was not improper.

We disagree with Petitioner's characterization of *IBG* and with the assertion that the holding is applicable to this case. In *IBG*, as the sole evidence that a reference was prior art, the petitioner submitted a witness's deposition testimony from prior litigation between the patent owner and a third party. *IBG*, slip op. at 1–2. The Board determined that it was the petitioner's responsibility to produce the witness for cross-examination, and the Board cautioned, that if not produced, the witness's availability would be considered when weighing his deposition. *Id.* at 3. Consequently, *IBG* does not stand for the proposition that if a party fails to produce a witness for cross-examination the deposition of that witness will be stricken or excluded; rather, the Board stated that such failure would impact the weight afforded that evidence, not its admissibility. Further, *IBG* is distinguishable from the case at hand in that in *IBG* the petitioner made an assertion that the witness was "unavailable," but the Board did not make such a finding, and here, it is uncontested that the witness is unavailable.[9] *Id.*

Third, Petitioner asserts that because the routine discovery period is closed and Patent Owner failed to make Mr. Merkel available, Mr. Merkel's testimony from earlier District Court litigation "must be stricken, expunged from the record, and given no weight." Paper 35, 4–5 (citing *IBG* and three

---

[9] In *IBG* the evidence at issue was a deposition rather than trial testimony.

other Board decisions). We address *IBG* above. The remaining three cases are distinguishable for the reasons that follow.

*Arisdyne* is distinguishable in that it dealt with the highly unusual situation of live testimony before at least one member of the panel. *Id.* at 1–2. *Arisdyne Sys., Inc. v. Cavitation Tech., Inc.*, Case IPR2015-00977, slip op. at 2–3 (PTAB Dec. 15, 2015) (Paper 32).

In *John's Lone Star,* the petitioner submitted affidavit testimony from a witness triggering cross-examination under 37 C.F.R. § 42.51(b)(1), and because petitioner did not make that witness available for cross-examination, the Board expunged that testimony. *John's Lone Star Distrib., Inc. v. Thermolife Int'l, Inc.*, Case IPR2014-01201 (PTAB May 13, 2015) (Paper 31). As noted above, Mr. Merkel's testimony from earlier District Court litigation is not in the form of affidavit testimony and does not trigger 37 C.F.R. § 42.51(b)(1).

*Ikaria* is distinguishable in that it was an unopposed motion to expunge. *Ikaria, Inc. v. Geno LLC,* Case IPR2013-00253 (PTAB Apr. 24, 2014) (Paper 22).

Petitioner has not persuaded us that expunging Mr. Merkel's testimony from the Pylon litigation is warranted as a matter of routine discovery. *See* 37 C.F.R. §§ 42.20(c), 42.22.

*3. Analysis of Motion to Exclude*

As stated above, Petitioner seeks to exclude: (1) Mr. Merkel's former trial testimony (Ex. 2005, 210–264), (2) portions of Mr. Kashnowski's testimony (Ex. 2007 ¶ 6, second, third, and fourth sentences), and (3) those portions of Patent Owner's response that rely on evidence that is excluded. Paper 50, 1–2.

*a) Mr. Merkel's former testimony*

Petitioner argues that, "the deadline for Patent Owner to submit supplemental evidence passed on August 12, 2016." Paper 50, 9–10. To the extent that Petitioner suggests it was improper for Patent Owner to submit Mr. Merkel's Declaration with Patent Owner's Opposition to Petitioner's Motion to Exclude, we disagree. As explained above, Patent Owner timely served Mr. Merkel's Declaration on Petitioner as supplemental evidence, and Petitioner filed Mr. Merkel's Declaration as Tab A of Exhibit 1106. *See* 37 C.F.R. § 42.64(b)(1).

Petitioner contends that the "Board does not even have the power to review this exhibit because it is neither an 'affidavit' nor a 'deposition transcript.'" Paper 50, 5 (citing 37 C.F.R. §§ 42.12, 42.53(a), 42.53(f)(7), 42.61(a), and 42.104(b)(5); Paper 64, 2).

We disagree. Petitioner's contention based on our rules does not belong in a Motion to Exclude because a Motion to Exclude deals with the admissibility of evidence under the Federal Rules of Evidence. *See* 37 C.F.R. §§ 42.62 (applying the Federal Rules of Evidence to *inter partes* reviews), 42.64; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,758 (August 14, 2012) ("Admissibility of evidence is generally governed by the Federal Rules of Evidence."). As stated in the Office Patent Trial Practice Guide, the parties may submit motions to exclude regarding evidence "believed to be inadmissible." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,758. Further, a motion to exclude "must explain why the evidence is not admissible (*e.g.*, relevance or hearsay)." *Id.* at 48,767. Even considering Petitioner's contention based on our rules, for the reasons given by Patent Owner (Paper 60, 2–3), § 42.53(a) applies to testimony taken for

the proceeding at hand and does not preclude our consideration of Mr. Merkel's prior testimony in litigation. Paper 60, 2–3.

The testimony in question is hearsay because Mr. Merkel's testimony in the Pylon litigation was not made while testifying at the current proceeding, and is being offered to prove the truth of the matter asserted.[10] Fed. R. Evid. 801(c); Paper 50, 6–7. Consequently, this testimony is inadmissible unless an exception applies. Fed. R. Evid. 802. Patent Owner contends that the exception of Federal Rule of Evidence 804(b)(1) applies, and Petitioner contends that it does not. *See* Paper 50, 8–12; Paper 60, 3–7; Paper 64, 1–3.

Petitioner does not disputed that Mr. Merkel is unavailable due to an infirmity or physical illness, namely his cardiac health.[11] Paper 60, 3–4; Ex. 1106, Tab A ¶¶ 5–6; Fed. R. Evid. 804(a)(4). Further, it is undisputed that the testimony at issue was given by a witness at trial. Fed. R. Evid. 804(b)(1)(A). Therefore, the focus of our inquiry is whether Pylon had an opportunity and similar motive to develop Mr. Merkel's testimony through cross-examination as Petitioner does in this proceeding. Patent Owner, as the proponent of former testimony, bears "the burden of establishing that [the transcript] came within the former testimony hearsay exception." *See generally, United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006) (citation omitted); *see also, e.g., United States v. Omar*, 104 F.3d 519, 522

---

[10] Regarding the matter asserted in the proffered testimony, *see* PO Resp. 9–11.

[11] Patent Owner asserts, and we agree, that on this preliminary question of the admissibility of Exhibit 2005, we may consider Mr. Merkel's Declaration. Paper 60, 4; Fed. R. Evid. 104(a).

(1st Cir. 1997) ("And, the evidence in question being hearsay, it was the defendants' burden to prove each element of the [804(b)(1)] exception they invoked.").

Petitioner contends that Patent Owner cannot demonstrate that the exception of Fed. R. Evid. 804(b)(1) applies because there is not sufficient identity of issues between the Pylon litigation and the proceeding at hand. Paper 50, 10. In particular, Petitioner emphasizes Mr. Merkel's failure to mention any prior art references. *Id.* Further, according to Petitioner, the Pylon litigation was primarily interested in derivation. *Id.*

Patent Owner contends that Pylon had a like opportunity and motive. Paper 60, 3 (citing *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978); *Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc.*, 71 F.3d 119, 128 (4th Cir. 1995); *Clay v. Johns–Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983)). In particular, Patent Owner asserts that Pylon was asserting the obviousness of Patent Owner's patents, to include the '974 patent, and some of the same prior art overlaps with this proceeding. *Id.* at 5; Ex. 2005, 22:2–3. Patent Owner contends that Mr. Merkel's testimony is offered to prove that:

> (i) no commercially viable beam blades existed before 2002, when Bosch satisfied the long-felt need for them, (*id.* at 218:16–220:2); (ii) Bosch's first commercial beam blade (Aerotwin) and later product (Icon) practice the challenged claims, (*id.* at 225:22–226:1); (iii) these blades included a flexible spoiler with diverging legs mounted on top of the blade, as well as plastic end caps, (*id.* at 231:12–232:4); and (iv) beam blades are sensitive to changes caused by adding structures, (*id.* at 260:23–263:8).[12]

[12] This quote was altered by converting native page numbering to exhibit numbering.

Paper 60, 5. According to Patent Owner, this evidence was relevant in the Pylon litigation for the same reason it is relevant here, as objective evidence of non-obviousness regarding consequences of modifications to beam blades. *Id.* at 6.

In response, Petitioner makes several contentions in support of the argument that Patent Owner has not demonstrated that Pylon was a "predecessor in interest" that had an opportunity and similar motive to develop what Petitioner would have sought to develop on cross-examination of Mr. Merkel in this case. Paper 64, 1–3. First, Petitioner contends that Mr. Merkel's assertion could have been presented by "any number of witnesses." Paper 64, 1. This contention is not a factor for consideration under Fed. R. Evid. 804(b)(1).

Second, Petitioner repeats the appeal to 37 C.F.R. § 42.53(a). Paper 64, 2. This contention is unpersuasive for the reasons given above.

Third, Petitioner asserts that Patent Owner had a powerful motive to shield Mr. Merkel from cross-examination because Mr. Merkel was found to have falsely taken credit for subject matter conceived by a third party. Paper 64, 2 (citing *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 775 F. Supp. 2d 739, 745 (D. Del. 2011) ("Merkel and Leutsch committed a material omission by presenting Fehrsen's ideas as their own during the prosecution of the '974 patent . . . .")).[13] This factor is also not relevant to our inquiry under Fed. R. Evid. 804(b)(1).

Fourth, Petitioner emphasizes that the Pylon litigation took place in 2010 and Petitioner's opportunity for cross-examination would have been in

[13] Notably, Petitioner does not make this argument in the Reply (Paper 33).

2016. Paper 64, 2–3. Petitioner adds that Patent Owner engaged in a "pattern of discovery misconduct" during the related litigation. *Id.* at 3 (citing *Robert Bosch LLC v. Alberee Products, Inc.*, 171 F. Supp. 3d 283, 291–92 (D. Del. 2016)).

The passage of time is not directly relevant to our inquiry. What matters, as stated above, is whether Pylon had opportunity and similar motive to develop Mr. Merkel's testimony through cross-examination.

Regarding the alleged pattern of misconduct, in the related litigation, the Court stated

> [a]mong the issues that have been repeatedly addressed are the failure of Bosch LLC to produce discovery ordered by the Court, for reasons including Bosch LL's insistence that the documents are in the control of its parent Bosch GmbH and Bosch GmbH for some time refused to provide them to Bosch LLC.

*Bosch LLC*, 171 F.Supp3d at 292 (citing D.I. 285 at 1).[14] The Court went on to state that Bosch LLC (Patent Owner) failed to comply with a discovery order and that Costco (Petitioner) was entitled to some relief, and the court authorized Costco to file a motion to dismiss as a sanction for Bosch LLC's (Patent Owner's) conduct. *Id.* at 292–293. Petitioner does not provide argument or evidence regarding subsequent action in this case.

The question at hand is whether Pylon had opportunity and similar motive to develop Mr. Merkel's testimony through cross-examination. Petitioner has failed to explain cogently how Patent Owner's misconduct during discovery in the related litigation is relevant to that inquiry.

---

[14] "D.I." refers to C.A. No. 12–574–LPS. *See Bosch LLC*, 171 F.Supp3d at 285, n. 1.

Petitioner contends that the prosecution history of the ’974 patent undermines Mr. Merkel’s prior testimony. Paper 50, 6–7. Even if the prosecution history contradicts Mr. Merkel’s testimony, that does not render Mr. Merkel’s testimony inadmissible.

We agree with Patent Owner that Mr. Merkel’s testimony in the Pylon litigation relates to secondary considerations and that those same secondary considerations are at issue here as well.

We agree with Patent Owner that the presence of the defense of derivation in the Pylon litigation did not negate Pylon’s motive and opportunity to cross-examine Mr. Merkel with regard to the obviousness of the claimed subject matter. Paper 60, 7.

In light of this, Mr. Merkel’s former trial testimony is admissible under Federal Rule of Evidence 804(b)(1). Consequently, Petitioner has not persuaded us that Mr. Merkel’s testimony should be excluded. *See* 37 C.F.R. §§ 42.20(c), 42.22.

Patent Owner also asserts that Mr. Merkel’s testimony is admissible under the residual hearsay exception. Paper 60, 8. We agree with Petitioner that Patent Owner has failed to demonstrate that the evidence “is more probative on the point[s] for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.” Paper 64, 3–4. Fed. R. Evid. 807(a)(3).

*b) Mr. Kashnowski’s testimony*

Petitioner seeks to exclude Mr. Kashnowski’s testimony as inadmissible on two bases: (1) under 37 C.F.R. §§ 42.61, 42.65, and (2) as hearsay. Paper 50, 12–15; Paper 64, 4–5.

*(1) 37 C.F.R. § 42.65*

Petitioner contends that Mr. Kashnowski's testimony (Ex. 2007 ¶ 6 second, third, and fourth sentences) deals with test results, but Patent Owner does not provide the information required by 37 C.F.R. § 42.65(b), rendering the testimony inadmissible under 37 C.F.R. § 42.61(a). Paper 50, 12–14.

Paragraph 6 of Mr. Kashnowski's Declaration, with the sentences at issue underlined, follows:

> Both the Aerotwin blade and the Icon blade included a flexible spoiler with diverging legs mounted on the top of the blade, as well as plastic end caps. Bosch tested these products extensively before releasing them. One aspect tested was noise. The Bosch beam blades were quiet in operation, including when the wiping direction changes and the wiper strip flips from one side to the other. Those features were part of the reason for the great customer demand for these products. Both products solved many of the problems associated with conventional blades.

Rule 42.65 does not apply because Mr. Kashnowski's testifies as a factual witness, not as an expert. *See* 37 C.F.R. § 42.65 ("Expert Testimony; tests and data"); Paper 60, 10 (asserting the Mr. Kashnowski is a factual witness). Nor is the testimony at issue an attempt to submit expert testimony by a factual witness. *See* Paper 60, 10–11 (explaining the context of the evidence). Patent Owner relies on the evidence in the following manner:[15]

> Bosch tested these products extensively before releasing them. Ex. 2007 at ¶ 6. One aspect tested was noise. Ex. 2007 at ¶ 6. The Bosch beam blades were quiet in operation, including

[15] Patent Owner also relies on the first sentence of paragraph 6 of Exhibit 2007 in support of the assertion that the Aerotwin and Icon blades practice the challenged claims. *See* PO Resp. 11. We need not address this evidence because Petitioner does not challenged the first sentence of paragraph 6 of Exhibit 2007.

> when the wiping direction changes and the wiper strip flips from one side to the other. Ex. 2007 at ¶ 6.

PO Resp. 11–12. Patent Owner is not utilizing Mr. Kashnowski's testimony to explain the details of a technical test or data. Rather, Patent Owner utilizes this evidence to support the more generalized contention that the products were tested to reduce noise.[16]

Patent Owner goes on to assert that,

> These features were part of the reason for the great customer demand for these products. Ex. 2007 at ¶ 6; Ex. 2005 at 270:14–271:3. Both products solved many of the problems associated with conventional blades. Ex. 2007 at ¶ 6.

*Id.* at 12. These assertions pertain to the fifth and sixth sentences of paragraph 6 of Exhibit 2007, sentences that are not challenged by Petitioner. *See* Paper 50, 2 (specifically identifying the second, third, and fourth sentences). Even if Petitioner intended to seek exclusion of the fifth and sixth sentences, our analysis above is equally applicable.

Petitioner has not persuaded us that Rule 42.65 prohibits use of evidence in this manner or is an improper attempt to skirt that rule.

*c) Hearsay*

Petitioner contends that

> Mr. Kashnowski's testimony regarding wiper testing and consumer demand in paragraph 6 of his declaration constitutes inadmissible hearsay because it conveys "a statement" made by a declarant who is not "testifying at the current trial or hearing,"

---

[16] *3D-Matrix* is distinguishable in that there the proffering party sought to submit what amounted to expert testimony. *3D-Matrix Ltd. v. Menicon Co.*, Case IPR2014-00398, slip op. at 7–9 (PTAB Aug. 1, 2014) (Paper 11) (discussing a calculation of the pH level of acidic and amino acid residue).

> and it is offered by Patent Owner "in evidence to prove the truth of the matter asserted in the statement."

Paper 50, 14 (citing Fed. R. Evid. 801(c)). In particular, Petitioner asserts that the evidence does not establish that Mr. Kashnowski actually observed the test, and that Mr. Kashnowski's statement may simply be repeating what he was told by another. *Id.* 14–15.

Mr. Kashnowski's statement was made while testifying in the current proceeding. Mr. Kashnowski's statement is silent regarding how the information was obtained, and does not explicitly repeat the statement of another. Regarding the lack of information that Mr. Kashnowski observed the tests, although Petitioner objected under Fed. R. Evid. 602, Petitioner did not preserve that objection by asserting that rule in the Motion to Exclude. *See* Paper 29, Paper 50, 14–15 (not asserting Fed. R. Evid. 602); Paper 60, 12; 37 C.F.R. § 42.64(c).

Consequently, Petitioner has not demonstrated effectively that the testimony at issue is inadmissible hearsay.

#### *d) Related Portions of Patent Owner's Response*

Given that we deny Petitioner's Motion to Exclude with regard to Mr. Merkel's testimony and Mr. Kashnowski's Declaration, there are no associated portions of Patent Owner's Response to consider for exclusion.

### B. Patent Owner's Motion to Exclude

Exhibit 1100 is the Declaration of David Peck.

Petitioner served and filed the Declaration of David Peck (Ex. 1100) on October 24, 2016, in conjunction with Petitioner's Reply. Within five business days, on October 31, 2016, Patent Owner objected for several

reasons, including Federal Rules of Evidence 701 and 702. *See* Paper 37, 1–2; Pet Reply, 24 (Certificate of Service); 37 C.F.R. § 42.64(b)(1). Petitioner does not challenge the timeliness or specificity of Patent Owner's objections. *See* Paper 57; 37 C.F.R. § 42.64(b)(1).

*1. Person of Ordinary Skill at the Time*

Patent Owner seeks to exclude paragraphs 7, 9–11, 18, 19, 21, and 23–26 because, according to Patent Owner, Mr. Peck is not qualified to give technical expert opinions regarding a person of ordinary skill in the art at the time of the invention. Paper 49, 1–4. In support, Patent Owner contends that: Mr. Peck's Declaration does not address the level of skill in the art, Mr. Peck's experience began after the critical data of the '974 patent, and Mr. Peck has never been a wiper-blade designer to include beam style wipers. Paper 49, 2–4.

Petitioner counters that Mr. Peck has a Bachelor of Science in mechanical engineering and has held various automotive engineering roles. Paper 57, 1. Petitioner enumerates other experience, and concludes that Mr. Peck qualifies to testify in the form of an opinion regarding windshield wiper design under Fed. R. Evid. 702. *Id.* Reviewing this evidence, we are persuaded that Mr. Peck's qualifications align with the challenged subject matter sufficiently so that his knowledge is helpful in understanding the evidence and determining facts in issue. *See* Ex. 1100, 3, 15–19.

Patent Owner responds that Petitioner ignores the distinction between beam and conventional wipers. Paper 63, 1–3. Patent Owner adds that Mr. Peck's only experience with beam wipers is an explanation from a third party (Mr. Swanepoel) regarding how certain beam wiper design software works. *Id.* at 3.

We find Petitioner's argument more persuasive and adopt it here. *See* Paper 57, 1–10. In particular, we emphasize that Mr. Peck need not be a person of ordinary skill in the art to testify as an expert under Federal Rule of Evidence 702. Nor must his qualifications perfectly match the patent at issue.

*2. Financial Issues, Commercial Success, or Consumer Demand*

Patent Owner seeks to excludes paragraphs 15, 18, and 21 of Exhibit 2007 because, according to Patent Owner, Mr. Peck is mechanical engineer with experience in designing wiper-blade production equipment, but is not qualified to give exert opinions regarding financial issues, commercial success, or consumer demand. *Id.* at 5–6. Patent Owner's observation that Mr. Peck is mechanical engineer with experience in designing wiper-blade production equipment supports our determination in the previous section.

Patent Owner is correct that there are situations where expert testimony should be excluded due to a lack of expertise in the matters asserted. This is not such a case.

Paragraph 18 of Mr. Peck's Declaration describes wiper noise testing procedures, not a matter related to financial issues, commercial success, or consumer demand. *See* Paper 57, 11 (asserting that the paragraphs at issue do not deal with finance or marketing). The remaining paragraphs deal with issues of finance, commercial success, or consumer demand, but not in a complicated or technical manner. In paragraph 15 Mr. Peck states that the Trico Innovision Wiper was a success rather than a failure as illustrated by a demand sufficient to trigger increased production. In paragraph 21 Mr. Peck states that one of the most important sources of wiper noise is blade reversal failure and this noise is most important to customers. These statements are

straightforward assertions that do not require specialized financial, commercial success, or consumer demand expertise. Further, we agree with Petitioner that the information conveyed is properly based on facts or data Mr. Peck was made aware of or personally observed. *See* Paper 57, 11–12; Fed. R. Evid. 703.

### *3. Conclusion*

Consequently, Patent Owner's Motion to Exclude portions of Mr. Peck's Declaration (Ex. 1100 ¶¶ 7, 9–11, 15, 18, 19, 21, and 23–26) is *denied.*

## C. MOTIONS FOR OBSERVATION

Patent Owner submitted a Motion for Observation on Cross-examination of Mr. Davis, and Petitioner submitted a response. Papers 51, 56. Patent Owner submitted a motion for Observation on cross-examination of Mr. Peck, and Petitioner submitted a response. Papers 52, 59. Generally, we are persuaded by each of Petitioner's responses. We considered both sets of observations in making our analysis below.

# III. THE CLAIMED SUBJECT MATTER

## A. ILLUSTRATIVE CLAIM

Claim 1 is the sole independent challenged claim and follows:

> 1. A wiper blade for windows of motor vehicles, comprising
>
> a curved, band-shaped, spring-elastic support element which distributes a pressure applied by a wiper arm and has a concave and a convex surface which defines corresponding planes;

> an elongated rubber-elastic wiper strip placeable on a window to be wiped and mounted to said concave surface of said support element which faces the window, substantially longitudinally parallel to said concave surface;
>
> a connection device provided for a wiper arm and arranged directly on a convex side of said support element; and
>
> a component which is separate from said wiper strip and is mounted directly to the convex surface of said support element so as to form a leading-edge face extending in a longitudinal direction of the support element and forming, as seen crosswise to its longitudinal extension, an acute angle with a plane which extends parallel to a plane formed by said convex surface.[17]

## B. Claim Interpretation

In an *inter partes* review, we interpret the claims of an unexpired patent using the broadest reasonable construction. *See* 37 C.F.R. § 42.100(b). In our Institution Decision, we did not expressly construe any claim term. Dec. 7–9. During the trial, the parties did not expressly construe any claim term, nor ask that we do so. *See* Pet. Reply, *passim*; PO Resp., *passim*. In light of this, we do not expressly construe any claim term. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy).

[17] Formatting added for clarity.

# IV. PATENTABILITY

## A. Scope of Reply

Patent Owner contends that portions of Petitioner's Reply are improper, and consequently, the Board should not consider those portions. Paper 55. Petitioner disagrees. Paper 58.

In our order authorizing submittals on this issue, we informed the parties that a portion of Petitioner's Reply is improper if: (1) that portion is beyond the scope of a reply under 37 C.F.R. § 42.23(b), or (2) Patent Owner did not have sufficient notice and opportunity to respond (*see, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) (applying a similar standard in *inter partes* review as in prosecution: "this court has determined whether the Board relied on a 'new ground of rejection' by asking 'whether applicants have had fair opportunity to react to the thrust of the rejection.'")). *See* Paper 43. In the discussion below, we apply that standard, and address each of Patent Owner's contentions.

## B. Credibility of Dr. Davis

Patent Owner contends that the opinions of Petitioner's technical expert, Dr. Davis, are not credible for two reasons. PO Resp. 15–19. Petitioner disagrees. Pet. Reply. 20–22. We examine Patent Owner's contentions in turn.

### *1. Alleged Failure to Admit Certain Facts*

It is undisputed that Dr. Davis's Curriculum Vitae (CV) does not mention producing a report for Patent Owner related to the '698 patent in

2013 during an ITC investigation ("the 2013 ITC report").[18] *See* PO Resp. 15–16; Pet. Reply 20–22. It is undisputed that Dr. Davis's Declaration in IPR2016-00034[19] copies some portion of Dr. Davis's 2013 ITC report.[20] PO Resp. 16; Pet. Reply 20–22. Dr. Davis stated during his deposition that the declarations submitted in these proceedings were his own work produced by someone else typing his thoughts, with revisions by himself alone or in coordination with others. *See* Ex. 2002, 5:17–7:2; PO Resp. 17. When asked if he could recall work on other earlier proceedings related to the '698 patent, he indicated that he remembered looking at that patent "like five years ago," but did not recall his opinions from that time. *See* Ex. 2002, 102:2–11; PO Resp. 17.

Patent Owner contends that if Dr. Davis does not recall his opinions from the 2013 ITC report when he just copied a large portion of that report into his Declaration for IPR2016-00034, then "his memory is too poor for his opinions to be relied upon." PO Resp. 18. Alternatively, Patent Owner contends that if someone else prepared the Declaration at issue, then Dr. Davis was not candid during his deposition when he said he prepared the Declaration, and for that reason, his opinions should not be relied upon. *Id.*

---

[18] Patent Owner cites to a portion of Dr. Davis's CV at pages 43–44 of Exhibit 1013 of IPR2016-00034, and that same portion is also found at pages 31–32 of Exhibit 1008 of this proceeding.

[19] Exhibit 1013 in that proceeding.

[20] A portion of Dr. Davis's Declaration in IPR2016-00034 (Exhibit 1013) is filed as Exhibit 2013 in this proceeding, and portions of Dr. Davis's 2013 ITC report are filed as Exhibit 2010.

Dr. Davis's statement that the 2013 ITC report was produced, "like five years ago," indicates that the period provided is a rough estimate. In that context, the difference between the estimate of five years and the actual time of approximately three years does not cast appreciable doubt on Dr. Davis's credibility. Further, Dr. Davis's inability to remember his opinions regarding the '698 patent related to the 2013 ITC report even when he had copied a portion of that report for the Declaration submitted in IPR2016-00034, casts little or no doubt on his credibility. There were "quite a few" earlier ITC investigations, so that the report in question was one of several reports. *See* Ex. 2002, 101:20–25. Further, as Patent Owner acknowledges, the 2013 ITC report and the Declaration at issue differ in that indefiniteness was an issue in the ITC report, but no ground of unpatentability presented in this proceeding is based on indefiniteness.

We agree with Petitioner that Dr. Davis's deposition testimony is consistent with the fact that portions of his 2013 ITC report were included in the declaration submitted in IPR2016-00034. Pet. Reply 21.

*2. Alleged Incomplete Disclosure*

Patent Owner contends it is unclear that all information inconsistent with Dr. Davis's opinions has been provided as required by 37 C.F.R. § 42.51(b)(1)(iii). PO Resp. 18. As an example of an inconsistency, Patent Owner mentions that Dr. Davis expressed no difficulty understanding the claims of the '698 patent in his Declaration, yet, in the 2013 ITC report Dr. Davis opines that those same claims are indefinite (*i.e.*, not understandable). *Id.* at 18–19. Patent Owner has not explained cogently how Dr. Davis's understanding of the '698 patent at issue in IPR2016-00034 impacts Dr. Davis's credibility in the case at hand. *See* Pet. Reply 21–22

(arguing that Dr. Davis's opinion regarding patents other than the patent at issue in this proceeding is immaterial).

*3. Conclusion*

The factors discussed above detract somewhat from Dr. Davis's testimony, but not so much to warrant that we give his testimony overall little or no weight. Our analysis below reflects this determination.

## C. LEVEL OF SKILL IN THE ART

Petitioner contends that, as of the date of the claimed invention, the level of skill in the art included knowledge of certain specified prior art. Pet. 17–18; Ex. 1008 ¶ 15; *see also* Pet. 3–5. Petitioner adds that the level of skill also included the ability to make predictable use of the materials described according to their established functions. *Id.* at 18.

Patent Owner contends that a person of ordinary skill would have had either an undergraduate degree in mechanical engineering or a similar discipline, or several years of experience in the field of wiper blade manufacture and design. PO Resp. 1 (citing Ex. 2003 ¶¶ 16–19). Patent Owner contends that Petitioner confused the "content of the prior art" *Graham* factor with the level of skill in the art *Graham* factor.[21] *Id.* at 2.

---

[21] The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) (cited with approval in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)).

Patent Owner contends that the point of identifying the level of skill in the art is to avoid hindsight and add objectivity to the obviousness analysis. *Id.*

Petitioner responds by reiterating that the level of ordinary skill in the art includes a degree of ingenuity or problem solving skill. Pet. Reply. 1–2 (citing *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 279 (1976)). Petitioner adds that Patent Owner is wrong to assert that ordinary skill in the art connotes merely a level of education or work experience. *Id.* at 2 (citing to PO Resp. 1). Petitioner goes on to assert that the prior art of record reflects the level of skill in the art.

The distance between the parties is not great. Patent Owner's specified level of skill in the art (either an undergraduate degree in mechanical engineering or a similar discipline, or several years of experience in the field of wiper blade manufacture and design) is not inconsistent with Petitioner's contention that the asserted prior art reflects the level of skill in the art. Similarly, Petitioner's contention that the level of skill in the art includes some level of ingenuity or problem solving is not inconsistent with Patent Owner's assertion. *See, e.g.*, *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A person of ordinary skill is also a person of ordinary creativity.").

We agree with Patent Owner that the point of identifying the level of skill in the art is to avoid hindsight and add objectivity to the obviousness analysis. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the significance of the level of skill in the art is to serve as a prism or lens to view the prior art and the claimed invention). Yet, Patent Owner does little to explain how Petitioner's view of the level of skill in the art impacted the obviousness analysis. For example, Patent Owner does not contend that the

proposed modification is beyond the level of skill in the art, nor does Patent Owner contend that Petitioner has failed to demonstrate an expectation of success.

The parties' definitions of one of ordinary skill in the art are substantially similar, and neither party states how any difference in the parties' articulated levels of skill impacts the proceeding. For purposes of this Decision and based on the current record, we agree with and apply Petitioner's definition of the level of ordinary skill in the art. The prior art of record is reflective of the level of skill in the art. To the extent that the parties disagree on the level of skill in the art with regard to the knowledge of a person of ordinary skill, we address what was known in the art in our chronology discussion below.

## D. Chronology

The following generally chronological discussion pertains to all four *Graham* factors, and is applicable to all of the challenged claims and both grounds of unpatentability.[22]

### *1. Prior to the '974 Patent*

Conventional wipers were known prior to the critical date of the '974 patent. *See* PO Resp. 8; Ex. 2003 ¶ 21; Ex. 2007 ¶ 2; *see also* PO Resp. 4 (citing Exs. 2008 and 2009 as examples of known conventional wipers). Conventional wipers, also known as yoke or yoke-style wipers, include a

[22] Much of what Patent Owner labels as "secondary considerations" (*see* PO Resp. 7–15) pertains to all four *Graham* factors and is addressed in this section.

series of flexible rails that distribute force along the wiper blade. Ex. 1008 ¶ 19; PO Resp. 4; Ex. 2003 ¶ 21. Barth is an example of a conventional, yoke wiper, as illustrated in Figure 1 below:

FIG.1



Figure 1 depicts a yoke-style wiper structure, having a support structure comprised of main member 4 and intermediate members 5 and 6 to support blade 14. *See* Ex. 1008 ¶ 19 (reproducing this Figure from Barth); Ex. 1007, 2:52–53, 3:6–35, Figs. 1, 2.

Beam wipers were known prior to the critical date of the '974 patent. *See* Pet. 2–3; Pet. Reply 2–3; PO Resp. 9 ("beam blades were described in paper patents long before the invention as issue here"); Ex. 2003 ¶ 23; Ex. 1005. Beam wipers, also known as flat wipers, use metal strips adjacent the wiper blade to distribute the load along the length of the wiper blade rather than the yokes. Ex. 1008 ¶ 22. Figure 5 of Appel is reproduced below:




FIG. 5

Figure 5 of Appel is a side elevation of a beam-style wiper structure.[23] Ex. 1005, 2:4–5, Fig. 5.

Patent Owner emphasizes that although the '974 patent was not the first beam wiper, it was the first "commercially viable" beam wiper. PO Resp. 9 (citing Ex. 2007 ¶ 3, Ex. 2005, 239:6–16, 218:16–220:2). While the '974 may be the first commercially viable beam wiper, that does not alter the fact that beam wipers were known in the art prior to the '974 patent.

The problem of wind-lift in conventional wipers was known prior to the critical date of the '974 patent. Wind-lift is the force caused by the air stream striking a wiper blade laterally, producing a lifting force that diminishes the contact pressure of the wiper on the windscreen.[24] Pet. 10–11; Ex. 1004, 1:8–16.[25] Dr. Davis explains that Prohaska, for example, countered the problem of wind lift with both a flexible strip extending almost the entire length of the wiper element to stiffen it, and a spoiler formed or attached on the flexible strip to maintain contact pressure with the windscreen. Pet. 11–12, 19, 22–23; Ex. 1004, 1:43–52, 2:56–58, 2:71–75, 3:16–21, Figs. 3, 6; Ex. 1008 ¶¶ 27–29.

Patent Owner acknowledges that wind lift was a known problem for conventional blades, but argues that it was not a known problem in beam

---

[23] Figure 5 depicts the blade then not depressed against the windshield (dotted lines) and when depressed against the windshield (solid lines). The curvature of het blade permits uniform contact pressure with the windshield. Ex. 1005, 3:75–4:3.

[24] The air stream, or relative wind, is caused by movement of the vehicle that the wipers are installed on. *See* Ex. 1001, 3:32–38.

[25] Citations to Exhibit 1004 are page numbers followed by a colon and then the line number. For example, "2:56" refers to page 2, line 56.

blades. PO Resp. 5. In support, Dr. Dubowsky opines that wind lift was not a recognized problem in beam blades. Ex. 2003 ¶¶ 59–60 (citing Ex. 1004, 1:8–11). Dr. Dubowsky also opines that a person of ordinary skill would have thought that the lift off problem was a result of too high a profile, and characterizes Prohaska as disclosing that lift results from the yoke. *Id.*

Dr. Dubowsky' s opinion that wind lift was not a recognized problem in beam blades is conclusory in that it is not supported by any underlying facts or data.[26] Consequently, this opinion is entitled to little weight. 37 C.F.R. § 42.65. Further, Dr. Dubowsky reads more into Prohaska than is disclosed. Contrary to Dr. Dubowsky's assertion, Prohaska does not disclose that wind lift results from the yoke; rather, Prohaska more broadly describes that the air stream "striking the wiper blade laterally" produces the lifting force. Ex. 1004, 1:8–11; *see also* Pet. Reply 7–8 (stating that Dr. Dubowsky mischaracterizes Prohaska).

Petitioner responds that Barth (Ex. 1007) demonstrates that wind lift is caused by the inverted triangle cross-sectional profile of a wiper's rubber strip, a feature common to conventional and beam wipers. Pet. Reply 3. Figures 3 and 4 of Barth follow.

---

[26] *See also* Ex. 2003 ¶ 25 (opining that Patent Owner encountered an "unexpected amount of wind lift at high speed" without providing any underlying facts or data for that opinion).




Figure 3 depicts the cross sectional profile of the wiper strip[27] as a "pine tree profile," and Figure 4 simplifies that profile to an isosceles triangle with the point nearest the windshield and the base remote from the windshield.[28] Ex. 1007, 4:7–10, 4:21–25, Figs. 3, 4. These Figures illustrate "the theory of air flow and lift-off forces as it pertains to the prior art." *Id.* at 2:52–53.

Petitioner explains, with support from Dr. Davis, that Barth discloses that it was known that a wiper strip having an inverted isosceles triangle cross sectional profile ("pine tree profile") creates over-pressure on the lateral side facing the airflow and under-pressure on the opposite lateral side, resulting in forces that tend to lift the blade away from the windshield. Pet.

---

[27] Carrier 1 of Barth is also known as a "wiper strip," that is, the portion of the wiper that contacts the window, often a rubber-elastic strip (Ex. 1007, 3:6–9, Figs. 1, 2). *See, e.g.*, Ex. 1001, 2:62–65 (strip 15), Figs. 1, 2; Paper 15, 5 ("an elongated rubber-elastic wiper strip"); Ex. 2003 ¶ 21; Ex. 1006, 5 ("rubber strip").

[28] In Figure 4 Barth simplifies the "pine tree profile" to a triangle on edge with the base remote from the windshield. Ex. 1007, 4:21–25. Given the orientation of Figures 3 and 4 we subsequently refer to this as an inverted isosceles triangle profile.

Reply 3, 5–8; Ex. 1007, 4:8–39, Figs. 3, 4; Ex. 1101 ¶ 8–11; Ex. 2002 127:25–128:17.

Thus, prior to the critical date of the '974 patent, it was known that wiper blades having an inverted isosceles triangle cross sectional profile produce a lift off force on the wiper when subject to relative wind in both conventional and beam blades.

Patent Owner contends that Petitioner's argument in the Reply that wind lift was a known problem in beam wipers is improper. Paper 55, 1–2 (referring to the arguments at Pet. Reply 3:3–5, and Section II.A. (pp. 5:13–8:13)). According to Patent Owner, prior to Petitioner's Reply, Patent Owner had no notice that the Barth reference was alleged to have taught that wind lift is a problem for beam blades. *Id.* Patent Owner elaborates that had there been notice, Patent Owner would have contested this point. *Id.* For the reasons that follow, we are not persuaded by this contention.

Although Barth (Ex. 1007) was not the basis of any ground of unpatentability, Barth was cited as part of the knowledge of a person of ordinary skill in the art. Pet., ii; Ex. 1008 ¶ 15 (reproducing Figure 1 of Barth); *see also Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (non-applied art should be considered as background information that could explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references to arrive at the claimed invention). The Petition asserts that use of Prohaska's spoiler on either Appel's or Hoyler's beam wiper was the predictable use of prior art elements performing the function it was known to perform. *See* Pet. 23–24; Ex. 1008 ¶¶ 37–40; *see also* Dec. 11–12, 17 (summarizing Petitioner's contentions for

each ground). Petitioner's expert, Dr. Davis, specifically stated that wind lift is a problem in both conventional and beam blades. Ex. 1008 ¶ 29.

