2017-2122, -2124, -2239, -2241

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

ROBERT BOSCH, LLC,

Appellant,

v.

ANDREI IANCU,

Director of the United States Patent and Trademark Office,

Intervenor.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, in Nos. IPR2016-00034, IPR2016-00036,
IPR2016-00038, and IPR2016-00040

Brief for the Intervenor,
Director of the United States Patent and Trademark Office

JOSEPH MATAL
Acting Solicitor

THOMAS W. KRAUSE
Deputy Solicitor

*Attorneys for the Director of the United States Patent and Trademark Office*

BENJAMIN T. HICKMAN
MAI-TRANG D. DANG
Associate Solicitors
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

September 28, 2018

## Relevant Excerpts of Disputed Claims

*Claim 1 of U.S. Patent No. 6,973,698 ("the '698 patent")*: "A wiper blade for a wiping device of a motor vehicle for wiping a window of the motor vehicle, comprising an elongated wiper strip placeable against the window, and an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window, said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, **said contact force of said wiper strip being greater in said center section than in at least one of said two end sections** …" Appx7784 (disputed limitation bolded).

*Claim 1 of U.S. Patent No. 6,292,974 ("the '974 patent")*: "A wiper blade for windows of motor vehicles … [comprising a] support element so as to form **a leading-edge face** extending in a longitudinal direction of the support element and forming, as seen crosswise to its longitudinal extension, an acute angle with a plane which extends parallel to a plane formed by said convex surface." Appx97 (disputed limitation bolded).

*Claim 13 of U.S. Patent No. 6,944,905 ("the '905 patent")*: "A wiper blade for cleaning windows … wherein the wind deflection strip … has two diverging legs … **wherein an end cap … is respectively disposed at both ends of the support element** …" Appx10220 (disputed limitation bolded).

# TABLE OF CONTENTS

Statement of Related Cases ........ vi

Statement of the Issues ........ 1

Statement of the Case and Facts ........ 1

1. Technical background and prior art ........ 2

   A. Windshield-wiper basics: rubber, metal, glass, and gravity ........ 2

   B. Windshield-wiper artisans have known several ways to adjust the contact force in a windshield wiper. ........ 6

   C. Windshield-wiper artisans have known that wind lift is a problem for beam blades. ........ 10

   D. Wiper artisans have been fastening the ends of wiper blades ........ 15

2. The challenged patents ........ 15

   A. Bosch's '698 patent: a blade in which the contact force is greater in the center than in at least one of the ends ........ 15

   B. Bosch's '974 patent: a spoiler to combat wind lift ........ 18

   C. Bosch's '905 patent: end caps on the blade ........ 18

3. The Board's decisions ........ 20

4. The Board's treatment of Bosch's duplicative objective evidence of nonobviousness ........ 24

Summary of Argument ........ 28

Standard of Review ........ 28

Argument ........ 29

5. The contact-force limitation of the '698 patent would have been obvious after Arai and Appel showed how to adjust blade pressure to be different in the center and the ends. ....29

6. The spoiler claimed in the '974 patent relied on conventional wisdom to solve a known problem, as shown by the '974 patent's own specification and other evidence illustrating the state of the art.....31

7. The end caps claimed in Bosch's '905 patent would have been obvious because Hoyler discloses the same component with his clamps. ....34

8. Bosch's alleged objective evidence of nonobviousness is supported by little evidence. ....35

9. The Director agrees with Bosch that reversal is appropriate in Appeal No. 17-2124. ....38

Conclusion ....38

# TABLE OF AUTHORITIES

## Cases

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........................................................ 29

*De Blauwe, In re*,
736 F.2d 699 (Fed. Cir. 1984) ........................................................ 35

*DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ........................................................ 30

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) ........................................................ 28, 29

*Genzyme Therapeutic Prod. Ltd. v. Biomarin Pharm. Inc.*,
825 F.3d 1360 (Fed. Cir. 2016) ........................................................ 34

*Huang, In re*,
100 F.3d 135 (Fed. Cir. 1996) ........................................................ 37

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ........................................................ 30

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ........................................................ 35

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ........................................................ 37

*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*,
73 F.3d 1085 (Fed. Cir. 1995) ........................................................ 28

*Piasecki, In re,*
745 F.2d 1468 (Fed. Cir. 1984) ........................................................ 37

*Richardson-Vicks, Inc. v. The Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ........................................................ 37

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ....................2

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
719 F.3d 1305 (Fed. Cir. 2013) (en banc)....................2

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
748 F. Supp. 2d 383 (D. Del. 2010) ....................2

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010) ....................29

**Statutes**

5 U.S.C. § 706(2)(E) ....................29

## STATEMENT OF RELATED CASES

The Director is unaware of any other appeal from the Patent Trial and Appeal Board in connection with IPR2016-00034, IPR2016-00036, IPR2016-00038, or IPR2016-00040 in this Court or any other court or agency. The Director is also unaware of any cases pending in this or any other court or agency that will directly affect, or be affected by, this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

A claimed invention is unpatentable if it would have been obvious to a person of ordinary skill in the art. This consolidated appeal presents three obviousness questions:

1. Bosch's '698 patent claims a wiper blade in which the force in the center of the blade is greater than the force in at least one end of the blade. Arai illustrates a wiper blade in which the force in the center is greater than the force at both ends of the blade. Appel also describes an embodiment of his wiper blade in which the pressure is greater in the center than in the ends.

2. Bosch's '974 patent claims a spoiler that reduces wind lift on a curved wiper blade. Prohaska teaches the spoiler, and Appel and Hoyler teach the curved blades, all facts that Bosch does not dispute. The '974 specification acknowledges that wind lift was a known problem for curved wiper blades.

3. Bosch's '905 patent claims end caps on the wiper blades. Hoyler's blade has clamps that fasten together the wiper's components at the ends.

Does substantial evidence support the Board's findings that Bosch's claims would have been obvious?