In light of this, Patent Owner was on notice that Petitioner contended that wind lift was a known problem in beam blades. The Response was Patent Owner's opportunity to present argument and evidence to the contrary. Indeed, Patent Owner actually availed themselves of that opportunity by presenting argument and evidence that lift off was not a known problem for beam blades. *See* PO Resp. 5–6. Petitioner's argument in the Reply that wind lift was a known problem for both beam and conventional blades is properly in response to Patent Owner's argument to the contrary. *See* Pet. Reply 3, 5–8; Paper 58, 1; 37 C.F.R. § 42.23(b). Consequently, Patent Owner has not persuaded us that Petitioner's argument is improper.[29]

During prosecution of the application that became the '974 patent, the Examiner rejected all of the claims as anticipated by, or obvious over, Ludwig (Ex. 1009). Pet. 6–8 (citing prosecution history at Ex. 1002, 97, 112). In response, Patent Owner amended the claims so that there was a single independent claim (now claim 1), and added language to that independent claim to distinguish over Ludwig. *Id.* Following this, the Examiner allowed the claims.

---

[29] Patent Owner's argument is unpersuasive for a second reason. In our order authorizing submittals on this issue, Patent Owner cited this example and we determined that Petitioner's argument is not improper. Paper 43, 3–6. Accordingly, we agree with Petitioner, that Patent Owner's submittal of that argument in Paper 55 was an untimely reconsideration request. *See* Paper 58, 1; 37 C.F.R. § 42.71(d).

As background, the '974 patent describes that the support element of a beam blade replaces the complicated support structure of a conventional blade, and is intended to assure that wiper blade contact pressure on the window is as even as possible over the entire swept field. Ex. 1001 at 1:7–23.

Also as background, the '974 patent describes "liftoff tendency" (forces that tend to lift the wiper blade off the window) as caused by oncoming wind creating overpressure on the front side of the wiper and underpressure on the back side (the lateral side opposite the front).[30] Ex. 1001, 1:25–40. It was known that at relatively high vehicle speeds, these forces may reduce contact pressure to the point that proper wiping is no longer possible. *Id.* at 1:40–45. It was also known that increasing wiper blade contact pressure can counter this problem, but the attending drawback is that at lower vehicle speeds the increased contact pressure increases friction, leading to undesirable noise buildup and high stress on the wiper and drive components. *Id.* at 1:45–51.

2. *The '974 Patent*

An object of the '974 patent was to avoid these disadvantages by providing a wiper blade with a leading-edge face which extends longitudinally over the wiper blade, substantially parallel to the window, facing into the wind and forming an acute angle with the window. *Id.* at 1:55–63. The wiper blade causes a force component that counters the liftoff

---

[30] This is true even though the pendulum motion of a wiper changes its position relative to the oncoming wind to some degree. This description of wind lift is consistent with the argument and evidence presented by Petitioner.

tendency and assures better cleaning quality, at least in the region most important to the vehicle's driver. *Id.* at 1:64–2:3. The wiper blade can be embodied in a separate, elongated component, with a cross section approximating a triangle that is solidly joined to the support element. *Id.* at 2:16–22. Alternatively, the leading edge face may have a hollow curvature facing into the wind. *Id.* at 2:25–27. The length, width, and height of the leading-edge face may be varied to suit requirements. *Id.* at 2:38–40.

As a solution to the shortcomings identified, the '974 patent describes that the wiper blade may be embodied as wiper blade 10 comprised of: support element 12, elongated rubber-elastic wiper strip 14, connection device 16, and single- or multiple-part component 32. *Id.* at 2:62–66, 3:22–37. Figures 1 and 3 of the '974 patent follow.

FIG.1




FIG.3




Figure 1 is a side view of wiper blade 10, and Figure 3 is a cross sectional view of wiper blade 10 along line III–III shown in Figure 1. *Id.* at

2:50–51, 53–55. Component 32 extends longitudinally along wiper blade 10, and has a triangle or wedge shaped cross section with the longest side of the triangle forming a leading edge face for relative wind 38 caused by the motor vehicle. *Id.* at 3:32–38.

### 3. *Patent Owner's Mischaracterizations of What was Known*

Patent Owner contends that the '974 patent recognized the previously unknown beam blade wind lift problem. PO Resp. 7. We disagree with this characterization. The '974 patent does not expressly disclose discovering that beam wipers are subject to wind lift at high vehicle velocities; rather, liftoff tendency is disclosed in the background portion of the Specification as something known in the art. Further, as detailed above, evidence outside of the '974 patent also demonstrates that wind lift was a known problem in both conventional and beam wipers.

Patent Owner contends that prior to the '974 patent, adding components to a beam wiper was unconventional. PO Resp. 7. We agree with Petitioner that it was not unconventional. *See* Pet. Reply 9. For example, Ludwig discloses an embodiment (28) that includes central longitudinal spine 15 above wiping edge 14. Pet. Reply 9; Ex. 1009, 3:24–67, Figs. 5, 7. Figure 7 of Ludwig follows:




FIG. 7.

Figure 7 is a cross-sectional view of Ludwig's wiper. *Id.* at 1:70–71. Spine 15 facilitates balanced distribution of load applied by the wiper arm. Ex.

1009, 3:64–67. Consequently, Ludwig demonstrates that it was known prior to the '974 patent that beam blades may include additional components that increase blade profile while still accounting for the desired pressure distribution.

Patent Owner argues that Petitioner's reliance on Ludwig is improper. Paper 55, 2 (referring to Pet. Reply 3:6–9 and Section II.B. (pp 9–10)). Petitioner does not rely on Ludwig to alter the ground of unpatentability; rather, Petitioner relies on Ludwig to demonstrate that Patent Owner's contention that the '974 patent's approach was unconventional is incorrect. Paper 58, 2 (referring to PO Resp. 5). Petitioner's argument was properly in response to Patent Owner's argument regarding conventional thinking at the time. *See* 37 C.F.R. § 42.23(b). Nor was Petitioner's argument required to be in the Petition. Given that Ludwig contradicts Patent Owner's assertion on conventional thinking, and that Ludwig was part of the prosecution history, cited in the Petition, and filed in this proceeding, Petitioner could not have reasonably anticipated that Patent Owner would make such argument.

In association with the argument that the '974 patent took an unconventional approach, Patent Owner characterizes the '974 patent as meeting a long-felt but unresolved need, producing unexpected results, and being met with skepticism. PO Resp. 8–9, 11 (citing Ex. 2005, 260:23–263:8; Ex. 2003 ¶¶ 22–25, 58–60, 65, 73, 77, 79).[31] The '974 patent does not support this characterization. Specifically, the '974 patent does not explicitly disclose or fairly imply that providing a beam wiper with a

[31] We note that paragraphs 65, 73, 77, and 79 do not relate to the patent at issue in this case. This argument and evidence is also dealt with in Sections IV.B.2 and IV.C.2.a.

leading-edge face met a long-felt but unresolved need, produced unexpected results, or was counter to any known teaching.

In the testimony cited, Mr. Merkel describes that during a meeting where he proposed adding a spoiler to a beam wiper, Mr. Fehrsen was concerned that the spoiler would alter the pressure distribution of the wiper. Ex. 2005, 260:23–263:8. Given that Mr. Merkel describes Mr. Fehrsen as a person having "beginning experience" in wiper design, this observation is entitled to little weight. Ex. 2005, 237:10. Even if we accept this testimony as correct, at most it demonstrates that addition of a spoiler to a wiper impacts the stiffness and pressure distribution of the wiper so that it is a design concern. Such evidence falls short of demonstrating that the results were unexpected or counter to any conventional thinking.

*4. Summary of What was Known*

Before the critical date of the '974 patent both conventional and beam wipers were known. Wind lift was a known concern for both types of wipers having a wiper strip with an inverted isosceles triangle cross sectional profile. In conventional wipers, it was known to counter wind lift and maintain contact pressure on the windscreen with a spoiler formed on or attached to the flexible strip.

## E. OBVIOUSNESS OVER PROHASKA AND EITHER APPEL OR HOYLER

*1. Uncontested Aspects*

Petitioner contends that claims 1, 2, and 8 would have been obvious over Prohaska and either Appel or Hoyler. Pet. 18–27; *see also* 9–14 (overview of the prior art).

Regarding independent claim 1, Petitioner contends that Appel discloses a wiper blade for windows of motor vehicles comprising a curved, band-shaped, spring-elastic support element that includes a concave and a convex surface that defines corresponding planes. Pet. 12–14, 18–19, 23; Ex. 1005, 1:11–15, 1:23–28, 3:9–16; Ex. 1014. Petitioner contends that Appel discloses an elongated rubber-elastic wiper strip and a connection device. Pet. 19; Ex. 1005, 4:18–22, Figs. 5, 7; Ex. 1014 (depicting arm attachment clip 41 of Appel, a connection device, as included in the proposed combination); Ex. 1005, 3:69–73.

Regarding claim 1, Petitioner contends that Hoyler is directed to a wiper bar for windshield wipers that includes an elongated band-shaped spring elastic support element (longitudinal spring 5) that distributes pressure and includes concave and convex surfaces. Pet. 14–15, 20–21, 23; Ex. 1006, 1:1, 2:15–19, 2:24–3:4, 3:8–9; Ex. 1015. Petitioner contends that Hoyler discloses an elongated rubber-elastic wiper strip (rubber blade 1) and a connection device (central clamp 9, eyelet-like opening 10, and hump 7). Pet. 14–15, 20–21, 23; Ex. 1006, 1:1, 2:15–19, 2:24–3:4, 3:8–9, Fig. 1; Ex. 1015.

Petitioner contends that Prohaska discloses a component (spoiler) as claimed. Pet. 10–12, 19–20, 22–23; Ex. 1004, 1:8–16, 25–52, 1:68–70, 2:56–58, 2:71–75, 3:16–21, Figs 3, 6; Ex. 1008 ¶¶ 37–40; Ex. 1014. Petitioner contends that Prohaska's spoiler: can be retrofitted to a wiper blade, diminishes liftoff tendency, and provides reliable contact between the wiper and the windscreen. Pet. 10–12, 19–20, 22–23; Ex. 1004, 1:8–16, 25–

52, 1:68–70, 2:56–58, 2:71–75, 3:16–21, Figs 3, 6; Ex. 1008 ¶¶ 37–40; Ex. 1014; *see also* Ex. 1016, 1–10.[32]

Claim 2 depends from independent claim 1 and recites, "wherein said leading-edge face is disposed on a face of said support element which faces away from the window." Petitioner contends that Prohaska's leading-edge face 21 of the spoiler faces away from the window when combined with either Appel or Hoyler's wiper.[33] Pet. 24–25; Ex. 1004, Figs. 3, 5; Ex. 1008 ¶¶ 52–53; Ex. 1017, 1–3 (illustrations explained in Ex. 1013).

Claim 8 depends from independent claim 1 and recites, "wherein said leading-edge face extends at least nearly over an entire length of the wiper blade." Petitioner contends that the leading edge of Prohaska's spoiler extends at least nearly over an entire length of the wiper blade. Pet. 25–27; Ex. 1008 ¶¶ 58–62; Ex. 1018, 1–2 (illustrations).

Petitioner's contentions regarding the claimed limitations are supported by a preponderance of the evidence and we adopt them here. Patent Owner does not dispute that the features of the challenged claims are found in the prior art. *See* Paper 17 ¶ 3 (instructing Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] will be deemed waived"); Pet. Reply 5 (asserting the Patent Owner does not contest that all claim limitations were shown); Office Patent Trial Practice

---

[32] The illustrations in Ex. 1016–1018 are explained in Ex. 1013. We reviewed the supporting animations of the grounds of unpatentability at Exhibits 1014, 1015.

[33] Petitioner's ground of unpatentability for claims 2 and 8 incorporates the discussion of the ground with respect to claim 1. *See* Pet. 24, 26. The ground of unpatentability asserted against claim 1 covers the limitations of claims 2 and 8. *See* Pet. 18–24.

Guide, 77 Fed. Reg. at 48,766 (stating that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief").

Patent Owner contests the obviousness of the combination by attacking Petitioner's rationale and by submitting secondary indicia of nonobviousness.

*2. Contested Aspects*

Petitioner contends that it would have been obvious to combine Prohaska's spoiler with either Appel's or Hoyler's wiper blade. Pet. 18, 22–23. Petitioner reasons that Prohaska's spoiler would have provided the benefit of countering wind lift, and further contends that such a combination would have been the predictable use of prior art elements according to the functions disclosed in the references. *Id.* at 22–24; Ex. 1008 ¶ 48.

*a) Alleged Hindsight*

Patent Owner contends that Petitioner's reasoning for adding Prohaska's spoiler for a conventional wiper to a beam blade such as Appel or Hoyer improperly invokes hindsight. PO Resp. 2–3. In particular, Patent Owner emphasizes: (1) fundamental differences between conventional and beam blades, (2) the beam blade wind lift problem the '974 patent sought to solve was previously unknown, and (3) the '974 patent's solution of adding a component that increased beam blade profile ran counter to the conventional wisdom at the time. *Id.* at 3. We analyze these contentions in turn.

*(1) Fundamental Differences*

According to Patent Owner, conventional and beam blades are so fundamentally different that a person of ordinary skill would not have combined conventional and beam blade teachings. PO Resp. 3–5 (citing Ex.

2003 ¶¶ 21–25, 58–61). This statement is contradicted by the evidence of record, in that conventional and beam wipers have commonalities. For example, beam and conventional wipers can use the same wiper strip, and can be attached to an actuating arm. *See, e.g.*, Ex. 1004, Fig. 1 (conventional strip); Ex. 1005, 1:16–17 (referring to an actuating arm), Fig. 7 (beam strip); Ex. 1007, Fig. 1 (Conventional attachment of arm).

Patent Owner contends that conventional blades have several disadvantages, and that beam blades solved these problems by utilizing a low profile design that evenly distributed pressure along the wiping element. PO Resp. 4 (citing Ex. 2003 ¶¶ 21–23, 58). In support, Dr. Dubowski opines that because beam blades avoid the high superstructure of a conventional wiper, beam blades "were hoped to perform better in extreme weather conditions" such as ice and snow. Ex. 2003 ¶ 23. Dr. Dubowski opines that beam blades are greatly affected by small changes in beam shape and by attaching additional components. Ex. 2003 ¶ 58. According to Dr. Dubowski, this is caused by the difference in pressure distribution in each wiper type, namely, that conventional wipers have a series of yokes to distribute pressure, while beam wipers distribute pressure through a spring-elastic support element that runs the entire length of the wiper strip. *Id.* Dr. Dubowski concludes that conventional thinking at the time of '974 patent was to avoid additional components on a beam blade and to keep the profile very low. *Id.* (citing three patents submitted in these proceedings)[34]

---

[34] Appel (Ex. 1005); Appel '770 (Ex. 1006 of IPR2016-00034); Swanepoel '564 (Ex. 1009 of IPR2016-00034).

An assertion that conventional wipers were "hoped" to perform better in ice and snow falls short of establishing that beam wipers performed better in ice and snow. *See* Ex. 2003 ¶ 23. More importantly, Patent Owner has not explained cogently how the superior ice and snow performance of a beam wiper relates to the modification proposed by Petitioner.

Although the three patents cited by Dr. Dubowski do not have additional components attached, Patent Owner does not identify, nor do we discern, any disclosure in these patents that is critical of increasing wiper profile or adding additional components. At most, these patents illustrate one approach and are silent regarding other approaches. Consequently, to the extent that Patent Owner's argument suggests that these patents teach away from the proposed modification, such is not the case.

Further, as explained above, Patent Owner's assertion that adding components to a beam wiper was unconventional is contradicted by the evidence of record.

*(2) Beam wiper wind lift problem*

As mentioned above, Patent Owner contends wind lift was known in conventional wipers, but not in beam wipers, and contends that a person of ordinary skill would have thought that wind lift was caused by having too high a profile. PO Resp. 5 (citing Ex. 2003 ¶¶ 59–60; Ex. 1004, 1:8–11). These arguments are unpersuasive for the reasons given above.

Patent Owner contends that even if a person of ordinary skill identified a wind lift problem in beam blades, there would not have been a desire to raise the profile by adding a spoiler top. PO Resp. 5. In support, Dr. Dubowsky essentially echoes the Response. Ex. 2003 ¶ 60. This contention is unpersuasive because Patent Owner simply concludes, without

a supporting explanation, that a person of ordinary skill would not have desired to increase the profile.

Patent Owner contends that Petitioner relies exclusively on Prohaska and offers no evidences that the wind lift problem was known in beam wipers. *Id.* at 5–6 (citing Pet. 22–23; Ex. 1008 ¶¶ 37–40). Such is not the case. As discussed above, Petitioner provides evidence that wind lift was a known problem in both beam and conventional wipers that include a wiper strip having an inverted triangle cross-sectional profile.

*(3) '974 solution*

Patent Owner contends that the '974 patent, contrary to conventional thinking, recognized the beam wiper wind lift problem and solved it with a spoiler that increased the blade profile. PO Resp. 7; *see also* PO Resp. 11 (making similar argument). According to Patent Owner, in cases such as this, recognition of the problem itself was invention. *Id.* (citing *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004) ("There can of course arise situations wherein identification of the problem is itself the invention.").

Contrary to this assertion, Patent Owner did not discover the previously unrecognized problem of wind lift in beam wipers. Rather, as detailed above, it was known many years prior to the critical date of the '974 patent that the inverted isosceles triangle cross sectional profile of a wiper strip (common to beam and conventional wipers) causes wind lift.

*(4) Rationale Summary*

As stated above, Petitioner reasons that Prohaska's spoiler would have provided the benefit of countering wind lift, and further contends that such a combination would have been the predictable use of prior art elements according to the functions disclosed in the references. *Id.* at 22–24; Ex. 1008 ¶ 48. In light of the evidence analyzed here, this reasoning has a rational underpinning. Patent Owner's arguments discussed above are not persuasive and do address cogently the rationale provided by Petitioner.

*b) Secondary Considerations*

We consider Patent Owner's contention that this case involves the secondary considerations of: long-felt but unresolved need, industry praise and awards, failure of others, commercial success, licensing, unexpected results, and copying. PO Resp. 8; *WBIP, LLC v. Kohler Co*. 829 F.3d 1317, 1328 (Fed. Cir. 2016) (when present, secondary indicia of nonobviousness must be considered).

"For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (emphasis and internal quotation marks omitted) (cited with approval in *ClassCo, Inc. v. Appel, Inc*, 838 F.3d 1214 (Fed. Cir. 2016)). There is a presumption of nexus for objective considerations when the Patent Owner demonstrates that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent. *WBIP*, 829 F.3d at 1329.

Before addressing the specifics of Patent Owner's secondary considerations, we emphasize that, as discussed above, most of Patent

Owner's secondary considerations arguments are based upon mischaracterizations of the scope and content of the prior art.

*(1) Lack of Connection between the Products and Challenged Claims*

Patent Owner contends that the Aerotwin and Icon blades each "practice the challenged claims." *Id.* at 11 (citing Ex. 2014, 3; Ex. 2015, 33–57, 59–62; Ex. 2016, 30–43, 45–48; Ex. 2007 ¶ 6; Ex. 2005, 234:25–235:4, 249:25–250:5, 252:17–254:21, 225:22–226:1, 231:12–232:4; Ex. 2006, 698:19–699:22). Patent Owner describes the Aerotwin and ICON wipers as having a flexible spoiler with diverging legs mounted on the top of the blade as well as plastic end caps.[35] *Id.*

Most of the cited evidence deals with patents other than the '974 patent, and does not evidence any connection between the challenged claims and the Aerotwin and ICON wipers. *See* Ex. 2015, 33–57 (relating to the '905 patent), 59–62 (relating to the '698 patent); Ex. 2016, 30–43 (relating to the '905 patent), 45–48 (relating to the '698 patent); Ex. 2005, 234:25–235:4 (relating to the '434 patent), 249:25–250:5 (discussing attachment of the spoiler, relevance unclear), 252:17–254:21 (discussing the meaning of "secured," relevance unclear), 231:12–232:4 (relating to the '905 patent); Ex. 2006, 698:19–699:22 (relating to the '905 patent).

[35] As mentioned above, at times the same paper is submitted in each of these proceedings without tailoring that paper to the particular case involved. This is perhaps most significant here. Further, we agree with Petitioner, that submitting the same evidence of secondary considerations in each of these proceedings undermines the evidence because the patents involved are directed to different inventions. *See* Pet. Reply 12.

Two citations relate to the ’974 patent. First, in response to interrogatories in the related litigation, Patent Owner asserted that the Aerotwin, ICON Generation 1, and ICON Generation 2 practice at least one claim of a list of patents that includes the ’974 patent. Ex. 2014, 3. This assertion is conclusory and not supported by a cogent explanation. Further, Patent Owner does not explain effectively how the ICON Generation 1 and 2 correspond to an ICON wiper. *See* Pet. Reply 14.

Second, Mr. Merkel testified that the spoiler described in the ’974 patent is utilized in, for example, the “ICON Evolution.” Ex. 2005, 225:22–226:1. This information does not demonstrate that the Aerotwin or Icon blades practice one of the challenged claims. Mr. Merkel provides no information regarding the relationship between the scope of the Aerotwin wiper and the challenged claims. Regarding the ICON Evolution, Mr. Merkel presents the unsupported conclusion that the spoiler of the ICON Evolution is that of the challenged claims. For example, Mr. Merkel does not explain if the spoiler is separate from the wiper strip and mounted directly on the convex surface of the support element as claimed. Nor does Patent Owner explain how the ICON Evolution corresponds to the ICON wiper.[36] Additionally, Patent Owner contradicts Mr. Merkel by asserting that the ICON wiper has a flexible spoiler with diverging legs mounted on the top of the blade as well as plastic end caps, features not found in the challenged claims. *See* PO Resp. 11. The absence of cross-examination of Mr. Merkel in this proceeding and the determination in the Pylon litigation

---

[36] Perhaps Patent Owner’s use of the term ICON refers to the ICON Generation 1, ICON Generation 2, and ICON Evolution. If so Patent Owner should have explained the relationship.

that Mr. Merkel committed a material omission further reduce the value of this evidence.

Patent Owner's proffered evidence may be applicable to IPR2016-00036 because the features enumerated by Patent Owner are found in claim 13 of the '905 patent. None of the challenged claims of this proceeding include diverging legs mounted on the top of the blade or plastic end caps. Further, the challenged claims do not recite that the spoiler ("component") is flexible. This information has little or no relevance to our inquiry here.

Consequently, Patent Owner is not entitled to a presumption of nexus, because Patent Owner has not demonstrated that the products (the Aerotwin and ICON wipers) are the invention disclosed and claimed in the patent. Indeed, Patent Owner has not demonstrated effectively any connection between those products and the claims of the '974 patent.

*(2) Commercial Success and Industry Praise*

Patent Owner contends that the Aerotwin wiper won the Pace, Automechankia, and Frost & Sullivan awards. PO Resp. 10, 13 (citing Ex. 2007 ¶¶ 3, 8; Ex. 2005, 239:6–16, 209:10–23). In support, Mr. Kashnowski states that the Pace award mentioned the use of a flexible spoiler on the Aerotwin blade and that Frost & Sullivan was "one of the more prominent automotive research organizations." Ex. 2007 ¶¶ 3, 8. The cited testimony of Mr. Merkel does not appear to relate to the '974 patent. *See* Ex. 2005, 239:6–16, 209:10–23.

Patent Owner does not provide a copy of any award or an explanation of the award criteria. Regarding the Pace award in particular, this evidence may apply to IPR2016-00036 because the spoiler (wind deflection strip 42) of the '905 patent is flexible (made of an elastic material), while none of the

challenged claims recite that the component (spoiler) is flexible. *See* Ex. 1001, 4:16–32, 36–38, 53–55; IPR2016-00036, Ex. 1001, 7:60–8:21. The observation that Frost & Sullivan was a prominent research organization does little to put the award in context. Without context, these awards have little meaning.

As mentioned above, Patent Owner contends that although beam blades were known, Patent Owner's Aerotwin wiper blade was the first commercially successful beam blade in the United States aftermarket. PO Resp. 9–10 (citing Ex. 2007 ¶ 3, Ex. 2005, 239:6–16 218:16–220:2).[37] Patent Owner contends that the ICON blade had commercial success and praise as evidenced by: (1) the demand from Bosch customers for the Icon blade was considerably high, even though it was more expensive than conventional blades; and (2) customers expressed a great deal of excitement for the Icon blade. *Id.* at 10 (citing Ex. 2007 at ¶ 5; Ex. 2005, 270:14–271:3[38]).

The evidence cited by Patent Owner has numerous shortcomings.

Although Patent Owner contends that the Aerotwin was the first commercially successful beam wiper in the United Sates, the sales figures and awards cited are for the ICON wiper.

Mr. Kashnowski, Director of Product Management for Wiping systems for Patent Owner has more than 20 years of working with wipers. Ex. 2007 ¶ 1. Mr. Kashnowski testified in the Pylon litigation that Patent

---

[37] The relevance of the citations to Exhibit 2005 to Patent Owner's contention is unclear.

[38] This testimony relates to a wiper with ends caps, not the '974 patent.

Owner's wipers having spoilers and end caps had the most success, growth, and value to customers of any product line he could recall. Ex. 2005, 270:14–271:3. Mr. Kashnowski does not explain how the success is tied to features of he challenged claims and appears to relate to the claims at issue in IPR2016-00036.

Mr. Kashnowski states that demand for the ICON blade was "considerably high" despite being more expensive than conventional blades. Ex. 2007 at ¶ 5. *Id.* Here we seek objective indicia of nonobviousness, yet, that demand was "considerably high" is a subjective opinion. Mr. Kashnowski does not provide gross sales figures in dollars or units sold, market share, growth in market share, or any objective indication of commercial success.

Similarly, Mr. Kashnowski states that customers were "more excited" for the ICON product than any other automotive product he has been involved with. Ex. 2007 ¶ 5. Presumably, with 20 years of experience in the automotive field, Mr. Kashnowski has been involved with numerous products; however, customer excitement is a subjective observation and not an objective indication of industry praise or commercial success. Even if customer excitement to some extent indicates industry praise or commercial success, Mr. Kashnowski does not provide any explanation that ties customer excitement to claimed features.

Patent Owner presents three years of "sales of the ICON product" (2006 - $17,000,000; 2007 - $24,000,000; 2008 - $28,000,000).[39] PO Resp. 13; Ex. 2007 ¶ 8. This testimony is not relevant because it relates to a wiper

[39] Presumably, these figures represent annual gross sales revenue.

with ends caps, not the claims of the ’974 patent. Even if the ICON wiper corresponds to the challenged claims, this evidence has little probative value. Patent Owner provides no argument or evidence that attributes this success to claimed features. Patent Owner presents no evidence regarding market share. This information, without market share information, is only weak evidence, if any, of commercial success. *See In re Applied Materials*, 692 F.3d 1289, 1299 (Fed. Cir. 2012). Although we note that sales grew in the period presented, Patent Owner does not address that growth, nor does Patent Owner explain how such growth is tied to claimed features.

Patent Owner argues that products having a flexible spoiler, plastic end caps, and diverging legs mounted on the top of the blade were tested extensively to reduce noise, and this reduced noise was part of het reason for great customer demand. PO Resp. 11–12. This description again applies to the ’905 patent at issue in IPR2016-00036 and is not relevant to our inquiry here.

*(3) Skepticism*

Although Patent Owner does not list skepticism as one of the objective indicia raised, Patent Owner does make such an argument. PO Resp. 8 (not listing skepticism), 11, n. 6 (mentioning skepticism). Specifically, Patent Owner argues that the solution of the ’974 patent of adding a top mounted spoiler ran against the grain of conventional wiper understanding. *Id.* at 11 (citing Ex. 2003 at ¶¶ 22–25, 58–60, 65, 73, 77,

79[40]; Ex. 2005 at 260:23–263:8). This argument and evidence are addressed above.

*(4) Long-felt but unresolved need and Unexpected Results*

Patent Owner contrasts the success of ICON wipers to the failure of a competitor's beam-blade product, the Trico Innovision wiper blade that was introduced in 2004 and "failed." PO Resp. 12–13 (Ex. 2007 ¶ 7; Ex. 2005, 250:6–251:7).[41]

To the extent that Patent Owner contends that Trico's failure is evidence of satisfying a long-felt, but unmet need, such argument and evidence is unpersuasive. The Trico product's introduction in 2004 was after the critical date of the '974 patent. *See* Pet. Reply 17; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) (the unmet need must exist on the patent's filing date).

To the extent that Patent Owner is suggesting Trico's lack of commercial success demonstrates the commercial success of ICON wiper, such contention is also unpersuasive. As detailed above, Patent Owner has not demonstrated effectively a connection between the ICON wiper and the challenged claims. Further, Mr. Kashnowski simply presents the subjective conclusion that the Trico wiper "failed in the market place." Ex. 2007 ¶ 7. Mr. Kashnowski does not reveal any factual data underlying that opinion, nor does Patent Owner explain what constitutes failure. The value of Patent

---

[40] We note that paragraphs 65, 73, 77, and 79 do not relate to the patent at issue in this case. The other paragraphs are addressed in previous analysis.

[41] The cited portion of Exhibit 2005 is testimony discussing a memo that addresses the attachment of a spoiler to the blade that does not appear to support Patent Owner's assertion that the Trico product failed.

Owner's evidence is further reduced by Petitioner's evidence that the Trico wiper achieved enough sales that manufacturing capacity had to be increased. Pet. Reply 18 (Ex. 1100 ¶ 15).

Patent Owner contends that the prior art asserted in the ground of unpatentability is more than 14 years prior to the filing of the application that became the '974 patent, evidencing a long-felt but unresolved need. PO Resp. 15 (citing *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356–57 (Fed. Cir. 2013) ("The record also shows evidence of *long* felt but unsolved need . . . The length of the intervening time between the publication dates of the prior art and the claimed invention can also qualify as an objective indicator of nonobviousness."). We agree with Petitioner that the age of the references, without more, is not evidence of long-felt, but unresolved need. Pet. Reply, 18 (citing *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1337–1338 (Fed. Cir. 2016) (distinguishing *Leo Pharm.*, 726 F.3d at 1356–57)).[42]

*(5) Other Alleged Indicia*

Patent Owner contends that within a year of introduction of the Aerotwin and Icon products knockoff products appeared having spoilers with diverging legs similar to those shown in the '905 patent, as well as end caps. PO Resp. 13–14 (Ex. 2007 ¶ 9). This evidence may relate to the '905 patent at issue in IPR2016-00036, but it does not pertain to the patent at issue here.

---

[42] *Leo Pharm* is distinguishable from the case at hand in that in there the inventor recognized and solved a problem, while here, as discussed above, wind lift was a known problem in both beam and conventional wipers having an inverted isosceles triangle cross sectional profile. *Leo Pharm.*, 726 F.3d at 1353.

Patent Owner contends that the industry is now largely respectful of Patent Owner's beam blade patent rights, and that all of Patent Owner's major competitors have entered licensing agreements for those rights. PO Resp. 14–15 (citing Ex. 2007 11). Patent Owner asserts that most of these agreements include the '974 patent. *Id.* (citing Ex. 2007, 11).

This evidence does not present a clear picture. Patent Owner does not provide a copy of the agreements, nor otherwise identify which claims of the '974 patent were licensed. Patent Owner does not identify the number of major competitors, nor provide any criteria for what makes a competitor a major competitor. Further, Patent Owner overstates Mr. Kashnowski's supporting evidence. Specifically, Patent Owner states that most of the agreements with Patent Owner's competitors include the '974 patent, but Mr. Kashnowski states that, "[t]he patents specifically licensed in most of these agreements include" the '974, '905, and '698 patents. Ex. 2007 ¶ 11. Mr. Kashnowski's statement means that most of the agreements include one of the three enumerated patents, not that most of the agreements include the '974 patent. Mr. Kashnowski's statement is true even if only one agreement includes the '974 patent provided that most of the agreement include one of the three listed patents.

Beyond the lack of any objective indicia, Patent Owner does not explain or provide evidence that ties the merits of claims to the licenses. Thus, this evidence is entitled to little weight because Patent Owner has not demonstrated a connection between the licenses and the merits of the claimed subject matter. *See* Pet. Reply 20.

*3. Conclusions*

Prior to the critical date of the ’974 patent, both conventional and beam wipers were known. Wind lift was a known concern for both types of wipers having a wiper strip with an inverted isosceles triangle cross-sectional profile, and in conventional wipers this problem had been solved with a spoiler formed on or attached to the flexible strip. Petitioner has shown by a preponderance of the evidence that the elements of the challenged claims were known. Patent Owner does not challenge these assertions.

Petitioner explains that adding Prohaska’s spoiler to either Appel or Hoyler’s beam blade would have provided the benefit of countering wind lift. This contention is well supported by the evidence of record. Patent Owner’s arguments regarding rationale are unpersuasive and do not address effectively the reasons provided by Petitioner.

Patent Owner’s evidence of secondary considerations may relate to the ’905 patent at issue in IPR2016-00036, not it does not pertain to the patent at issue here. Even if this evidence was tied to claimed features, it suffers from additional shortcomings. For example, Patent Owner’s evidence of skepticism, unexpected results, and long-felt but unresolved need is contradicted by the evidence of record. The ICON wiper had some success in terms of three industry awards and gross revenue figures; however, Patent Owner did not provide sufficient information to put this success in perspective and the evidence relates to the ’905 patent, not the ’974 patent.

The ’974 patent applied the known technique of adding a spoiler to counter wind lift on a conventional wiper to a beam wiper, when it was

known that the cause of wind lift was the inverted triangle profile of the wiper strip common to both types of wipers. The predictable result was that the spoiler performed as it was known to perform.

In light of this, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, and 8 would have been obvious over Prohaska and either Appel or Hoyler.

## V. ORDER

For the reasons given, it is:

ORDERED that claims 1, 2, and 8 have been shown by a preponderance of the evidence to be unpatentable as obvious over Prohaska and Appel;

FURTHER ORDERED that claims 1, 2, and 8 have been shown by a preponderance of the evidence to be unpatentable as obvious over Prohaska and Hoyler;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied;

FURTHER ORDERED that Petitioner's Motion to Strike is denied;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied;

FURTHER ORDERED that Paper 32 is expunged; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements.

PETITIONER:

Richard Koehl
richard.koehl@hugheshubbard.com

James Klaiber
james.klaiber@hugheshubbard.com

David Lansky
david.lansky@hugheshubbard.com

Stefanie Lopatkin
stefanie.lopatkin@hugheshubbard.com

James Dabney
james.dabney@hugheshubbard.com

PATENT OWNER:

Patrick Colsher
patrick.colsher@shearman.com

Mark Hannemann
mark.hannemann@shearman.com

Joseph M. Purcell, Jr.
Joseph.purcell@sherman.com

US006292974B1

(12) **United States Patent**
**Merkel et al.**

(10) **Patent No.: US 6,292,974 B1**
(45) **Date of Patent: Sep. 25, 2001**

(54) **GLASS WIPER BLADE FOR MOTOR VEHICLES**

(75) Inventors: **Wilfried Merkel**, Kappelrodeck; **Wolfgang Leutsch**; **Thomas Kotlarski**, both of Buehlertal, all of (DE)

(73) Assignee: **Robert Bosch GmbH**, Stuttgart (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/284,398**

(22) PCT Filed: **Jul. 9, 1998**

(86) PCT No.: **PCT/DE98/01893**

§ 371 Date: **Jun. 11, 1999**

§ 102(e) Date: **Jun. 11, 1999**

(87) PCT Pub. No.: **WO99/10211**

PCT Pub. Date: **Mar. 4, 1999**

(30) **Foreign Application Priority Data**

Aug. 21, 1997 (DE) .......................................... 197 36 368

(51) **Int. Cl.**[7] ................................ **B60S 1/38**; B60S 1/40
(52) **U.S. Cl.** .................................. **15/250.201**; 15/250.43
(58) **Field of Search** ......................... 15/250.201, 250.43, 15/250.44, 250.361, 250.48, 250.451, 250.32

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,088,155 * 5/1963 Smithers .
3,317,945 * 5/1967 Ludwig .
3,418,679 * 12/1968 Barth et al. .
3,879,793 * 4/1975 Schlegel .
5,546,627 * 8/1996 Chen .

FOREIGN PATENT DOCUMENTS

1 247 161 1/1970 (DE) .
2311293 * 9/1974 (DE) ................................ 15/250.43
2336271 * 2/1975 (DE) .
2440179 * 11/1975 (DE) ................................ 15/250.43
316114 * 5/1989 (EP) .
2199302 * 4/1974 (FR) .
1429820 * 3/1976 (GB) ................................ 15/250.43

* cited by examiner

*Primary Examiner*—Gary K. Graham
(74) *Attorney, Agent, or Firm*—Michael J. Striker

(57) **ABSTRACT**

A wiper blade (**10**) is proposed that serves to clean windows of motor vehicles. The wiper blade has an elongated, rubber-elastic wiper strip (**14**) which can be placed against the window to be wiped and is disposed substantially longitudinally axially parallel to one face, that is, the face oriented toward the window, of a striplike, spring-elastic support element (**12**), which is connected to a wiper arm (**18**) that is driven crosswise to the length of the wiper blade and can be urged toward the window. Even at high vehicle speeds, a requisite wiper blade contact pressure for attaining a swept field clean enough to meet legal requirements is achieved if the wiper blade (**10**) is provided with a leading-edge face (**36** or **60**), which extends longitudinally of the wiper blade and substantially parallel to the window and faces into the wind (arrow **38**), and which crosswise to its length forms an acute angle with the window.

**8 Claims, 1 Drawing Sheet**







FIG. 1
FIG. 2
FIG. 3
FIG. 4

## GLASS WIPER BLADE FOR MOTOR VEHICLES

### BACKGROUND OF THE INVENTION

The present invention relates to a wiper blade for windows of motor vehicles.