## STATEMENT OF THE CASE AND FACTS

Bosch owns at least fourteen patents that claim aspects of windshield wipers. In this appeal, Bosch challenges the Board's decisions finding six claims, spanning four

of those patents, unpatentable as obvious. Bosch asserted some of those claims, among others, in infringement litigation against Pylon Manufacturing Corp. and other defendants in the District of Delaware.[1] The Pylon litigation has been appealed to this Court twice, but the validity of the asserted claims was not at issue in either appeal.[2]

Bosch asserted the claims at issue here against Costco Wholesale Corp. in separate litigation in the District of Delaware. Costco filed the four IPRs on appeal here. Costco settled its dispute with Bosch after Bosch filed its notices of appeal to this Court. Costco declined to participate in the appeals; the Director has intervened to defend the Board's decisions.

### 1. Technical background and prior art

#### A. Windshield-wiper basics: rubber, metal, glass, and gravity

The prior art in these appeals dates back to the 1950s. The basic design of windshield wipers has remained constant since then.[3] For example, figure 1 of German Patent Publication No. 1 028 896 ("Hoyler"), a prior-art reference, filed in 1954, is shown below:[4]

---

[1] *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 748 F. Supp. 2d 383, 387–89 (D. Del. 2010).
[2] *See generally Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305 (Fed. Cir. 2013) (en banc).
[3] *See, e.g.*, Appx264; Appx8107; Appx8110 at 1:10–68; Appx8113; Appx8118.
[4] Appx262–268; Appx268.




Figure 1 of Bosch's '698 patent, filed in 1998, is shown below:[5]




Windshield wipers typically are made of rubber and metal parts.[6] There are three parts relevant to this appeal. The first part is a wiper strip, also called a wiper blade.[7] A long piece of rubber, the wiper strip is the part that actually wipes a windshield.[8] The wiper strip is usually molded into different elements, which have different shapes.[9] The element that touches the glass is called the wiper lip sometimes.[10]

---

[5] Appx7779.

[6] *See, e.g.*, Appx252 at ll. 43–49; Appx266 at cols. 1&2; Appx8115 at 1:16–51; Appx8120 at 2:42–68.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

A portion of figure 1 of Hoyler and figure 4 of Bosch's '698 patent are shown below, Hoyler on the left and the '698 patent on the right:[11]







Fig. 4

The figures show cross sections of the wiper blades.[12] Both blades are molded in the shape of an upside-down pine tree, with the same piece of rubber transitioning from one element to the next.[13] The element labeled **7** in Hoyler is the "hump," and the element labeled **14** in the '698 patent is the wiper strip.[14] The element labeled **4** in Hoyler and the element labeled **28** in the '698 patent are the wiper lips.[15] Both wiper lips are connected to the upper parts of the blades with a thin strip, element **3** in Hoyler and element **30** in the '698 patent.[16] The '698 patent shows the wiper lip **28** dragging against the windshield **15**.[17]

---

[11] Appx268; Appx7781.
[12] Appx266–267 cols. 2–3; Appx7783 at 3:38–55.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

The second part of the wiper blade relevant to this appeal is a carrying element, also called a backing, which houses the rubber wiper strip. The carrying element has a cutout for the wiper strip and mirrors the length and shape of the wiper strip.[18] Figure 5 of U.S. Patent No. 4,807,326 ("Arai"), a prior-art reference, is shown below:[19]




The ends of the backing are both labeled as element **3A**; element **3B** is the center.[20]

The third part relevant to this appeal is a wiper arm or yoke. The carrying element is attached to an arm, which in turn is attached to a motor on the windshield.[21] The motor supplies energy to move the wiper blade back and forth across the windshield. In Arai's figure 5, the yoke attaches to the backing at points **8'**and **9'**.[22]

---

[18] Appx8111 at 3:3–9.
[19] Appx8107–8111; Appx8109.
[20] Appx8111 at 3:28–36.
[21] Appx7783 at 3:1–6.
[22] Appx8111 at 3:28–36.

Gravity pulls on a windshield wiper just as it does on everything else on Earth. If the windshield were not in the way, the wiper would fall to the ground.[23] When a wiper is in use, the blade rests on the windshield.[24] The arm has mass, which exerts contact force, also called pressing force or pressure in some of the prior art, on the blade and windshield.[25]

Bosch's patents claim beam, or curved, wiper blades. Everyone involved in these IPRs has agreed that beam blades existed long before Bosch's claimed inventions. Hoyler, for example, the 1950s reference at issue here, describes a beam blade.[26]

### B. Windshield-wiper artisans have known several ways to adjust the contact force in a windshield wiper.

The prior art shows that wiper artisans have identified several variables that affect the amount of contact force in a blade: the curvature, rigidity, and thickness of the blade, and the pressure applied by the arm or yoke.

Arai addresses curvature, rigidity, and yoke pressure. The ends **3A** in Arai's backing have slightly less curvature than center section **3B**.[27] The sections near yoke-attachment points **8'** and **9'** are made of rigid material, which prevents bending when

[23] *See* Appx8111 at 3:3–9.
[24] *Id.*
[25] *Id.*
[26] *See, e.g.*, Appx266 col. 1.
[27] Appx8111 at 3:28–53.

the yoke rests on the backing and wiper blade. End portions **3A** and center portion **3B**, which do not directly bear the yoke, are made of less rigid material.[28]

The result of this configuration is that the windshield wiper enjoys what Arai calls "relatively uniform pressing force" on the windshield, producing good wiping properties.[29] Arai's view of "relatively uniform pressing force," however, does not require the pressing force to be identical throughout the wiper. Arai provides a graph of possible pressure distributions along the wiper, shown in figure 7 below:[30]




The pressure curves track the shape of the backing depicted in figure 5 above. When the yoke applies high pressure at the attachment points **P**, the high-pressure curve shows that the force is greater at the center than the ends.[31] When the yoke applies medium and low pressure, other variations in force distribution occur.[32]

[28] *Id.*
[29] *Id.*
[30] Appx8109.
[31] *Id.*; Appx8111 at 3:48–4:8.
[32] *Id.*

But even the medium-pressure scenario, arguably the closest to completely uniform force, allows some variation through the wiper blade.[33]

Appel, another prior-art reference, also discusses variables that affect the pressure: the load that the arm places on the wiper, and "the length, thickness, width and modulus of elasticity of the material used."[34] Appel is the inventor named on two patents, U.S. Patent No. 4,028,770 ("Appel '770") and U.S. Patent No. 3,192,551 ("Appel '551). Appel '770 incorporates by reference Appel '551, the earlier-issued patent.