In wiper blades the support element is meant to assure the evenest possible distribution of the wiper blade contact pressure on the windows, over the entire swept field swept by the wiper blade. By means of a suitable curvature of the unstressed support element—that is, when the wiper blade is not applied to the wiper blade—the ends of the wiper strip, which in wiper blade operation is pressed entirely against the window, are urged toward the window by the then-stressed support element, even if the radii of curvature of spherically curved vehicle windows differ in every position of the wiper blade. The curvature of the wiper blade must accordingly be somewhat greater than the greatest curvature measured in the swept field of the window to be wiped. The support element thus replaces the complicated support bracket construction, having two spring rails disposed in the wiper strip, of the kind employed in conventional wiper blades.

The invention takes as its point of departure a wiper blade of this type. In a known wiper blade of this type (German Patent DE-PS 12 47 161), the wiper blade, or its support element, which for reasons of distributing the contact pressure protrudes far past the wiper strip in the middle region of the wiper blade, can on the one hand be engaged from below, on the front side facing into the wind, with an attendant buildup of overpressure, by this overpressure. On the other hand, on the back side facing away from the wind, because of the structural form noted above, a considerable negative pressure builds up. Although the wiper blade, which during operation usually executes a pendulum motion, constantly changes its position relative to the oncoming relative wind, even then one of its long sides is always more or less greatly exposed to the wind and is therefore called the front side, while its other long side is accordingly also thought of as the back side. At relatively high vehicle speeds, given the cooperation of these two aforementioned pressures, both of which are oriented counter to the wiper blade contact pressure, this contact pressure is reduced at least enough that proper wiping is no longer possible. Increasing the wiper blade contact pressure against the window at high vehicle speeds could admittedly reduce the severity of this problem, but at lower vehicle speeds, when the liftoff tendency is less, the friction between the wiper blade and the window increases; this leads to undesirable noise buildup and to excessively high stress on the drive components and on the rubber of the wiper.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a wiper blade which avoids the disadvantages of the prior art.

In keeping with these objects, one feature of present invention, resides, briefly stated, in a wiper blade provided with a leading-edge face which extends longitudinally over the wiper blade and substantially parallel to the window and faces into the wind, and which crosswise to its length forms an acute angle with the window.

In the wiper blade of the invention, via the leading-edge face that faces into the wind, a force component aimed at the window is built up, which counteracts the liftoff tendency of the two pressures and thus assures excellent cleaning quality,



at least in the region of the swept field swept by the wiper blade, that is, the region that is important to the vehicle's driver. Depending on the size of the leading-edge face and/or on the size of the approach angle $\alpha$, this auxiliary contact pressure can be adapted to the variable demands that depend on the type of vehicle. It is also advantageous in the arrangement of the invention that as a function of the vehicle speed, the contact pressure rises or falls with this speed. Thus a suitably "high auxiliary contact pressure" is opposed only to the liftoff tendency that occurs at high speed.

A compact wiper strip is obtained if the leading-edge face is disposed on the face of the support element facing away from the window. The auxiliary contact pressure is then distributed not in point form but areally, over the entire length of the wiper blade.

The embodiment of a leading-edge face can advantageously by attained in that it is embodied on a separate, elongated component that is solidly joined to the support element.

A simple structure of such a separate component is obtained in that, seen in cross section, it has at least approximately the shape of a triangle, one side of which contacts the face of the support element facing away from the window, and also that the leading-edge face is embodied on another side of the triangle. In certain cases, it can be advantageous to equip the leading-edge face at least partially with a hollow curvature facing into the wind.

Securing the component to the one side of the support element is achieved economically by a glued connection. So that the distribution of the contact pressure effected by the support element will not be impaired, the component is made from a rubber-elastic material whose hardness is no greater, and is preferably less, than the hardness of the rubber-elastic wiper strip. Advantages in terms of production are attained if the component is made from a suitable plastic.

The length, and the width and height projected in the operating direction of the wiper blade, of the leading-edge face is designed to suit the requirements. In certain cases it is expedient if the leading-edge face extends at least nearly over the entire length of the wiper blade.

Further advantageous refinements and features of the invention are recited in the ensuing description of an exemplary embodiment shown in the accompanying drawing.

### BRIEF DESCRIPTION OF THE DRAWING

In the drawing:

FIG. **1** shows a side view of a wiper blade of the invention;

FIG. **2** shows a plan view on the wiper blade of FIG. **1**;

FIG. **3** shows a section through the wiper blade, taken along the line III—III in FIG. **1** and shown on a larger scale in schematic form; and

FIG. **4** shows a basic illustration of the wiper blade of FIG. **3**.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

A wiper blade **10** shown in FIGS. **1** and **2** has a single- or multi-part, elongated, spring-elastic support element **12**, to whose underside an elongated, rubber-elastic wiper strip **15** is secured longitudinally axially parallel to it. A connection device **16** is disposed on the top side of the support element, and with its aid the wiper blade **10** can be detachably

connected to a driven wiper arm **18**. A hook acting as a counterpart connection means is formed onto the free end **20** of the wiper arm **18** and grasps a pivot pin **22** that belongs to the connection device **22** of the wiper blade. The securing between the wiper arm **18** and the wiper blade **10** is taken on by securing means not shown in further detail but known per se and embodied as adapters. The wiper arm **18** and thus also the hook on the end **20** of the arm is urged in the direction of the arrow **24** toward the window to be wiped, whose surface to be wiped is suggested in FIG. **1** by a dot-dash line **26**. Since the dot-dash line **26** is meant to represent the greatest curvature of the window surfaces, it is quite apparent that the curvature of the wiper blade **10**, which rests with its two ends on the window, is greater than the maximum curvature of the window. Under the contact pressure (arrow **24**), the wiper blade presses with its wiper lip **28** over its entire length against the window surface **26**. This causes a tension to build up in the bandlike, spring-elastic support element **12**, and this tension assures a proper contact of the wiper strip **14** or wiper lip **28**, over their entire length, with the motor vehicle window.

The particular design of the wiper blade **10** will be described in further detail, especially in terms of FIGS. **3** and **4**. On the upper face **30** of the bandlike support element **12**, facing away from the windshield **25**, a single- or multiple-part component **32** extending longitudinally of the wiper blade **10** is secured; it is made from a rubber-elastic material, preferably a plastic, whose hardness is less than the hardness of the rubber-elastic wiper strip **14**. This wiper strip **14** is disposed on the lower face **34**, toward the window **25**, of the support element **12**. As FIG. **1** shows, the component **32** extends over the entire length of the wiper blade **10**. It has a cross section in the shape of a triangle or wedge (FIG. **3**). In the exemplary embodiment, to that end, the shape of a non-isosceles triangle has been selected. The longest side **36** of this triangle forms a leading-edge face for the relative wind created by the motor vehicle, which is symbolized by the arrow **38** in FIG. **3**. A second, shorter side **40** of the triangular shape faces toward the upper face **30** of the support element **12**. The two faces, facing one another, of the support element **12** and **40** of the component **32** are joined together by gluing.

To explain the mode of operation of the wiper blade of the invention, see FIG. **4**, in which all the necessary parts of the wiper blade are shown in basic form. During operation of the wiper blade, whose operating motion is represented by the double arrow **42** when the wiper blade is displaced with its wiper strip **14** over the surface **26** of the window, the support element **12** is located in a plane that extends substantially parallel to the surface **26** of the window. The wiper blade **10** then experiences a contact pressure **52** (FIG. **3**) that is countered during wiper blade operation, especially at high vehicle speeds, by a liftoff tendency acting in the direction of the arrow **54** in FIG. **4**. Since the leading-edge face **36** of the component **30** facing into the wind **38**, and forms an acute angle a with the surface **26** of window **25**, the pressure of the relative wind **38** generates a force component that is represented in FIG. **4** by the arrow **56**. This force component **56** acts counter to the liftoff tendency (arrow **54**) in FIG. **3** and thus keeps the contact pressure (arrow **52**) within the legally prescribed range. In a departure from the exactly triangular cross-sectional shape shown in FIG. **3** for the component **12**, this component can also be embodied such that its side facing into the wind **38** is provided with a hollow curvature **60**, which is represented in FIG. **4** by a dot-dash line. But even with the provision of a hollow curvature on the side toward the wind **38**, the component **30** maintains its basically triangular cross-sectional shape and thus also the possibility of the development of a force component (arrow **56** in FIG. **4**) from the contact pressure with which the wind (arrow **38**) meets the curved leading-edge face **60**.

What is claimed is:

**1**. A wiper blade for windows of motor vehicles, comprising a curved, band-shaped, spring-elastic support element which distributes a pressure applied by a wiper arm and has a concave and a convex surface which defines corresponding planes; an elongated rubber-elastic wiper strip placeable on a window to be wiped and mounted to said concave surface of said support element which faces the window, substantially longitudinally parallel to said concave surface; a connection device provided for a wiper arm and arranged directly on a convex side of said support element; and a component which is separate from said wiper strip and is mounted directly to the convex surface of said support element so as to form a leading-edge face extending in a longitudinal direction of the support element and forming, as seen crosswise to its longitudinal extension, an acute angle with a plane which extends parallel to a plane formed by said convex surface.

**2**. A wiper blade as defined in claim **1**, wherein said leading-edge face is disposed on a face of said support element which faces away from the window.

**3**. A wiper blade as defined in claim **1**, wherein said leading-edge face is formed as a separate elongated component which is solidly joined to said support element.

**4**. A wiper device as defined in claim **3**, wherein said component, seen in a transverse cross-section, has at least approximately a shape of a triangle with one side contacting a face of said support element facing away from the window, and said leading-edge face being formed on another side of said triangle.

**5**. A wiper device as defined in claim **3**, wherein said component is glued to the one side of said support element.

**6**. A wiper device as defined in claim **3**, wherein said component is composed of a rubber-elastic material with a hardness which is no greater than a hardness of said rubber-elastic wiper strip.

**7**. A wiper device as defined in claim **3**, wherein said component is composed of plastic.

**8**. A wiper blade as defined in claim **1**, wherein said leading-edge face extends at least nearly over an entire length of the wiper blade.

* * * * *

Trials@uspto.gov
Tel: 571-272-7822

Paper 67
Entered: March 30, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

COSTCO WHOLESALE CORP.,
Petitioner,

v.

ROBERT BOSCH LLC,
Patent Owner.

---

Case IPR2016-00040
Patent 7,484,264 B2

---

Before PHILLIP J. KAUFFMAN, WILLIAM V. SAINDON, and BARRY L. GROSSMAN, *Administrative Patent Judges.*

KAUFFMAN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION

*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

## A. Overview

Costco Wholesale Corp. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, and 3 of U.S. Patent No. 7,484,264 B2 (Ex. 1001, "the '264 patent"). Pet. 1. Robert Bosch LLC ("Patent Owner") filed a Preliminary Response (Paper 15, "Prelim. Resp.") to the Petition. We instituted *inter partes* review of claims 1, 2, and 3.

We discuss preliminary matters, such as motions, in Section II below.

We held an oral hearing on January 18, 2017. *See* Paper 65 ("Tr."); *see also* Ex. 1206 (Petitioner's transcript errata).

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, and 3 the '264 patent are unpatentable.

## B. Related Proceedings

The parties indicate that the '264 patent is at issue in: *Robert Bosch LLC v. Alberee Products Inc. et al.*, No. 12-574-LPS (consolidated with No. 14-142-LPS) (D. Del.) ("the related litigation"). Pet. 1; Paper 4, 1.

The parties are currently involved in the following *inter partes* proceedings ("these proceedings"):

| Case # | U.S. Patent # | Abbreviation |
|---|---|---|
| IPR2016-00034 | 6,973,698 | "the '698 patent" |
| IPR2016-00036 | 6,944,905 | "the '905 patent" |
| IPR2016-00038 | 6,292,974 | "the '974 patent" |
| IPR2016-00039 | 7,228,588 | "the '588 patent" |
| IPR2016-00040[1] | 7,484,264 | "the '264 patent" |
| IPR2016-00041 | 8,099,823 | "the '823 patent" |

Two of the patents at issue in these proceedings, the '905 patent and the '974 patent, were at issue in prior litigation between Patent Owner and Pylon Manufacturing Corporation. Paper 36, 2. *Robert Bosch LLC v. Pylon Manufacturing Corporation* (D. Del., Case No. 08-542 (SLR)) ("the Pylon litigation"). *See* Paper 33, 1.

In these proceedings, sometimes a party submitted an identical paper or exhibit in all of the proceedings even though that paper or exhibit may not be applicable, or applies in a different manner, to a particular proceeding. At other times, we are able to apply the analysis of one proceeding to another.

[1] The '264 patent is a division of the application that became the '588 patent (IPR2016-00039). Ex. 1001, [62]. The remaining patents are not related.

C. EVIDENCE AND ASSERTED GROUNDS OF UNPATENTABILITY

Petitioner asserts that the challenged claims are unpatentable under the following grounds:

| Claims Challenged | § | References(s) |
|---|---|---|
| 1, 2 | 103(a) | Prohaska[2] and Kotlarski '383[3] |
| 1, 2 | 103(a) | Prohaska and Merkel[4] |
| 3 | 103(a) | Prohaska, Kotlarski '383, and Kotlarski '090[5] |
| 3 | 103(a) | Prohaska, Merkel, and Kotlarski '090 |
| 3 | 103(a) | Prohaska, Kotlarski '383, and Mathues[6] |
| 3 | 103(a) | Prohaska, Merkel, and Mathues |

In the Patentability section below, we address these grounds in three groupings:

1. *Prohaska and either Kotlarski '383 or Merkel*
2. *Prohaska, either Kotlarski '383 or Merkel, and Kotlarski '090*
3. *Prohaska, either Kotlarski '383 or Merkel, and Mathues*

[2] U.K. Patent Application No. GB 2 106 775 A, published Apr. 20, 1983 (Ex. 1003).

[3] PCT WO 99/02382, published Jan. 21, 1999 (Ex. 1006). The certified English translation begins at page 27.

[4] PCT WO 99/12784, published March 18, 1999 (Ex. 1016). The certified English translation begins at page 20. We reference the U.S. counterpart filed as Ex. 1017 (U.S. Pat. No. 6,295,690 B1). References to "Merkel," mean the prior art, while references to "Mr. Merkel" pertain to that person.

[5] PCT WO 00/34090, published June 15, 2000 (Ex. 1008). We reference the U.S. counterpart (Pat. No. 6,523,218 (Ex. 1009)). *See* Pet. 5, n. 1.

[6] U.S. Patent No. 3,121,133, issued Feb. 11, 1964 (Ex. 1013).

## II. PRELIMINARY MATTERS

### A. PETITIONER'S MOTION TO STRIKE AND MOTION TO EXCLUDE

#### *1. Motion to Strike*

Petitioner's Motion to Strike and associated papers[7] do not differ from the Motion to Strike in IPR2016-00038 in any meaningful way. We adopt that analysis here, and accordingly, that Motion is *denied.*

#### *2. Motion to Exclude*

Petitioner's Motion to Exclude and associated papers[8] do not differ from the Motion to Exclude in IPR2016-00039 in any meaningful way. We adopt that analysis here, and accordingly, that Motion is *granted-in-part* and *denied-in-part* as outlined below.

##### *a) Mr. Merkel's former testimony*

Just as in IPR2016-00039, the patent at issue in the proceeding at hand was not at issue in the Pylon litigation. Consequently, for the reasons given in IPR2016-00039, Petitioner has demonstrated that Mr. Merkel's testimony from the Pylon litigation is inadmissible hearsay, and with respect to this evidence, Petitioner's Motion is *granted.*

##### *b) Mr. Kashnowski's testimony*

Our analysis in IPR2016-00038 is applicable here. Consequently, Petitioner has not demonstrated effectively that the testimony at issue is

---

[7] *See* Paper 31 (authorizing the Motion), Paper 33 (Petitioner's Motion), Paper 36 (Patent Owner's opposition).

[8] *See* Paper 29 (Petitioner's Objections); Paper 50 (Petitioner's Motion); Paper 58 (Patent Owner's Opposition); Paper 63 (Petitioner's Reply to Patent Owner's Opposition).

inadmissible hearsay, and with respect to this evidence, the Motion to Exclude is *denied*.

*c) Related Portions of Patent Owner's Response*

We do not exclude any portion of Patent Owner's Response, but will not consider any citations to the excluded portion of Exhibit 2005.

### B. Patent Owner's Motion to Exclude

The Motion to Exclude and associated papers[9] have no meaningful distinction from the Motion to Exclude in IPR2016-00038, and consequently Patent Owner's Motion to Exclude portions of Mr. Peck's Declaration (Ex. 1100) is *denied*.

### C. Motions for Observation

Patent Owner submitted a Motion for Observation on cross-examination of Mr. Peck, and Petitioner submitted a response. Papers 51, 57. We considered these observations in making our analysis below. Generally, we are persuaded by each of Petitioner's responses.

[9] *See* Papers 37, 49, 55, 62.

## III. THE CLAIMED SUBJECT MATTER

### A. Illustrative Claim

Of the challenged claims, 1 is independent and follows:

> 1. A wiper blade (**10**) for an automobile windshield (**14**), with an elongated belt-shaped, flexible resilient support element (**12**) having a longitudinal axis, on the lower belt surface (**22**) of which that faces the windshield is located an elastic rubber wiper strip 24 sitting against the windshield that extends parallel to the longitudinal axis, and on the upper belt surface (**16**) of which a wind deflection strip (**42** or **112**) is located that has an incident surface (**54** or **140**) facing the main flow direction of a driving wind (arrow **52**), said deflection strip extending in the longitudinal direction of the support element, characterized in that the wind deflection strip has two sides (**48**, **50** or **136**, **138**) that diverge from a common base point (**46** or **134**) as seen in a cross section, that the incident surface (**54** or **140**) is located at the exterior of one side (**50** or **138**) and that the profile of the cross section of the wind deflection strip is the same along its entire length, wherein the support element has outer edges, and wherein the sides of the wind deflection strip have respective free ends having thereon respective claw-like extensions that fittingly grip around the outer edges of the support element at least in sections, so that the wind deflection strip can be snapped onto the outer edges or slid onto the outer edges in a longitudinal direction, wherein between the two sides (**48**, **50** or **136**, **138**) of the wind deflection strip (**42** or **112**) there is at least one support means (**58** or **144**) located at a distance from their common base point (**46** or **134**) that stabilizes the sides, wherein the support means is made up of a wall (**58** or **144**) connected to both sides (**48**, **50** or **136**, **138**) that extends in the longitudinal direction of the wind deflection strip (**42** or **112**), and wherein the wall (**58** or **144**) extends along the entire length of the wind deflection strip (**42** or **112**).

Claims 2 and 3 depend from independent claim 1.

B. CLAIM INTERPRETATION

In an *inter partes* review, we interpret the claims of an unexpired patent using the broadest reasonable construction. *See* 37 C.F.R. § 42.100(b).

In our Institution Decision, we stated

> We determine that the "at least one support means" of independent claim 1 is not a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6. We emphasize that this claim construction is based on the record to this point, and is preliminary.

Dec. 10.

Neither party challenges this determination or otherwise addresses construction of these terms. We adopt our analysis from the Institution Decision. *See* Dec. 7–9.

We do not expressly construe any other claim terms. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy).

## IV. PATENTABILITY

A. SCOPE OF REPLY

Patent Owner contends that portions of Petitioner's Reply are improper, and consequently, the Board should not consider those portions. Paper 54. Petitioner disagrees. Paper 56. The arguments here on this issue do not differ in any meaningful way from those in IPR2016-00039 and we adopt that analysis here. Consequently, Petitioner's arguments are proper.

## B. CREDIBILITY OF DR. DAVIS

There is no meaningful distinction between this argument here and that made in IPR2016-00038. *See* PO Resp. 19–23; Pet. Reply. 23–24. As in IPR2016-00038, the factors discussed detract slightly from Dr. Davis's testimony, but not so much to warrant that we give his testimony overall little or no weight. Our analysis below reflects this determination.

## C. LEVEL OF SKILL

We do not discern a meaningful difference between the arguments on this issue here and that in IPR2016-00038, and we incorporate that analysis here. *See* PO Resp. 1–2; Pet. Reply 2–4. Here, as in IPR2016-00038, the prior art of record is reflective of the level of skill in the art. We address what was known in the art in our analysis below.

## D. CHRONOLOGY

The following generally chronological discussion pertains to all four *Graham* factors, and is applicable to all of the challenged claims and grounds of unpatentability.[10]

### *1. Prior to the '264 Patent*

Conventional wipers were known prior to the critical date of the '264 patent. *See* PO Resp. 12; Ex. 1018 ¶¶ 19–20; Ex. 2003 ¶ 21; Ex. 2007 ¶ 2; *see also* PO Resp. 4 (citing Exs. 2008 and 2009 as examples of known

---

[10] Much of what Patent Owner labels as "secondary considerations" (*see* PO Resp. 11–19) pertains to all four *Graham* factors and is addressed in this section.

conventional wipers). Conventional wipers, also known as yoke or yoke-style wipers, include a series of flexible rails that distribute force along the wiper blade. Ex. 1018 ¶ 19; PO Resp. 4; Ex. 2003 ¶ 21. Barth is an example of a conventional, yoke wiper, as illustrated in Figure 1 below:




Figure 1 depicts a conventional or yoke-style wiper structure. *See* Ex. 1018 ¶ 19 (including this Figure from Barth).

Beam wipers were known prior to the critical date of the '264 patent. *See* Pet. 15–17 (discussing Kotlarski '383 (Ex. 1007) and Merkel (Ex. 1016)); Pet. Reply 3; PO Resp. 13 ("beam blades were described in paper patents long before the invention at issue here"). Beam wipers, also known as flat wipers, use metal strips adjacent the wiper blade to distribute the load along the length of the wiper blade rather than the yokes. Ex. 1018 ¶ 22. Figure 1 of the '264 patent is reproduced below:




Fig. 1

Figure 1 of the '264 patent is a perspective view of a beam wiper blade with the wiper arm shown as a dot-dashed outline. Ex. 1001, 3:65–67; *see also* Ex. 1005, Fig. 1; Ex. 1004, Fig. 1.

Patent Owner emphasizes that although beam wipers were known, there were no "commercially viable" beam wipers prior to 2002. PO Resp. 13 (citing Ex. 2007 ¶ 3; 2003 ¶ 23).[11] Even if the beam wipers that were known prior to 2002 were not commercially viable, that does not alter the fact that beam wipers were known prior to the '264 patent.

Use of a spoiler (wind deflection strip) to counter the lifting force that occurs at high vehicle speeds and ensure reliable contact pressure between the wiper strip and the windscreen was known for both conventional and beam wipers. Pet. 10–12, 15–17, 38; Ex. 1003 (conventional); Ex. 1006

---

[11] Patent Owner also cites to Exhibit 2005, but we do not consider that evidence here.

(beam); Ex. 1013 (beam); *see also* Ex. 1001, 5–8 (incorporating the application that became the '588 patent).

Use of claw-like extensions to fittingly grip the outer edges of the support element was known. Pet. 12, 31, 34–35; Ex. 1003, 1:68–83, 2:61–70, 80–86, (describing that the spoiler includes downwardly directed elongations having claws, formed either as individual claws or along the entire length of the strip, that attach the spoiler to wiper strip by engaging the longitudinal grooves of the wiper strip), Figs. 1–3.[12]

In sum, prior to the '264 patent, conventional and beam wipers were known. Use of a spoiler to counter lift off in both conventional and beam wipers was known. *See* Pet. 10–18; Pet. Reply 3. Specifically, use of a hollow spoiler on a conventional wiper (*e.g.*, Ex. 1003) and use of a solid spoiler on a beam wiper (*e.g.*, Exs. 1006, 1013) were both known. Pet. 11–12, 15–18; Pet. Reply 3; *see also* Ex. 1001, 1:46–51 (acknowledging in the '264 patent a beam wiper with spoiler as prior art).

*2. Patent Owner's Mischaracterizations*

Given what was known in the art, Patent Owner's argument that conventional thinking at the time of the '264 patent was to avoid additional components on a beam blade and that beam blades are highly sensitive to such modifications is directly contradicted by the evidence of record. PO Resp. 3–5, 9, 11, 14; Pet. Reply 5–6. We agree with Dr. Peck that the sensitivity of beam blades was a design factor that was understood prior to the '264 patent. *See* Pet. Reply 7 (citing Ex. 1100 ¶ 9).

---

[12] Although some of this description relates to Figure 1, it is applicable to similar Figure 3. *See* Ex. 1003, 2:56–61.

In association with the argument that the ’264 patent took an unconventional approach, Patent Owner characterizes the ’264 patent as meeting a long-felt but unresolved need, producing unexpected results, and being met with skepticism. PO Resp. 12, 15–16 (citing Ex. 2003 ¶¶ 22–25, 58–60, 65, 73, 77, 79).[13] This evidence applies to a flexible spoiler with diverging legs and not the claims at issue here. Further, the ’264 patent does not explicitly disclose or fairly imply that providing a beam wiper with a spoiler met a long-felt but unresolved need or produced unexpected results. To the contrary, as mentioned above, the ’264 patent itself acknowledges that the prior art included a wiper blade provided with a wind deflection strip. We agree with Petitioner that the proposed modification was not contrary to conventional thinking at the time. *See, e.g.,* Pet. Reply 20 (citing Ex. 1100 ¶¶ 7–8).

*3. The ’264 Patent*

The ’264 patent discloses a wiper blade having a wind deflection strip that produces a force component directed toward the windshield to counteract the tendency of the wiper blade to lift off the windshield due to airflow at high vehicle speeds. Ex. 1001, 1:46–51.

---

[13] We note that paragraphs 65, 73, 77, and 79 do not relate to the patent at issue in this case.

Wiper blade 10 includes elongated belt-shaped, flexible spring support element 12 and wind deflector strip 42. *Id.* at 4:9–10, 4:67–5:6; Figs. 1, 2. Wind deflector strip 42 is made of an elastic material such as plastic, and has an essentially triangular cross section formed by sides 48 and 50 diverging from common base point 46 at one end and connected at the opposite ends by a support means such as wall 58. *Id.* at 5:6–34. Figure 2 follows.

Fig. 2




Figure 2 is a cross sectional view of wiper blade 10 through line II-II shown in Figure 1. *Id.* at 4:1–2.

E. OBVIOUSNESS OVER PROHASKA AND EITHER KOTLARSKI '383 OR MERKEL

Claim 2 follows:

> A wiper blade according to claim **1,** characterized in that the support element **(12)** includes two flexible rails **(36)** each of which sits in a longitudinal notch **(34)** associated with it, respectively, said longitudinal notches being open toward the opposite lateral sides of the wiper strip **(24),** that the outer strip edges **(38)** of each of said flexible rails extend out of these notches, and that the support means **(58 or 144)** are positioned at a distance from the support element **(12)**.

*1. Uncontested aspects*

Petitioner contends that claims 1 and 2 would have been obvious over Prohaska and either Kotlarski '383 or Merkel. Pet. 10–12, 15–17, 29–36, 46–51.[14] Specifically, Petitioner contends that Kotlarski '383 and Merkel each disclose a wiper as claimed, except the wind deflection strip is not hollow. *Id.* at 29–32, 35. Petitioner contends that Prohaska discloses a hollow wind deflection strip as claimed, except that profile of the cross section is not the same along the entire length. *Id.* at 10–12, 30–32, 34–36, 38–43. Petitioner contends that it would have been obvious to substitute Prohaska's hollow wind deflection strip (spoiler) for either Kotlarski '383's or Merkel's deflection strip, and to form Prohaska's strip with a cross section that is the same along the entire length. *Id.*

Petitioner's contentions regarding the claimed limitations are supported by a preponderance of the evidence and we adopt them here. As discussed above, each of the claimed elements was known. Patent Owner

[14] *See also* Exhibit 1019, Declaration of Dr. Kruger, and associated illustrations of claims 1–3 at Exhibits 1026–1028.

does not dispute that the features of the challenged claims are found in the prior art. *See* Paper 17 ¶ 3 (instructing Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] will be deemed waived"); Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,766 (stating that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief").

*2. Contested Aspects*

Patent Owner contests the obviousness of the combination by arguing that a person of ordinary skill would not have made the proposed modifications, and by submitting secondary indicia of nonobviousness. PO Resp. 2–10.

Petitioner contends that the proposed modification would have predictably yielded a lighter weight blade that provides the benefit of a less powerful drive system. Pet. 38–39 (citing Ex. 1005, col. 2 (evidencing that reduced weight reduces wiper drivetrain stress) (citing Ex. 1021, col. 3–4 (evidencing that a hollow spoiler reduces manufacturing materials)). Petitioner contends that modifying Prohaska's wind deflector strip to have a constant cross section along its length is faster and cheaper to manufacture than a cross section that varies along the length and improves stability. *Id.* at 40 (citing Ex. 1018 ¶ 66 (explaining the benefits of manufacturing with a constant cross section); Ex. 1017, 2:47–49 ("Advantages from a manufacturing standpoint can be obtained if the wiper strip has a constant cross section substantially over its entire length.")). Petitioner contends that such a combination would lead to predictable results. *Id.* at 39–40 (Ex. 1018, Davis Decl. ¶ 55 (explaining that the proposed combination reduces material costs and system weight). Petitioner contends that a person of

ordinary skill would have recognized that Prohaska's claws provide a method of attachment and could have easily been adapted to clip to either Kotlarski '383's or Merkel's spring rails. *Id.* at 41–43.

*a) Alleged Hindsight*

Patent Owner contends that Petitioner's reasoning for adding Prohaska's spoiler improperly invokes hindsight. PO Resp. 2–3. In particular, Patent Owner emphasizes: (1) fundamental differences between conventional and beam blades, (2) a person of ordinary skill in the art would not have had reason to modify Kotlarski '383 or Merkel, and (3) the disadvantages mentioned by Prohaska of its hollow-shaped Figure 3 conventional spoiler would have led a POSITA to avoid using it, particularly given the highly sensitive beam blade.[15] *Id.* at 3. We analyze these contentions in turn.

*(1) Fundamental Differences*

According to Patent Owner, conventional and beam blades are so fundamentally different that a person of ordinary skill would not have combined conventional and beam blade teachings. PO Resp. 3–5 (citing Ex. 2003 ¶¶ 21–25, 58–61, 65–67, 77–79). This statement is contradicted by the evidence of record, in that conventional and beam wipers have commonalities. For example, beam and conventional wipers can use the same wiper strip, and can be attached to an actuating arm.[16]

---

[15] Although there is considerable overlap between the argument and evidence here and in IPR2016-00039, there are enough distinctions so that we cannot simply rely on that analysis there.

[16] Regarding the wiper strip, *see, e.g.*, Ex. 1003, Fig. 1 (conventional strip); Ex. 1006, Fig. 10 (beam strip). Regarding the arm *see, e.g.*, Ex. 1006, 33

Patent Owner contends that conventional blades have several disadvantages, and that beam blades solved these problems by among other things, eliminating the yoke. PO Resp. 4 (citing Ex. 2003 ¶¶ 21–23, 79). In support, Dr. Dubowski opines that because beam blades avoid the high superstructure of a conventional wiper, beam blades "were hoped to perform better in extreme weather conditions" such as ice and snow. Ex. 2003 ¶ 23. Dr. Dubowski opines that beam blades are greatly affected by small changes in beam shape and by attaching additional components. Ex. 2003 ¶ 58. According to Dr. Dubowski, this is caused by the different in pressure distribution in each wiper type, namely, that conventional wipers have a series of yokes to distribute pressure, while beam wipers distribute pressure through a spring-elastic support element that runs the entire length of the wiper strip. *Id.* Dr. Dubowski concludes that conventional thinking at the time of '264 patent was to avoid additional components on a beam blade.[17] *Id.* (citing three patents submitted in these proceedings).[18]

An assertion that conventional wipers were "hoped" to perform better in ice and snow falls short of establishing that beam wipers performed better in ice and snow. *See* Ex. 2003 ¶ 23. More importantly, Patent Owner has

(referring to driven wiper arm 18 for a beam blade); Ex. 2008 (U.S. Pat. No. 2,596,063 to Anderson), 3:6–8 (referring to conventional wiper arm 1), Fig. 2.

[17] Paragraphs 65 and 73 do not relate to the '264 patent, and this evidence adds nothing to Patent Owner's assertion here.

[18] Appel '551 (Ex. 1005 of IPR2016-00038); Appel '770 (Ex. 1006 of IPR2016-00034); Swanepoel '564 (Ex. 1010 of IPR2016-00034).

not explained cogently how the superior ice and snow performance of a beam wiper relates to the modification proposed by Petitioner.

Although the three patents cited by Dr. Dubowski do not have additional components attached, Patent Owner does not identify, nor do we discern, any disclosure in these patents that is critical of increasing wiper profile or adding additional components. At most, these patents illustrate one approach and are silent regarding other approaches. Consequently, to the extent that Patent Owner's argument suggests that these patents teach away from the proposed modification, such is not the case. Further, both Katlarski '383 and Merkel are beam patents that include spoilers. This evidence directly contradicts Patent Owner's contention that conventional thinking was to avoid such additions, yet, Dr. Dubowski's opinion does not address that evidence. Patent Owner's choice of addressing other approaches and not addressing the strongest evidence is unpersuasive.[19]

In sum, we are not persuaded by Patent Owner's contention that conventional thinking at the time of the '264 patent was to avoid additional components on a beam blade. As detailed above, use of a spoiler (additional component) to counter lift off in both conventional and beam wipers was known.

*(2) Reason to Modify*

Patent Owner makes two contentions in support of the argument that a person of ordinary skill in the art would not have reason to modify either

[19] Patent Owner's reference to the "failure" of the Trico wiper is similarly flawed. *See* PO Resp. 5. This assertion is addressed in greater detail in the secondary considerations analysis that follows.

Kotlarski '383 or Merkel: one, because each discloses a complete beam solution, and two, because none of the prior art teaches the required changes to the wiper strip, support element, and spoiler attachment mechanism. PO Resp. 5–6; (citing *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 759 (Fed. Cir. 2015)). In support, Dr. Dubowski echoes the Response, stating that Kotlarski and Merkel disclose a complete beam blade solution, and that the modification would necessitate changes that the references do not teach. Ex. 2003 ¶¶ 74, 77.

Patent Owner's contention that a person of ordinary skill would not have made the proposed modification because Kotlarski '383 and Merkel each disclose a complete solution is unpersuasive. This argument is overbroad and not tied to the facts of this case. As Petitioner observes, this argument would largely render § 103 superfluous. Pet. Reply. 10.

Further, the non-precedential case cited by Patent Owner is distinguishable from the case at hand. *See* PO Resp. 5–6. In *Plas-Pak* the proposed modification would render either fundamentally alter a prior art reference's principle of operation or would render it inoperable for its intended purpose. *Plas-Pak,* 600 F. App'x at 759–60. We agree with Petitioner's characterization that the proposed modification here would not fundamentally alter the principle of operation of Katlarski '383 or Merkel, nor render them inoperable for their intended purpose. Pet. Reply 12–13. Rather, the modified wipers would weigh less and require less material to manufacture, but would otherwise clean windshields and counter wind-lift in the same way as when unmodified. *Id.*

Patent Owner's contention that the references do not teach the needed changes is also unpersuasive. We agree with Petitioner that Patent Owner

has not gone so far as to assert that the proposed change is beyond the level of skill in the art. Pet. Reply 12. As Petitioner explained and Patent Owner did not contest, a person of ordinary skill includes a degree of ingenuity or problem solving skill. *See* Pet. 21–22; Pet. Reply 1–2; PO Resp. 1–2. Further, given what was known in the art as detailed above, the proposed modification was within the level of skill in the art to make the proposed modification.

*(3) Prohaska's alleged disadvantages*

Patent Owner contends that Prohaska "taught away from using the Figure 3 hollow spoiler at all" because, as a person of ordinary skill would have understood, that spoiler "would lead to aerodynamically excited, degrading vibrations—which would disturb wiping ability and lead to premature failure." PO Resp. 6–7 (citing Ex. 1003, 3:7–22). According to Patent Owner, Dr. Davis agrees. *Id.* at 7–9 (citing Ex. 2002, 113:15–115:14).

We are not persuaded by Dr. Dubowski's opinion that adding Prohaska's spoiler shown in Figure 3 would "lead to aerodynamically excited, degrading vibrations." *See* Ex. 2003 ¶¶ 66, 73. Dr. Dubowski does not explain the feature or features that cause vibrations. Nor does Dr. Dubowski cite any underlying facts or data. The only portion of Prohaska cited by Dr. Dubowski is the portion describing that Figure 3 has a possible disadvantage.

We consider the cited portion of Prohaska in context. Prohaska discloses several embodiments of a windshield wiper blade assembly. Ex. 1003 [57], 2:56–57. Figures 3 and 6 of Prohaska follow:




Figures 3 and 6 are wiper assemblies that each include a flexible strip having a back formed as a spoiler. Ex. 1003, 2:33–34, 49–40. Prohaska describes that the embodiment shown in Figure 3 includes a spoiler in the form of a hollow resilient strip that "possibly might be disadvantageous." *Id.* at 3:2–6. Prohaska describes that this disadvantage is avoided in the embodiment shown in Figure 6 in that head 11 includes inclined surface 18 which closely rests against back 31 of flexible strip 30. *Id.* at 3:7–10.

Prohaska does not expressly state that the embodiment shown in Figure 3 may induce aerodynamic vibrations, that it should not be used, or that it is ineffective. Rather, Prohaska states the embodiment "possibly might be disadvantageous." This language indicates that the negative aspect may or may not be present. Further, the severity of that negative aspect is characterized as a disadvantage, not as a feature that would prohibit effective wiper operation. A person of ordinary skill would understand that the embodiment shown in Figure 3 may or may not have a disadvantage. In contradiction of Dr. Dubowski's assertion, Prohaska indicates that the invention (meaning all embodiments including that of Figure 3) ensures

reliable contact between the wiper element and windscreen. Ex. 1003, 1:38–42, 97–100.

As we stated in our Institution Decision, Prohaska is best characterized as disclosing that the disadvantage of Figure 3 is a tradeoff and not a teaching away. Dec. 15–16. We incorporate that analysis here. Further, we agree with Petitioner that Dr. Davis's testimony is consistent with this interpretation rather than Patent Owner's assertion. Pet. Reply 14 (quoting Dr. Davis's testimony from Ex. 2002, 113:15–115:14) ("[I]t's kind of one of the design trade offs that you would be making . . . and it would certainly be lighter, but there could be a bit of a tradeoff there.")).