Appel '551 describes a simplified spring for the wiper backing.[35] The wiper is curved and has a radius less than that of the windshield. Appel envisions the wiper "wrapping" the windshield with help from the spring. When the wiper is lowered toward the windshield, the ends of the wiper touch the windshield first and the center follows; the pressure increases with the arm's load.[36] Figure 2 of Appel '551 below illustrates that action:[37]

---

[33] *Id.*
[34] Appx8115 at 2:37–41.
[35] *Id.* at 1:11–14.
[36] *Id.* at 2:35.
[37] Appx8112.



FIG. 2

Appel discusses the concept of "progressive dimensional variations."[38] That, Appel explains, means that the curvature, width, shape, and thickness of the blade can be adjusted to achieve the desired pressure characteristics in the blade.[39] Appel prefers uniform pressure throughout the wiper, but Appel says that in some embodiments, which he calls a "practical compromise," the blade can "compensate for a limited degree of non-uniform spring load."[40]

Appel '770 describes an improvement to the wiper claimed in Appel '551, adding a one-piece, polymeric structure for the backing.[41] Appel '770 recommends adjusting the same variables as Appel '551, noting that "[t]he particular radius of curvature is, of course, dependent on the length, thickness, width and modulus of elasticity …"[42]

---

[38] Appx8116 at 3:16–30.
[39] *Id.*
[40] *Id.* at 4:10–17.
[41] Appx8120 at 1:37–45.
[42] Appx8121 at 3:29–34.

### C. Windshield-wiper artisans have known that wind lift is a problem for beam blades.

A major difference between conventional and beam wiper blades is that beam blades are curved while conventional blades are flat. But the cross sections of conventional and beam blades look the same. Both types of blade have a wiper strip and a wiper lip molded from rubber. And both look like an upside-down pine tree.

Figure 6 of UK Patent Application No. GB 2 106 775 ("Prohaska"), a prior-art reference that discloses a conventional blade, is shown below:[43]




Figure 6, a cross section of Prohaska's wiper blade, illustrates the upside-down pine tree. The wiper strip—Prohaska calls it a "head"—is element **11**.[44] The wiper lip is element **15**.[45] To combat wind lift, Prohaska teaches molding a section of the rubber into a spoiler **20**, which deflects air flowing laterally into the wiper blade.[46]

---

[43] Appx249–255; Appx251.
[44] Appx253 at ll. 39–49.
[45] *Id.* at ll. 46.
[46] *Id.* at ll. 71–98.

Figure 3 of Bosch's '974 patent is shown below:




47

Figure 3 is a cross section of Bosch's blade. Although the '974 patent discloses a beam blade, the cross section of the blade appears similar to Prohaska's upside-down pine tree. Element **14** is the wiper strip; element **28** is the wiper lip.[48] Element **36** is the "leading-edge face"—Bosch calls it a spoiler in its brief—which deflects oncoming airflow to prevent wind lift.[49]

Wind lift, the problem that Prohaska and the '974 patent address, occurs when a vehicle is moving at a high speed.[50] The wind striking the side of the wiper blade facing the wind causes what is called "over pressure," while the side of the blade

---

[47] Appx95.
[48] Appx97 at 3:15–21.
[49] Appx97 at 3:22–57.
[50] Appx96 at 1:24–52; Appx252 at ll. 8–17.

facing away from the wind experiences "under pressure."[51] Neither type of pressure is desirable, because each detracts from the windshield-facing pressure needed to keep the wiper blade on the windshield.[52]

The '974 specification acknowledges that wind lift has been a known problem for beam blades.[53] The specification identifies a prior German patent application, No. DE-PS 12 47 161, owned by Walter Appel, of the Appel patents discussed above, which attempts to combat wind lift on beam blades.[54] The '974 specification cites that application as an example of how wind lift affects the wiping quality of a beam blade, discussing the effect of over pressure and under pressure.[55] The '974 specification goes on to criticize Appel's approach to addressing wind lift.[56]

Other evidence that Costco submitted with its IPR petition demonstrates wiper artisans being aware of wind lift on blades that have a pine-tree cross section. The Barth patent, another Bosch patent, provides an illustration of the over- and under-pressure forces working on a wiper blade. Figures 3 and 4 of Barth are shown below:[57]

---

[51] *Id.*
[52] *Id.*
[53] Appx96 at 1:24–52.
[54] *See id.*
[55] *Id.*
[56] *Id.*
[57] Appx269–274; Appx269.




Figure 3 illustrates over pressure (the positive signs) affecting the side of the blade facing the wind, while under pressure (the negative signs) exists on the non-wind side and above the blade backing. Figure 4 is a simplified version of the scenario in figure 3; the inverted triangle is an abstraction of the blade.[58] The upward-pointing arrow ($P_3$) represents the wind lift.[59] Barth explains that these figures illustrate "how the forces generated in this construction tend to lift the blade away from the windshield."[60] Costco's expert Dr. Gregory W. Davis relied on Barth to conclude that wind lift resulting from the over- and under-pressure forces was known to be a problem caused by all pine-tree, or inverted-triangle, blades, whether they were in beam or conventional wipers.[61]

---

[58] Appx272 at 4:7–10, 4:21–25.
[59] *Id.* at 4:45.
[60] *Id.* at 4:18–20.
[61] Appx1635–1645; Appx1638–1640.