*(4) Hindsight Summary*

Specifically, As detailed above, Petitioner reasons, with uncontested supporting evidence, that modifying Katlarski '383 and Merkel to have a hollow spoiler as taught by Prohaska, would yield a lighter weight blade that provides the benefit of a less powerful drive system, modifying Prohaska's wind deflector strip to have a constant cross section along its length is faster and cheaper to manufacture than a cross section that varies along the length and improves stability. Thus, Petitioner's reasoning has a rationale underpinning. Patent Owner's arguments to the contrary are unpersuasive.

*b) Secondary Considerations*[20]

We consider Patent Owner's contention that this case involves the secondary considerations of: long-felt but unresolved need, industry praise

[20] We do not consider Patent Owner's citations to the excluded portion of Exhibit 2005 (pp. 210–264). Alternatively, that evidence is unpersuasive for the reasons given in IPR2016-00038, and we incorporate that analysis here.

and awards, failure of others, commercial success, licensing, unexpected results, and copying. PO Resp. 12; *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) (when present, secondary indicia of nonobviousness must be considered).

"For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (emphasis and internal quotation marks omitted) (cited with approval in *ClassCo, Inc. v. Apple, Inc*, 838 F.3d 1214 (Fed. Cir. 2016). There is a presumption of nexus for objective considerations when the Patent Owner demonstrates that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent. *WBIP*, 829 F.3d at 1329.

Before addressing the specifics of Patent Owner's secondary considerations, we emphasize that, as discussed above, most of Patent Owner's secondary considerations arguments are based upon mischaracterizations of the scope and content of the prior art.

*(1) Lack of Connection between the Products and Challenged Claims*

Patent Owner contends that the Aerotwin and Icon blades each "practice the challenged claims." PO Resp. at 15 (citing Ex. 2014, 3; Ex. 2015, 33–57, 59–62; Ex. 2016, 30–43, 45–48; Ex. 2007 ¶ 6; Ex. 2006, 698:19–699:22).[21] Patent Owner describes the Aerotwin and ICON wipers

[21] We do not consider the evidence cited in Ex. 2005.

as having a flexible spoiler with diverging legs mounted on the top of the blade as well as plastic end caps.[22] *Id.*

Most of the cited evidence deals with patents other than the ’264 patent, and does not evidence any connection between the challenged claims and the Aerotwin and ICON wipers. *See* Ex. 2015, 33–57 (relating to the ’905 patent), 59–62 (relating to the ’698 patent); Ex. 2016, 30–43 (relating to the ’905 patent), 45–48 (relating to the ’698 patent); Ex. 2006, 698:19–699:22 (relating to the ’905 patent).

One citation relates to the ’264 patent. In response to interrogatories in the related litigation, Patent Owner asserted that the Aerotwin, ICON Generation 1, and ICON Generation 2 practice at least one claim of a list of patents that includes the ’64 patent. Ex. 2014, 3. This assertion is conclusory and not supported by a cogent explanation. Further, Patent Owner does not explain effectively how the ICON Generation 1 and 2 correspond to an ICON wiper. *See* Pet. Reply 14.

Patent Owner’s proffered evidence may apply to IPR2016-00036 because the features enumerated by Patent Owner are found in claim 13 of the ’905 patent. None of the challenged claims of this proceeding include diverging legs mounted on the top of the blade or plastic end caps. Further,

[22] As mentioned above, at times the same paper is submitted in each of these proceedings without tailoring that paper to the particular case involved. This is perhaps most significant here. Further, we agree with Petitioner, that submitting the same evidence of secondary considerations in each of these proceedings undermines the evidence because the patents involved are directed to different inventions. *See* Pet. Reply 18–19.

the challenged claims do not recite that the spoiler ("wind deflection strip") is flexible. This information has little or no relevance to our inquiry here.

Consequently, Patent Owner is not entitled to a presumption of nexus, because Patent Owner has not demonstrated that the products (the Aerotwin and ICON wipers) are the invention disclosed and claimed in the patent. Indeed, Patent Owner has not demonstrated effectively any connection between these products and the claims of the '264 patent.

*(2) Commercial Success and Industry Praise*

Patent Owner contends that the Aerotwin wiper won the Pace, Automechankia, and Frost & Sullivan awards. PO Resp. 14, 17–18 (citing Ex. 2007 ¶¶ 3, 8). In support, Mr. Kashnowski states that the Pace award mentioned the use of a flexible spoiler on the Aerotwin blade and that Frost & Sullivan was "one of the more prominent automotive research organizations." Ex. 2007 ¶¶ 3, 8.

Patent Owner does not provide a copy of any award or an explanation of the award criteria. Regarding the Pace award in particular, it appears this evidence may apply to IPR2016-00036 because the spoiler (wind deflection strip 42) of the '905 patent is flexible (made of an elastic material), while none of the challenged claims recite that the component (spoiler) is flexible. *See* Ex. 1001, 7:10–8:20; IPR2016-00036, Ex. 1001, 7:60–8:21. The observation that Frost & Sullivan was a prominent research organization does little to put the award in context. Without context, these awards have little meaning.

As mentioned above, Patent Owner contends that although beam blades were known, Patent Owner's Aerotwin wiper blade was the first commercially successful beam blade in the United States aftermarket. *Id.* 13

(citing Ex. 2007 ¶ 3). In particular, Patent Owner contends that the ICON blade had commercial success and praise as evidenced by: (1) the demand from Bosch customers for the Icon blade was considerably high, even though it was more expensive than conventional blades; and (2) customers expressed a great deal of excitement for the Icon blade. *Id.* at 14–15 (citing Ex. 2007 at ¶ 5; Ex. 2005, 270:14–271:3[23]).

The evidence cited by Patent Owner has numerous shortcomings.

Although Patent Owner contends that the Aerotwin was the first commercially successful beam wiper in the United Sates, the sales figures and awards cited are for the ICON wiper.

Mr. Kashnowski, Director of Product Management for Wiping systems for Patent Owner has more than 20 years of working with wipers. Ex. 2007 ¶ 1. Mr. Kashnowski testified in the Pylon litigation that Patent Owner's wipers having spoilers and end caps had the most success, growth, and value to customers of any product line he could recall. Ex. 2005, 270:14–271:3. Mr. Kashnowski does not explain how the success is tied to features of the challenged claims and appears to relate to the claims at issue in IPR2016-00036.

Mr. Kashnowski states that demand for the ICON blade was "considerably high" despite being more expensive than conventional blades. Ex. 2007 at ¶ 5. *Id.* Here we seek objective indicia of nonobviousness, yet, that demand was "considerably high" is a subjective opinion.
Mr. Kashnowski does not provide gross sales figures in dollars or units sold,

---

[23] This portion of Exhibit 2005 was not excluded. The record does not reflect why Petitioner sought to exclude Mr. Merkel's testimony from the Pylon litigation, but not Mr. Kashnowski's.

market share, growth in market share, or any objective indication of commercial success.

Similarly, Mr. Kashnowski states that customers were "more exited" for the ICON product than any other automotive product he has been involved with. Ex. 2007 ¶ 5. Presumably, with 20 years of experience in the automotive field, Mr. Kashnowski has been involved with numerous products; however, customer excitement is a subjective observation and not an objective indication of industry praise or commercial success. Even if customer excitement to some extent indicates industry praise or commercial success, Mr. Kashnowski does not provide any explanation that ties customer excitement to claimed features.

Patent Owner presents three years of "sales of the ICON product" (2006 - $17,000,000; 2007 - $24,000,000; 2008 - $28,000,000).[24] PO Resp. 17; Ex. 2007 ¶ 8. This testimony relates to a wiper with ends caps, not the claims of the '264 patent. Even if the ICON wiper corresponds to the challenged claims, this evidence has little persuasive value for several reasons. Patent Owner provides no argument or evidence that attributes this success to claimed features. Patent Owner presents no evidence regarding market share. This information, without market share information, is only weak evidence, if any, of commercial success. *See In re Applied Materials*, 692 F.3d 1289, 1299 (Fed. Cir. 2012). Although we note that sales grew in the period presented, Patent Owner does not address that growth, nor does Patent Owner explain how such growth is tied to claimed features.

[24] Presumably, these figures represent annual gross sales revenue.

Patent Owner argues that products having a flexible spoiler, plastic end caps, and diverging legs mounted on the top of the blade were tested extensively to reduce noise, and this reduced noise was part of the reason for great customer demand. PO Resp. 15–16. This description may apply to the ’905 patent at issue in IPR2016-00036, but is not relevant to our inquiry here.

*(3) Skepticism*

Although Patent Owner does not list skepticism as one of the objective indicia raised, Patent Owner does make such an argument. PO Resp. 12 (not mentioning skepticism), 16, n. 7 (mentioning skepticism). Specifically, Patent Owner argues that a top mounted spoiler ran against the grain of conventional wiper understanding. *Id.* at 15 (citing Ex. 2003 at ¶¶ 22–25, 58–60, 65, 73, 77, 79[25]). This argument is unpersuasive because, as detailed above, a top mount spoiler for a beam blade was known prior to the ’264 patent.

*(4) Long-felt but unresolved need and Unexpected Results*

Patent Owner contrasts the success of ICON wipers to the failure of a competitor’s beam-blade product, the Trico Innovision wiper blade that was introduced in 2004 and “failed.” PO Resp. 16–17 (Ex. 2007 ¶ 7); *see also* PO Resp. 5 (suggesting that Trico’s wiper failed due to lack of a flexible spoiler).

To the extent that Patent Owner contends that Trico’s failure is evidence of satisfying a long-felt, but unmet need, such argument and

---

[25] We note that paragraphs 65, 73, and 79 do not relate to the patent at issue in this case. The other paragraphs are addressed in previous analysis.

evidence is unpersuasive. The Trico product's introduction in 2004 was after the critical date of the '264 patent, and Patent Owner presents no evidence regarding when the Trico product was developed. *See* Pet. Reply 21; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) (the unmet need must exist on the patent's filing date).

To the extent that Patent Owner is suggesting Trico's lack of commercial success demonstrates the commercial success of ICON wiper, such contention is also unpersuasive. As detailed above, Patent Owner has not demonstrated the connection between the ICON wiper and the challenged claims. Further, Mr. Kashnowski simply presents the subjective conclusion that the Trico wiper "failed in the market place." Ex. 2007 ¶ 7. Mr. Kashnowski does not reveal any factual data underlying that opinion, nor does Patent Owner explain what constitutes failure. The value of that assertion is further reduced by Petitioner's evidence that the Trico wiper achieved enough sales that manufacturing capacity had to be increased. Pet. Reply 17, n. 12 (Ex. 1100 ¶ 15).

*(5) Other Alleged Indicia*

Patent Owner contends that within a year of introduction of the Aerotwin and Icon products knockoff products appeared having spoilers with diverging legs similar to those shown in the '905 patent, as well as end caps. PO Resp. 18 (Ex. 2007 ¶ 9). This evidence may relate to the '905 patent at issue in IPR2016-00036, but it does relate to the patent at issue here. *See In re GPAC, Inc.* 57 F.3d 1573, 1580 (Fed. Cir. 1995) (evidence that does not detail what aspects of the invention were target by industry copies is entitled to little weight).

Patent Owner contends that the industry is now largely respectful of Patent Owner's beam blade patent rights, and that all of Patent Owner's major competitors have entered licensing agreements for those rights. PO Resp. 19 (citing Ex. 2007 ¶ 11). However, these agreements do not cover the '264 patent, and for that reason this licensing is not evidence of secondary indicia for the '264 patent.

*3. Conclusions*

Prior to the '264 patent, both conventional and beam wipers were known as well as use of a spoiler to counter lift off in both wiper types. Further, Petitioner has shown by a preponderance of the evidence that the elements of the challenged claims were known, and Patent Owner does not challenge these assertions.

Petitioner reasons that the proposed modification would have predictably yielded a lighter weight blade that provides the benefit of a less powerful drive system, and that modifying Prohaska's wind deflector strip to have a constant cross section along its length is faster and cheaper to manufacture than a cross section that varies along the length and improves stability. These assertions are well supported by the evidence of record. Patent Owner's arguments regarding rationale are unpersuasive, and to not address effectively Petitioner's rationale.

Patent Owner's evidence of secondary considerations may relate to the '905 patent at issue in IPR2016-00036, but not the patent at issue here. Even if this evidence was tied to claimed features, it suffers from additional shortcomings. For example, Patent Owner's evidence of skepticism, unexpected results, and long-felt but unresolved need is contradicted by the evidence of record. The ICON wiper had some success in terms of three

industry awards and gross revenue figures; however, Patent Owner did not provide sufficient information to put this success in perspective and the evidence may relate to the ’905 patent, but not the ’264 patent.

The ’264 patent applied the known technique of adding a hollow spoiler to counter wind lift on a conventional wiper to a beam wiper, and the predictable result was that the spoiler performed as it was known to perform. Further, forming the spoiler with a constant cross sectional profile along its length was a known technique for lowering manufacturing costs.

In light of this, Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 2 would have been obvious over Prohaska and either Kotlarksi ’383 or Merkel.

### F. Obviousness over Prohaska, either Kotlarski ’383 or Merkel, and Kotlarski ’090

Claim 3 follows:

> 3. A wiper blade according to claim 1, characterized in that the wind deflection strip (**42**) is designed as a binary component whose longitudinal area provided with the claw-like extensions (**56**) is made of a harder material than a longitudinal area lying closer to the base point (**46**).

Figure 2, annotated, of the '264 patent follows:




Figure 2 of the '264 patent depicts a cross section through the wiper blade along the line II-II of Figure 1 with the element number of deflection strip 42, claw-like extensions 56, and base point 46 circled. Ex. 1001, 4:1–2.

Petitioner builds upon the grounds of unpatentability based on (1) Prohaska and Kotlarski '383 and, (2) Prohaska and Merkel by adding Kotlarski '090 to each combination.[26] Pet. 51–56. Specifically, Petitioner contends that Kotlarski '090's spoiler is a soft flexible material while the claws of the retainers are formed of a relatively stiff material such as plastic. *Id.* at 17–18, 51–52 (citing Ex.1009, 3:11–12, 3:59–62, 4:33–36, 4:43–48, 4:62–64, 5:45–46, Figs. 5, 9; Ex. 1018 ¶¶ 53, 74). Petitioner reasons that a person of ordinary skill in the art would have utilized claw-like extensions formed of a harder material (plastic) than the longitudinal area closer to the

---

[26] Based on content, in the chart on page 51, reference to claim 15 is meant to be claim 1. Pet. 51.

base of the spoiler (rubber), as disclosed by Kotlarski ’090, in order to grip the spring rails. *Id.* at 52–54; Ex. 1018 ¶ 74. Petitioner contends that the resulting combination retains a flexible spoiler. Pet. 53–54 (noting that Prohaska describes the desirability of a flexible spoiler, Ex. 1003, 3:108–112). Petitioner adds that such an improvement was the use of a familiar element according to a known method to produce predictable results. Pet. 54.

Patent Owner argues that even if Kotlarski ’090’s spoiler and retainer are of a different hardness, that does not meet the requirement of claim 3 of a binary component having two different hardnesses. PO Resp. 10–11.

Patent Owner does not contest Petitioner’s contention that Kotlarski ’090’s spoiler and retainer are of a different hardnesses. This contention is supported by a preponderance of the evidence, and we adopt it here.

Patent Owner’s argument does not address the ground as articulated by Petitioner. Petitioner does not propose to add Kotlarski ’090’s spoiler and retainer to the combination of either Prohaska and Kotlarski ’383 or Prohaska and Merkel. Rather, as explained above, Petitioner contends that Kotlarski ’090 teaches retainers of a greater stiffness than the spoiler and applying this teaching to the combination of either Prohaska and Kotlarski ’383 or Prohaska and Merkel would result in the wind deflector strip corresponding to a binary component as claimed.

As mentioned above, Patent Owner’s evidence of secondary considerations relates to the ’905 patent at issue in IPR2016-00036, not the patent at issue here. Even if this evidence was tied to claimed features, it suffers from additional shortcomings.

Petitioner's reasoning that a person of ordinary skill in the art would have utilized claw-like extensions formed of a harder material (plastic) than the longitudinal area closer to the base of the spoiler (rubber), as disclosed by Kotlarski '090, in order to grip the spring rails is well supported by the evidence of record. The improvement was the use of a familiar element according to a known method to produce predictable results. Patent Owner's arguments do not persuade us otherwise.

In light of this, Petitioner has demonstrated by a preponderance of the evidence that claim 3 would have been obvious over Prohaska, either Kotlarski '383 or Merkel, and Kotlarski '090.

### G. Obviousness over Prohaska, either Kotlarski '383 or Merkel, and Mathues

Petitioner builds upon the grounds of unpatentability based on (1) Kotlarski '383 and Prohaska, and (2) Merkel and Prohaska by addressing the added limitation of claim 3 in view of Mathues. Pet. 52–56. Specifically, Petitioner contends that Mathues's squeegee 20 includes a retention portion 22 formed of a harder material than blade portion 30. *Id.* at 52 (citing Ex. 1013, 1:56–59, 2:1–7, 2:59–66). Petitioner contends that Mathues teaches making the retention portion of an article harder than the remainder of that article. Pet. 54–55. Petitioner reasons a person of ordinary skill in the art armed with this teaching from Mathues, would have modified the combination of either Prohaska and Kotlarski '383 or Prohaska and Merkel so that the claw-like extensions (retaining portion) were harder the spoiler (the remainder). *Id.* at 55. Petitioner adds that such an improvement was

use of a familiar element according to a known method to produce predictable results. Pet. 55–56.

Patent Owner argues that Mathues discloses a wiper strip made with progressively different hardnesses in different parts of the wiper strip to improve wiping quality, and does not disclose a binary component as recited in claim 3. PO Resp. 11 (citing Ex. 2003 ¶ 80).

Patent Owner does not contest Petitioner's contention that Mathues discloses a wiper strip with a retention portion of greater hardness than the remainder of the wiper strip. This contention is supported by a preponderance of the evidence and we adopt it here. Specifically, Mathues discloses a squeegee for use with windshield wipers (*i.e.*, the wiper strip portion of a windshield wiper). Ex. 1013, 1:9–11. Mathues describes that the wiper strip has two or more strata of hardness. *Id.* at 1:52–60. Specifically, the uppermost portion of that wiper strip (retention portion 22, having for example a Shore A hardness of about 95) is formed of a harder material than the lower portion of the wiper strip (blade portion 30, having a Shore A hardness of about 60). *Id.* at 2:1–5, 2:57–66. Figure 1 of Mathues follows:




Figure 1 of Mathues depicts a perspective view of the wiper strip. *Id.* at 1:41–42.

Patent Owner's argument does not address the ground as articulated by Petitioner. Petitioner does not propose to add Mathues's wiper strip to the combination of either Prohaska and Kotlarski '383 or Prohaska and Merkel. Rather, as explained above, Petitioner contends that Mathues teaches to make the retaining portion of the greater hardness than the reminder of that component.

As mentioned above, Patent Owner's evidence of secondary considerations may relate to the '905 patent at issue in IPR2016-00036, but it does not relate to the patent at issue here. Even if this evidence was tied to claimed features, it suffers from additional shortcomings.

Petitioner's reasoning that a person of ordinary skill in the art would have utilized claw-like extensions being made of a harder material (plastic) than the longitudinal area closer to the base of the spoiler (rubber), as disclosed by Mathues, in order to grip the spring rails is well supported by

the evidence of record. The improvement was use of a familiar element according to a known method to produce predictable results. Patent Owner's arguments do not persuade us otherwise.

In light of this, Petitioner has demonstrated by a preponderance of the evidence that claim 3 would have been obvious over Prohaska, either Kotlarski '383 or Merkel, and Mathues.

## V. ORDER

For the reasons given, it is:

ORDERED that claims 1 and 2 are unpatentable under 35 U.S.C. § 103(a) over Kotlarski '383 and Prohaska;

FURTHER ORDERED that claims 1 and 2 are unpatentable under 35 U.S.C. § 103(a) over Merkel and Prohaska;

FURTHER ORDERED that claim 3 is unpatentable under 35 U.S.C. § 103(a) over Kotlarski '383, Prohaska, and Kotlarski '090;

FURTHER ORDERED that claim 3 is unpatentable under 35 U.S.C. § 103(a) over Merkel, Prohaska, and Kotlarski '090;

FURTHER ORDERED that claim 3 is unpatentable under 35 U.S.C. § 103(a) over Kotlarski '383, Prohaska, and Mathues; and

FURTHER ORDERED that claim 3 is unpatentable under 35 U.S.C. § 103(a) over Merkel, Prohaska, and Mathues;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied-in-part and granted-in-part as outlined herein; and

FURTHER ORDERED that Petitioner's Motion to Strike is denied; and

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements.

PETITIONER:

Richard Koehl
richard.koehl@hugheshubbard.com

James Klaiber
james.klaiber@hugheshubbard.com

David Lansky
david.lansky@hugheshubbard.com

Stefanie Lopatkin
stefanie.lopatkin@hugheshubbard.com

James Dabney
james.dabney@hugheshubbard.com

PATENT OWNER:

Patrick Colsher
patrick.colsher@shearman.com

Mark Hannemann
mark.hannemann@shearman.com

Jospeh Purcell
Joseph.purcell@sherman.com

US007484264B2

(12) **United States Patent**
**Kraemer et al.**

(10) **Patent No.: US 7,484,264 B2**
(45) **Date of Patent: *Feb. 3, 2009**

(54) **AUTOMOBILE WINDSHIELD WIPER BLADE**

(75) Inventors: **Godelieve Kraemer**, Huegelsheim (DE); **Juergen Mayer**, Gaggenau (DE)

(73) Assignee: **Robert Bosch LLC**, Broadview, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/760,394**

(22) Filed: **Jun. 8, 2007**

(65) **Prior Publication Data**

US 2007/0226941 A1 Oct. 4, 2007

**Related U.S. Application Data**

(62) Division of application No. 10/312,279, filed as application No. PCT/DE02/01336 on Apr. 11, 2002, now Pat. No. 7,228,588.

(30) **Foreign Application Priority Data**

Apr. 26, 2001 (DE) ................................ 101 20 467

(51) **Int. Cl.**
***B60S 1/38*** (2006.01)

(52) **U.S. Cl.** .............................. **15/250.201**; 15/250.43; 15/250.48

(58) **Field of Classification Search** .............. 15/250.43, 15/250.44, 250.201, 250.451, 250.452, 250.48, 15/250.361

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,687,544 A 8/1954 Scinta

(Continued)

FOREIGN PATENT DOCUMENTS

DE 1028896 4/1958

(Continued)

OTHER PUBLICATIONS

International Search Report dated Aug. 19, 2002, European Patent Office, International Application No. PCT/DE02/01336 published Jul. 11, 2002.

*Primary Examiner*—Gary K Graham
(74) *Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

(57) **ABSTRACT**

A wiper blade that cleans panes, in particular of motor vehicles. The wiper blade (**10**) comprises a strip-shaped, elongated, elastically resilient support element (**12**), the lower strip surface of which faces the pane (**14**) and is provided with an elongated, elastic wiper strip (**24**) running parallel to the longitudinal axis. The upper strip surface (**16**) of the element is provided with a wind deflector strip (**42**), which consists of an elastic material, extends in the longitudinal direction of the support element and has an oncoming stream surface (**54**) that faces the principal flow direction, (arrow **52**), of the air stream. A particularly advantageous wiper blade, which is cost-effective to produce, can be achieved if the wind deflector strip, (when viewed in cross-section), comprises two limbs (**48**, **50**), diverging from a common base (**46**) but mutually attached thereto, the free ends of said limbs facing the pane (**14**) and being supported on the wiper blade, and if in addition, the oncoming stream surface (**54**) is configured on the external face of one limb (**50**) and the cross-sectional profile of the wind deflector strip is the same over its entire length.

**6 Claims, 2 Drawing Sheets**






U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,814,820 | A | 12/1957 | Elliott et al. | |
| 2,983,945 | A | 5/1961 | De Pew | |
| 3,084,372 | A | 4/1963 | Krohm | |
| 3,088,155 | A | 5/1963 | Smithers | |
| 3,107,384 | A | 10/1963 | Wise | |
| 3,116,507 | A | 1/1964 | Scinta | |
| 3,116,509 | A | 1/1964 | Contant et al. | |
| 3,121,133 | A | 2/1964 | Mathues | |
| 3,317,945 | A | 5/1967 | Ludwig | |
| 3,418,679 | A | 12/1968 | Barth et al. | |
| 3,427,637 | A | 2/1969 | Quinlan et al. | |
| 3,626,544 | A | 12/1971 | Lopez et al. | |
| 3,636,583 | A | 1/1972 | Rosen | |
| 3,785,002 | A | 1/1974 | Quinlan et al. | |
| 3,879,793 | A | 4/1975 | Schlegel et al. | |
| 3,881,214 | A | 5/1975 | Palu | |
| 3,958,295 | A | 5/1976 | Green et al. | |
| 4,360,943 | A | 11/1982 | Thompson et al. | |
| 4,683,606 | A | 8/1987 | Sharp | |
| 5,052,072 | A | 10/1991 | Chen | |
| 5,493,750 | A | 2/1996 | Bollen et al. | |
| 5,546,627 | A | 8/1996 | Chen | |
| 5,933,910 | A | 8/1999 | Buechele et al. | |
| 6,192,546 | B1 | 2/2001 | Kotlarski | |
| 6,292,974 | B1 | 9/2001 | Merkel et al. | |
| 6,588,048 | B2 * | 7/2003 | Ohyama | 15/250.43 |
| 6,675,434 | B1 | 1/2004 | Wilhelm et al. | |
| 6,944,905 | B2 | 9/2005 | De Block et al. | |
| 6,978,512 | B2 | 12/2005 | Dietrich et al. | |
| 7,228,588 | B2 * | 6/2007 | Kraemer et al. | 15/250.201 |
| 2003/0014828 | A1 | 1/2003 | Edner-Walter et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 1077540 | | 3/1960 |
| DE | 1247161 | | 8/1967 |
| DE | 1505357 | | 5/1969 |
| DE | 2336271 | | 7/1973 |
| DE | 2344876 | | 9/1973 |
| DE | 2440179 | | 8/1974 |
| DE | 2311293 | | 9/1974 |
| DE | 2839587 | A1 | 3/1980 |
| DE | 29611722 | | 7/1996 |
| DE | 19627114 | | 1/1998 |
| DE | 19627115 | | 1/1998 |
| DE | 19650159 | | 6/1998 |
| DE | 19734843 | | 2/1999 |
| DE | 19736368 | | 2/1999 |
| DE | 19802451 | | 7/1999 |
| DE | 19856300 | A1 | 6/2000 |
| DE | 10000373 | A1 | 8/2001 |
| EP | 0316114 | | 5/1989 |
| EP | 0624133 | | 2/1993 |
| EP | 0646507 | | 4/1995 |
| EP | 0930990 | | 7/1999 |
| FR | 2199302 | | 5/1974 |
| FR | 2679185 | | 1/1993 |
| GB | 1222648 | | 2/1971 |
| GB | 1269993 | | 4/1972 |
| GB | 1429820 | | 3/1976 |
| GB | 2036547 | | 7/1980 |
| GB | 2106775 | | 4/1983 |
| GB | 2336293 | | 10/1999 |
| GB | 2346318 | A | 9/2000 |
| JP | 6219467 | | 2/1987 |
| JP | 6222172 | | 2/1987 |
| JP | 2001502638 | T | 2/2001 |
| WO | 9850261 | | 11/1998 |
| WO | 9902383 | | 1/1999 |
| WO | 0034090 | | 6/2000 |
| WO | 0149537 | | 7/2001 |
| WO | 0192073 | A1 | 12/2001 |

* cited by examiner




Fig. 1

Fig. 2


46
64
44
42
52
50
48
54
58
34
16
56
34
25
60
12
62
16
56
38
38
22
36
22
36
10
24
28
14


134
142
138
136
140
110
124
112
122
144
126
124
123
123
130
120
122
116
124
118
148
148
114
126
146
128
14

Fig. 3

## AUTOMOBILE WINDSHIELD WIPER BLADE

### RELATED APPLICATION

This application is a divisional of U.S. application Ser. No. 10/312,279, filed Jul. 29, 2003, now U.S. Pat. No. 7,228,588 the entire content of which is incorporated herein by reference.

### BACKGROUND

In wiper blades with a spring-action support element, the support element is intended to guarantee as even a distribution of wiper blade pressure onto the windshield issued from the wiper arm as possible, and over the entire wipe field swept by the wiper blade. By appropriately bending the un-loaded support element into shape—the unloaded state being when only the two ends of the wiper blade sit against the windshield—the ends of the wiper strip, which sits completely against the windshield when the wiper blade is in operation, are pushed toward the windshield by the loaded support element, even if the radii of curvature of spherically curved vehicle windshields change with the wiper blade position. The curvature of the wiper blade must therefore be somewhat greater than the maximum curvature measured within the wipe field on the windshield to be wiped. This is because during wiping, the wiper strip, or its wiping lip that sits against the windshield, must be continuously pressed against the windshield with a specific force. The support element thus replaces the expensive stirrup design with two flexible rails located in the wiper strip, as is practiced in conventional wiper blades (DE-OS 15 05 257) since the support element provides the necessary cross-stiffening of the elastic rubber wiper strip in addition to providing a distribution of pressure. Specifically, in the known wiper blade the contact force directed toward the windshield that is exerted by a wiper arm onto a main stirrup is conveyed to two claw-like stirrups and distributed from these onto the elastic rubber wiper strip via four claws. The two flexible rails of this wiper blade mainly provide a cross-stiffening of the wiper strip between the claws when the wiper blade is pushed across the windshield perpendicular to its longitudinal length.

### SUMMARY OF THE INVENTION

In a prior art wiper blade of this type (DE 197 36 368.7), the wiper blade is provided with a so-called wind deflection strip in order to produce a force component directed toward the windshield to counteract the tendency of the wiper blade to lift off of the windshield due to the airflow at high vehicle speeds. To this end, the wind deflection strip has a leading edge during the pendulum wiping motion that is mainly impacted by the driving wind, said leading edge being designed as an incident surface. The cross section of the wind deflection strip has approximately the shape of a right triangle, one leg of which directly opposite the support element and the hypotenuse of which represents the incident surface. This makes a sharp angle with the pendulum-like plane of motion of the wiper blade and with the surface of the windshield. The triangle profile used requires a relatively large amount of material to manufacture the wind deflection strip, which is reflected in the costs of the wiper blade. Moreover, the weight of the wiper blade becomes undesirably high. Specifically, the increased mass to be accelerated in the pendulum wiping motion requires a more powerful drive system as well as a more expensive design of pendulum gear attached to it. Furthermore, the action of the support element and of the



wiper blade can be adversely affected by the bending stiffness, which depends on its profile, of a wind deflection strip thus formed.

In the wiper blade according to the invention, the weight of the wind deflection strip is considerably reduced due to the cross sectional structure of an angular profile. Moreover, in addition to the material savings, there is a reduction in the moving mass along with the advantages with respect to the design of the drive system and the pendulum gear as a result. Also, the bending stiffness of the wind deflection strip is reduced, thus considerably reducing its influence on the bending and spring behavior of the wiper blade support element. For more detailed shapes, this wind deflection strip can be manufactured both as an injection molded part as well as using the simple, and thus cost effective, extrusion process.

In a further development of the invention, at least one support means is placed between the two sides of the wind deflection strip at a distance from their common base point, said support means stabilizing the sides. This provides a certain degree of stiffening even when using a relatively soft material for the manufacture of the wind deflection strip, which provides the necessary form stability of the wind deflection strip even at a high wind loads.

What is helpful here is that the support means is made up of a wall that extends in the longitudinal direction of the wind deflection strip that is connected to both sides, said wall extending along the entire length of the wind deflection strip, if necessary.

If the support element is made up of two flexible rails, each of which sits in a longitudinal notch associated with it, respectively, said longitudinal notches being open toward the opposite lateral sides of the wiper strip, and if the outer strip edges of each of said flexible rails extend out of these notches, the support means are positioned at a distance from the support element. This results in a space between the wiper strip and the support means into which the area of the wiper strip located above the support element can extend. By correspondingly dimensioning this space, undesired friction between the wiper strip and the wind deflection strip is prevented.

In another embodiment of the concept of the invention, the free ends of the sides of the wind deflection strip are provided, respectively, with claw-like extensions that grip tightly around these exterior strip edges of the support element at least in sections. This provides the ability to snap the wind deflection strip onto the exterior edge or to push it onto this edge in the longitudinal direction. This makes it possible to do away with a glued connection between the wind deflection strip and the support element. A glued connection of this type can limit the flexibility of the support element needed to attain a satisfactory wipe result due to its stiffness.

In the process, it can be advantageous if the wind deflection strip is designed as a binary component whose longitudinal area provided with the claw-like extensions is made of a harder material than the longitudinal area lying closer to the base. In this way, the longitudinal area of the wind deflection strip provided with the extensions can be manufactured from a material that is well suited for the purposes of securing the wind deflection strip to the support element, whereas the area of the wind deflection strip provided with the incident surface can be made of a material that accounts for the further requirements on the wind deflection strip.

In a wiper blade designed in this way, it can be advantageous if the transition from the harder longitudinal area to the softer longitudinal area occurs near the wall.

According to another embodiment of the invention, it can be advantageous in certain applications if the wind deflection

strip and the wiper strip form a one-piece component that is penetrated by a longitudinal channel in which the support element sits that is designed as a one-piece flexible belt. It is further advantageous for the channel wall facing the upper belt surface of the support element to constitute the support means located between the two sides of the wind deflection strip. Designing the wiper blade according to the invention in this way is especially cost-effective to install since the wind deflection strip is made in one piece together with the wiper strip and thus some installation steps can be eliminated.

If the wall surfaces of the longitudinal channel facing the two belt surfaces of the support element are provided with longitudinal ribs that sit against the belt surfaces, this makes it considerably easier to insert the support element into the longitudinal channel as a result of the reduced friction surfaces.

In a wiper blade with a one-piece component encompassing the wind deflection strip and the wiper strip, the component has three longitudinal strip areas that are permanently connected to one another as seen in cross section, of which the wiper strip can be pressed against the windshield. The wiper strip is located on the side of the base strip, which contains the longitudinal channel, that is opposite the wind deflection strip. The three strip areas thus resulting must be designed to meet the requirements placed on them individually.

Thus, it can be very helpful if at least one of the strip areas of the component is made of a material whose hardness differs from the hardness of the other strip areas. In this way, it is possible to optimize the materials to be used with respect to the associated tasks of the individual strip areas.

Based on the requirements placed on the base strip, it is practical to make it out of a harder material than the wind deflection strip. It can also be advantageous if the transition from harder material to softer material occurs near the wall of the longitudinal channel that faces the upper belt surface of the support element.

In order to attain a satisfactory wipe result, it is practical to make the wiper strip out of a softer material than the base strip.

In the process, manufacturing advantages result if the transition from softer material to harder material occurs near the root of the wiper strip.

In order to avoid material such as snow, ice, etc. that is pushed away during the wiping process from getting jammed between the base strip and the windshield, the base strip becomes narrower as seen in cross section as it approaches the wiper strip.

To fasten a connector to the wiper blade, by means of which it can be attached to a driven wiper arm, a recess is provided in the center section of the wind deflection strip to which to attach this equipment. This recess can be produced by subsequently removing a central section of the wind deflection strip. However, in a wiper blade with a separate wind deflection strip, it is also conceivable to design this in two parts as seen in the longitudinal direction, so that one half of the wind deflection strip can be attached to the support element on both sides of the connector.

Other advantages of the further developments and configurations of the invention are given in the following description of exemplary embodiments illustrated in the associated drawing.

## DESCRIPTION OF THE DRAWINGS

FIG. **1** a wiper blade according to the invention in a perspective representation with the wiper arm shown as a dot-dashed outline,



FIG. **2** a cross section through the wiper blade along the line II-II in FIG. **1** in an enlarged representation and

FIG. **3** the arrangement according to FIG. **2** for another embodiment of the wiper blade according to the invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

A wiper blade **10** shown in FIG. **1** has an elongated belt-shaped, flexible spring, one or more part support element **12** that is curved in the longitudinal direction in the un-loaded state. Located on the convex upper, or exterior, side of the belt **16** (FIGS. **1** and **2**) of the support element facing away from the windshield **14** to be wiped there is a connector **18** attached to the center section of the support element, for example flat. By means of this connector, the wiper blade **10** can be removably connected to a driven wiper arm **20** that leads to the body of an automobile. Located on the concave lower, or inner, side of the belt **22** of the curved support element **12** that directly faces the windshield is an elongated elastic rubber wiper strip **24** that extends parallel to the longitudinal axis of the support element **12**. At the free end of the wiper arm are mating connectors, which are not illustrated in more detail, that cooperate with the connector **18** of the wiper blade to form a hinge. The wiper arm **20**, and thus the wiper blade **10**, is forced in the direction of the arrow **26** toward the windshield to be wiped whose surface to be wiped is indicated in FIG. **1** by the dot-dashed line **14**. Since the dot-dashed line indicates the greatest amount of curvature of the windshield surface, it can be clearly seen that the curvature of the as yet unloaded wiper blade **10**, whose ends **10** sit against the windshield **14**, is greater than the maximum windshield curvature. The wiper blade thus has—in the unloaded state—a concave shape in comparison to the windshield. Under pressure (arrow **26**) the wiping lip **28** of the wiper blade **10** that performs the wiping presses its entire length against the windshield surface **14** and assumes its working position approximating the stretched position. In the process, tension builds up in the belt-shaped flexible spring support element **12**, ensuring proper seating of the wiper strip **24** and its wiping lip **28** along its entire length against the automobile windshield **14**. Since the generally spherically curved windshield is not in fact a section of a spherical surface, the wiper blade **10** in conjunction with the wiper arm **20** must be able to constantly adjust itself according to its respective position and to the shape of the windshield surface **14** during its wiping motion (double arrow **30**). This necessitates a hinged connection between the wiper arm **20** and the wiper blade **10**, which enables a tilting motion (double arrow **32**) about the hinge axis of the connection, if necessary.

Below, more detail is provided on the special configuration of the wiper blade **10** according to the invention with the help of a first embodiment of the wiper blade shown in FIG. **2**.