Costco also submitted the Ludwig patent, figure 7 of which is shown below:[62]




FIG. 7.

Figure 7 is a cross section of a beam wiper. Element **15** is the spine, which distributes load from the wiper arm through the blade.[63] Element **14** is the wiping edge.[64]
The profile of the spine **15** adds height to the blade. Dr. Davis concluded that adding a component such as Ludwig's would have routine: "a person of ordinary skill in the art would have understood and been able to calculate the relative stiffness, and bending behavior under load, of the various components of wipers based on their cross sections and material properties using elementary beam equations that were widely known in the engineering disciplines."[65]

---

[62] Appx309–315; Appx310.
[63] Appx313 at 3:64–67.
[64] *Id.* at 3:57–58.
[65] Appx1643.

### D. Wiper artisans have been fastening the ends of wiper blades.

Hoyler describes clamps at the ends of his blades. Referring to figure 1, provided above, Hoyler explains that the "[t]he longitudinal springs **5** are inserted in lateral slots, held together at the ends of the bar by the clamps **6**."[66]

## 2. The challenged patents

### A. Bosch's '698 patent: a blade in which the contact force is greater in the center than in at least one of the ends

The '698 patent describes a wiper blade in the same terms as Arai and Appel. A carrying element made of spring elastic is fastened to the wiper strip.[67] The side of the wiper strip that touches the windshield is called the wiper lip.[68] When the wiper arm rests on the blade, it distributes force throughout the blade.[69]

The specification proposes that the wiper arm distribute the force uniformly throughout the blade, except at the ends, where the force sharply tapers.[70] Doing so, the specification explains, allows the ends of the wiper lip to ride in a higher position than in the center.[71] That configuration, according to the specification, encourages the wiper lip to tilt over without generating a knocking noise when the wiper reverses

---

[66] Appx266 col. 2.
[67] Appx7782 at 2:62–67.
[68] Appx7783 at 3:30–35.
[69] *Id.* at 3:1–5.
[70] *Id.* at 4:16–20.
[71] *Id.* at 3:66–4:5.

direction.[72] To achieve that force distribution, the specification describes several variables that can be adjusted. The first variable is to place the connection point for the wiper arm in certain places on the carrying element.[73] The second variable is the length of the carrying element.[74] The specification recommends terminating the carrying element slightly before the ends of the wiper strip to reduce contact force at the ends. The third variable is to adjust the curvature of the blade. Less curvature results in less pressing force.[75]

The '698 patent's ideal force distributions are depicted in figures 5–7, shown below, with uniform force through most of the blade and a sharp taper in at least one end:[76]




[72] Appx7782 at 1:65–2:4.
[73] Appx7783 at 4:32–43.
[74] *Id.* at 4:58–4:62.
[75] Appx7783–7784 at 4:63–5:18.
[76] Appx7781.

The specification uses the term "non-uniform pressure," but the sole claim of the patent, claim 1, does not. Claim 1 recites as follows, with the disputed limitation in bold:[77]

> A wiper blade for a wiping device of a motor vehicle for wiping a window of the motor vehicle, comprising an elongated wiper strip placeable against the window, and an elongated spring-elastic carrying element disposed on a side of the wiper strip remote from the window, said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, **said contact force of said wiper strip being greater in said center section than in at least one of said two end sections,** said spring-elastic carrying element has on a side thereof oriented toward the window a concave curvature that is sharper than the sharpest curvature of a spherically curved window in a region of a wiping field that can be swept across by said wiper blade and a concave curvature in said center section of the carrying element is sharper than in said sections thereof.

Claim 1 only requires the contact force to be greater in the center section in at least one end of the blade. The claim does not require specific pressure values anywhere in the blade. The claim does not require specific radii for the curvature at any point in the blade. The claim does not require the blade to reduce or eliminate noise.

---

[77] Appx7784.

### B. Bosch's '974 patent: a spoiler to combat wind lift

The '974 patent, as previewed above, addresses wind lift by adding a leading-edge face or spoiler to the top of the wiper blade.[78] Claim 1 recites as follows, with the disputed limitation in bold:[79]

> A wiper blade for windows of motor vehicles, comprising a curved, band-shaped, spring-elastic support element which distributes a pressure applied by a wiper arm and has a concave and a convex surface which defines corresponding planes; an elongated rubber-elastic wiper strip placeable on a window to be wiped and mounted to said concave surface of said support element which faces the window, substantially longitudinally parallel to said concave surface; a connection device provided for a wiper arm and arranged directly on a convex side of said support element; and a component which is separate from said wiper strip and is mounted directly to the convex surface of said support element so as to form **a leading-edge face** extending in a longitudinal direction of the support element and forming, as seen crosswise to its longitudinal extension, an acute angle with a plane which extends parallel to a plane formed by said convex surface.

### C. Bosch's '905 patent: end caps on the blade

The primary focus of the '905 patent is a wind-deflection strip that, like the spoiler in the '974 patent, combats wind lift.[80] The parties litigated that feature before the Board, but in this appeal, Bosch declines to address the wind-deflection strip. Bosch limits its challenge to another aspect of the wiper blade claimed in '905 patent:

---

[78] Appx97 at 3:22–57.
[79] Appx97.
[80] Appx10217 at 1:26–32.

end caps on the blade. Claim 13, which is illustrative for this appeal, recites as follows, with the end-cap limitation in bold:[81]

> A wiper blade for cleaning windows, comprising:
>
> a band-like, elongated, spring-elastic support element (12), wherein a lower band surface (13) oriented toward the window (22) has an elongated, rubber-elastic wiper strip (14), which can be placed against the window, disposed on it so that the longitudinal axes of these two parts are parallel and wherein an upper band surface (11) of the support element has a wind deflection strip (42) disposed on it, wherein the wind deflection strip extends in a longitudinal direction of the support element (12), is provided with an attack surface (54) oriented toward the main flow of the relative wind, and is made of an elastic material, wherein the wind deflection strip (42, 142, 242) has two diverging legs (44, 46), viewed in transverse cross section, wherein the two diverging legs are connected to each other at a common base (48) and wherein free ends of the two diverging legs oriented toward the window (22) are supported on the support element, and the attack surface (54) is embodied on the outside of the one leg (44), wherein the upper band surface (11) of the support element (12), in its middle section, includes a wiper blade part (15) for connecting the wiper blade (10) to a reciprocally driven wiper arm (16) and is supported, **wherein an end cap (38) is respectively disposed at both ends of the support element (12)**, and wherein a section (40) of the wind deflection strip (42) is disposed between and in contact with each respective end cap (38) and the device piece (15).