The embodiment according to FIG. **2** of the wiper blade according to the invention has a wiper strip **24** whose two lateral sides opposite one another are each provided with a longitudinal notch **34**, said notches being opposite one another, that is open toward the lateral side. Placed into each of the longitudinal notches **34** is a flexible rail **36** whose width is larger than the depth of the longitudinal notches **34**. The two flexible rails **36** are part of the support element **12**. Their outer longitudinal edges or strip edges **38** extend out from the longitudinal notches **34**. The two flexible rails **36** are properly secured in their longitudinal notches **34** by end caps **40** (FIG. **1**). Moreover, the connector **18** (FIG. **1**) can also contribute to the securing of the flexible rails **36** in their longitudinal notches **34**. At the side of the belt of the support element

opposite the wiping lip **28**, the wiper blade **10** is provided with a wind deflection strip **42** that is made of two pieces **41**, between which the connector **18** for the wiper arm **20** sits on the support element **12** in a gap **65**. The effective area of the wind deflection strip **42** extends from each end cap **40** to the connector **18** (FIG. **1**). The wind deflection strip **42** is made of an elastic material, for example a plastic. It has an essentially triangular cross section with a cavity **44** that extends in the longitudinal direction of the wind deflection strip so that—as seen in the cross section—two side **48**, **50** result that diverge from a common base point **46** and are connected to one another at the base point. Of these, side **50** is provided with a sloped incident surface **54** at its exterior that faces the main flow direction of the wind during driving (FIG. **2**). The free ends of the two sides **48** and **50**, which extend toward the windshield **14**, are supported at the wiper blade, i.e. at the longitudinal edges **38** of the support element **12**. To this end, they grip around the longitudinal edges **38** with tightly fitting claw-like extensions **56**, at least in sections. Thus, on one side they sit against the upper side of the belt **16** of the support element **12** and grip under the lower side of the belt **22** via the extensions **56**. To install the wind deflection strip **42**, it is pushed onto the flexible rails **36** of the support element **12** in the longitudinal direction, said flexible rails having the wiper strip **24** installed on it, so that the longitudinal edges **38** are wrapped tightly by the claw-like extensions **56** of the wind deflection strip **42**. So that the wind deflection strip **42**, which is made of an elastic material, also has the necessary form stability at high rates of speed and thus at high wind pressures, a support means is placed between the two sides **48**, **50** of the wind deflection strip **42** at a distance from their common base point **46**, said support means stabilizing these sides. In the exemplary embodiment, this support means is made up of a wall **58** that is connected to the two sides **48**, **50**.

Furthermore, FIG. **2** shows that the wind deflection strip **42** has two longitudinal areas **62** and **64** that are made of different materials. The materials have different hardnesses. In the exemplary embodiment, the longitudinal area **64**—which assumes the main tasks of the wind deflection strip by means of its incident surface **54**—is made of a softer material than longitudinal area **62**, which has in particular the claw-like extensions **56** that serves to secure the wind deflection strip **42** to the support element **12**. In the process, the transition from harder longitudinal area **42** to the softer longitudinal area **64** occurs near the wall **58**. In general, the wall **58** is placed at a distance from the claw-like extensions **56** and the support element **12** between it and the common base point **46** of the two sides **48**, **50**, so that an recess **60** results between the support element and the wall **58** that provides space for the strip flaps **25** of the wiper strip **24** located above the support element. This prevents the wiper strip **28** and the wind deflection strip **42**, i.e. its wall **58** from touching one another, which disrupts the wiping process. The binary wind deflection strip **42** described has an even profile along its entire length. Thus it can be manufactured in an especially cost-effective manner by means of the so-called complex extrusion process.

The embodiment of the wiper blade **110** according to the invention corresponding to FIG. **3** differs from the wiper blade according to FIG. **2** especially in that the wind deflection strip **112** and the wiper strip **114** are permanently connected to a base strip **130**. This results in a single strip-shaped component **116** whose base strip area is penetrated by a longitudinal channel **118** into which a support element **120** is placed that is designed as a one-piece flexible spring belt. This longitudinal channel wraps around both the two belt surfaces **122** as well as the two lateral edges **123** of the support element **120**. The channel walls directly facing the belt surfaces are



provided with a number of longitudinal recesses **124** so that longitudinal ribs **126** form between the recesses that sit against the belt surfaces **122**. This facilitates the insertion of the support element **120** into the longitudinal channel **118**. At the bottom of the base strip **130** facing the windshield **114** is the wiper strip **114** with its wiping lip **128**, said wiper strip sitting against the windshield. The base strip becomes narrower—as seen in cross section—in the direction toward the wiper strip **114** so that walls result that slope toward the windshield **14**, which is particularly advantageous when wiping iced windshields or windshields covered with wet snow. On the upper side of the base strip **130** that is opposite the wiper strip **114** is the wind deflection strip **112** with its incident surface **140**. It also has a longitudinal cavity **142** that is placed such that between it and the longitudinal channel **118** a wall **144** remains that connects the sides **136**, **138**, which result from the cavity, that diverge from a common base point **134** toward the windshield **14**. The wall stabilizes the two side **136**, **138** of the wind deflection strip **112**. Some of the longitudinal ribs **126** are located on the bottom. Further, each of the three strip areas **112**, **128** and **130** of the component **116** is made of a different material. This makes it possible to select the appropriate material characteristics to account for the different requirements placed on the respective areas. For example, the hardness values of a strip area can differ from the hardness values of the others. It is especially advantageous if the base strip **130** is made of a harder material than the wind deflection strip **112** and/or the wiper strip **114**. The transition from harder material to softer material then is intended to occur near the stabilizing wall **144** or in the root **146** of the wiper strip **114** where it transitions to the base strip **130**. This results in transition regions between two directly adjacent strip areas **112** and **130** or **130** and **114**. The exact position of these transition regions is established on a case-by-case basis by one trained in the art—taking into consideration the appropriate special requirements placed on the wiper blade.

In the embodiment of the wiper blade **110** according to FIG. **3**, component **116** first of all has the same length as the support element **120**. To secure component **116** to the support element in its longitudinal direction, it is provided at both ends with a recess so that the two end areas of the support element **120** are exposed and accessible to snap on end caps **40**. Further, the wind deflection strip **112** is provided with a gap or recess at its center section that in principle corresponds to the gap **65** in FIG. **1**. This recess can be designed deep enough that in this embodiment the support element **120** is exposed and thus ready for the installation of the connector **18**. In this embodiment, it has been shown to be especially helpful if this gap **65** is attached by means of a process known as "water jet cutting".

Both the wind deflection strip **42** and the wiper strip **24** as well as the component **116** have an even profile along their entire length and can thus be manufactured in an especially cost-effective manner in one piece by means of the so-called extrusion process. In the process, it is quite helpful to manufacture these parts using the so-called complex extrusion process. The necessary sections can then be cut to length as needed—as well in the embodiment according to FIG. **2**.

All exemplary embodiments share the characteristic that the wind deflection strip **42** or **112** has two sides **48**, **50** or **136**, **138** that diverge from a common base point **46** or **134** as seen in cross section and that are connected to it. The free ends of the sides that face the windshield **14** are supported at the wiper blade. What is also common is that the incident surface **54** or **140** is designed at the exterior of one side **50** or **138** and that the profile of the cross section of the wind deflection strip is the same along its entire length. Further, both exemplary

embodiments have at least one support means located between the two sides **48, 50** of the wind deflection strip **42** or **112** at a distance from their common base point **46** or **134**. This support means is made up of a wall **58** or **144** that is connected to both sides and extends in the longitudinal direction of the wind deflection strip, said wall extending along the entire length of the wind deflection strip, if necessary.

The invention claimed is:

**1**. A wiper blade (**10**) for an automobile windshield (**14**), with an elongated belt-shaped, flexible resilient support element (**12**) having a longitudinal axis, on the lower belt surface (**22**) of which that faces the windshield is located an elastic rubber wiper strip **24** sitting against the windshield that extends parallel to the longitudinal axis, and on the upper belt surface (**16**) of which a wind deflection strip (**42** or **112**) is located that has an incident surface (**54** or **140**) facing the main flow direction of a driving wind (arrow **52**), said deflection strip extending in the longitudinal direction of the support element, characterized in that the wind deflection strip has two sides (**48, 50** or **136, 138**) that diverge from a common base point (**46** or **134**) as seen in a cross section, that the incident surface (**54** or **140**) is located at the exterior of one side (**50** or **138**) and that the profile of the cross section of the wind deflection strip is the same along its entire length, wherein the support element has outer edges, and wherein the sides of the wind deflection strip have respective free ends having thereon respective claw-like extensions that fittingly grip around the outer edges of the support element at least in sections, so that the wind deflection strip can be snapped onto the outer edges or slid onto the outer edges in a longitudinal direction, wherein between the two sides (**48, 50** or **136, 138**) of the wind deflection strip (**42** or **112**) there is at least one support means (**58** or **144**) located at a distance from their common base point (**46** or **134**) that stabilizes the sides, wherein the support means is made up of a wall (**58** or **144**) connected to both sides (**48, 50** or **136, 138**) that extends in the longitudinal direction of the wind deflection strip (**42** or **112**), and wherein the wall (**58** or **144**) extends along the entire length of the wind deflection strip (**42** or **112**).

**2**. A wiper blade according to claim **1**, characterized in that the support element (**12**) includes two flexible rails (**36**) each of which sits in a longitudinal notch (**34**) associated with it, respectively, said longitudinal notches being open toward the opposite lateral sides of the wiper strip (**24**), that the outer strip edges (**38**) of each of said flexible rails extend out of these notches, and that the support means (**58** or **144**) are positioned at a distance from the support element (**12**).

**3**. A wiper blade according to claim **1**, characterized in that the wind deflection strip (**42**) is designed as a binary component whose longitudinal area provided with the claw-like extensions (**56**) is made of a harder material than a longitudinal area lying closer to the base point (**46**).

**4**. A wiper blade according to claim **3**, characterized in that a transition from the harder longitudinal area to the softer longitudinal area occurs near the wall (**58**).

**5**. A wiper blade according to claim **1**, characterized in that the wind deflection strip (**42** or **112**) has a longitudinal center section, and in that a recess (**65**) is located in the center section of the wind defection strip (**42** or **112**) at which to place a device (**18**) to connect a drive wiper arm (**20**).

**6**. A wiper blade according to claim **1**, characterized in that the wind deflection strip (**42** or **112**) is made of a flexible plastic.

* * * * *

Trials@uspto.gov
Tel: 571-272-7822

Paper 65
Entered: April 24, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

COSTCO WHOLESALE CORP.,
Petitioner,

v.

ROBERT BOSCH LLC,
Patent Owner.

IPR2016-00034
Patent 6,973,698 B1

Before PHILLIP J. KAUFFMAN, WILLIAM V. SAINDON, and BARRY L. GROSSMAN, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION

*Incorporating Decisions on*
Petitioner's Motion to Exclude Evidence
Petitioner's Motion to Strike
Patent Owner's Motion to Exclude Evidence
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

## I. INTRODUCTION

Costco Wholesale Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claim 1, the sole claim, in U.S. Patent No. 6,973,698 B1 (Ex. 1001, "the '698 patent"). Paper 1 ("Pet."). Robert Bosch LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 15 ("Prelim. Resp."). We instituted review on two of the six grounds asserted in the Petition. Paper 16 ("Dec. Inst."). After our Decision on Institution, Patent Owner filed a Response (Paper 26, "PO Resp."), and Petitioner filed its Reply (Paper 32, "Pet. Reply"). An oral hearing was held January 18, 2017. Paper 63 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

We also address herein the parties' Motions to Strike and to Exclude Evidence.

As described below, we determine that a preponderance of the evidence establishes that claim 1 is unpatentable.

### *A. Grounds of Unpatentability*[1]

*Inter partes* review was instituted to determine: (1) whether claim 1 of the '698 patent would have been obvious under 35 U.S.C. § 103 in view of

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2012. Because the application for the patent at issue in this proceeding has an effective filing date before that date, we refer to the pre-AIA versions of §§ 102 and 103.

Arai[2] and Appel ’770[3]; and (2) whether claim 1 of the ’698 patent is anticipated under 35 U.S.C. § 102(b) based on Swanepoel[4].

*B. Related Proceedings*

The parties state that the ’698 patent is asserted in *Robert Bosch LLC v. Alberee Products Inc. et al.*, Civil Action No. 12-574-LPS (consolidated with Civil Action No. 14-142-LPS), pending in the United States District Court for the District of Delaware. Pet. 1; Paper 5, 1. The ’698 also has been the subject of several judicial proceedings and an ITC proceeding, each of which have been closed or terminated. Pet. 1–2; Paper 5, 1–2.

Petitioner filed petitions against several of Patent Owner’s other patents related to windshield wiper technology, including: U.S. Patent Nos. 6,836,926 (IPR2016-00035), 6,944,905 (IPR2016-00036), 6,292,974 (IPR2016-00038), 7,228,588 (IPR2016-00039), 7,484,264 (IPR2016-00040), 8,099,823 (IPR 2016-00041), and 8,544,136 (IPR2016-00042). Pet. 1; Paper 5, 1. The petition in IPR2016-00035 was denied. Trial was instituted in the other listed cases. A single, consolidated hearing was held for this case and the other listed cases.

*C. The ’698 Patent*

The back and forth action of windshield wipers clearing a vehicle windshield can produce noise that is disturbing to the driver and passengers. According to the Specification, the “abrupt flipping over” of the wiper lip

---

[2] U.S. Pat. No. 4,807,326, issued February 28, 1989 (“Arai”) (Ex. 1004).
[3] U.S. Pat. No. 4,028,770, issued June 14, 1972 (“Appel ’770”) (Ex. 1006).
[4] U.S. Pat. No. 5,325,564, issued July 5, 1994 (“Swanepoel”) (Ex. 1009).

"produces undesirable knocking noises." Ex. 1001, col. 1, ll. 47–50. The disclosed wiper blade addresses this problem.

In the disclosed wiper blade, in order to "produce as low noise as possible" (*id.* at col. 4, l. 6), the contact force between the wiper blade and the windshield is less in at least one of the end sections of the blade than at the center of the blade (*id.* at col. 1, ll. 60–62; col. 4, ll. 8–12). The '698 patent recognizes that this "fundamental concept" (*id.* at col. 4, l. 13) can be implemented in various ways. For example, the center region of the blade may have "a virtually uniform contact force" that "sharply decreases" at both end sections of the wiper blade. *Id.* at col. 4, ll. 16–20; *see also* col. 4, ll. 27–29 (disclosing a contact force "of a uniform magnitude" until it "decreases sharply" at one end region). Another alternative is an "essentially uniform" force in the center region that "decreases slightly" toward one end and "decreases considerably in the vicinity of" the other end. These disclosed different designs all have uniform force over most of the blade. The different designs of the blade depend on the different "spherical curvatures" of windshields. *Id.* at col. 4, ll. 46–49. As succinctly summarized by Patent Owner, "the key to this is that we have the end sections and the center sections and the pressure in one end section is less than the pressure in the center section." Tr. 47, ll. 8–10.

In the context of a specific embodiment, the '698 patent discloses a wiper blade, shown below in Figure 1.



Figure 1 of the '698 patent showing a perspective view
of a wiper blade connected to a wiper arm

The wiper blade includes wiper strip 14 carried by carrying element 12. Wiper strip 14 includes wiper lip 28. Carrying element 12 distributes the contact force (shown by arrow 24) of wiper lip 28 against window surface 26 over the entire length of the wiper strip. Ex. 1001, col. 3, ll. 27–29.

To address the noise issue, carrying element 12, used for distributing the contact force, is designed so that the contact force of the wiper strip against the windshield surface is greater in the center section of the wiper strip than in its end sections. As explained in the Specification, and as shown in Figures 2 and 8, carrying element 12 used for distributing the contact force (arrow 24, Fig. 2) is designed so that the contact force of the wiper strip 24 or the wiper lip 28 against the window surface 26 is greater in its center section 36 (Fig. 8) than in at least one of the two end sections 38. *Id.* at col. 4, ll. 6–12. The reduced contact force at the end sections results in a steeper drag position of the wiper lip (*see* Fig. 4 below) in comparison to the center region with the greater contact force (*see* Fig. 3 below – note compressed lip 28). *Id.* at col. 1, ll. 62–65.




Fig. 3




Fig. 4

Figure 3 is a sectional view near the *center* of wiper strip 14

Figure 4 is a sectional view *near the end* of wiper strip 14

According to the Specification, the reduced contact force at the end sections, resulting in a steeper position of the wiper lip, shown in Figure 4, "encourages its tilting-over process in the wiping direction reversal positions of the wiper blade." *Id.* at col. 1, l. 65–col. 2, l. 1; col. 5, ll. 3–18. This prevents the abrupt snapping over of the entire wiper lip and the "unpleasant knocking noise connected with it." *Id.* at col. 2, ll. 2–4. The Specification explains that "[i]t is particularly advantageous if the contact pressure of the wiper strip against the window is lower at its two end sections than in its center section because the tilting-over process of the wiper lip then takes place starting from both ends and is therefore finished more quickly." *Id.* at col. 2, ll. 11–15. The Specification also states that matching the carrying element stress to the desired pressure distribution "is problematic in the case of spherically curved windows." *Id.* at col. 1, ll. 50–53.

To provide the desired pressure distribution, as shown generally in Figures 2 and 8, carrying element 12, when unloaded, has a sharper concave curvature than the window in the region of the wiping field being swept by

the wiper blade. The curvature is sharper in the center section 36 of the carrying element than at its end sections 38. *Id.* at col. 4, ll. 50–58.

### *D. Illustrative Claim*

The '698 patent has only one claim, which is reproduced below.[5]

> 1. A wiper blade for a wiping device of a motor vehicle for wiping a window of the motor vehicle, comprising
>
> an elongated wiper strip placeable against the window, and an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window,
>
> said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip,
>
> said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections,
>
> said spring-elastic carrying element has on a side thereof oriented toward the window a concave curvature that is sharper than the sharpest curvature of a spherically curved window in a region of a wiping field that can be swept across by said wiper blade and
>
> a concave curvature in said center section of the carrying element is sharper than in said sections thereof.

## II. EVIDENTIARY MOTIONS

Before addressing the merits, we first decide several evidentiary motions filed by the parties.

---

[5] Line breaks have been added to claim 1 to assist in identifying the elements recited in claim 1.

*A. Patent Owner's Motion to Exclude*

Patent Owner moves to exclude Paragraphs 7, 9–11, 15, 18, 19, 21, and 23–26 of the Declaration testimony of Mr. David Peck (Ex. 1100). Paper 46. Petitioner offers its opposition (Paper 54), to which Patent Owner offers its reply (Paper 60). The Motion to Exclude and associated papers have no meaningful distinction from the similar Motion to Exclude Mr. Peck's testimony in IPR2016-00038, slip op. at 19–22, Paper 68 (PTAB Mar. 30, 2017). We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Patent Owner's Motion to Exclude portions of Mr. Peck's Declaration (Ex. 1100) is *denied.*

*B. Petitioner's Motion to Exclude*

Petitioner moves to exclude the testimony of Wilfried Merkel offered by Patent Owner in Exhibit 2005, at pages 210–264. Paper 47, 1–11. This testimony is from a 2010 district court trial transcript in *Robert Bosch LLC v. Pylon Manufacturing Corp.*, No. 08-542 (D. Del. Apr. 15, 2010), in which Mr. Merkel testified on behalf of Patent Owner. Paper 47, 4.

Petitioner also moves to exclude portions of the Declaration testimony of Martin Kashnowski offered by Patent Owner in Exhibit 2007. Paper 47, 11–14.

Patent Owner offers its opposition (Paper 57), to which Petitioner offers its reply (Paper 61).

With respect to the testimony of Mr. Merkel, our analysis in IPR2016-00039, slip op. at 5–6, Paper 69 (PTAB Mar. 30, 2017) is applicable here because the '698 patent was not involved in the *Pylon* litigation. We adopt

the findings, analysis, and conclusions from that case on this issue. Consequently, Patent Owner's Motion to Exclude portions of Mr. Merkel's prior trial testimony (Ex. 2005) is *granted.*

With respect to the testimony of Mr. Kashnowski, our analysis in IPR2016-00038, slip op. 16–19, Paper 68 is applicable here. We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Petitioner has not demonstrated effectively that the testimony at issue is inadmissible hearsay, and with respect to this evidence, the Motion to Exclude is *denied.*

### *C. Petitioner's Motion to Strike*

Petitioner moves to strike the testimony of Mr. Merkel in Exhibit 2005, at pages 210–264. Paper 31. This testimony is from a 2010 district court trial transcript in *Robert Bosch LLC v. Pylon Manufacturing Corp.*, No. 08-542 (D. Del. Apr. 15, 2010), in which Mr. Merkel testified on behalf of Patent Owner. Paper 31, 1. Patent Owner filed an opposition. Paper 34. Petitioner's Motion to Strike and associated papers do not differ from the similar Motion to Strike in IPR2016-00038, slip op. at 4–10, Paper 68 (PTAB Mar. 30, 2017). We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Patent Owner's Motion to Strike portions of Mr. Merkel's prior trial testimony (Ex. 2005) is *denied.*

## III. ANALYSIS

### *A. Claim Construction*

When interpreting a claim, words of the claim generally are given their ordinary and accustomed meaning, unless it appears from the

specification, the file history, or other evidence asserted by the parties that the inventor used them differently. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Id.*

"Petitioner asserts that none of the claim terms in the ['698] patent need to be construed for purposes of this petition." Pet. 13. Patent Owner does not address claim interpretation in its Response. We agree with the parties. For purposes of this Decision, claim 1 does not require specific construction.

*B. Prosecution History*

The prosecution of the application that matured into the '698 patent was extensive, including an appeal of the Examiner's rejections to our predecessor, the Board of Appeals and Interferences. Ex. 1002, 289–298. As explained below, patent claim 1, challenged in this *inter partes* review proceeding, is a combination of application claims 9 and 12, and is substantively similar to application claim 8.

In the Final Office Action, application claims 5–7, 9–11, 13, and 14 were rejected under 35 U.S.C. § 102(b) as anticipated by Arai. *Id.* at 204. Application claims 9–14 were rejected under 35 U.S.C. § 102(b) as anticipated by Appel '770 "as evidenced by Arai." *Id.* at 205. Application claim 8, dependent from claim 5, was rejected under 35 U.S.C. § 103(a) as unpatentable based on Arai and Appel '770. *Id.* at 206. Appel '770 and Arai are the same references asserted by Petitioner in its Petition. Applicant

appealed the final rejection of application claims 5–14. Ex. 1002, 249.[6] Application claims 5, 9, and 14 were independent claims. *Id.* at 262–265.

On appeal, the Board affirmed the rejection of application claims 5–7, 9–11, and 14 as anticipated by Arai (*id.* at 295); affirmed the rejection of application claim 8 under § 103 based on Arai and Appel '770 (*id.* at 296); and reversed the rejection of application claims 9–12 and 14 as anticipated by Appel '770 "as evidenced by Arai" (*id.* at 295).

With respect to the reversal of application claims 9–12 and 14, the Board determined that claims 9–12 and 14 were not anticipated by Appel '770 because the Examiner relied on *Arai* Figure 8 to establish that "the contact pressure in the center of the [*Appel '770*] blade would be greater than ends sections." *Id.* at 295.[7] The Board determined there was no disclosure of the structure of the prior art wiper blade represented in Arai Figure 8. *Id.* As the Board explained, the pressure distribution curves in Arai Figure 8 are described as being based on a "prior art wiperblade" for which the reference provides no disclosure of the structure of the prior art article. *Id.* at 293 n.5.

Thus, the result of the various affirmances and reversals was that application claim 12 was the sole claim remaining in the application.

---

[6] Application claim 13 was cancelled, however, and thus was not involved in the appeal. Ex. 1002, 258.

[7] The Board stated that "[w]hile it is entirely appropriate to rely on another reference to clarify a fact in the anticipating reference, . . . the supporting reference must in fact accomplish that purpose." *Id.* at 295.

Application claim 12 was replaced by new application claim 15 (*id.* at 301–305). Applicant stated that "[c]laim 15 combines the features of original claims 9 and 12," and argued that "since claim 12 was indicated as allowable by the Board of Appeals and Patent Interferences it is believed that claim 15 should be allowed." *Id.* at 304.[8] Application claim 15 was allowed (*id.* at 314) and became claim 1 of the '698 patent (*id.* at 3 (index of claims)).

The Board did *not* have before it any rejection of application claim 12 under § 103 based on Arai combined with Appel '770 or based on the other references asserted by Petitioner.

### *C. Grounds of Unpatentability*

#### *1. Obviousness Based on Arai and Appel '770 (Petitioner's "Ground #1")*

Petitioner contends that claim 1 would have been obvious to one of ordinary skill in the art based on Arai and Appel '770. Pet. 3, 29–40. Petitioner also relies on the Declaration testimony of Gregory W. Davis, Ph.D. (Ex. 1013).

> Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been

---

[8] The Board reversed the rejection of application claim 12. The Board did not comment on whether claim 12 was "allowable." *See In re Voss*, 557 F.2d 812, 816 n.11 (CCPA 1977) ("reversal is not a mandate to the PTO to issue a patent and does not preclude the PTO from reopening prosecution") (citing *In re Borkowski*, 505 F.2d 713, 718 (CCPA 1974) (the Board may not force the granting of patents on inventions that do not comply with the statutes).

> obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls.").

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To reach this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F. 2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a *whole* in deciding the question of obviousness.") (citation omitted); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious.") (citation omitted).

"A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to common sense" or to that which the prior art teaches. *Id.*

Against this general background, we consider the references, other evidence, and arguments on which the parties rely.

*a Scope and Content of the Prior Art*

*i. Arai, Ex. 1004*

In affirming the Examiner's rejections, the Board stated:

> The examiner submits, *and we agree*, that as a matter of fact, *prima facie*, the wiper device and *wiper blade taught by Arai anticipate* the claimed wiper device encompassed by appealed claim 5 and the claimed wiper blade encompassed by appealed claim 9 and appealed claim 14, because each and every element arranged as required for the claimed articles encompassed by each of these appealed claims is shown in Arai.

Ex. 1002, 292 (emphasis added). For purposes of this Decision, we agree with and adopt the Board's prior determination.

Thus, based on the Board's prior determination that Arai anticipates application claim 9, Arai discloses the following structure:

> 9. A wiper blade for a wiping device of a motor vehicle for wiping a window of the motor vehicle, comprising an elongated wiper strip placeable against the window, and an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window, said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, such that a contact force of said wiper strip would be greater in said center section than in at least one of said two end sections.

Ex. 1002, 263–264.

Figure 5 of Arai is shown below.




Figure 5 is a side view of the backing member under no load condition.

As shown in Figure 5, Arai also discloses that the curvature of backing member 3 "is gradually decreased at longitudinally opposite end portions 3A and 3A, and the rigidity against bending is large at and adjacent to pivot connections 8' and 9', and is small at opposite end portions 3A and 3A and at the central portion 3B." Ex. 1004, col. 3, ll. 28–33. According to Arai, this results in a uniform pressure distribution along the length of the blade allowing the wiper blade to "follow a curved windshield." *Id.* at col. 3, ll. 34–36. Figure 6 of Arai shows an alternative structure "to obtain relatively uniform pressure distribution with respect to a wide range between a low pressure and a high pressure" along the length of the wiper blade. *Id.* at col. 3, ll. 43–45. Thus, while Arai refers to a uniform pressure distribution, Arai recognizes that the pressure along the wiper blade varies widely "between a low pressure and a high pressure." This pressure variation is shown in Figure 7.

Figure 7 shows the change in the pressure distribution at wiping edge 1A (*see* Figure 2) of wiper strip 1 when the pressing force applied on the wiper-blade from the yoke member so that the wiper strip "contacts with the surface of the windshield within a suitable range of inclination angle." *Id.* at col. 4, ll. 3–5. With respect to pressure distribution, the Board in its prior decision also determined that:

> While Arai is interested in applying a uniform pressure along the length of the wiper blade with the carrying element disclosed therein (col. 3, lines 30-36), we agree with the examiner that the high pressure distribution curve showing the pressure applied on the wiper blade by the article of Arai in FIG. 7[] (*see* col. 3, lines 48-51) demonstrates that, at that pressure, the contact force of the

> wiper strip is greater in the center section than at both of the end sections (*see also* col. 4, lines 1-8).

Ex. 1002, 293. For purposes of this Decision, we also agree with and adopt this prior analysis of pressure distribution in Arai.

*ii. Appel '770, Ex. 1005*

Appel '770 discloses a windshield wiper that is flexibly adaptable to efficient wiping of variable curvatures as well as relatively flat portions of vehicle windshields. Ex. 1005, col. 1, ll. 11–15. The objective is to distribute a centrally applied actuating arm pressure load relatively uniformly along the length of the blade throughout variations in windshield contour traversed by the wiper. *Id.* at col. 1, ll. 25–28. The "backbone member," or blade carrying element, has a radius of curvature less than that of the windshield. *Id.* at col. 1, ll. 32–34. The wiper blade, attached to the carrying element, has a width and/or thickness varying from a maximum near the central arm attachment point to a minimum at the ends. *Id.* at col. 1, ll. 34–37. The width, thickness, and degree of curvature is proportioned with the modulus of elasticity, total pressure load, and length of blade to provide substantially uniform pressure along the length of contact between the wiper blade and the windshield. *Id.* at col. 1, ll. 37–41.

Appel '770 discloses that progressive pressure contact from ends to center can be achieved through various constructional approaches incorporating progressive dimensional variations in free form curvature, width and/or thickness of a carrying element to provide a single spring backbone element having uniform pressure loading characteristics when pressed against a flat or curved windshield. *Id.* at col. 3, ll. 9–22; ll. 31–36.

We find this suggests a wide range of design options to a person of ordinary skill. The combination of the flexible wiping blade with the spring backbone element determines the final pressure characteristic between the wiping blade and the windshield surface. *Id.* at col. 3, ll. 23–26. Thus, the shape and section of the flexible wiping blade also must be taken into account with the spring backbone element in determining the proper design proportions. *Id.* at col. 3, ll. 26–30.

Appel '770's disclosure regarding the design analysis for flat windshields applies equally to curved windshields. With whatever specific constructional form is employed, it may be adapted to also provide substantially uniform pressure loading on any given *curved* windshield surface by adding to the free form curvature which produces uniform pressure loading on a flat surface the additional curvature of the curved windshield surface. *Id.* at col. 3, ll. 31–36.

Appel '770 is an improvement over a prior patent by the same inventor, U.S. Patent 3,192,551 ("Appel '551"). *Id.* at col. 1, ll. 25–33 ("the present invention incorporates significant improvements which provide for improved economy of production, operation and assembly" over Appel '551). The disclosure of Appel '551 "is incorporated by reference in the description portion of [the Appel '770] specification." *Id.* at col. 3, ll. 18–20.

*b Level of Ordinary Skill*

Petitioner asserts the references cited in the Petition reflect the level of ordinary skill in the relevant technology. Pet 28–29. Petitioner also asserts a person of ordinary skill would have had "education and experience in

mechanical engineering." *Id.* at 29. Petitioner does not cite any authority to support its asserted level of ordinary skill. We note, however, that Dr. Davis repeats substantially verbatim Petitioner's asserted level of ordinary skill. Ex. 1013 ¶¶ 15, 16.

Patent Owner asserts that a person of ordinary skill in the art at the time of the invention of the '698 patent would have had either an undergraduate degree in mechanical engineering or a similar discipline, or several years of experience in the field of wiper blade manufacture and design. PO Resp. 1 (citing Ex. 2003 at ¶¶ 16–19). Exhibit 2003 is the declaration testimony of Dr. Steven Dubowsky. Among his numerous academic credentials and professional experience, Dr. Dubowsky is a Professor Emeritus in the Department of Mechanical Engineering and in the Department of Aeronautics and Astronautics at the Massachusetts Institute of Technology. Ex. 2003 ¶ 5.

Neither party presents a detailed evidentiary showing under the factors typically considered in determining the level of ordinary skill in the art. Factors pertinent to this determination include: (1) educational level of the inventor; (2) type of problems encountered in the art: (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field. Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Both parties refer to "education and experience in mechanical engineering." Their proposals are not, in fact, substantially different. Patent Owner's proposed level of skill, however, would include anyone with an undergraduate degree in mechanical engineering or similar discipline, regardless of whether they had any actual knowledge or experience in the present field of endeavor, i.e. windshield wiper blades. *See* PO Resp., 1 (proposing "mechanical engineering . . . or . . . experience in the field"). Patent Owner's proposed level, thus, would include virtually anyone with a mechanical engineering degree with no knowledge of "the art" of windshield wiper technology. Accordingly, we adopt Petitioner's proposed level of skill.

*c Discussion*

Application claim 8, which, according to Petitioner, incorporates every element of claim 1 of the '698 patent, was rejected under 35 U.S.C. § 103(a) as unpatentable over Arai in view of Appel '770. Pet. 10 (citing Ex. 1002, 206–07); *see also* Pet. 30–32 (charts comparing patent claim 1 to application claim 8). As discussed in Section III. B (Prosecution History), the Board affirmed the Examiner's rejection of application claim 8. Ex. 1002, 291 ("We affirm . . . the ground of rejection [of claim 8] under § 103(a) over Arai in view of Appel ['770]."); *see also id.* at 296 ("appellants have not disputed this ground of rejection in the brief . . . we summarily affirm this ground of rejection.").

We agree with Petitioner's analysis that all the limitations in claim 1 were present in rejected application claim 8. If so, why did claim 1 issue? Also as discussed in Section III. B (Prosecution History), claim 1 resulted *not* from application claim 8, but from combining application claims 9 and 12 into a new claim 15. Application claims 9 and 12 were *not* rejected under § 103(a) as unpatentable over Arai in view of Appel '770. They were rejected only as anticipated by Appel '770. Thus, patentability of application claims 9 and 12 under Section 103 was not before the Board. On remand to the Examiner following the Board decision, new application claim 15 was allowed without further substantive prosecution.

Patent Owner asserts that the references fail to teach or suggest two claim limitations in claim 1: (1) "said contact force of said wiper strip being greater in said center section than in at least one of said two end sections"; and (2) "a concave curvature in said center section of the carrying element is *sharper* than in said sections thereof". PO Resp. 9, 2–3. According to Patent Owner, Arai discloses "*uniform* pressure distribution along the length of the blade rubber." *Id.* at 10.

Patent Owner's argument, however, is inconsistent with the Board's prior finding:

> "that as a matter of fact, *prima facie*, the wiper device and wiper blade taught by Arai anticipate . . . the claimed wiper blade encompassed by appealed claim 9 . . . because each and every element arranged as required for the claimed article[] . . . is shown in Arai.

Ex. 1002, 292. As discussed above, application claim 9 recited "that a *contact force of said wiper strip would be greater in said center section than*

*in at least one of said two end sections*." *Id.* 263–264 (emphasis added). The Board referred to Figure 5 from Arai, reproduced below, to establish that "curvature is gradually decreased at longitudinally opposite end portions 3A and 3A." *Id.* at 292–293 (citing col. 3, lines 29-30 of Arai).

*FIG. 5*




Figure 5 of Arai is a side view of the backing member under "no load"

The Board also found "that one skilled in the art would reasonably interpret [the Arai] disclosure to describe a center section which has a greater curvature than either of the end portions 3A." *Id.* at 293. Additionally, the Board stated, "the contact force of the wiper strip [in Arai] is greater in the center section than at both of the end sections." *Id.* The Board also stated:

> in view of the congruent structure between the carrying elements of the claimed wiper device and wiper blades encompassed by appealed claim 5 with the corresponding articles disclosed by Arai, we further agree with the examiner that the wiper blade of Arai would inherently react in the same manner to the distribution of contact force at high pressure as required by appealed claim 5, that is, the wiper blade tip would tilt over in reversal positions beginning at the wiper blade tip regions and continuing to the center region of the wiper blade, even though Arai is silent in this respect.

*Id.*

We agree with and adopt the Board's findings of fact concerning the Arai disclosure as it would have been understood by a person of ordinary skill in the art.

The Board considered, but was not persuaded by, applicant's argument that application claim 9 was not anticipated by Arai. *Id.* at 295.

Patent claim 1, and also application claim 8, recite that the spring-elastic carrying element (1) has a concave curvature that is sharper than the sharpest curvature of a spherically curved window, and (2) a concave curvature in the center section of the carrying element that is sharper than in the end sections. Based on our analysis of the reference above, we determine that this element also is disclosed in Appel '770 and in Arai.

The Board did not specifically address application claim 8, except to "summarily affirm" the rejection by the Examiner based on Arai and Appel '770 because "appellants have not disputed this ground of rejection in the brief." *Id.* at 296. With respect to application claim 8, the Examiner determined that Arai discloses the elements and limitations of claim 8 "with the exception of the conventional backing member/blade of [claim] 8 being curved sharper than the windshield to be wiped and having a curvature in a center section sharper than in end sections." *Id.* at 206. The Examiner also determined that "[t]he patent to Appel discloses all of the above recited subject matter." *Id.* We agree with and adopt the Examiner's findings of fact, based on our additional analysis below.

Figure 5 of Appel '551, incorporated by reference into Appel '770, is reproduced below.




FIG. 5

Figure 5 from Appel '551
is a side elevation of a windshield wiper blade.

As shown in Figure 5, backbone 36a and rubber blade 37a have a free form circular arc curvature *modified at the ends with somewhat less curvature*, adapted to provide uniform contact pressure along the length of contact with a flat windshield when fully depressed by the actuating arm. Ex. 1005, col. 3, l. 73–col. 4, l. 3. This described structure, less curvature at the ends, is the same structure disclosed in the '698 patent to provide reduced pressure at the end portions. As disclosed in the '698 patent, to provide the desired pressure distribution, the curvature is sharper in the center section 36 of the carrying element than at its end sections 38. *Id.* at col. 4, ll. 8–12, 50–58; *see* Figs. 2, 8. Appel '551 discloses this same structure – the ends have less curvature than the center.

We recognize that the disclosure of Appel '551, incorporated by reference into Appel '770, refers to "uniform contact pressure." *Id.* at col. 4, ll. 1–2. Appel '551, incorporated by reference into Appel '770, explains, however, that notwithstanding the objective of uniform contact pressure, "as a practical compromise" the provision of a circular curvature terminating somewhat short of straight end portions has been found satisfactory due to

the ability of the rubber wiper blade to compensate for a limited degree of *non-uniform* spring load." *Id.* at col. 4, ll. 12–17.