The specification says little about the role of the end caps, other than that they can help extend the projection of the wind-deflection strip's flute.[82]

---

[81] Appx10220.
[82] Appx10218 at 3:6–10.

**3. The Board's decisions**

For the '698 patent, the Board concluded that Arai and Appel illustrate wiper blades with greater contact force in the center than in the ends. Arai, the Board found, expressly teaches such a wiper when Arai provides the pressure curves.[83] The high-pressure curve shows that, when the wiper arm exerts high pressure on the blade, the pressing force is greater in the center of the blade than in the ends.[84] The Board also relied on Appel '551's discussion of an alternative wiper—a "practical compromise"—that has greater force in the center than in the ends.[85] The Board also noted Appel's teaching "progressive dimensional variations" in the blade curvature.[86] The Board found no difference between what the '698 patent's inventors and those before them did. The Board found that the express disclosures of the references provided a rationale for a person of ordinary skill in the art to combine their teachings.[87]

The Board also found the breadth of the '698 patent's claim significant, noting that the claim failed to require noise reduction or a certain level of pressure at

[83] Appx7698–7699; Appx8109; Appx8111 at 3:48–4:8.
[84] *Id.*
[85] Appx7702; Appx8116 at 4:10–17.
[86] *Id.*
[87] Appx7702–7703.

particular points on the blade.[88] The blade required only the pressure to be greater in the center than in at least one end—the precise concept that Arai and Appel taught.

At Costco's invitation, the Board noted that it had considered the same contact-force limitation during prosecution of the application that produced the '698 patent.[89] The Board had affirmed rejections of the application claims based on Arai and Appel '770. Because of a lengthy prosecution history, the details of which are irrelevant to this appeal, the application had returned to prosecution after the appeal to the Board. During that later round of prosecution, the examiner ultimately allowed what is now claim 1 of the '698 patent. So, although all the limitations of claim 1 had been previously found unpatentable by the Board, the Board never had an opportunity to consider claim 1. While the Board here did not apply collateral estoppel, the Board viewed claim 1, Arai, and Appel, the same way the Board did when it considered the claims during prosecution.

For the '974 patent, the Board concluded that the claims would have been obvious in light of Prohaska's teaching to place a spoiler on top of the blade, just as the '974 patent does, to address the wind-lift problem, which was a known problem for all wipers. The Board agreed with Costco's rationale that it would have been

---

[88] *Id.*
[89] Appx7691–7694.

obvious to place Prohaska's spoiler on a beam blade of the type disclosed by Hoyler and Appel.[90]

Bosch did not dispute the teachings of Prohaska, Hoyler, and Appel.[91] Bosch, instead, challenged Costco's obviousness case by arguing that a person of ordinary skill in the art would not have been motivated to combine the references' teachings.[92] Bosch argued that people of ordinary skill in the art did not appreciate that wind lift was a problem for beam blades; the '974 patent's inventors were allegedly the first to recognize that problem.[93] Bosch also argued that conventional wisdom in the art counseled against constructing beam blades with high profiles.[94] To place a spoiler on a beam blade and increase the blade height, Bosch argued, went against conventional wisdom.[95]

The Board rejected Bosch's arguments, citing the '974 patent's own discussion acknowledging that wind lift was a known problem for beam blades.[96] To reinforce that conclusion, the Board cited the Barth patent's teachings about wind lift.[97] Costco had submitted Barth with its IPR petition and discussed Barth in its reply after Bosch

---

[90] Appx40–47.
[91] Appx43–46.
[92] Appx29–40.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] Appx36.
[97] Appx32–33.

questioned in its patent owner's response whether wind lift was a known problem.[98] Barth depicted the wind-lift problem as one that affected all wiper blades—conventional or beam—that had a pine-tree shape—a view that Dr. Davis supported in his testimony.[99] The Board credited Dr. Davis's testimony and discounted the testimony of Bosch's expert Dr. Steven Dubowsky as merely conclusory and contradicted by the documentary evidence.[100]

The Board also rejected Bosch's argument that its spoiler went against conventional wisdom about the profile height of beam blades, citing Ludwig to show that it was conventional before the '974 patent to increase the height of a beam blade.[101]

For the '905 patent, the Board found that Hoyler teaches the '905 patent's end caps, the sole limitation from the '905 patent that Bosch contests on appeal here. Bosch attempted to distinguish its end caps from Hoyler's clamps by arguing that Hoyler's clamps fail to completely cover the blade's ends and thus fails to protect a person and vehicle from scratches.[102] But the Board pointed out that the '905 patent fails to recite or even mention any features that prevent scratches; it merely recites

---

[98] *Compare* Appx519–521 *with* Appx1596–1601.
[99] Appx1638–1640.
[100] Appx31–35.
[101] Appx38–39.
[102] Appx10138–10140.

generic end caps disposed at both ends of the support element.[103] The Board found that Hoyler's clamps are the same thing.