Appel '770 also discloses that *progressive pressure contact from ends to center* can be achieved through various constructional approaches incorporating progressive dimensional variations in free form curvature (Ex. 1006, col. 3, ll. 9–22; ll. 31–36).

Patent Owner asserts that "Appel '770 only incorporates Appel '551 by reference for its uniform pressure distribution teachings." PO Resp. 15. We disagree.

A host document incorporates material by reference if it "identif[ies] with detailed particularity what specific material it incorporates and clearly indicate[s] where that material is found in the various documents." *Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*, 838 F.3d 1236, 1248 (Fed. Cir. 2016) (citing *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). In making such a determination, we assess whether a skilled artisan would understand the host document to describe with sufficient particularity the material to be incorporated. *Id.* (citation omitted). The incorporation standard relies only on the reasonably skilled artisan and his or her ability to deduce from language, however imprecise, what a host document aims to incorporate. *Id.*

As we have discussed above, the '698 patent and the cited references all use substantially uniform force throughout the blade, with a decrease in the force at the end portions. Appel '551 does the same. We determine a skilled artisan would understand that the entire disclosure in Appel '551, which discloses the magnitude and extent of the substantially uniform force,

is incorporated into Appel ’770, including references to a non-uniform force at the ends of the blade and the disclosure as to why a non-uniform force is a practical comprise.

We also note that the ’698 patent, like the cited references, discloses “virtually uniform contact force (line 44)” (see Figure 5 below); a contact force “of a uniform magnitude (line 144)” (*see* Figure 6 below); and an “essentially uniform” contact force (line 244) (*see* Figure 7 below). Thus, a reference to “uniform contact pressure” in Appel ’551 incorporated by reference into Appel ’770 is not inconsistent with lower contact pressure at the end portions, particularly when the rubber wiper blade is able to compensate for a limited degree of non-uniform spring load. Ex. 1005, col. 4, ll. 12–17.




Fig. 5




Fig. 6




Fig. 7

Figures 5, 6, and 7 from the '698 patent are graphic representations of the wiper blade contact pressure (lines 44, 144, and 244, respectively) over the wiper blade length according to three different embodiments Each shows a uniform contact force except at the end portions.

Petitioner also asserts correctly that the "High Pressure" curve in Arai Figure 7 (reproduced below; annotated to highlight the High Pressure curve) "shows a contact pressure that is greater in the center section than in the end sections." Reply 3.

FIG. 7




Figure 7 (annotated) from Arai showing a High Pressure distribution curve where the pressure is greater in the center than the end portions

Patent Owner admits that Arai "identifies that there is some unspecified 'small' pressure fluctuation along the blade; it does not describe the contact force as claimed." PO Resp. 7 (citing Ex. 1004, col. 3, l. 48–col. 4, l. 8). Patent Owner also asserts that Figure 7 from Arai only "shows that the pressure fluctuates slightly over the length," and "[t]he figure provides no sense of where on the blade the pressure fluctuates, or how much it fluctuates." *Id.* at 8. The "where" or "how much" information that Patent Owner asserts is missing from the references, however, is not recited in claim 1.

Claim 1 does not recite any specific magnitude of the force differential between the center and at least one end portion, nor does it recite a precise location for what constitutes the "end portions. The High Pressure curve in Figure 7 of Arai clearly shows a force differential between the center of the blade and the end portions of the blade wherein the force is greater in the center section than at least one end section. This is all that

claim 1 recites with respect to the force distribution. Patent Owner asserts that a person of ordinary skill in the relevant technology "would understand that minor fluctuations in force distribution are not within the scope of the claim requirement of a greater contact force in the center section than in an end section." PO Resp. 9. Patent Owner does not cite to any persuasive evidence to support this argument. As discussed above, claim 1 does not require any specific magnitude of a force differential. Moreover, Patent Owner does not cite to any persuasive evidence that a person of ordinary skill would understand that the force differential disclosed in Figure 7 is so "minor" that it would not be considered a difference in force as claimed.

Based on the analysis above, we determine all the claim elements are disclosed in the cited references. Before we proceed, however, to a determination of whether Petitioner has provided a persuasive rationale for why a person of ordinary skill would have combined these elements as recited in claim 1, we address one additional argument by Patent Owner.

Patent Owner suggests that there is some inconsistency in the Board's action in its consideration of the disclosures of Arai, Appel '770, and Appel '551 (incorporated by reference into Appel '770) because the "Board denied institution based on the combination of Arai, Appel '770 *and* Appel '551." PO Resp. 15, fn14. We understand Patent Owner's argument to be a reference to our actions in the Decision to Institute an *inter partes* review in this case. Patent Owner misstates the Board's actions.

In our Decision to Institute, we stated the following:

> In its 'Ground #2,' Petitioner asserts that claim 1 is unpatentable based on Arai and Appel '770 "and further in view of" Appel

> ’551, DE’939, or Swanepoel. Pet. 3, 40–42. Petitioner acknowledges, however, that the additional Appel ’551, DE ’939, and Swanepoel references “disclose the same features” as are disclosed in Arai and Appel ’770. Pet. 40; see also *id.* at 33–38 (presenting a claim chart asserting that Appel ’551, DE ’939, and Swanepoel disclose the same elements as are disclosed in Arai and Appel ’770). Thus, according to Petitioner, Appel ’551, DE ’939, and Swanepoel add nothing new or different from what we have considered in Petitioner’s “Ground #1” based on Arai and Appel ’770. We agree with Petitioner’s characterization of these additional references. Accordingly, we decline to institute a trial on Petitioner’s ‘Ground #2.’

Dec. on Inst. 33. Following further analysis of our authority to manage cases, we concluded, “in the interests of efficiency, we exercise our discretion *not to review* the three additional asserted grounds of unpatentability in Petitioner’s “Ground #2.” *Id.* (emphasis added). Thus, contrary to Patent Owner’s argument, the Board did not “deny” institution based on the additional, separate ground of Arai, Appel ’770, and Appel ’551. We declined to review it because of our decision to review based on Arai, Appel ’770, and Appel ’551 (incorporated by reference into Appel ’770).

*iii. i. Rationale for Combination*

Patent Owner asserts, that a person of ordinary skill “would not have been motivated to combine Arai and Appel ’770.” PO Resp. 3. We disagree.

Petitioner asserts:

> Every limitation of issued Claim 1 was also found in application claim 8, which was found to be unpatentable for obviousness by this Board’s predecessor, the Board of Patent Appeals and

> Interferences ("BPAI"). Claim 1 is broader than application claim 8. It should also be unpatentable for obviousness in view of the same references, Arai and Appel '770, that rendered application claim 8 obvious.

Pet. 29–30. As stated by Petitioner:

> Issued Claim 1 corresponds to application claim 12, which depended from application claim 9. The only limitation introduced by application claim 12 was identical to a limitation found in application claim 8, which depended from application claim 5.

Pet. 30. Petitioner concludes that its claim chart "shows[] Arai in combination with Appel '770 renders Claim 1 of the '698 Patent obvious." Pet. 38; *see also id.* at 39–40 (stating why a person of ordinary skill would have combined Arai and Appel '770).

As discussed above, Figure 5 of Appel '551, incorporated by reference into Appel '770, makes clear that backbone 36a *and* rubber blade 37a have a free form circular arc curvature *modified at the ends with somewhat less curvature*. Appel '551 explains that this is a "practical compromise" that provides "a limited degree of *non-uniform* spring load." Ex. 1005, col. 3, l. 73–col. 4, l. 3, ll. 12–17. This practical comprise suggested in the references is a reason to combine them, resulting in reduced contact force from less curvature of the backbone and blade at the ends.

As discussed above, Appel '770 also discloses various constructional approaches incorporating progressive dimensional variations in free form curvature. *Id.* at col. 3, ll. 9–22; ll. 31–36.

Arai shows a similar result in the high pressure curve in Figure 7.

In reaching the determination of why it would have been obvious to combine the cited references to achieve the curvature and force differential recited in claim 1, we reiterate that claim 1 does *not* refer to noise reduction, does *not* quantify the amount of curvature of the blade or its backing, and does *not* quantify the amount of force differential.

In support of its obviousness argument, Petitioner cites to Dr. Davis' Declaration. Pet. 40 (citing Ex. 1013, 11–19, 31–33). Dr. Davis' opinion (Ex. 1013, 31–33) essentially repeats the arguments in the Petition. *E.g.*, *compare* Ex. 1013 ¶ 53, *with* Pet. 39; *compare* Ex. 1013 ¶ 54, *with* Pet. 40.

Based on the record before us, Appel '770, which incorporates Appel '551, provides a rationale for why a person of ordinary skill would modify Arai so that the combined structure has a concave curvature in the center that is greater than in the end sections, resulting in a contact force being greater in the center section than in the end sections. It is a "practical compromise" to have a non-uniform spring load.

*d Objective Evidence of Non-Obviousness*

Objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). "[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Id.* at 1538. "For

objective evidence . . . to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re Kao,* 639 F.3d 1057, 1068 (Fed.Cir.2011) (quoting *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed.Cir.2010)) (emphasis omitted) (internal quotation marks omitted).

Patent Owner offers evidence it asserts shows objective evidence of non-obviousness (PO Resp. 20–28), in the form of commercial success (*id.* at 23–26), praise and awards (*id.* at 15, 18), copying/knockoff products (*id.* at 27), licensing (*id.*), and long-felt need and failure of others (*id.* at 21, 22, 28). Patent Owner recognizes there must be a nexus between the objective evidence and the merits of the claimed invention. PO Resp. 21. Patent Owner asserts the nexus is presumed because the objective evidence is tied to a specific product and that product is the invention claimed in the '698 patent. *Id.*

Petitioner provides its arguments in rebuttal, asserting there is no nexus between the '698 patent and any purported commercial success, and no success is established. Pet. Reply 11–19. Petitioner asserts correctly that Patent Owner submitted the same evidence in this case and in each of the other related *inter partes* reviews identified above – IPR2016-00036, 00038, 00039, 00040, and 00041. Petitioner asserts this undermines [Patent Owner's] commercial success arguments because the '698 Patent and the patents that are the subject of the related IPRs are directed to different

inventions. *Id.* at 11 (citing *GraftTech Int'l Holdings, Inc. v. Laird Techs. Inc.*, No. 2015-1796, 2016 WL 3357427, at *5 (Fed. Cir. June 17, 2016).[9]

We have reviewed the arguments and evidence cited in these papers.

*i. Nexus*

For objective indicia evidence to be accorded substantial weight, "a nexus must exist 'between the evidence and the merits of the claimed invention.'" *Novartis Ag V. Torrent Pharmaceuticals*, No. 2016-1352, slip op. at 24, Fed. Cir. April 12, 2017) (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent." *WBIP*, 829 F.3d at 1329 (citations omitted). The presumption of nexus is rebuttable. A patent challenger may respond by presenting evidence that shows the proffered objective evidence was "due to extraneous factors other than the patented invention." *Id.* (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988)). Such extraneous factors include additional unclaimed features and external factors, such as improvements in marketing. *WBIP*, 829 F.3d at 1329. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (holding that evidence that commercial success was due to unclaimed or non-novel features of device "clearly rebuts the

---

[9] This case was identified as "nonprecedential." *See* Fed. Cir. R. 32.1 regarding the effect of nonprecedential dispositions.

presumption that [the commercial product's] success was due to the claimed and novel features"). *See also Novartis*, slip op. at 25 (stating that "In evaluating whether the requisite nexus exists, the identified objective indicia must be directed to what was not known in the prior art").

We determine that Patent Owner has not satisfied the threshold evidence required to establish a presumption of nexus. Patent Owner has not shown with persuasive evidence that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the '698 patent. Patent Owner relies on two specific products to establish a presumption of nexus, its "Aerotwin" wiper blade (*e.g.*, PO Resp. 22)[10] and its "Icon" wiper blade (*e.g.*, *id.* at 23). However, Patent Owner has not established with persuasive evidence that either the Aerotwin or Icon wiper blades include the specific structures and elements recited in claim 1. Even though there is evidence indicating that embodiments of the '698 patent were commercialized, the totality of the evidence fails to persuasively link any commercial success the products may have achieved to the elements in claim 1. Based on the totality of the evidence, the evidence fails to establish that the success of the commercial embodiment of the '698 patent was attributable to the invention recited in claim 1, which includes a specific force distribution. This undermines the probative force of the evidence pertaining to the success of these products.

---

[10] The Aerotwin also is referred to as an "OE" wiper blade. PO Resp. 24, n.19.

Patent Owner alleges its commercial Aerotwin and Icon blades "practice the challenged claims." PO Resp. 24. Patent Owner then cites to dozens of pages of exhibits, without explanation, that have no clear persuasive connection to the challenged patent's claims.

Patent Owner asserts:

> Both the Aerotwin blade and the Icon blade practice the challenged claims. Ex. 2014 at 3 (identifying products and patents); Ex. 2015 at 33–57, 59–62 (Aerotwin claim charts); Ex. 2016 at 30–43, 45–48 (Icon claim charts); Ex. 2007 at ¶ 6; Ex. 2005 at 234:25–235:4, 249:25–250:5, 252:17–254:21, 353:22–354:1, 359:12–360:4; Ex. 2006 at 698:19–699:22.

*Id.*. We discuss below the evidence on which Patent Owner relies.

Exhibit 2014 is Patent Owner's "Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated June 2, 2015, in *Robert Bosch LLC v. Alberee Products, Inc.*, in the District of Delaware, Case No. 12-574 (LPS)." *Id.* at vi. It lists the Aerotwin wiper as practicing the '698 patent (along with 15 other patents), and Generation 1, 2, and 3 of the Icon wiper as practicing the '698 patent (along with nine or more other patents). This evidence is merely an allegation that Patent Owner's Aerotwin and Icon wiper blades have incorporated the patented technology of the '698 patent along with also incorporating the patented technology of numerous other patents. Ex. 2014, 3–5. The exhibit does not discuss any of '698 patent's claims, does not provide any analysis, and is not probative evidence of nexus.

Exhibit 2015 is a series of claim charts mapping claims of various patents, including the '698 patent, to the Aerotwin wiper. Patent Owner

identifies Exhibit 2015 as "Exhibit 24 to Complaint in *In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts)." PO Resp., vi. An excerpt from Exhibit 2015, relevant to the '698 patent, is reproduced below.

| Claim Element | Bosch OE Wiper Blade |
| --- | --- |
| said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections, | The wiper blade is characterized in that the spring-elastic carrying element (a) extending parallel to an axis of elongation of the wiper strip to distribute a contact force against the window over an entire length of the wiper strip (b) has a center section and two end sections, the contact force of the wiper strip being greater in the center section than in at least one of the two end sections. |







Excerpt from Ex. 2015 illustrating variation in contact force of an OE (Aerotwin) blade over the length of the blade.

Ex. 2015, 61. Exhibit 2015 does not disclose the source of the force distribution data shown in Exhibit 2015 or provide any explanation of the illustrated force curve. Patent Owner provides no explanation of the exhibit or its data in its Response.

We note that the illustrated force curve in Exhibit 2015 differs dramatically from the force curves shown and described in the '698 patent.

*See* Ex. 1001, Figs. 5–7; col. 4, ll. 16–40 (showing and describing graphic representations of the contact pressure over the wiper blade length according to three different embodiments). The force curves shown and described in the ’698 patent are “virtually uniform” (*id.* at col. 4, l. 18), “uniform” (*id.* at col. 4, l. 28) and “essentially uniform” (*id.* at col. 4, l. 35) throughout the blade except for the end portions, where the force decreases “sharply” (*id.* at col. 4, l. 19, 29) or “slightly” toward one end and “considerably” at the other end (*id.* at col. 4, ll. 37–39). In dramatic contrast, the force curve shown in Ex. 2015 for the symmetrical Aerotwin blade asserted to include the invention claimed in the ’698 patent, is significantly asymmetrical and irregular, with a large decrease in the mid-portion, beyond the center portion, and a subsequent *increase* at the end portions. Ex. 2015, 61 (note particularly the right end). The force at the end portion, however, is less than the force at the center. Patent Owner does not provide any evidence or argument explaining the data in this exhibit.

Patent Owner provides a similar illustration for the Icon blade. Ex. 2016, 47. Patent Owner identifies Exhibit 2016 as “Exhibit 25 to Complaint in *In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts).” PO Resp. vi.

Because we have no evidence or testimony about the source or underlying facts on which the illustrated force distribution is based, we give this evidence little probative weight.

Patent Owner also relies on the declaration testimony of Martin Kashnowski to establish a presumption of nexus with its objective evidence. PO Resp. 24 (citing Exhibit 2007 ¶ 6). Mr. Kashnowski is employed by

Patent Owner as Director, Commodities Management. Ex. 2007 ¶ 1. He also served as Director of Product Management for Wiping Systems. *Id.* Mr. Kashnowski refers to general acclaim and commercial success of the Aerotwin and Icon blades. *Id.* at ¶ 3–5. Mr. Kashnowski then testifies:

> Both the Aerotwin blade and the Icon blade included a *flexible spoiler* with diverging legs mounted on the top of the blade, as well as plastic *end caps*. Bosch tested these products extensively before releasing them. One aspect tested was noise. The Bosch beam blades were quiet in operation, including when the wiping direction changes and the wiper strip flips from one side to the other. *Those features were part of the reason for the great customer demand for these products*. Both products solved many of the problems associated with conventional blades.

*Id.* at ¶ 6 (emphasis added). Mr. Kashnowski further testifies that:

> The ·commercial success of the Icon product was in contrast to the failure of a competitor's beam-blade product, the Trico Innovision wiper blade. The Trico product was introduced in 2004, before Icon, but it *failed in the marketplace*. The *Trico product included neither a flexible spoiler nor end caps*.

*Id.* at ¶ 7 (emphasis added).

Mr. Kashnowski refers to "quiet" blades, but neither the Specification nor claim 1 defines or recites a "quiet" blade. *E.g.* Tr. 40, ll. 2–20. Patent Owner admits that a "quiet" blade is not claimed. *Id.* at 40, ll. 12–16 ("No, there isn't [anything in the Specification that tells us what 'less quiet' means]. Nor is there quiet in the claim."). Neither a flexible spoiler nor end caps, nor any equivalent or similar structure, are recited in claim 1 of the '698 patent. Patent Owner admits that the flexible spoiler with diverging legs "are unconnected to the claim" in the '698 patent. Tr. 33, ll. 7– 22). Thus, the reasons Mr. Kashnowski identified for the success of the Aerotwin

and Icon products have no nexus to the ’698 patent. Moreover, the only reason identified by Mr. Kashnowski for the failure of a competitive product, the Trico Innovision wiper blade, was because it *lacked* a flexible spoiler and end caps. Mr. Kashnowski does not mention anything about whether the contact force of the wiper strip being greater in the center section than in at least one of said two end sections, as required by claim 1 of the ’698 patent, was a factor in commercial success, failure of others, or industry praise. Mr. Kashnowski also does not mention anything about whether a sharper concave curvature in the center section of the carrying element, also as required by claim 1 of the ’698 patent, was a factor in commercial success, failure of others, or industry praise.

Mr. Kashnowski’s testimony has strong probative weight in establishing that that the proffered objective evidence in support of patentability is *not* tied to the invention claimed in the ’698 patent. The objective evidence is based on unclaimed features.

In its argument, Patent Owner also emphasizes that it was the flexible spoiler and end caps that established the success and praise of the Aerotwin and Icon blades. PO Resp. 24 (“Both blades include a flexible spoiler with diverging legs mounted on the top of the blade, as well as plastic end caps. This top-mounted spoiler totally ran against the grain of conventional wiper understanding.” (citations omitted)).

“Questions of nexus are highly fact-dependent . . . . ‘It is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between commercial success of the product and its patented features, and to determine the probative value of evidence of

secondary considerations.'" *WBIP*, 829 F.3d at 1331 (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996)).

We recognize that it is the claimed combination as a whole that serves as a nexus for the objective evidence. *WBIP*, 829 F.3d at 1330. Proof of nexus is not limited to only when objective evidence is tied to the supposedly "new" feature(s) of a claimed invention. *Id.*

However, considering the weight of the totality of the objective evidence before us, the asserted objective evidence is based on an unclaimed feature of the device, the spoiler and end caps. Thus, the asserted evidence is due little-to-no weight. *Ormco*, 463 F.3d 1312.

Based on the totality of the evidence before us, we determine that Patent Owner has not established a presumption of nexus. Thus, the burden of production does not shift to Petitioner to rebut that presumption with evidence.

We also determine that Patent Owner has not established any nexus, in fact, based on the asserted commercial success, failure of others, copying, or industry praise for the patented invention. All of Patent Owner's arguments are based on the Aerotwin and Icon blades.

In asserting industry recognition, Patent Owner asserts, for example, that the "Pace award" awarded to the Aerotwin blade was based on "the use of a flexible spoiler on the Aerotwin blade." PO Resp. 23.

In asserting failure of others, Patent Owner attributes failure of the competitive Trico products to the lack of a flexible spoiler and end caps. Patent Owner admits "there is no evidence of record that the failure of the Trico product was attributable to its lack of the '698 patent." Tr. 36, ll. 15–

17. Patent Owner also admits that "the Trico failure goes to the '974[11] and the other spoiler patents." *Id.* at 37, ll. 1–8.

In asserting copying, Patent Owner states "the knockoff products included spoilers with diverging legs similar to that shown on the cover of U.S. Patent No. 6,944,905[12], as well as end caps." PO Resp. 26–27. This evidence may have some relevance to the '905 patent. It is not persuasive of any nexus to the '698 patent involved in this proceeding. Indeed, Patent Owner admits "we're not arguing that those features demonstrate -- objectively demonstrate the non-obviousness of the '698 patent." Tr. 37, ll. 9–17.

As described above, a flexible spoiler and end caps are *not* elements in the invention claimed or disclosed in the '698 patent, and thus do not establish a nexus between the objective evidence and the invention claimed in the '698 patent. Thus, the proffered objective evidence in support of patentability is *not* tied to the invention claimed in the '698 patent. It is based on unclaimed features.

Patent Owner offers some sales figures that allegedly show commercial success. PO Resp. 26. Patent Owner merely lists sales figures for three different years and touts this as "significant." *Id.* (citing Ex. 2007

---

[11] Patentability of related U.S. Patent No. 6,292,974 is the subject of IPR2016-00038.

[12] Patentaility of related U.S. Patent No. 6,944,905 is the subject of IPR2016 00036.

¶ 8). It is not clear to us where these sales figures come from; Patent Owner offers no discussion of their origin. Mr. Kashowski recites these numbers without providing supporting documentation. Ex. 2007 ¶¶ 1, 8. Taking them at face value, these raw sales figures are of little use. Patent Owner alleges the sales numbers are "significant" but provides no explanation or evidence in support, and Mr. Kashnowski's verbatim testimony likewise is not supported by evidence. Notwithstanding the lack of nexus, this characterization is not credible evidence of commercial success, and the numbers by themselves are also not credible evidence of commercial success. This objective evidence in support of patentability is *not* tied to the invention claimed in the '698 patent.

Patent Owner also refers to licensing agreements with competitors as objective evidence of patentability. PO Resp. 27–28. Patent Owner states the licensing agreements relate to its family of "beam-blade patents," and that "most" of these agreements include the '698 patent. *Id.* We find this generic evidence of little probative weight of patentability of the invention claimed in the '698 patent.

Accordingly, we do not find a nexus between the asserted objective evidence and the '698 patent. Moreover, considering the totality of objective evidence before us, we determine that the objective evidence has little if any probative weight in support of patentability of claim 1 of the '698 patent.

*e Conclusion – (Petitioner's Ground #1)*

Based on the totality of evidence before us and the analysis above, we are persuaded that a preponderance of the evidence establishes that claim 1

would have been obvious to one of ordinary skill in the art based on Arai and Appel '770.

*2. Anticipation by Swanepoel (Petitioner's "Ground #3")*

Petitioner asserts Swanepoel anticipates claim 1. Pet. 4, 29.

"The hallmark of anticipation is prior invention." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). As explained in *Net MoneyIN,*

> unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.

*Id.* at 1371; *see also Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."). "The identical invention must be shown in as complete detail as is contained in the . . . claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).

Based on the claim chart in its Petition (Pet. 42–47), "Petitioner contends that Swanepoel '564 (Ex. 1009) discloses each limitation of Claim 1, either explicitly or inherently." *Id.* at 47. According to Petitioner, an "inherent property of the Swanepoel '564 patent" is a force distribution that has a higher contact force in the middle than at the end when a wiper blade is being pressed against a curved windshield rather than a flat windshield. *Id.* at 47–48 (citing Ex. 1013, 22–31, 35). Petitioner also relies on the testimony of Dr. Davis, who opines "the inherent property of a wiper blade

designed according to the teachings of the '564 Patent would have a force distribution that had a higher contact force in the middle than at the end when such a wiper blade is being pressed against a **curved windshield**." Ex. 1013 ¶ 58.

Patent Owner argues Swanepoel teaches the *opposite* of what is claimed in the '698 patent. PO Resp. 29. According to Patent Owner, Swanepoel teaches that "the force should be *less* in the center section than in the end sections." *Id.* Patent Owner argues that Swanepoel "teaches as vital to its invention that the force per unit length *increases from the center section to the end sections*." *Id.* at 29–30. We agree with Patent Owner's general characterization of Swanepoel, and so stated in our Decision to Institute this *inter partes* review.

Swanepoel discloses a windshield wiper having "an elongate curved backbone." Ex. 1009, col. 1, ll. 10–12. Swanepoel discloses several variants of the force distribution between the wiper blade and the windshield. In summarizing the disclosed invention, our Decision to Institute noted that "Swanepoel states that the force per unit length exerted by the backbone perpendicularly to the windshield '*increases substantially* from the position of the connecting formation towards at least one end of the backbone.'" Dec. Inst. 29. We also cited to Swanepoel's disclosure that "*Most importantly to the invention* . . . the backbone will provide a force per unit length distribution in a longitudinal direction which *increases* towards both tips of the windscreen wiper when the windscreen wiper is, in use." *Id.* Additionally, we noted Swanepoel's disclosure that "it is *essential to this invention* that the reactive loading on the wiper backbone when pressed onto

a flat surface, as illustrated in FIG. 4, must *increase* towards the tips of the backbone." *Id.* We then recognized that "[a]n *increasing* force at the end of the wiper blade is the opposite of what claim 1 recites. *Id.*

In our Decision to Institute, we also noted, however, that Swanepoel discloses that "an increasing force at the end of the wiper blade is *not* essential and, in fact, the force at the end of the wiper blade may decrease to zero." *Id.* at 29–30 (citing Ex. 1009, col. 2, ll. 8–20) ("[t]he force per unit length . . . may increase progressively towards the ends of the backbone until a short distance from each end . . . [and then] *decrease from the constant value to zero at the extremities of the backbone*") (emphasis added)). We also cited Swanepoel's disclosure that "the loading may *decrease* right at the tips, although this is not shown in FIG. 4." *Id.* (citing Ex. 1009, col. 5, ll. 17–18). Additionally, we cited Swanepoel's disclosure that "to achieve a constant angle of wipe of the blade 12 along its length it may be necessary to shed the distributed blade load at the tip portions of the wiper." *Id.* (citing col. 9, ll. 33–36). We concluded from these disclosures that when the loading decreases to zero at the "extremities" or "tip portions," as Swanepoel states it may, the contact force of the wiper strip will be greater in the center section than in at least one of the two end sections, as recited in claim 1.

Patent Owner now asserts that "a decrease of the contact force 'to zero at the extremities' takes the Swanepoel wiper disclosure outside the scope of the claim because the claimed contact force distribution must be 'over an *entire* length of said wiper strip.'" PO Resp. 32. Patent Owner concludes that "[i]f there is no force at a location along the wiper, the contact force is

plainly not distributed along the entire length of the wiper. *Id.* 35 (citing Ex. 2003 ¶ 39).

Petitioner asserts a person of ordinary skill in the art would understand the Swanepoel disclosure "to teach a force distribution over the entire length of the wiper." Pet. Reply 21 (citing Ex. 1103 ¶ 15). Dr. Davis testifies that this interpretation "could be visualized" by the following annotated Figure 4 from Swanepoel, where the annotation is in red:




FIG 4

Ex. 1103 ¶ 15. According to Dr. Davis, a person of ordinary skill would have understood that Swanepoel teaches "'distribut[ing] a contact force against the window *over an entire length* of said wiper strip,' exactly as recited in claim 1 of the '698 Patent." *Id.* at ¶ 16.

As recited in claim 1, the spring-elastic carrying element (reference numeral 12) extends parallel to an axis of elongation of the wiper strip (14) "to distribute a contact force against the window *over an entire length* of said wiper strip." Ex. 1001, col. 6, ll. 9–12 (emphasis added). The Specification explains that the "[f]orce (arrow 24) places the wiper blade 10 *over its entire length against the surface 26 of the window 15* to be wiped." *Id.* at col. 3, ll. 19–21 (emphasis added); *see* Figs. 1, 2. The Specification also states:

> Due to the pressure (arrow 24), the wiper blade 10 rests *over its entire length* against the window surface 26 with its wiper lip 28 that belongs to the wiper strip 14. This produces a stress in the band-like spring-elastic carrying element 12, which assures a proper contact of the wiper strip 14 or the wiper lip 28 *over its entire length against the motor vehicle window 15*.

*Id.* at col. 3, ll. 27–33 (emphases added).

Notwithstanding Dr. Davis' opinion, there is no persuasive evidence that a zero force at the extremities of backbone 10 in Swanepoel results in a contact force against the window over an entire length of the wiper strip, as required by claim 1.

Moreover, Swanepoel's disclosure that "it is essential" to his invention that the reactive loading on the wiper backbone when pressed onto a flat surface *must increase towards the tips* of the backbone is, as asserted by Patent Owner (PO Resp. 29), the opposite of the invention recited in claim 1, which requires a *decreased* force at the end portions. Based on the evidence, we cannot conclude that Swanepoel demonstrates "prior invention" of all of the limitations arranged or combined in the same way as recited in claim 1.

## IV. CONCLUSIONS ON PATENTABILITY

Based on the analysis above, we determine, based on a preponderance of the evidence, that Petitioner has demonstrated that claim 1 would have been obvious in view of Arai and Appel '770. We also determine that Petitioner has not demonstrated that Swanepoel anticipates claim 1.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claim 1 of the ’698 patent has been shown by a preponderance of the evidence to be unpatentable under 35 U.S.C. § 103 based on Arai and Appel ’770;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*;

FURTHER ORDERED that Petitioner’s Motion to Exclude is *granted-in-part*;

FURTHER ORDERED that Petitioner’s Motion to Strike is *denied*; and

FURTHER ORDERED that this is a Final Written Decision under 35 U.S.C. § 318(a), and that parties to the proceeding seeking judicial review of the decision under 35 U.S.C. § 319 must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Richard M. Koehl
richard.koehl@hugheshubbard.com
James R. Klaiber
james.klaiber@hugheshubbard.com
David E. Lansky
david.lansky@hugheshubbard.com

For PATENT OWNER:

Patrick R. Colsher
SHEARMAN & STERLING LLP
patrick.colsher@shearman.com

US006973698B1

(12) **United States Patent**
**Kotlarski**

(10) **Patent No.: US 6,973,698 B1**
(45) **Date of Patent: Dec. 13, 2005**

(54) **WIPER BLADE FOR MOTOR VEHICLE WINDOWS**

(75) Inventor: **Thomas Kotlarski**, Buehlertal (DE)

(73) Assignee: **Robert Bosch GmbH**, Stuttgart (DE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 100 days.

(21) Appl. No.: **09/445,046**

(22) PCT Filed: **Dec. 18, 1998**

(86) PCT No.: **PCT/DE98/03721**

§ 371 (c)(1),
(2), (4) Date: **Feb. 18, 2000**

(87) PCT Pub. No.: **WO99/51470**

PCT Pub. Date: **Oct. 14, 1999**

(30) **Foreign Application Priority Data**

Apr. 1, 1998 (DE) ................................ 198 14 610

(51) **Int. Cl.**[7] .................................................. **B60S 1/38**
(52) **U.S. Cl.** ............................... **15/250.43**; 15/250.451
(58) **Field of Search** ........................ 15/250.43, 250.44, 15/250.361, 250.451, 250.48

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,192,551 A * 7/1965 Appel
4,028,770 A * 6/1977 Appel ..................... 15/250.43
4,343,063 A * 8/1982 Batt
4,807,326 A * 2/1989 Arai et al.
5,485,650 A * 1/1996 Swanepoel

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 1 505 357 | | 5/1969 |
| DE | 1 247 161 | | 1/1970 |
| EP | 279640 | * | 8/1988 |
| EP | 528643 | * | 2/1993 |

* cited by examiner

*Primary Examiner*—Gary K. Graham
(74) *Attorney, Agent, or Firm*—Michael J. Striker

(57) **ABSTRACT**

A wiper device with a wiper blade for cleaning windows of motor vehicles, in which the wiper blade can be moved back and forth laterally to its longitudinal span by a driven wipe arm which can be connected to the wiper blade and loads the same against the window. The wiper blade has an elongated wiper strip that can be placed against the window and an elongated spring-elastic carrying element, which has a connecting unit for the wiper arm and is disposed parallel to the longitudinal axis of the wiper strip to distribute a contact force over the entire wiper strip length. A particularly effective and low-noise operation of the wiper system is achieved because the contact force of the wiper strip against the window is greater in its center section than in at least one of two end sections of the wiper strip.

**1 Claim, 3 Drawing Sheets**









Fig. 1




Fig. 2




Fig. 8




Fig. 3




Fig. 4




Fig. 5




Fig. 6




Fig. 7

# WIPER BLADE FOR MOTOR VEHICLE WINDOWS

This application is a 371 of PCT/DE98/03721 filed Dec. 18, 1998.

## PRIOR ART

In wiper blades of the type under consideration, the carrying element is intended to assure a predetermined distribution of the wiper arm-induced wiper blade pressing force—often also called pressure—against the window over the entire wiping field swept across by the wiper blade. Through a corresponding curvature of the unstressed carrying element—i.e. when the wiper blade is not resting against the window—the ends of the wiper strip, which is placed completely against the window during the operation of the wiper blade, are loaded toward the window by the carrying element which is then stressed, even when the curvature radii of spherically curved vehicle windows change with each wiper blade position. The curvature of the wiper blade must therefore be slightly sharper than the sharpest curvature measured in the wiping field on the window to be wiped. The carrying element consequently replaces the expensive support bracket construction with two spring rails disposed in the wiper strip, as is the practice in conventional wiper blades (published, non-examined German patent application 15 05 357).

Iu a known wiper blade of this type (German patent 12 47 161), in order to produce as uniform as possible a pressure loading of the wiper blade against a flat window over its entire length, a number of embodiments of the carrying element are provided.

In another known wiper blade according to the preamble to claim **1** (EP 05 28 643 B1), in order to produce a uniform pressure loading of the wiper blade against spherically curved windows, the pressure loading at the two end sections increases significantly when the wiper blade is pressed against a flat window.

The uniform pressure distribution over the entire wiper blade length desired in both instances, however, causes the wiper lip, which belongs to the wiper blade and does the actual wiping work, to abruptly flip over along its entire length from its one drag position into the other when the wiper blade reverses its working direction. This drag position is essential for an effective and low-noise operation of the wiper system. However, the abrupt flipping over of the wiper lip—which is inevitably connected with a back and forth movement of the wiper blade—produces undesirable knocking noises. Also, the matching of the carrying element stress to the desired pressure distribution, which is different from case to case, is problematic in the case of spherically curved windows.

## SUMMARY OF THE INVENTION

According to the present invention, a wiper blade which can be moved back and forth across the window comprises an elongated wiper strip, and a spring-elastic carrying element wherein a contact force of the wiper strip against the window is greater in its center section then in at least one of two end sections thereof. In the wiper blade according to the present invention, in the vicinity of the reduced contact force, a steeper drag position of the wiper lip is produced in comparison to the region with the greater contact force. This steeper position of the wiper lip encourages its tilting-over process in the wiping direction reversal positions of the wiper blade, which is initiated there and then continued in the region that has the greater contact force. This prevents the abrupt snapping over of the entire wiper lip and the unpleasant knocking noise connected with it. This also eliminates the problems in the design of the carrying element with regard to the contact pressure distribution in spherically curved windows. Namely, it has turned out that the reduction of the contact pressure at the end section of the wiper blade does not inevitably also attend a reduction in the wiping quality.



It is particularly advantageous if the contact pressure of the wiper strip against the window is lower at its two end sections than in its center section because the tilting-over process of the wiper lip then takes place starting from both ends and is therefore finished more quickly.

With particularly problematic window curvatures, it can be useful if the contact pressure of the wiper strip against a window in its center section is at least almost uniform in magnitude and decreases at the end section(s).

A preferred embodiment of the carrying elements for achieving the desired distribution of the contact pressure provides that the carrying element has a concave curvature on its side oriented toward the window which is sharper than the sharpest curvature of the spherically curved window in the vicinity of the wiping field that can be swept across by the wiper blade and that the concave curvature in the center section of the carrying element is sharper than that of its end section(s).

Other advantageous embodiments and updates of the invention are disclosed in the following description of an exemplary embodiment shown in the respective drawings.

## DRAWINGS

FIG. **1** is a perspective depiction of a wiper blade that is resting against the window and is connected to a wiper arm that is loaded in the direction of the window,

FIG. **2** is a schematic representation of a side view of an unloaded wiper blade placed against the window, shown at a reduced scale in comparison to FIG. **1**,

FIG. **3** shows the sectional plane of the section through the wiper blade according to FIG. **1**, along the line III—III in an enlarged depiction,

FIG. **4** shows the sectional plane of a section through the wiper blade according to FIG. **1** along the line IV—IV in an enlarged depiction,

FIG. **5** is a graphic representation of the wiper blade contact pressure over the wiper blade length according to a first possible embodiment of the invention,

FIG. **6** is a graphic representation of the wiper blade contact pressure over the wiper blade length according to a different possible embodiment of the invention,

FIG. **7** is a graphic representation of the wiper blade contact pressure over the wiper blade length according to another possible embodiment of the invention, and

FIG. **8** is a schematic representation, not to scale, of a side view of a carrying element belonging to the wiper blade.