### 4. The Board's treatment of Bosch's duplicative objective evidence of nonobviousness

Each IPR involved a different claimed invention, but Bosch submitted the same objective evidence of nonobviousness in all the IPRs. The objective evidence focused on Bosch's Aerotwin and Icon windshield wipers. These were the highlights:

• A claim chart from a prior ITC investigation that mapped claim elements onto Bosch products. The following page purported to map the contact-force limitation of the '698 patent onto Bosch's blade and accompanying pressure curve:[104]



| Claim Element | Bosch OE Wiper Blade |
|---|---|
| said spring-elastic carrying element extending parallel to an axis of elongation of said wiper strip to distribute a contact force against the window over an entire length of said wiper strip, said wiper strip having a center section and two end sections, said contact force of said wiper strip being greater in said center section than in at least one of said two end sections. | The wiper blade is characterized in that the spring-elastic carrying element (a) extending parallel to an axis of elongation of the wiper strip to distribute a contact force against the window over an entire length of the wiper strip (b) has a center section and two end sections, the contact force of the wiper strip being greater in the center section than in at least one of the two end sections. |



---

[103] *Id.*

[104] Appx1203.

• Testimony from Martin Kashnowski, who used to work as a product manager for Bosch. The following are excerpts from Kashnowski's testimony, with pertinent portions in bold:[105]

> Both the Aerotwin blade and the Icon blade included a **flexible spoiler** with diverging legs mounted on the top of the blade, as well as plastic **end caps**. Bosch tested these products extensively before releasing them. One aspect tested was noise. The Bosch beam blades were quiet in operation, including when the wiping direction changes and the wiper strip flips from one side to the other. **Those features were part of the reason for the great customer demand for these products**. Both products solved many of the problems associated with conventional blades.
>
> The commercial success of the Icon product was in contrast to the failure of a competitor's beam-blade product, the Trico Innovision wiper blade. The Trico product was introduced in 2004, before Icon, but it failed in the marketplace. The **Trico product included neither a flexible spoiler nor end caps**.

• Assertions by Kashnowski that the Aerotwin "was given a number of awards by industry groups, including both the Pace award and the Automechanika award"; and that "the Icon product was given the Frost & Sullivan award for innovation."[106]

• An assertion by Kashnowski that "[i]n 2006, Bosch's sales of the Icon product were approximately $17M; in 2007, they were approximately $24M, and in 2008, approximately $28M. These sales figures are significant in the context of aftermarket wiper blades."[107]

---

[105] Appx3827.
[106] Appx11522; Appx11524.
[107] Appx11523.

• An assertion by Kashnowski that, within a year of Bosch's creating a successful market, "knockoff products that to me looked identical to Icon appeared in the United States."[108]

• An assertion by Kashnowski that "[a]ll of Bosch's major competitors have made licensing agreements with Bosch related to Bosch's beam-blade patents."[109]

The Board concluded that the objective evidence demonstrated a nexus with the claimed invention in the '905 patent: the wiper blade with a flexible strip for combatting wind lift and with end caps.[110] The Board cited Kashnowski's testimony that the Aerotwin and Icon blades feature a flexible spoiler and end caps as the '905 patent claims.[111]

The Board, however, found that the duplicative objective evidence in the IPRs involving the '698 and '974 patents—claiming the non-uniform contact force and the spoiler, respectively—failed to establish a nexus in those cases.[112] The Board observed the overall superficiality of the evidence, which mostly comprised Kashnowski's declaration and Bosch's interrogatory responses in past litigation.[113] The Board

---

[108] Appx11524.
[109] Appx11525.
[110] Appx10147.
[111] *Id.*
[112] Appx47–56; Appx7705–7714.
[113] *Id.*

criticized Bosch for citing "to dozens of pages of exhibits, without explanation, that have no clear persuasive connection to the challenged patent's claims."[114]

The Board found that evidence too sparse and too poorly explained to outweigh the other evidence of obviousness.[115] For the '698 patent, for example, the Board found that the claim chart shown above cut against Bosch.[116] The Board noted that the pressure curve in the claim chart wildly varied, while the '698 specification expressed a preference for uniform force through the blade and no taper until the ends, as shown in figures 5–7 of the '698 patent above.[117] The Board also noted that it had "no evidence or testimony about the source or underlying facts" of the claim chart.[118]

The Board ultimately found that the objective evidence failed to outweigh the other evidence of nonobviousness in any of the IPRs, primarily because of the superficiality.[119] The Board viewed Kashnowski's testimony as too conclusory and unsupported to be afforded weight.[120] The Board also noted that Bosch failed to

---

[114] Appx7707.
[115] *Id.*
[116] Appx7708.
[117] *Id.*
[118] Appx7709.
[119] *E.g.*, Appx7713–7714.
[120] *Id.*

provide the source of factual information in other evidence such as the claim charts.[121]

## SUMMARY OF ARGUMENT

The prior art demonstrates that people of ordinary skill in the art would have combined wiper parts and design principles known long before the date of invention to do what Bosch claims in the challenged patents. Bosch declines to challenge most of the teachings of the prior art, instead arguing for patentability based on Bosch's alleged discovery of previously unknown problems and objective considerations of nonobviousness. But Bosch's own patents and other evidence in the record refute its assertions about what was previously known. Bosch also provides little support for its objective considerations of nonobviousness. The Board reasonably weighed all the evidence in the record and concluded that the prior art provides the answers. The Board's decisions are supported by substantial evidence.

## STANDARD OF REVIEW

Whether an invention would have been obvious is a legal question based on underlying findings of fact.[122] What a reference teaches is a question of fact.[123] And, as this Court has held, whether a person of ordinary skill in the art would have been

---

[121] Appx7708.
[122] *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).
[123] *Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995).

motivated to combine references is also a question of fact.[124] This Court upholds fact findings made by the Board that are supported by substantial evidence and reviews the Board's legal conclusions de novo.[125] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[126]

## ARGUMENT

### 5. The contact-force limitation of the '698 patent would have been obvious after Arai and Appel showed how to adjust blade pressure to be different in the center and the ends.

Arai and Appel each disclose windshield wipers that feature the only limitation that Bosch argues distinguishes claim 1 from the prior art: the requirement for higher pressure in the center of the blade than in at least one end. Arai's high-pressure curve illustrates that in no uncertain terms:[127]




[124] *Gartside*, 203 F.3d at 1319; *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238–39 (Fed. Cir. 2010).
[125] 5 U.S.C. § 706(2)(E); *Gartside*, 203 F.3d at 1315–16.
[126] *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).
[127] Appx8109.