## DESCRIPTION OF THE EXEMPLARY EMBODIMENT

A wiper blade **10** shown in FIG. **1** has an elongated, spring-elastic carrying element **12** for a wiper strip **14**, and this carrying element **12** is shown separately in FIG. **8**. As can be seen from FIGS. **1**, **3**, and **4**, the carrying element **12** and the wiper strip **14** are connected to each other so that their longitudinal axes are parallel. A connecting device **16**

is disposed on the top side of the carrying element **12** remote from the window **15** to be wiped—indicated with dot-and-dash lines in FIG. **1**—and with the aid of this connecting device **16**, the wiper blade **10** can be detachably connected to a driven wiper arm **18** that is supported on the body of a motor vehicle. The elongated, rubber-elastic wiper strip **14** is disposed on the underside of the carrying element **12** oriented toward the window **15**. A hook, which is used as a reciprocal connecting means, is formed onto the free end **20** of the wiper arm **18** and encompasses a pivot bolt **22** belonging to the connecting device **16** of the wiper blade **10**. The retention between the wiper arm **18** and the wiper blade **10** is performed by an intrinsically known securing means that is embodied as an adapter and is not shown in detail. The wiper arm **18** and therefore also its hook end **20** are loaded in the direction of the arrow **24** in relation to the window **15** to be wiped, whose surface to be wiped is indicated in FIGS. **1** and **2** by means of a dot-and-dash line **26**. The force (arrow **24**) places the wiper blade **10** over its entire length against the surface **26** of the window **15** to be wiped. Since the dot-and-dash line **26** depicted in FIG. **2** is intended to represent the sharpest curvature of the window surface in the region of the wiping field, it is clearly evident that the curvature of the as yet unloaded wiper blade **10** resting with both of its ends against the window is sharper than the maximal curvature of the spherically curved window **15**. Due to the pressure (arrow **24**), the wiper blade **10** rests over its entire length against the window surface **26** with its wiper lip **28** that belongs to the wiper strip **14**. This produces a stress in the band-like spring-elastic carrying element **12**, which assures a proper contact of the wiper strip **14** or the wiper lip **28** over its entire length against the motor vehicle window **15**. During wiper operation, the wiper arm **18** moves the wiper blade **10** lateral to its longitudinal span, across the window **15**. This wiping or working motion is indicated in FIG. **1** with the double arrow **29**.

The particular embodiment of the wiper blade according to the invention will now be discussed in detail. As shown by the not-to-scale FIGS. **3** and **4**, the wiper strip **14** is disposed on the lower band surface of the carrying element **12** oriented toward the window **15**. Spaced apart from the carrying element **12**, the wiper strip **14** is constricted from its two long sides in such a way that a tilting piece **30** remains in its longitudinal center region and extends over the entire length of the wiper strip **14**. The tilting piece **30** transitions into the wiper lip **28**, which has an essentially wedge-shaped cross section. Because of the contact force (arrow **24**), the wiper blade or the wiper lip **28** is pressed against the surface **26** of the window **15** to be wiped, wherein due to the influence of the wiping movement—one of the two opposing wiping motions (double arrow **29**) in particular is considered in FIGS. **3** and **4** and is indicated by the direction arrow **32**—, this wiper lip **28** tilts into a so-called drag position in which the wiper lip is supported over its entire length against the part of the wiper strip **14** that is secured to the carrying element **12**. This support, which is indicated in FIGS. **3** and **4** with the arrow **34**, is always produced—depending on the respective wiping direction (double arrow **29** or arrow **32**)—against the upper edge of the wiper lip **28** disposed toward the rear in the respective wiping direction so that it is always guided across the window in a so-called drag position. This drag position is required for an effective and low-noise operation of the wiper apparatus. The reversal of the drag position takes place in the so-called reversal position of the wiper blade **10** when this reverses its wiping motion (double arrow **29**). The wiper blade executes a back and forth motion, which is induced by the tilting over of the wiper lip **28**. The upward motion occurs counter to the direction **24** and consequently also counter to the contact force. In the other wiping direction directed counter to the arrow **32**, a mirror image of the FIGS. **3** and **4** is consequently produced.

In order to produce as low-noise as possible a tilting over of the wiper lip **28** from its one drag position into its other drag position, the carrying element **12** used for distributing the contact force (arrow **24**) is designed so that the contact force of the wiper strip **24** or the wiper lip **28** against the window surface **26** is greater in its center section **36** (FIG. **8**) than in at least one of the two end sections **38**. This fundamental concept, for example, can be incorporated, as shown in a graphic representations according to FIGS. **5** to **7**.

According to FIG. **5**, the carrying element **12** is designed so that viewed in terms of the length **40** of the wiper blade, its center region **36** has a virtually uniform contact force (line **44**) and that this contact force **44** sharply decreases at both end sections **38** of the wiper blade. The dot-and-dash line **42** is intended to indicate a possible position of the pivot bolt **22**, i.e. the engagement point of the wiper arm-induced contact force.

In another embodiment (FIG. **6**), the carrying element **12** is designed so that viewed in terms of the length **140** of the wiper blade, starting from the one and **138** of the wiper blade until well beyond its linkage point (line **142**), the contact force **24** is of a uniform magnitude (line **144**) until it decreases sharply in the region of the other and **139** of the wiper blade. The possible linkage point of the wiper blade to the wiper arm has been labeled **142** in FIG. **6**.

Another possible design of the wiper blade according to the invention, which is shown in FIG. **7**, provides that the contact pressure or contact force (**244**) of the wiper lip **28** against the window surface **26** is essentially uniform in the center region **242** of the wiper blade—where the linkage point of the wiper arm **18** is disposed—and that it decreases slightly toward one and **238** of the wiper blade whereas it decreases considerably in the vicinity of the other and **239** of the wiper blade. With this design of the wiper blade, the engagement point **243** of the wiper arm **18**, is disposed on the wiper blade outside the center of the wiper blade length **240**, as in the design according to FIG. **6**. Naturally, it is possible to use such a positioning of the linkage point even in wiper blades that are designed in accordance with FIG. **5**. The different designs of the wiper blade can be required by particular window types, which differ from one another, for example due to the type of spherical curvatures of the windows.

FIG. **8** shows a possible curvature course of the carrying element **12**, which can produce a pressure distribution of the wiper lip **28** against the window **15**, as is graphically depicted in FIG. **5**. With this spring-elastic carrying element **12**, which when unloaded has a sharper concave curvature than the window in the region of the wiping field being swept across by the wiper blade, the curvature course is embodied so that it is sharper in the center section **36** of the carrying element than at its end sections **38**. In order to achieve the desired contact force distribution, however, it is also conceivable to reduce the end sections **38** of the carrying element **12** cross sectionally so that a comparable effect is achieved.

Naturally, this possibility can also be combined with correspondingly coordinated changes in the curvature course of the carrying element **12**.

The reduction of the contact force of the wiper lip **28** against the window surface **26** in the region of one or both

wiper blade ends, prevents an abrupt flipping over or snapping over of the wiper lip **28** from its one drag position into its other drag position. In contrast, with the wiper blade according to the invention, a comparatively gentle tilting over of the wiper lip is produced, starting from the wiper blade end and continuing to the wiper lip center or to the other wiper lip end. FIGS. **3** and **4**, in connection with FIG. **1**, show that even with spherically curved windows, the less-loaded end sections of the wiper lip **28** still rest effectively against the window surface. A comparison of FIGS. **3** and **4** shows this, from which it is clear that in the less-loaded end region (FIG. **4**), the wiper lip **28** is disposed more steeply in relation to the window surface **26** than in its center section (FIG. **3**), where the greater contact force is in effect. This steeper disposition of the wiper lip **28** encourages the beginning of the tilting over of the wiper lip when the reverse motion of the wiping motion begins (double arrow **29**).

It is common to all of the exemplary embodiments that the contact pressure (arrow **24**) of the wiper strip **14** against the window **15** is greater in its center section **36** than in at least one of its two end sections **38**. This is true even if in contrast to the currently shown wiper blade **10** with a one-piece carrying element **12** depicted as a spring rail, the carrying element is embodied as having a number of parts. The only crucial thing is the distribution of the contact pressure according to the invention.

What is claimed is:

**1**. A wiper blade for a wiping device of a motor vehicle for wiping a window of the motor vehicle, comprising an elongated wiper strip placeable against the window, and an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window, said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections, said spring-elastic carrying element has on a side thereof oriented toward the window a concave curvature that is sharper than the sharpest curvature of a spherically curved window in a region of a wiping field that can be swept across by said wiper blade and a concave curvature in said center section of the carrying element is sharper than in said sections thereof.

* * * * *

Trials@uspto.gov
Tel: 571-272-7822

Paper 69
Entered: April 24, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

COSTCO WHOLESALE CORPORATION
Petitioner,

v.

ROBERT BOSCH LLC,
Patent Owner.

---

Case IPR2016-00036
Patent 6,944,905

---

Before PHILLIP J. KAUFFMAN, WILLIAM V. SAINDON, and BARRY L. GROSSMAN, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION

*Incorporating Decisions on*
Petitioner's Motion to Exclude Evidence
Petitioner's Motion to Strike
Patent Owner's Motion to Exclude Evidence
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

## I. INTRODUCTION

Costco Wholesale Corporation ("Petitioner") filed a Petition requesting inter partes review of claims 13, 17, and 18 of U.S. Patent No. 6,944,905 (Ex. 1001, "the '905 patent"). Paper 1 ("Pet."). Robert Bosch LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 15 ("Prelim. Resp."). We instituted review on the sole asserted ground of whether claims 13, 17, and 18 would have been obvious in view of Prohaska[1], and Hoyler[2]. Paper 16 ("Dec. Inst."). After our Decision on Institution, Patent Owner filed a Response (Paper 28, "PO Resp."), and Petitioner filed its Reply (Paper 34, "Pet. Reply"). An oral hearing was held January 18, 2017. Paper 67 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

We also address herein the parties' Motions to Strike or Exclude Evidence.

As described below, we determine that a preponderance of the evidence establishes that claims 13, 17, and 18 are unpatentable.

### *A. Related Matters*

The parties represent that the '905 Patent is asserted in *Robert Bosch LLC v. Alberee Products Inc. et al.*, cv-12-574-LPS (D. Del) (consolidated with cv-14-142-LPS). Pet. 1; Paper 5, 1.

---

[1] U.K. Patent App. GB 2 106 775 A, published April 20, 1983 (Ex. 1003).

[2] German Patent No. 1,028,896, published April 24, 1958 (Ex. 1004). The English translation begins at page 5.

In addition, Petitioner has filed petitions against several of Patent Owner's other patents related to windshield wiper technology, including: U.S. Patent Nos. 6,973,698 (IPR2016-00034), 6,836,926 (IPR2016-00035), 6,292,974 (IPR2016-00038), 7,228,588 (IPR2016-00039), 7,484,264 (IPR2016-00040), 8,099,823 (IPR2016-00041), and 8,544,136 (IPR2016-00042). Pet. 1–2; Paper 5, 1–2. The petition in IPR2016-00035 was denied. Trial was instituted in the other listed cases. A single, consolidated hearing was held for this case and the other listed cases.

### *B. Wiper Blade Background*

There are two main types of windshield wiper structures: beam blades, and yoke, or conventional, blades. The conventional or yoke-style structure includes a series of flexible rails that distribute force along the wiper blade. Ex. 1007 ¶ 19. Figure 1 of U.S. Patent 3,418,679 (Ex. 1016) is reproduced below:




Figure 1 depicts a yoke-style wiper structure, having a large main rail 4 connected to two smaller rails 5 and 6, which in turn are connected to the wiper blade.

In contrast to the conventional or yoke style wiper is the beam-style of wiper. This type of wiper uses metal strips adjacent the wiper blade to distribute the load along the length of the wiper blade rather than the yokes.

Ex. 1007 ¶ 22. The '905 patent discloses a beam wiper. Figure 1 of the '905 patent illustrating a beam wiper, is reproduced below:



Figure 1 of the '905 patent depicts a beam-style wiper structure, in which the beam is attached along the entire length of the wiper.

### *C. The '905 Patent*

When driving at high speeds, the windshield wipers on a vehicle tend to lift off the windshield. The '905 patent addresses this problem by providing a "wind-deflection strip" on the windshield wiper to create a force directed towards the windshield. Wind-deflection strips on windshield wipers are, admittedly, well-known. *E.g.* Ex. 1001, 1:26–32.[3] The wiper blade disclosed and claimed in the '905 patent, however, is hollow, which reduces its weight and rigidly. This creates savings in material, reduces the mass that the drive unit must reciprocate, and reduces bending on the wiper blade support element. *Id.* at 1:55–64.

The disclosed wiper blade is made of three main components: elastic rubber wiper strip 14, resilient support element 12, and wind deflection strip 42. *Id.*, Abstract. These three components are illustrated in Figure 2 of the '905 patent, reproduced below:

---

[3] Citations to the '905 patent are in the format of "column:line[s]."




Figure 2 of the '905 patent depicts a cross-sectional view of a windshield wiper blade embodiment. As shown in Figure 2 and also in Figure 3, of the '905 patent, wind deflection strip 42 has two diverging legs (44, 46) that diverge from common point 48. Free ends 50 and 52 of legs 44 and 46 are oriented toward window 22 and are supported against wiper blade 10 or its support element 12, so that deflection strip 42 is generally triangular in cross section and has a hollow interior. *Id.* at 2:54–62.

End caps 38 (*see* Fig. 1) are at each end of the blade. *Id.*4:34. Attack surface 54, which is fluted in the exemplary embodiment, is on the outside of leg 44. *Id.* at 4:48–49. The relative wind flows against this attack surface to provide a force directed towards the windshield. *Id.* at 4:50–51.

### *D. Challenged Claims*

Petitioner challenges claims 13, 17, and 18, each of which is written as an independent claim. Claim 13 is reproduced below. [4]

> 13. A wiper blade for cleaning windows, comprising:
> a band-like, elongated, spring-elastic support element (12),

---

[4] Line breaks have been added to claim 13 to assist in identifying the elements recited in claim 1. Reference numerals appear is the issued claim.

wherein a lower band surface (13) oriented toward the window (22) has an elongated, rubber-elastic wiper strip (14), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and

wherein an upper band surface (11) of the support element has a wind deflection strip (42) disposed on it,

wherein the wind deflection strip extends in a longitudinal direction of the support element (12), is provided with an attack surface (54) oriented toward the main flow of the relative wind, and is made of an elastic material,

wherein the wind deflection strip (42, 142, 242) has two diverging legs (44, 46), viewed in transverse cross section, wherein the two diverging legs are connected to each other at a common base (48) and

wherein free ends of the two diverging legs oriented toward the window (22) are supported on the support element, and the attack surface (54) is embodied on the outside of the one leg (44),

wherein the upper band surface (11) of the support element (12), in its middle section, includes a wiper blade part (15) for connecting the wiper blade (10) to a reciprocally driven wiper arm (16) and is supported,

wherein an end cap (38) is respectively disposed at both ends of the support element (12), and

wherein a section (40) of the wind deflection strip (42) is disposed between and in contact with each respective end cap (38) and the device piece (15).

Claims 17 and 18 are substantially similar to claim 13.

Claim 17 adds a limitation, not in claims 13 or 18, stating that the end caps are provided with a "flute (68), which extends in a projection of the

flute of the attack surface (54)[5] of the wind deflection strip." Ex. 1001, 10:2–4.

Claim 18 adds a limitation, not in claims 13 or 17, stating that "the wiper blade part (15) of the connecting device is provided with a flute (70), which extends in a projection of the flute of the attack surface (54)[6] of the wind deflection strip (42)." *Id.* at 10:32–34.

## II. EVIDENTIARY MOTIONS

Before addressing the merits, we first decide several evidentiary motions filed by the parties.

### *A. Patent Owner's Motion to Exclude*

Patent Owner moves to exclude Paragraphs 7, 9–11, 15, 18, 19, 21, and 23–26 of the Declaration testimony of Mr. David Peck (Ex. 1100). Paper 49. Petitioner offers in opposition (Paper 58), to which Patent Owner offers its reply (Paper 64). The Motion to Exclude and associated papers have no meaningful distinction from the similar Motion to Exclude Mr. Peck's testimony in IPR2016-00038, slip op. at 19–22, Paper 68 (PTAB Mar. 30, 2017). We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Patent Owner's Motion to Exclude portions of Mr. Peck's Declaration (Ex. 1100) is *denied.*

---

[5] We note that claim 17 does not have an antecedent basis for the reference to "the flute of the attack surface (54) of the wind deflection strip."

[6] We note that claim 18 does not have an antecedent basis for the reference to "the flute of the attack surface (54) of the wind deflection strip."

*B. Petitioner's Motion to Exclude*

Petitioner moves to exclude the testimony of Wilfried Merkel offered by Patent Owner in Exhibit 2005, 210–264. Paper 50, 1–11. This testimony is from a 2010 district court trial transcript in *Robert Bosch LLC v. Pylon Manufacturing Corp.*, No. 08-542 (D. Del. Apr. 15, 2010), in which Mr. Merkel testified on behalf of Patent Owner. Paper 50, 4.

Petitioner also moves to exclude portions of the Declaration testimony of Martin Kashnowski offered by Patent Owner in Exhibit 2007. *Id.* at 11–15.

Patent Owner offers its opposition (Paper 61), to which Petitioner offers its reply (Paper 65).

With respect to the testimony of Mr. Merkel, our analysis in IPR2016-00038, slip op. at 10–16, Paper 68 (PTAB Mar. 30, 2017) is applicable here. We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Petitioner's Motion to Exclude portions of Mr. Merkel's prior trial testimony (Ex. 2005) is *denied.*

With respect to the testimony of Mr. Kashnowski, our analysis in IPR2016-00038, slip op. 16–19, Paper 68 is applicable here. We adopt the findings, analysis, and conclusions from that case on this issue. Consequently, Petitioner has not demonstrated effectively that the testimony at issue is inadmissible hearsay, and with respect to this evidence, the Motion to Exclude is *denied.*

*C. Petitioner's Motion to Strike*

Petitioner moves to strike the testimony of Mr. Merkel in Exhibit 2005, 210–264. Paper 33. This testimony is from a 2010 district court trial transcript in *Robert Bosch LLC v. Pylon Manufacturing Corp.*, No. 08-542

(D. Del. Apr. 15, 2010), in which Mr. Merkel testified on behalf of Patent Owner. Paper 33, 1. Patent Owner filed an opposition. Paper 36. Petitioner's Motion to Strike and associated papers do not differ from the similar Motion to Strike in IPR2016-00038, slip op. at 4–10, Paper 68 (PTAB Mar. 30, 2017). We adopt the findings, analysis, and conclusions from that case on this issue. Consequently Patent Owner's Motion to Strike portions of Mr. Merkel's prior trial testimony (Ex. 2005) is *denied.*

## III. ANALYSIS

### *A. Claim Construction*

We interpret the claims of an unexpired patent using the broadest reasonable interpretation in light of the specification of the patent. 37 C.F.R. § 42.100(b). Petitioner asserts that none of the claim terms in the '905 patent needs to be construed for purposes of this Petition. Pet. 19. Patent Owner does not address claim construction.

We determine that the challenged claims do not require specific construction.

### *B. Petitioner's Asserted Ground of Unpatentability*

Petitioner asserts that claims 13, 17, and 18 would have been obvious under 35 U.S.C. § 103 based on Prohaska in view of Hoyler. Petitioner also relies on the declaration of Gregory W. Davis, Ph.D. (Ex. 1007).

> Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls.").

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To reach this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State*

*Sys. Corp.*, 755 F. 2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a *whole* in deciding the question of obviousness.") (citation omitted); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences *themselves* would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious.") (citation omitted).

"A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to common sense" or to that which the prior art teaches. *Id.*

Against this general background, we consider the references, other evidence, and arguments on which the parties rely.

*1. Scope and Content of the Prior Art*

The first step in our analysis is to review the scope and content of the prior art.

*a. Prohaska*

Prohaska is directed to an automobile windshield wiper blade. Ex. 1003, 4:5–7.[7] Prohaska describes the known problem of an air stream

[7] Citations are to exhibit page number, in the form "page:line[s]."

striking the wiper blade, which diminishes the contact pressure of the wiper, causing lifting and deterioration of the wiper blade, especially at high vehicle speeds. *Id.* at 4:8–16. Prohaska explains that spoilers are known, but prior spoilers were attached to the yoke or were unduly complicated and unattractive. *Id.* at 4:25–29. Prohaska proposes a spoiler formed on, or attached to, a flexible strip, which in turn is attached to a wiper blade. *Id.* at 4:48–52, 68–77. Prohaska explains that its spoiler makes it "easily possible to retrofit a wiper blade." *Id.* at 4:68–69. One embodiment is shown in Figure 3, reproduced below with added coloring:




Fig. 3

Figure 3 of Prohaska depicts spoiler 20 (in green) integral with flexible strip 30 (also green) and attached to wiper 10 (in blue). *Id.* at 2:71–75. In the embodiment shown in Figure 3, spoiler 20 clearly is hollow.

*b. Hoyler*

Hoyler discloses a windshield wiper shown generally in the several images that make up Figure 1, which is reproduced below.




Figure 1 of Hoyler depicts side, top, and cross-section views of a beam-style wiper blade.

As shown in Figure 1, rubber wiper blade 1 with a back part 2 is connected via a strip 3 with wiper lip 4. Ex. 1004, 5.[8] Longitudinal springs 5 are inserted in lateral slots in back part 4, held together at the ends by clamps 6. *Id.* Rubber blade 1 may be adhered or vulcanized to longitudinal spring 5 to reduce weight. *Id.* at 6 ("the rubber blade is adhered or vulcanized to the longitudinal spring 5, allowing a particularly light and narrow embodiment of the wiper bar.").

Hoyler also describes the importance of having light-weight wipers. *Id.* at 5 ("The weight of the moving parts can be largely reduced thereby so that the stress upon the drive elements is low.").

### 2. *Level of Ordinary Skill*

Petitioner asserts that the references cited or discussed in the Petition reflect the level of ordinary skill in the relevant technology. Pet 30–31.

[8] Citations are to the exhibit page number.

Petitioner also asserts a person of ordinary skill would have had "education and experience in mechanical engineering to have knowledge of the information deployed in these patents and printed publications." *Id.* at 31. Petitioner does not cite any evidence or authority to support its asserted level of ordinary skill. We note, however, that Dr. Davis states a slightly different view. Dr. Davis opines that a person of ordinary skill "would have the education and experience in automotive design, automotive manufacture, or mechanical engineering. Ex. 1007 ¶¶ 15, 16.

Patent Owner asserts a person of ordinary skill in the art at the time of the invention of the '905 patent would have had either an undergraduate degree in mechanical engineering or a similar discipline, or several years of experience in the field of wiper blade manufacture and design. PO Resp. 1 (citing Ex. 2003 ¶¶ 16–19).

Patent Owner's proposed level of skill would include anyone with an undergraduate degree in mechanical engineering or similar discipline, regardless of whether they had any actual knowledge or experience in the present field of endeavor, i.e. windshield wiper blades. *See id.* at 1 (proposing "mechanical engineering . . . or . . . experience in the field"). Patent Owner's proposed level would include virtually anyone with a mechanical engineering degree. We cannot accept Patent Owner's proposed level of skill because it reads out at least "in the art" in "a person of ordinary skill in the art."

Neither party presents a detailed evidentiary showing under the factors typically considered in determining the level of ordinary skill in the art. Factors pertinent to this determination include: (1) educational level of the inventor; (2) type of problems encountered in the art: (3) prior art

solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field. Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

We adopt the level of skill proposed by Petitioner, as explained by Dr. Davis. A person of ordinary skill would have sufficient education and experience in mechanical engineering to have knowledge of and understand the information disclosed in the prior art discussed in the Petition. This includes experience in automotive design and manufacture. *See also Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("the prior art itself reflects an appropriate level [of skill]").

*3. Obviousness in View of Prohaska and Hoyler*

In general, Petitioner asserts that it would have been obvious to clip the spoiler of Prohaska on the beam-style wiper of Hoyler. Pet. 36, 41–42, 46–47.

The figures below are excerpts from Petitioner's Exhibit 1202, page 2, comparing the proposed combination of prior elements, shown on the left, to the disclosed structure in the '905 patent on the right. [9]

[9] We recognize that we compare the prior art to the *claimed* invention, not the *illustrated* invention. These illustrations, however, provide a useful aid to our analysis of the claimed invention.







Excerpt from Ex. 1202, 2 comparing
Prohaska and Hoyler figures to '905 patent figures.

Petitioner identifies where Prohaska and Hoyler disclose each limitation of the challenged claims. Pet. 31–34, 37–41, 42–46. Petitioner asserts that Prohaska "teaches that existing wiper blades may be retrofitted by clipping wind deflector strips on a flexible strip, and that a flexible wind deflector strip may be inserted onto the head of the wiper strip." *Id.* at 6 (citing Ex. 1003, 4:68–70) ("It is easily possible to retrofit a wiper blade by squeezing a spoiler against its flexible strip or clipping it on this flexible strip."). Prohaska states that "conventional rubber wiper elements and supporting structure can be used." Ex. 1003, 4:13–15. Moreover, Prohaska discloses that the:

> embodiments shown illustrate a flexible strip which laps over the head of at least one wiper element. However it would also be possible to insert individual flexible strips in the head of the wiper element, which flexible strips either consist of steel as

> usual or of plastics material, and to equip one of them with a spoiler.

*Id.* at 4:1–7.

Petitioner asserts, therefore, that the proposed combination is "nothing more than a simple arrangement of old elements with each performing the same function it had been known to perform yielding predictable results." *Id.* at 37; Ex. 1007 ¶ 50; *see also* Ex. 1007 ¶ 46 ("In my view it would have been well within the skill of a person of ordinary skill in the art to modify the elongations 32, 33 of Prohaska to clip to the springs 5 of Hoyler in order to implement this teaching.").

*a. Conventional vs. Beam Blades*

Patent Owner's basic argument against combining the disclosures of Prohaska and Hoyler is that a conventional blade, like Prohaska, is "fundamentally different" from a beam blade. PO Resp. 8–9. According to Patent Owner, they are not "interchangeable." *Id.* at 8. We disagree.

The level of skill in the art is education and experience in mechanical engineering, with experience in automotive design and manufacture. This level of skill is not limited to the nuances or limitations of yoke or beam windshield wipers. A person with this level of skill and experience would be readily capable of adapting features from one type of windshield wiper to another.

Moreover, we have not been directed to any persuasive evidence that the disclosure of Prohaska is limited to any specific type of windshield wiper. Prohaska discloses, in general, the problem of the air stream of a moving vehicle causing the windshield wipers to lift from the windshield. Ex. 1003, 4:8–15. To solve this problem, Prohaska explains, "[i]t is easily possible to retrofit a wiper blade by squeezing a spoiler against its flexible

strip or clipping it on this flexible strip." *Id.* at 4:68–70. Prohaska does not limit the problem and solution identified to any specific type of windshield wiper.

The specific embodiment in which Prohaska implements his disclosed invention is a yoke-style blade. *Id.* at 4:46. This does not limit the teaching of the disclosure to this specific embodiment. "A reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As explained in *KSR*, "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one." 550 U.S. at 417. Additionally, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve *similar devices* in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* (emphasis added). Prohaska and Hoyler are "similar devices" and there is no persuasive evidence that the proposed combination is beyond the skill of a person with education and experience in mechanical engineering, and with experience in automotive design and manufacture. Moreover, as the Supreme Court informs us, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421 (2007).

*b. The "End Cap" Limitations*

Patent Owner also asserts that neither Prohaska nor Hoyler disclose an "end cap," as recited in the challenged claims." PO Resp. 3–4. We disagree.

The Specification discloses that spring strips 30 are secured in longitudinal grooves 34 by end caps 38 disposed at each end of the wiper blade. Ex. 1001, 4:31–34. We have not been directed to any persuasive disclosure in the Specification that states a specific shape of the end caps or discloses a specific function other than merely securing the spring strips. *Id.*

As shown in the excerpt from Figure 1 in Hoyler, reproduced below, which shows only the right end of the wiper blade, Hoyler discloses "clamps" 6 at the ends of the wiper bar. Ex. 1004, 5 (The longitudinal springs 5 are inserted in lateral slots, held together *at the ends* of the bar by the clamps 6." (emphasis added)).




**Fig. 1**

Excerpt of right side of blade from Fig. 1 of Hoyler.

Thus, clamps 6 in Hoyler, like end caps 38 in the '905 patent, are positioned at the ends of the wiper blade and function to secure longitudinal spring strips.

In arguing that Hoyler "does not describe an end cap" (PO Resp. 4), Patent Owner asserts "a clamp [is] not an end cap" (*id.*). Patent Owner asserts "[a] person of ordinary skill in the art at the time of the invention would not have understood these 'clamps' to cap the ends of the wiper blade, that is, to cover the sharp corners that could scratch a car or a person." *Id.* (citing Ex. 2003 at ¶ 69). We disagree.

As shown in the excerpt from Figure 1 of Hoyler, clamp 6 clears has a flange or component that bends over the end of the blade. Clamp 6 covers the end and sides of the blade. Thus, it caps the end. We have not been directed to any limitations in the challenged claims that require the end cap to have a specific structure, to cover the *entirety* of the end of the blade, or to perform a specific function, such as to prevent scratching. Thus, the evidence does not support Patent Owner's argument.

Petitioner also asserts that because Prohaska does not have end caps, the Prohaska spoiler is not "disposed between and in contact with both the end caps and the device (element 15 in the '905 patent) connecting the wiper blade to the wiper arm, as recited in the claims. PO Resp. 7. We disagree.

The asserted basis of unpatentabilty is based on adding the spoiler of Prohaska to the blade of Hoyler. Pet. 36. Prohaska teaches that it is "reasonable to arrange spoilers in [the working points] of the wiper element." Ex. 1003, 4:107–112. These "working points" extend from end cap to end cap in Hoyler. Thus, when the spoiler of Prohaska is added to Hoyler, it would extend from end cap to end cap.

Hoyler discloses that "hump 7" is fastened in the center of the rubber blade. Ex. 1004, 5. Hump 7 is the "device" that connects the wiper blade to the wiper arm. *Id.* at 6 ("the hump includes an eyelet-like opening 10, which serves for the suspension at the wiper arm not shown."). Hump 7 is fastened to the wiper blade. *Id.* at 5. If the wiper blade of Hoyler is fitted with a spoiler, as suggested by Prohaska, the spoiler will thus contact hump 7 and extend from end cap to cap, contrary to Patent Owner's assertions. *See* Pet. 36–37 (citing Ex. 1007 ¶ 49).

*c. A "Wind Deflection Strip" Having "Two Diverging Legs"*

Patent Owner asserts that the spoiler disclosed in Prohaska combined with Hoyler do not meet the "wind deflecting strip" limitations in the claims because of "(1) the fundamental differences between conventional and beam blades; (2) the problems of wind lift and spoiler rigidity and mass reduction were not known in beam blades; and (3) the disadvantages mentioned by Prohaska of its hollow-shaped Figure 3 conventional spoiler." PO Resp. 8–12.

We have addressed above Patent Owner's reason 1.

As to reason 2, Prohaska addresses the problem of "wind lift" in general. *See* Ex. 1003, 4, ll. 8–("the air stream striking the wiper blade laterally produces a lifting force at the supporting structure and at the wiper element"). Further, Hoyler teaches that flat-spring wipers should be designed so "[t]he weight of the moving parts can be largely reduced," by using a "rubber or elastic plastic" component above the metal flat springs. Ex. 1004, 5.

As to reason 3, spoiler 20 of Prohaska, as shown in Figure 3, has two sides that diverge from a common base point, which are then connected by a wall. *Id.*, Fig. 3. It clearly is hollow with diverging legs. We acknowledge that Prohaska cautions that a hollow spoiler, "possibly migh[t] be disadvantageous." Ex. 1003, 3:2–6. Prohaska indicates that the possible disadvantage stems from the pressure exerted by the airstream, which Prohaska proposes can be eliminated by a "close fit of the parts," i.e., by filling the void in the hollow of the spoiler. *See id.* at 3:7–21. "The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference

with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n. 8 (Fed. Cir. 2000).

The rationale for adding Prohaska's spoiler to Hoyler's windshield wiper is suggested by Prohaska – it solves the lift-off problem faced by all windshield wipers.

Petitioner asserts that a person of ordinary skill "would have understood that Prohaska *taught away* from using the Figure 3 hollow spoiler at all." PO Resp. 12 (emphasis added) (citing Ex. 2003 ¶ 66). We find that Prohaska does not affirmatively teach away from a hollow spoiler; indeed it provides an embodiment specifically directed to a hollow spoiler. In addition, just because a patent teaches that a particular course of action has certain disadvantages does not preclude a person of ordinary skill in the art considering that course of action for what it teaches. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away [...] if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed."). Prohaska identifies a potential disadvantage and then suggests a solution to overcome the identified disadvantage. This is not a teaching away from using the Prohaska spoiler technology in the Hoyler wiper.

*d. Objective Evidence of Non-Obviousness*

Objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). "[E]vidence of secondary considerations may often be the most

probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). "[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Id.* at 1538. "For objective evidence . . . to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re Kao,* 639 F.3d 1057, 1068 (Fed.Cir.2011) (quoting *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed.Cir.2010)) (emphasis omitted) (internal quotation marks omitted).

Patent Owner offers evidence it asserts shows objective evidence of non-obviousness (PO Resp. 17–23), in the form of commercial success (*id.* at 18–21), praise and awards (*id.* at 17–18, 21), copying/knockoff products (*id.* at 21), licensing (*id.* at 22–23), and long-felt need and failure of others (*id.* at 20–21, 23). Patent Owner recognizes there must be a nexus between the objective evidence and the merits of the claimed invention. *Id.* at 16. Patent Owner asserts the nexus is presumed because the objective evidence is tied to a specific product and that product is the invention claimed in the '905 patent. *Id.*

Petitioner provides its arguments in rebuttal, asserting there is no nexus between the '905 patent and any purported commercial success, and no success is established. Pet. Reply 15–22. Petitioner asserts correctly that Patent Owner submitted the same evidence in this case and in each of the other related *inter partes* reviews identified above – IPR2016-00034, 00038, 00039, 00040, and 00041. Petitioner asserts this "undermines [Patent Owner's] commercial success arguments" because the '905 patent and the patents that are the subject of the related IPRs are directed to different

inventions. *Id.* at 15 (citing *GraftTech Int'l Holdings, Inc. v. Laird Techs. Inc.*, No. 2015-1796, 2016 WL 3357427, at *5 (Fed. Cir. June 17, 2016).[10]

We have reviewed the arguments and evidence cited in these papers.

*i. Nexus*

For objective indicia evidence to be accorded substantial weight, "a nexus must exist 'between the evidence and the merits of the claimed invention.'" *Novartis Ag V. Torrent Pharmaceuticals*, No. 2016-1352, slip op. at 24, Fed. Cir. April 12, 2017) (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). "[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent." *WBIP*, 829 F.3d at 1329 (citations omitted). The presumption of nexus is rebuttable. A patent challenger may respond by presenting evidence that shows the proffered objective evidence was "due to extraneous factors other than the patented invention." *Id.* (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988)). Such extraneous factors include additional unclaimed features and external factors, such as improvements in marketing. *WBIP*, 829 F.3d at 1329. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (holding that evidence that commercial success was due to unclaimed or non-novel features of device "clearly rebuts the presumption that [the commercial product's] success was due to the claimed and novel features"). *See also Novartis*, slip op. at 25 (stating that "In evaluating whether the requisite nexus exists, the identified objective indicia

[10] This case was identified as "nonprecedential." *See* Fed. Cir. R. 32.1 regarding the effect of nonprecedential dispositions.

must be directed to what was not known in the prior art").

Patent Owner relies on two specific products to establish a presumption of nexus, its "Aerotwin" wiper blade (*e.g.*,PO Resp. 19)[11] and its "Icon" wiper blade (*e.g.*, *id.*). We determine that sufficient evidence establishes that Aerotwin and Icon products are embodiments of the claimed invention and that the proffered objective evidence relates to these products. This is sufficient to establish the presumption of nexus for the objective considerations at issue in this case. Thus, Patent Owner was entitled to rely upon the presumption of nexus for the objective considerations at issue, and the burden of production shifted to Petitioner to rebut that presumption with evidence if it sought to challenge nexus. A patent challenger cannot successfully rebut the presumption with argument alone—it must present evidence. *WBIP*, 829 F.3d at 1329. We also determine that Petitioner has not rebutted the presumption.

Patent Owner alleges its commercial Aerotwin and Icon blades "practice the challenged claims." PO Resp. 19. Patent Owner asserts:

> Both the Aerotwin blade and the Icon blade practice the challenged claims. Ex. 2014 at 3 (identifying products and patents); Ex. 2015 at 33–57, 59–62 (Aerotwin claim charts); Ex. 2016 at 30–43, 45–48 (Icon claim charts); Ex. 2007 at ¶ 6; Ex. 2005 at 234:25–235:4, 249:25–250:5, 252:17–254:21, 353:22–354:1, 359:12–360:4; Ex. 2006 at 698:19–699:22.

*Id.*. We discuss below the evidence on which Patent Owner relies.

Exhibit 2014 is Patent Owner's "Amended Response to Defendant Costco Wholesale Corporation's First Set of Interrogatories (No. 1), dated

[11] The Aerotwin also is referred to as an "OE" wiper blade. PO Resp. 19, fn8.

June 2, 2015, in *Robert Bosch LLC v. Alberee Products, Inc.*, in the District of Delaware, Case No. 12-574 (LPS)." PO Resp. at v. It lists the Aerotwin wiper as practicing the '905 patent (along with 15 other patents), and Generation 1, 2, and 3 of the Icon wiper as practicing the '905 patent (along with nine or more other patents). Ex. 2014, 3–4. This evidence is merely an allegation that Patent Owner's Aerotwin and Icon wiper blades have incorporated the patented technology of the '905 patent along with also incorporating the patented technology of numerous other patents. Ex. 2014, 3–5. The '905 patent includes 19 claims. Only three claims are challenged in this *inter partes* review. The exhibit does not discuss any of the challenged claims, does not provide any analysis, and is not probative evidence establishing that the asserted objective evidence is tied to the invention disclosed and claimed in the challenged claims.