In Arai's example, there are two wiper arms that exert pressure on the blade at points **P**. In the high-pressure scenario, the peaks below points **P** are the highest points in the graph while the ends are the lowest points. The pressure in center of the blade, between points **P**, is substantially higher than in the ends. That's exactly what claim 1 of the '698 patent recites: "said contact force of said wiper strip being greater in said center section than in at least one of said two end sections." Appel teaches the same feature with his discussion of an alternative wiper—a "practical compromise"—that has greater force in the center than in the ends.[128]

Arai and Appel prove on their face that others invented a blade with higher pressure in the center than in the ends before the inventors of the '698 patent. Arai and Appel arguably could support an anticipation theory of unpatentability if that were the theory Costco chose to present in its IPR petition. In an obviousness analysis, Arai and Appel bolster what each readily proves on its own.

Because Arai and Appel each supply an express teaching of the contact-force limitation, the references would have been readily combined in the mind of a person of ordinary skill in the art.[129] Arai, Appel, and the '698 patent draw on the same techniques to adjust the pressure in the wiper blade, tweaking the curvature of the blade and the load that the arm exerts on the blade. The '698 patent's disclosure fails

---

[128] Appx7702; Appx8116 at 4:10–17.

[129] *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); *see also DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

to expand on the available techniques or offer a new way of combining them or applying them. The patent claims precisely what Arai and Appel shows the field had been doing for years.

That Arai and Appel discuss the desirability of uniform force distribution while the ’698 patent claims varied force distribution is true. It is also irrelevant. Bosch argues that the problem that the ’698 patent’s non-uniform force distribution solves is a knocking noise. But only the specification of the ’698 patent discusses that benefit. The patent does not claim a reduction in noise.[130] It does not claim—or even describe in the specification—specific amounts of contact force in the center and ends that would cure the knocking problem. The analysis might have been different if the patent had limited the claim in that manner. But the claim, as it stands, grants Bosch a property right that excludes others from practicing non-uniform force even when it has no bearing on noise reduction. And that’s what the prior art shows the field achieved before the ’698 patent’s inventors.

**6. The spoiler claimed in the ’974 patent relied on conventional wisdom to solve a known problem, as shown by the ’974 patent’s own specification and other evidence illustrating the state of the art.**

For the ’974 patent’s spoiler limitation, Bosch has declined to challenge the Board’s findings on the teachings of the prior art. Indeed, that Prohaska teaches the same spoiler for combatting wind lift as the ’974 patent claims is indisputable.

---

[130] Appx7784.

And Hoyler and Appel show, if there were any doubt by now, that beam blades were known in the art decades before the '974 patent. Bosch has never contended that people of skill in the art lacked the skills to place a spoiler on a beam blade.

That people of skill in the art never would have thought to place a spoiler on a beam blade—Bosch's only argument—fails on account of Bosch's own patent and the state of the art.

The background section of the '974 specification demonstrates that wind lift was a known problem for beam blades.[131] The specification devotes considerable space to discussing the problem of over pressure, under pressure, and wind lift.[132]
The specification cites an Appel beam blade as an example of a prior effort to address the problem.[133] The specification goes on to criticize Appel's approach, then proposes the spoiler claimed in the '974 patent. Discovery of a problem can, of course, support a conclusion of nonobviousness, but that's not what the evidence shows occurred here. The '974 specification is an admission that wind lift was a known problem for beam blades.

Barth underscores that wind lift was a known problem for all blades with a pine-tree cross section, whether beam or conventional blades. Barth illustrates that the

---

[131] Appx96 at 1:24–52.
[132] *Id.*
[133] *Id.*

pine-tree shape is what causes wind lift: the shape causes the interaction of over pressure, under pressure, and the blade, which produces the upward force away from the windshield.[134] Wind lift has nothing to do with whether the blade is curved or flat; people of skill in the art understood that before the ’974 patent. Dr. Davis, Costco’s expert, opined on that point.[135]

Ludwig disproves Bosch’s contention that conventional wisdom shied away from increasing the profile height of a beam blade by adding a spoiler. Ludwig attaches a spine to the wiper lip of a beam blade, raising the height of the blade.[136] Bosch declines to address Ludwig in its opening brief and has forfeited any challenge to the Board’s reliance on Ludwig.

The Board acted well within bounds when it cited Barth and Ludwig to support its analysis. Costco presented Barth and Ludwig with its IPR petition. In the patent owner’s response, Bosch argued that there was no motivation to combine Prohaska with Appel or Hoyler because wind lift was not a known problem and wiper artisans would not have thought to increase the profile height.[137] In its reply, Costco rebutted Bosch’s argument by citing Barth and Ludwig.[138]

---

[134] Appx272 at 4:18–20..
[135] Appx1635–1645; Appx1638–1640.
[136] Appx313 at 3:64–67.
[137] *Compare* Appx519–521 *with* Appx1596–1601.
[138] *Id.*

The Board acts consistent with due-process requirements when the Board addresses a matter that a party has put in issue and cites evidence offered with an IPR petition.[139] Bosch was aware of Barth and Ludwig; Bosch put the references in play. Bosch received the process it was due.

**7. The end caps claimed in Bosch's '905 patent would have been obvious because Hoyler discloses the same component with his clamps.**

The Board found claims 13, 17, and 18 of the '905 patent unpatentable based on an obviousness theory that combined Prohaska with Hoyler. The limitation that was primarily in dispute before the Board was a flexible strip for combatting wind lift. On appeal, however, Bosch limits its challenge to whether Hoyler teaches the end caps recited in the '905 patent.