Exhibit 2015 is a series of claim charts mapping claims of various patents, including the '905 patent, to the Aerotwin wiper. Ex. 2015, 33–57. Patent Owner identifies Exhibit 2015 as "Exhibit 24 to Complaint in *In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts)." PO Resp., v. Exhibit 2015 maps claims 13, 16 (not at issue in this proceeding), 17, and 18 to the Aerotwin product. Ex. 2015, 33–57

Patent Owner provides a similar illustration for the Icon blade. Ex. 2016, 30–43. Patent Owner identifies Exhibit 2016 as "Exhibit 25 to Complaint in *In the Matter of Certain Wiper Blades*, Inv. No. 337-TA-816 before the U.S. International Trade Commission (claim charts)." PO Resp. v.

These claim charts map every element of the challenged claims to the Aerotwin and Icon products. We have no evidence or testimony about the source or underlying facts about the preparation of these charts prepared for litigation. Nonetheless, we give this evidence probative weight.

Patent Owner also relies on the declaration testimony of Martin Kashnowski to establish a presumption of nexus with its objective evidence. PO Resp. 19 (citing Exhibit 2007 ¶ 6). Mr. Kashnowski is employed by Patent Owner as Director, Commodities Management. Ex. 2007 ¶ 1. He also served as Director of Product Management for Wiping Systems. *Id.* Mr. Kashnowski refers to general acclaim and commercial success of the Aerotwin and Icon blades. *Id.* at ¶ 3–5. Mr. Kashnowski then testifies:

> Both the Aerotwin blade and the Icon blade included a *flexible spoiler with diverging legs* mounted on the top of the blade, as well as plastic *end caps*. Bosch tested these products extensively before releasing them. One aspect tested was noise. The Bosch beam blades were quiet in operation, including when the wiping direction changes and the wiper strip flips from one side to the other. *Those features were part of the reason for the great customer demand for these products*. Both products solved many of the problems associated with conventional blades.

*Id.* at ¶ 6 (emphasis added). Mr. Kashnowski further testifies that:

> The ·commercial success of the Icon product was in contrast to the failure of a competitor's beam-blade product, the Trico Innovision wiper blade. The Trico product was introduced in 2004, before Icon, but it *failed in the marketplace*. The *Trico product included neither a flexible spoiler nor end caps*.

*Id.* at ¶ 7 (emphasis added).

Mr. Kashnowski refers to "quiet" blades, but the challenged claims do not recite a "quiet" blade. We discount this part of his testimony in evaluating the presumption of nexus.

Mr. Kashnowski's testimony refers generally to spoilers with diverging legs and end caps, as recited in the challenged claims, but the claimed invention in the challenged claims is more than just spoilers and end caps. Nonetheless, this evidence has some probative value in establishing that the asserted objective evidence is tied to the invention disclosed and claimed in the challenged claims.

"Questions of nexus are highly fact-dependent . . . . 'It is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between commercial success of the product and its patented features, and to determine the probative value of evidence of secondary considerations.'" *WBIP*, 829 F.3d at 1331 (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996)).

We recognize that it is the claimed combination as a whole that serves as a nexus for the objective evidence. *WBIP*, 829 F.3d at 1330; *see also id.* at 1332 (stating that this is especially true for a combination of elements that were known individually in the prior art, because commercial success may be linked to the inventive combination of known elements).

Proof of nexus is not limited to only when objective evidence is tied to the supposedly new features of a claimed invention. *Id.* at 1331 ("We further reject Kohler's categorical claim that objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight.").

Based on the totality of the evidence before us, we determine that Patent Owner has established a presumption of nexus. Thus, the burden of production shifts to Petitioner to rebut that presumption with evidence.

Petitioner provides legal argument, but not evidence. Petitioner asserts:

> "there can be no legally significant nexus between the '905 Patent and any alleged success because Bosch's evidence is that that features of the purportedly successful Aerotwin and Icon wiper products are either 'unclaimed' in the '905 Patent, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed Cir. 2006), or were 'known in the prior art,' *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016).

Pet. Reply 15. Petitioner also criticizes the evidence on which Patent Owner relies (*id.* at 15–17), but offers no persuasive evidence of its own rebutting nexus.

Accordingly, we determine that there is a presumption of nexus. Establishing nexus, however, does not establish commercial success or patentability. We consider below the objective evidence of non-obviousness asserted by Patent Owner. We then consider the totality of the evidence in our conclusion on patentability.

*ii. Praise*

Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. *WBIP*, 829 F.3d at 1334. Patent Owner states the Aerotwin was "given a number of awards," but only mentions two awards, the Pace award and the Automechanika award. PO Resp. 17. Patent Owner also asserts that "[t]he Icon blade was subject to praise" (*id.* at 18), but describes it only as "the Frost & Sullivan award for innovation" (*id.* at 21 (citing Ex. 2007 ¶ 8)). There is no description of these awards, copies of them, or persuasive evidence as to what these awards were for and

how specifically they relate to the claimed invention. We determine that this praise for the Aerotwin and Icon products has minimal probative weight.

*iii. Long Felt Need*

Long-felt need can be shown by evidence that indicates that the prior art had a recognized need for a solution to the problem and that others had tried and failed to find a solution to that problem. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1325 (Fed. Cir. 1999); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983). Notably, the case law characterizes the need in terms of a long-felt but *unresolved* need. *Al-Site*, 174 F.3d at 1325 (discussing "long felt but unresolved needs"). Accordingly, Patent Owner must show that the need was both known and not resolved.

Patent Owner alleges that the commercial success of the Icon product was in contrast to the failure of a competitor's beam-blade product, the Trico Innovision wiper blade. PO Resp. 20. This relates only to the Icon blade, not the Aerotwin. But Patent Owner acknowledges that the Trico wiper did not have similar features such as a spoiler or end caps. *Id.* at 21. Further, the prior art already included wipers with spoilers (e.g., Prohaska) and end caps (e.g., Hoyler), such that a long felt need for these features, had there been any, was resolved.

*iv. Copying*

For copying to be effective in showing non-obviousness, there must be more than simply a competing version of the product. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) ("Not every competing product that arguably falls within the scope of a patent is evidence of copying. Otherwise every infringement suit would

automatically confirm the nonobviousness of the patent.”). Evidence of copying can be particularly persuasive when a competitor had tried and failed to introduce a competing product until the patented product became available. *Vandenberg v. Dairy Equipment Co., a Div. of DEC Int'l, Inc.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984). We have no such evidence in this case.

Patent Owner alleges that it created a new “market category” with its Aerotwin and Icon blades, and that others sold “knockoff” products” that “looked identical to the Icon.” PO Resp. 21. Thus, this evidence relates only to the Icon. Patent Owner cites a single lawsuit it filed based on these alleged knock-off products. *Id.* at 22. Merely offering competing products or alleging infringement are not signs of non-obviousness. *Wyers v. Master Lock*, 616 F.3d at 1246 (Fed. Cir. 2010). The secondary consideration of copying is very specific—“evidence of efforts to replicate a specific product.” *Id.* This specifically is not *evidence of efforts to provide a competing product* or *evidence of a product having the same features*, or we would be reading out the crux of the basis for the court's reasoning in *Wyers*, that “[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying.” *Id.* Here, we have no evidence of efforts to replicate a specific product.

Thus, the evidence on which Patent Owner relies has no probative weight of copying.

*v. Commercial Success*

Patent Owner offers some sales figures that allegedly show commercial success of the Icon. PO Resp. 21. We have no sales data for the Aerotwin. Patent Owner merely lists Icon sales figures for three different

years and touts this as "significant." *Id.* (citing Ex. 2007 ¶ 8). It is not clear to us where these sales figures come from; Patent Owner offers no discussion of their origin. There also is no evidence explaining the significance of sales in these three years, compared, for example, to prior and subsequent years. Mr. Kashowski, recites these numbers without providing supporting documentation. Ex. 2007 ¶¶ 1, 8. Taking them at face value, these raw sales figures are of little use. Patent Owner alleges the sales numbers are "significant" but provides no explanation or evidence in support, and Mr. Kashnowski's verbatim testimony likewise is not supported by evidence. This characterization is not credible evidence of commercial success, and the numbers by themselves are also not credible evidence of commercial success. This evidence has little or no probative value of commercial success.

Patent Owner also refers to licensing agreements with competitors as objective evidence of patentability. PO Resp. 22–23. Patent Owner states the licensing agreements relate to its family of "beam-blade patents," and that "most" of these agreements include the '905 patent. *Id.* We find this generic evidence of little or no probative weight of commercial success.

*vi. Conclusion Regarding Objective Evidence*

Based on the analysis above, we find a nexus between the asserted objective evidence and the '905 patent. However, considering the totality of objective evidence before us, we determine that the objective evidence has little if any probative weight in support of patentability of the challenged claims.

*C. Conclusion Regarding Patentability*

Based on the totality of evidence before us and the analysis above, we

are persuaded that a preponderance of the evidence establishes that claims 13, 17, and 18 would have been obvious to one of ordinary skill in the art based on Prohaska and Hoyler.

## IV. ORDER

In view of the foregoing, it is hereby:

ORDERED that claims 13, 17, and 18 of the ’905 patent have been shown by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*;

FURTHER ORDERED that Petitioner’s Motion to Strike is *denied*;

FURTHER ORDERED that Petitioner’s Motion to Exclude is *denied*; and

FURTHER ORDERED that this is a Final Written Decision under 35 U.S.C. § 318(a), and that parties to the proceeding seeking judicial review of the decision under 35 U.S.C. § 319 must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Richard M. Koehl
James R. Klaiber
David Lansky
Stefanie Lopatkin
HUGHES HUBBARD & REED LLP
richard.koehl@hugheshubbard.com
james.klaiber@hugheshubbard.com
david.lansky@hugheshubbard.com
stefanie.lopatkin@hugheshubbard.com

PATENT OWNER:

Patrick Colsher
SHEARMAN & STERLING LLP
patrick.colsher@shearman.com

US006944905B2

# (12) United States Patent
De Block et al.

(10) Patent No.: **US 6,944,905 B2**
(45) Date of Patent: **Sep. 20, 2005**

(54) **WIPER BLADE FOR CLEANING SCREENS IN PARTICULAR ON MOTOR VEHICLES**

(75) Inventors: **Peter De Block**, Halen (BE); **Peter Wijnants**, Wezemaal (BE)

(73) Assignee: **Robert Bosch GmbH**, Stuttgart (DE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 313 days.

(21) Appl. No.: **10/048,202**

(22) PCT Filed: **Apr. 4, 2001**

(86) PCT No.: **PCT/DE01/01304**

§ 371 (c)(1), (2), (4) Date: **Apr. 22, 2002**

(87) PCT Pub. No.: **WO01/92073**

PCT Pub. Date: **Dec. 6, 2001**

(65) **Prior Publication Data**

US 2002/0133897 A1 Sep. 26, 2002

(30) **Foreign Application Priority Data**

May 29, 2000 (DE) ........................................ 100 26 419
Sep. 12, 2000 (DE) ........................................ 100 44 913

(51) **Int. Cl.**[7] .................................................. **B60S 1/38**
(52) **U.S. Cl.** ................................ **15/250.201**; 15/250.43
(58) **Field of Search** ....................... 15/250.201, 250.43, 15/250.44, 250.361, 250.48

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,814,820 A 12/1957 Elliott
3,088,155 A * 5/1963 Smithers ............... 15/250.201
3,881,214 A 5/1975 Palu
2003/0014828 A1 * 1/2003 Egner-Walter et al. 15/250.201

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 1 505 357 | 5/1969 |
| DE | 197 36 368 A | 2/1999 |
| FR | 2679185 * | 1/1993 |
| GB | 2 346 318 A | 8/2000 |
| WO | 00 340 90 A | 6/2000 |
| WO | 01 49537 A | 7/2001 |

* cited by examiner

*Primary Examiner*—Gary K. Graham
(74) *Attorney, Agent, or Firm*—Michael J. Striker

(57) **ABSTRACT**

A wiper blade for cleaning motor vehicles is proposed, which is provided with a band-like, elongated, spring-elastic support element (**12**). The lower band surface (**13**) of the support element (**12**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window (**22**), disposed on it so that the longitudinal axes of these two parts are parallel and the upper band surface (**11**) of the support element (**12**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element, is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is comprised of an elastic material. A considerable weight savings for the wiper blade is achieved if the wind deflection strip (**42**, **142**, or **242**) has two diverging legs (**44**, **46**), viewed in cross section, which are connected to each other at a common base (**48**) and whose free ends (**50**, **52**) oriented toward the window (**22**) are supported on the wiper blade (**10**), and the attack surface (**54**) is embodied on the outside of the one leg (**44**).

**19 Claims, 4 Drawing Sheets**








FIG.1


48
42
40
44
46
54
11
50
30
32
32
52
11
30
36
36
56
13
58
13
34
34
12
10
14
26
22

FIG. 2


48
42
40
44
54
46
56
60
60
58
64
64
62
66

FIG. 3



140
110
142
VI
144
VI
V


FIG. 4



VI
48
140
142
144
44
46
54
148
146
60
56
60
VI
152
58
14
150


FIG. 5


140
44
48
54
144
58
12
146
60
112
154

FIG. 6


44
244
242
246
54
α
58
248
60
12
112
254

FIG. 7

# WIPER BLADE FOR CLEANING SCREENS IN PARTICULAR ON MOTOR VEHICLES

## BACKGROUND OF THE INVENTION

In known wiper blades, the purpose of the support element is to assure as uniform as possible a distribution of the wiper blade pressure against the window, which pressure is exerted by the wiper arm, over the entire wiping field wiped by the wiper blade. Through an appropriate curvature of the unloaded support element—i.e. when the wiper blade is not resting against the window—the ends of the wiper strip, which is placed completely against the window during operation of the wiper blade, are loaded toward the window by the support element, which is stretched in this state, even though the curvature radii of spherically curved vehicle windows change with each wiper blade position. The curvature of the wiper blade must therefore be somewhat sharper than the sharpest curvature measured within the wiping field on the window to be wiped. The support element consequently replaces the expensive support bracket structure with two spring strips disposed in the wiper strip, as is the practice in conventional wiper blades (DE-OS 15 05 357).

The invention is based on a wiper blade. In a known wiper blade of this kind (DE 197 36 368), the wiper blade is provided with a so-called wind-deflection strip so that the airflow-induced tendency of the wiper blade to lift up from the window that occurs at high driving speeds is counteracted by a force component directed toward the window. To this end, the wind-deflection strip has a front side, which is embodied as an attach surface and is acted on chiefly by the relative wind during the reciprocating wiper operation. The cross section of the wind-deflection strip is approximately the shape of a right triangle, whose one leg is oriented toward the support element and whose hypotenuse represents the attach surface. This attach surface encloses an acute angle with the plane of the reciprocating motion of the wiper blade and with the surface of the window. The triangular profile used requires a relatively large amount of material for the manufacture of the wind-deflection strip, which is reflected in the costs for the wiper blade. Moreover, the weight of the wiper blade is considerably increased in an undesirable fashion. Namely, the increased mass, which must be accelerated in the reciprocating wiper operation, requires a more powerful drive unit and a more expensive design of the reciprocating mechanism connected to this drive unit. In addition, the profile-induced rigidity of a wind-deflection strip that is shaped in this way can impair the operating behavior of the support element and/or the wiper blade.

## SUMMARY OF THE INVENTION

In the wiper blade according to the invention, the weight of the wind-deflection strip is considerably reduced by the cross sectional embodiment of an angular profile. Moreover, in addition to the savings in material, there is also a reduction of the mass being moved, with the resulting advantages with regard to the design of the drive unit and the reciprocating mechanism. In addition, the rigidity of the wind deflection strip is considerably reduced and as a result, so is its influence on the bending and elastic behavior of the wiper blade support element.

If the wiper blade part of a device, which is for connecting the wiper blade to a reciprocally driven wiper arm, is supported on the upper band surface of the support element



in its middle section and an end cap is placed at both ends of the support element, then a simple installation of the wind deflection strip is produced when the strip is comprised of two sections, each of which extends between a respective end cap and the device piece.

In a modification of the invention, the profile of the cross section is the same over the entire length of the wind deflection strip. As a result, it can be manufactured in a particularly inexpensive manner using the extrusion process.

In a modification of the invention, the two legs of the wind deflection strip are connected to each other by a wall in the vicinity of the two wiper blade ends. With the use of a wind deflection strip of this kind, which is to be manufactured in an injection mold, the end caps to be placed at the ends of the support element or the wiper blade can be eliminated because this wall constitutes the end of the wind deflection strip. Furthermore, a wind deflection strip manufactured in this way can be arbitrarily shaped. It can also easily adapt to arbitrary shapes of the support element, for example when the support element has a cross sectional reduction in the longitudinal direction from the middle region toward the ends.

It is also possible to embody the tapering of the cross section of the wind deflection strip toward its ends in accordance with stylistic considerations. Thus on the one hand, it can be useful if the wall is aligned essentially perpendicular to the support element.

On the other hand, an attractively formed end of the wind deflection strip can also be achieved through a correspondingly oblique alignment of the wall in which an outside of the wall encloses an acute angle $\alpha$ with the support element. It goes without saying that each of the two ends of two sections belonging to a wind deflection strip can be embodied differently in accordance with the measures outlined above.

In certain applications, in order to simplify installation of the wiper blade, it can be advantageous if the wall is provided with a recess, which is open at the edge toward the window and whose width is greater than the depth of wiper strip in the vicinity of the support element and whose depth reaches to the upper band surface of the support element.

An operationally reliable support of the wind deflection strip on the wiper blade is achieved through attachment of the leg ends to the wiper blade.

Such an attachment to the wiper blade can be easily and inexpensively achieved by means of a glued attachment.

If the free leg ends of the wind deflection strip are attached, preferably glued, to the support element of the wiper blade, this assures a precise positioning of the wind deflection strip on the wiper blade.

The positioning is further improved if in the embodiment of the concept of the invention, the free leg ends of the wind deflection strip are provided, at least in sections, with claw-like projections, which encompass the mutually opposed outer edge strips of the support element.

When using wind deflection strips, which are provided with the above-mentioned end walls, it is useful if the claw-like projections extend from the leg ends into the vicinity of the wall and suitably encompass end regions of the support element.

The claw-like projections, which are used as positioning aids, offer particularly advantageous regions for the glued attachment.

For a particularly stable, operationally reliable attachment of the wind deflection strip to the support element, the claw

surface disposed on the upper band surface of the support element has a greater width than the claw surface engaging the lower band side.

The attack surface of the wind deflection strip is suitably embodied as a flute on the outer wall of the one leg.

In order to avoid an unfavorable flow progression of the relative wind sweeping past the wiper blade in the vicinity of the wiper blade ends, the end caps are provided with a flute, which extends in the projection of the flute of the wind deflection strip.

In order to counteract this disadvantage in the middle section of the wiper blade as well, the wiper blade part of the connecting device is provided with a flute, which extends in the projection of the flute of the wind deflection strip.

So that the distribution of the wiper blade pressure against the window by means of the individually designed support element is not significantly influenced by the wind deflection strip, the hardness of the material for the wind deflection strip is at most 40 percent greater than the hardness of the material for the wiper strip.

In this connection, it is particularly advantageous if the hardness of the material for the wind deflection strip is at most 20 percent greater than the hardness of the material for the wiper strip.

In many instances, it has turned out to be advantageous if the wiper strip has a Shore hardness A of between 64 and 71 and the wind deflection strip has a Shore hardness A of between 70 and 78.

Other advantageous modifications and embodiments of the invention are disclosed in the following description of exemplary embodiments shown in the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective representation of a wiper blade according to the invention, with the wiper arm indicated with dot-and-dash lines,

FIG. **2** shows an enlarged cross section through the wiper blade along the line II—II in FIG. **1**,

FIG. **3** shows the cross section according to FIG. **2** through the wind deflection strip associated with the wiper blade, without the wiper strip and the support element,

FIG. **4** is a partial depiction according to FIG. **1** of a differently embodied wiper blade according to the invention,

FIG. **5** shows an enlarged view of the wiper blade according to FIG. **4**, viewed in the direction of the arrow V,

FIG. **6** shows an enlarged partial section along the line IV—IV through the end of the wind deflection strip associated with the wiper blade according to FIG. **4**, whose position is clarified in FIG. **5** by a line VI—IV, and

FIG. **7** shows a section according to FIG. **6** through another embodiment of a wind deflection strip associated with the wiper blade according to the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

A wiper blade **10** shown in FIG. **1** has a band-like, elongated, spring-elastic support element **12** (FIGS. **1** and **2**), whose lower band side **13** oriented toward the window has an elongated, rubber-elastic wiper strip **14** attached to it so that the longitudinal axes of these two parts are parallel. On the upper band side **11** of the support element **12**, which is oriented away from the window, which support element is also referred to as a spring strip, the middle section of the support element is provided with the wiper blade part **15** of a connecting device, with the aid of which the wiper blade **10** can be detachably connected in an articulating fashion to a wiper arm **16** indicated with dot-and-dash lines in FIG. **1**. The wiper arm **16**, which is driven to reciprocate in the direction of a double arrow **18** in FIG. **1**, is loaded in the direction of an arrow **24** toward the window to be wiped, for example the windshield of a motor vehicle, whose surface is indicated with a dot-and-dash line **22** in FIG. **1**. Since the line **22** is intended to represent the sharpest curvature of the window surface, it is clear that the curvature of the wiper blade, which is not yet under tension and rests with both of its ends against the window, is sharper than the maximal window curvature (FIG. **1**). As a result of the pressure (arrow **24**), the wiper blade **10** rests with its wiper lip **26** against the window surface **22** over its entire length. This causes a tension to be built up in the spring-elastic metal support element **12**, which assures a uniform contact of the wiper strip **14** and the wiper lip **26** over its entire length against the window surface **22** and assures a uniform distribution of the pressure (arrow **24**).

The particular embodiment of the wiper blade according to the invention will now be discussed in detail.

FIG. **2** shows that the support element **12** in the exemplary embodiment has two spring strips **30**, which are disposed in a common plane approximately parallel to the window surface **22**. The two spring strips **30** protrude with their mutually opposed inner edge strips **32** into longitudinal grooves **34** of the wiper strip **14**, which are open at the edges, and protrude from these longitudinal grooves **34** with external edge strips **36**. The two spring strips **30** are secured in their longitudinal grooves **34** by the part **15** of the connecting device in the middle region of the wiper blade and by end caps **38** disposed at each end of the wiper blade. To this end, these components **15** and **38** encompass the outer edge strips **36** of the spring strips **30**. Sections **40** of a wind deflection strip **42** are respectively disposed between the part **15** and each of the two end caps **38**. The disposition of the wind deflection strip **42** and its embodiment can be inferred from FIGS. **2** and **3**. The wind deflection strip **42** comprised of an elastic material, for example a plastic, and its two sections **40** rest against the upper band side **11** of the support element **12**. Viewed in cross section, the wind deflection strip **42** has two diverging legs **44** and **46**, which are connected to each other by a common base **48**. The free ends **50** and **52** of the legs **44** and **46** are oriented toward the window **22** and are supported against the wiper blade **10** or its support element **12**. An attack surface **54**, which is fluted in the exemplary embodiment, is embodied on the outside of the one leg **44** and the relative wind chiefly flows against this attack surface **54** during operation of the wiper device. The cross sectional form of the wind deflection strip **42** and/or of its sections **40** shown in FIGS. **2** and **4** is the same over the entire length so that these sections can be inexpensively extruded. At their free leg ends **50** and **52**, the sections **40** of the wind deflection strip **42** are attached to the wiper blade and/or to its support element **12**. Suitably, the free leg ends of the wind deflection strip **42** are glued to the support element **12** of the wiper blade **10**. To that end, the free ends **50** and **52** of the legs **44** and **46** are provided with claw-like projections **56**, **58**, which suitably encompass the mutually opposed outer edge strips **36** of the support element **12**. The surfaces of the claw-like projections **56**, **58** resting against the edge strips **36** serve as gluing surfaces with which the sections **40** of the wind deflection strip **42** are glued to the support element. For a particularly stable glued attachment, the claw surfaces **60** resting against the upper band side **11** of the support element

12 (FIG. 3) have a greater width 62 than the claw surfaces 64 engaging the lower band surface 13, whose width is labeled with the reference numeral 66 in FIG. 3. It can be inferred from FIG. 1 that the fluted attack surface 54 of the sections 40 also extends on the end caps 38 and on the part 15 of the connecting device. The fluting of the end caps 38 is labeled with the reference numeral 68 in FIG. 1, while the fluting of the component 15 is provided with the reference numeral 70. The wind deflection strip 42 or its sections 40 have a cross section that remains uniform over its entire length so that it can be inexpensively extruded.

FIGS. 4 to 6 show another embodiment of the wiper blade 110 according to the invention. Since the deviations from the wiper blade 10 relate solely to the wind deflection strip, FIG. 4 shows only a section of the wiper blade 110, which reaches from one end to the part 15 of the connecting device, which part is no longer depicted. The design of the wind deflection strip 142 associated with the wiper blade 110 corresponds to the exemplary embodiment described above insofar as its attachment to the support element 12 at the outer edge strips 36 of the support element spring strips 30 is concerned, so that the attendant details need not be discussed further. Therefore, the reference numerals that have been indicated in the embodiment described above will also be used below for the embodiments of the wind deflection strip 142 that have already been explained. Viewed in cross section, the wind deflection strip 142 likewise has two legs 44, 46, which are connected to each other at a common base 48. The free ends 50 and 52 of the legs 44 and 46 are likewise provided with claw-like projections 56 and 58, which suitably encompass the outer edge strips 36 of the spring strips 30. In this exemplary embodiment as well, the two sections 140 of the wind deflection strip 142, which are produced in an injection molding die, are glued to the support element 12 of the wiper blade 10. The claw-like projections permit the wind deflection strip to be simply clipped onto the support element and thus permit a precise positioning for the gluing process. Also, the glue points reliably overlap each other. In addition, a fluted attack surface 54 is likewise embodied on the leg 44 of the wind deflection strip 142 or on its sections 140 (FIG. 5).

Diverging from the exemplary embodiment according to FIGS. 1 to 3, the two legs 44 and 46 are connected to each other by means of a wall 144 at the wiper blade ends and at the ends of the sections 140 disposed there, which wall extends from the base 48 to the claw-like projections 56, 58. The wall 144 is aligned essentially perpendicular to the support element 12 and to the claw-like projections 56, 58 encompassing it.

As FIGS. 5 and 6 show, the wall 144 is provided with a recess 146, which is open at the edge oriented toward the window and whose width 148 is greater than the width 150 of the wiper strip 14 indicated with dot-and-dash lines in FIG. 5. The depth 152 of the recess 146 reaches to the upper band surface 11 of the support element 12. This can be conceptualized on the basis of the upper claw surface 60 in FIG. 5, which when the wind deflection strip is glued to the support element, rests against the upper band side 11 of the support element 12 or against the top of its spring strips 30. It can also be inferred from FIG. 6 that the claw-like projections extend from the ends of the legs 44, 46, into the vicinity of the wall 144 and suitably encompass the end regions 112 of the support element 12, which are indicated with dot-and-dash lines. In FIG. 6, the claw-like projection of the wall 144 of the section 140 has been labeled with the reference numeral 154. The claw-like projections 56, 58 in the exemplary embodiments according to FIGS. 1 to 3 and



4 to 6 are also used to cover the sharp, free end edges of the support element 12 and are used as a reliable placement aid for the sections 40 and 140 when they are glued to the support element 12.

FIG. 7 shows an alternative disposition of the wall 144 (FIG. 6). The wall 244 situated in the end region of the wind deflection strip 242 is disposed so that its outside 246 encloses an acute angle α with the support element 12. This can be conceptualized on the basis of the claw-like projection 58, which encompasses the support element when the wind deflection strip 242 is connected to it and rests with its claw surface 60 against the upper band side 11 of the support element 12. Also in this embodiment, the wall 244 and/or its claw-like projection 254 is provided with a recess 248, which corresponds in its disposition and dimensions to the recess 146 according to the embodiment in FIGS. 4 to 6. FIG. 7 also shows that claw-like projections 254 are likewise disposed on the wall 244, which suitably encompass end regions 112 of the support element 12 that is indicated with dot-and-dash lines.

So that the desired properties of the wiper blade are not influenced to an impermissible degree by the design of the support element, the hardness of the material for the wind deflection strip 42 is at most 40% greater than the hardness of the material for the wiper strip 14. It is particularly advantageous to limit this value to 20%. In practice, it has turned out that the most favorable results with regard to the wiping quality over a broad vehicle speed range are achieved if the wiper strip 14 has a Shore hardness A of 68 and the wind deflection strip 42 has a Shore hardness A of 72.

In this connection, the thickness of the legs 44 and 46 is also of particular importance in the matching of the selected hardness of the materials for the wind deflection strip and the wiper strip.

All of the exemplary embodiments share the common trait that the wind deflection strip 42, 142, or 242 has two diverging legs 44 and 46, viewed in cross section, which are connected to each other at a common base 48 and whose free ends 50 and 52, which are oriented toward the window 22, are supported on the wiper blade 10, where the outflow surface 54 is embodied on the outside of the one leg 44.

By contrast to the exemplary embodiments described above, though, instead of the wind deflection strip 42 having two sections 40, it is also conceivable for it to be made up of one piece that extends over and covers the device part 15. Naturally, in this case, the wind deflection strip must have at least one appropriate recess, which permits the articulating connection between the wiper arm and the wiper blade.

It is also conceivable that due to particular criteria, it can be quite useful for the wiper blade according to FIG. 1 or FIG. 4 to be provided with only one section 40 or 140 of the wind deflection strip, which is fastened to the wiper blade either in its region close to the reciprocation axis or its region remote from this axis.

What is claimed is:

1. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (12), wherein a lower band surface (13) of the support element oriented toward the window (22) has an elongated, rubber-elastic wiper strip (14), disposed on it so that the longitudinal axes of these two parts are parallel, wherein the wiper strip can be placed against a window, and wherein an upper band surface (11) of the support element (12; 30, 30) has a wind deflection strip (42) disposed on it, which extends in the longi-

tudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42, 142, 242**) has two diverging legs (**44, 46**), viewed in transverse cross section, wherein the two diverging legs are connected to each other at a common base (**48**) and wherein free ends of the two diverging legs oriented toward the window (**22**) are supported on the support element of the wiper blade (**10**), and the attack surface (**54**) is embodied on the outside of the one leg (**44**) above the support element, and the legs (**44, 46**) form therebetween an angular hollow space that expands from an upper narrowest point of the base downwardly to the upper band surface of the support element (**12; 30, 30**) and are in contact with the upper band surface (**11**) of the support element said legs contacting the upper band surface at a location laterally spaced from said rubber-elastic wiper strip.

2. The wiper blade according to claim **1**, wherein the profile of the cross section is the same over the entire length of the wind deflection strip (**42**).

3. The wiper blade according to claim **1**, wherein the two legs (**44, 48**) of the wind deflection strip (**142** or **242**) are connected to each other by means of a wall (**144** or **244**) in the vicinity of the two wiper blade ends.

4. The wiper blade according to claim **3**, wherein the wall (**144**) is aligned essentially perpendicular to the support element (**12**).

5. The wiper blade according to claim **3**, wherein the outside (**246**) of the wall (**244**) encloses an acute angle (a) with the support element (**12**).

6. The wiper blade according to claim **1**, wherein the free leg ends (**50, 52**) of the wind deflection strip (**42, 142**, or **242**) are glued to the support element.

7. The wiper blade according to claim **1**, wherein the free leg ends (**50, 52**) of the wind deflection strip (**42, 142**, or **242**) are attached, preferably glued, to the support element (**12**) of the wiper blade (**10**).

8. The wiper blade according to claim **1**, wherein the free leg ends (**50, 52**) of the wind deflection strip (**42, 142**, or **242**), at least in sections, are provided with claw-like projections (**56, 58**), which suitably encompass the mutually opposed outer edge strips (**36**) of the support element (**12**).

9. The wiper blade according to claim **8**, wherein a glued attachment is produced in the vicinity of the claw-like projections (**56, 58**).

10. The wiper blade according to claim **1**, wherein the attack surface (**54**) of the wind deflection strip (**42, 142**, or **242**) is embodied as a flute on the outer wall of the one leg (**44**).

11. The wiper blade according to claim **1**, wherein a hardness of the material for the wind deflection strip (**42**) is at most 40 percent greater than the hardness of the material for the wiper strip (**14**).

12. The wiper blade according to claim **1**, wherein a hardness of the material for the wind deflection strip (**42, 142**, or **242**) is at most 20 percent greater than the hardness of the material for the wiper strip (**14**).

13. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), wherein a lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and wherein an upper band surface (**11**) of the support element has a wind deflection strip (**42**) disposed on it, wherein the wind deflection strip extends in a longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42, 142, 242**) has two diverging legs (**44, 46**), viewed in transverse cross section, wherein the two diverging legs are connected to each other at a common base (**48**) and wherein free ends of the two diverging legs oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein the upper band surface (**11**) of the support element (**12**), in its middle section, includes a wiper blade part (**15**) for connecting the wiper blade (**10**) to a reciprocally driven wiper arm (**16**) and is supported, wherein an end cap (**38**) is respectively disposed at both ends of the support element (**12**), and wherein a section (**40**) of the wind deflection strip (**42**) is disposed between and in contact with each respective end cap (**38**) and the device piece (**15**).

14. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42, 142, 242**) has two diverging legs (**44, 46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein the two legs (**44, 46**) of the wind deflection strip (**142** or **242**) are connected to each other by means of a wall (**144** or **244**) in the vicinity of the two wiper blade ends, and wherein the wall (**144** or **244**) is provided with a recess (**146** or **246**) that is open at the edge oriented toward the window (**22**), wherein the width (**148**) of this recess is greater than the width (**150**) of the wiper strip (**14**) in a vicinity of the support element and its depth (**152**) reaches to the upper band surface (**11**) of the support element (**12**).

15. A wiper blade for cleaning windows, comprising

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42, 142, 242**) has two diverging legs (**44, 46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the wiper blade (**10**), and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein

the free leg ends (**50**, **52**) of the wind deflection strip (**42**, **142**, or **242**), at least in sections, are provided with claw-like projections (**56**, **58**), which suitably encompass the mutually opposed outer edge strips (**36**) of the support element (**12**), and wherein the claw-like projections extend from the leg ends (**50**, **52**) into a vicinity of a wall (**154** or **254**), and suitably encompass end regions (**112**) of the support element (**12**).

**16**. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42**, **142**, **242**) has two diverging legs (**44**, **46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein the free leg ends (**50**, **52**) of the wind deflection strip (**42**, **142**, or **242**), at least in sections, are provided with claw-like projections (**56**, **58**), which suitably encompass the mutually opposed outer edge strips (**36**) of the support element (**12**), and wherein the claw surfaces (**60**) resting against the upper band surface (**11**) of the support element (**12**) have a greater width (**62**) than the claw surfaces (**64**) engaging the lower band side (**13**).

**17**. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42**, **142**, **242**) has two diverging legs (**44**, **46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein the upper band surface (**11**) of the support element (**12**), in its middle section, the wiper blade part (**15**) of a device, which is for connecting the wiper blade (**10**) to a reciprocally driven wiper arm (**16**), is supported, wherein an end cap (**38**) is respectively disposed at both ends of the support element (**12**), wherein a section (**40**) of the wind deflection strip (**42**) is disposed between



each respective end cap (**38**) and the device piece (**15**), and wherein the end caps (**38**) are provided with a flute (**68**), which extends in a projection of the flute of the attack surface (**54**) of the wind deflection strip.

**18**. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42**, **142**, **242**) has two diverging legs (**44**, **46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), wherein the upper band surface (**11**) of the support element (**12**), in its middle section, the wiper blade part (**15**) of a device, which is for connecting the wiper blade (**10**) to a reciprocally driven wiper arm (**16**), is supported, wherein an end cap (**38**) is respectively disposed at both ends of the support element (**12**), and wherein a section (**40**) of the wind deflection strip (**42**) is disposed between each respective end cap (**38**) and the device piece (**15**), and the wiper blade part (**15**) of the connecting device is provided with a flute (**70**), which extends in a projection of the flute of the attack surface (**54**) of the wind deflection strip (**42**).

**19**. A wiper blade for cleaning windows, comprising:

a band-like, elongated, spring-elastic support element (**12**), whose lower band surface (**13**) oriented toward the window (**22**) has an elongated, rubber-elastic wiper strip (**14**), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and whose upper band surface (**11**) has a wind deflection strip (**42**) disposed on it, which extends in the longitudinal direction of the support element (**12**), is provided with an attack surface (**54**) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (**42**, **142**, **242**) has two diverging legs (**44**, **46**), viewed in transverse cross section, which are connected to each other at a common base (**48**) and whose free ends oriented toward the window (**22**) are supported on the support element, and the attack surface (**54**) is embodied on the outside of the one leg (**44**), and wherein the wiper strip (**14**) has a Shore hardness A of between 64 and 71, in particular 68, and the wind deflection strip (**42**) has a Shore hardness A greater than the wiper strip and is of between 70 and 78, in particular 72.

* * * * *

FORM 30. Certificate of Service

Form 30
Rev. 03/16

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on June 18, 2018
by:

- ☐ U.S. Mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means (by E-mail or CM/ECF)

Mark A. Hannemann — Name of Counsel

/s/ Mark A. Hannemann — Signature of Counsel


Law Firm: Shearman & Sterling LLP

Address: 599 Lexington Avenue

City, State, Zip: New York, NY 10022

Telephone Number: 212-848-7696

Fax Number: 646-848-7696

E-Mail Address: Mark.Hannemann@Shearman.com


NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

FORM 19. Certificate of Compliance With Rule 32(a)

Form 19
Rev. 12/16

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a) or Federal Rule of Federal Circuit Rule 28.1.

☒ This brief contains [*state the number of*] 13,686 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐ This brief uses a monospaced typeface and contains [*state the number of*] ________ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ This brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program*] Microsoft Word 2010 in

[*state font size and name of type style*] 14 point font; Times New Roman, or

☐ This brief has been prepared in a monospaced typeface using

[*state name and version of word processing program*] ________ with

[*state number of characters per inch and name of type style*] ________.

/s/ Mark A. Hannemann

(Signature of Attorney)

Mark A. Hannemann

(Name of Attorney)

Appellant

(State whether representing appellant, appellee, etc.)

June 18, 2018

(Date)

Reset Fields