Hoyler uses "clamps" to hold springs together at the end of his blade.[140] Bosch's '905 patent provides few clues about the role of its end caps. The claims merely recite end caps disposed on the ends of the blade. The specification says that they can help extend the projection of the wind-deflection strip's flute.[141] In its briefing, Bosch presents another rationale: the end caps supposedly protect people and cars from being scratched. But the '905 patent says nothing about scratch protection. Bosch also contends that Hoyler's clamps cannot be end caps because they do not cover the

---

[139] *Genzyme Therapeutic Prod. Ltd. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016)
[140] Appx266 col. 2.
[141] Appx10218 at 3:6–10.

entire end of the blade. But the '905 patent claims recite nothing about any particular structure, let alone a structure that completely covers the end of a blade. There can be no serious dispute that Hoyler teaches the end caps.

**8. Bosch's alleged objective evidence of nonobviousness is supported by little evidence.**

Objective evidence is as important as any other evidence in an obviousness analysis. In some cases, it is the most important evidence.[142] But objective evidence is evidence; objective evidence is not unsupported assertions.[143] The Board appropriately gave Bosch's objective considerations little weight because Bosch offered little support for them. As the Board observed, Bosch cited "to dozens of pages of exhibits, without explanation, that have no clear persuasive connection to the challenged patent's claims."[144]

The nexus is the first problem with Bosch's objective evidence. Bosch submitted duplicative objective evidence in the IPRs even though each IPR involved a different claimed invention.[145] The Board found a nexus between Bosch's claims and the '905 patent's flexible strip for combatting wind lift, citing Kashnowski's testimony that

---

[142] *See, e.g.*, *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012).
[143] *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).
[144] Appx7707.
[145] *See, e.g.*, Appx7704.

the Aerotwin and Icon blades feature a flexible spoiler and end caps as the '905 patent claims.[146]

But the Board appropriately found nexus lacking for the '698 and '974 patents. The Board, for example, observed that Bosch failed to provide a source for the pressure curve that Bosch cited as mapping onto the contact-force limitation, and that the curve deviated from the pressure curves described in the '698 patent.[147] "[W]e have no evidence or testimony about the source or underlying facts" for that evidence, the Board said.[148]

In all the IPRs, nexus or not, the Board appropriately found too little actual evidence to enjoy probative value. It was not enough, for example, for Kashnowski to drop into his declaration four sentences mentioning that Bosch's products won awards without more detail.[149] Bosch never provided any evidence to show, for example, what the awards were for or the criteria for selection.

Nor was it enough for Kashnowski to mention three years of raw sales data without further explanation.[150] There is no evidence in the record to put those sales figures in context. "[T]he most probative evidence of commercial success is not

---

146 *Id.*
147 Appx7708.
148 Appx7709.
149 Appx11522; Appx11524.
150 Appx11523.

overall sales, but whether those sales represent a substantial quantity in the market."[151] There is nothing to show how these sales compare to those of Bosch's competitors. There is nothing to show how sales during the three-year period compare to those during any other period.

Bosch's other evidence fails for similar reasons: vague references to unnamed competitors who obtained licenses, unspecified and unquantified knockoff wipers, and a competing product's alleged failure without any data or context to explain the failure.[152]

The Board must weigh the objective evidence against all other evidence in the record before reaching a conclusion on obviousness.[153] The Board reasonably concluded here that the prior-art references, which expressly taught all the disputed claim limitations, packed more punch than the sparsely supported objective evidence.[154]

---

[151] *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1356 n.5 (Fed. Cir. 2013); *see also In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) ("evidence related solely to the number of units sold provides a very weak showing of commercial success, if any").

[152] Appx11524–11525.

[153] *In re Piasecki,* 745 F.2d 1468, 1472 (Fed. Cir. 1984).

[154] *See Richardson-Vicks, Inc. v. The Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997).

### 9. The Director agrees with Bosch that reversal is appropriate in Appeal No. 17-2124.

As Bosch explains in its opening brief, the Board found claim 3 of U.S. Patent No. 7,484,264 unpatentable in the IPR at issue in Appeal No. 17-2124. In a parallel IPR, which Costco had appealed but then dismissed after the parties settled, the Board found a similar claim not proven unpatentable over the same prior art.

The parties brought the discrepancy to the Board's attention. After receiving briefing, the Board concluded that it should have found claim 3 of the '264 patent not proven unpatentable. The Board, however, had lost jurisdiction of the IPR that involved claim 3 by that time because Bosch had filed its notice of appeal. That appeal was docketed in this Court as Appeal No. 17-2124.

The happenstance of timing precluded the Board from correcting the error. Because the Board has acknowledged the error, the Director agrees that reversal in Appeal No. 17-2124 is appropriate.

## CONCLUSION

The claims at issue here recite elements and concepts rooted in rubber, metal, glass, and gravity taught in the prior art for decades. The claimed inventions would have been obvious to people of ordinary skill in the art. The Board's decisions—with the exception of that in Appeal No. 17-2124—should be affirmed.

Dated: September 28, 2018

Respectfully submitted,

/s/ Benjamin T. Hickman
JOSEPH MATAL
Acting Solicitor

THOMAS W. KRAUSE
Deputy Solicitor

BENJAMIN T. HICKMAN
MAI-TRANG D. DANG
Associate Solicitor
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Fed. R. App. Proc. 32(a)(7) that the foregoing BRIEF FOR THE INTERVENOR—DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type-volume limitation required by the Court's rule. The total number of words in the foregoing brief, excluding the table of contents and the table of authorities, is 7,478 words as calculated using the Word® software program.

/s/ Benjamin T. Hickman
BENJAMIN T. HICKMAN
Associate Solicitor
U.S. Patent and Trademark Office

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2018, the foregoing BRIEF FOR THE INTERVENOR—DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE was electronically filed with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b) and the Court's Administrative Order Regarding Electronic Case Filing 6(A) (May 17, 2012), to all registered CM/ECF users.

/s/ Benjamin T. Hickman
BENJAMIN T. HICKMAN
Associate Solicitor
U.S. Patent and Trademark Office